June 28, 2024

The Honorable Thomas S. Hixson
United States District Court for the Northern District of California
San Francisco Courthouse, Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Re:   *Kadrey et al v. Meta Platforms, Inc.*, Case No. 3:23-cv-03417-VC

Dear Magistrate Judge Hixson:

Pursuant to the Court's Order dated June 24, 2024 (ECF 103), the parties submit this letter brief concerning both (1) defendant Meta Platforms, Inc.'s ("Meta") motion for a protective order regarding certain communications made by a former part-time Meta employee on the Discord platform over which Meta asserts attorney-client privilege ("Subject Communications"), and (2) Plaintiffs' cross-motion to compel regarding the Subject Communications.

**META'S POSITION**
**I.      Factual Background and The Privilege Dispute**

This is a copyright case in which Plaintiffs, the authors of certain books, allege that their copyrights were infringed when Meta allegedly used their books to train its Llama artificial intelligence ("AI") large language model ("LLM"). The present discovery dispute centers around a handful of messages that a former part-time Meta employee and AI researcher, Mr. Tim Dettmers, posted on the "Discord" platform. These communications, which were posted on Discord without knowledge of or authorization from Meta, conveyed to third parties the content of legal advice that Mr. Dettmers had received from Meta in-house attorneys, concerning an AI research project. Meta first learned of these communications when they were quoted in Plaintiffs' First Consolidated Amended Complaint ("FCAC") filed in December 2023, by which time the communications were no longer on Discord. It is Meta's understanding that a then-anonymous third party provided those communications to Plaintiffs' counsel, who have refused to identify their source. The issue presented by this dispute is whether the unauthorized disclosures by Mr. Dettmers operated as a waiver of Meta's attorney-client privilege. Because the answer to this question is "no," Meta respectfully requests that the Court enter a protective order preventing Plaintiffs and their counsel from further using or referring to the Subject Communications for any purpose and accordingly, also deny Plaintiffs' cross-motion to compel.

   A.     **The Discord Platform**

"Discord is a real time messaging service for people to talk and hang out online with their friends and communities." Brief for Discord, Inc. as Amicus Curiae, at 3, *Moody v. Netchoice, LLC & Netchoice, LLC v. Paxton*, Nos. 22-277 & 22-555 (U.S. Dec. 7, 2023) ("Discord Amicus

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Honorable Thomas S. Hixson
June 28, 2024
Page 2

Brief").[1] Unlike with traditional social media platforms, Discord's users interact with their chosen communities via dedicated "servers" that are made up of "channels" on which users communicate by text, voice, and video." *Id.* at 4. The "vast majority" of Discord servers are invite-only space for small communities. *Id.* at 5.

Also, unlike traditional social media platforms, Discord is not designed to maximize engagement; there is "no news feed, no endless scrolling, no counting of likes, and no 'going viral.'" *Id.* at 4. Rather, Discord emphasizes real time interaction and, as such, messages on Discord are displayed in the order in which they are sent. *Id.* at 5. Older conversations are therefore not readily accessible within servers or channels on the platform.

### B.    Former Meta Employee Tim Dettmers

Between March 2020 and March 2022, Tim Dettmers was a Ph.D. student at the University of Washington and a part-time Visiting Researcher at Meta. (Declaration of Tim Dettmers ("Dettmers Decl."), ¶ 3.) He obtained this position through a joint program with the University of Washington whereby certain students could work part-time for Meta for up to two years. (*Id.* ¶ 2.) Mr. Dettmers was a low-level employee; he was not part of Meta's management. (Declaration of Luke Zettlemoyer ("Zettlemoyer Decl."), ¶ 3.)

The legal advice underlying the Subject Communications—regarding sources of data that Meta might use for AI research—was requested from Meta attorneys by others on the research team that included Mr. Dettmers ("Legal Advice"). (Dettmers Decl., ¶ 7.) The Legal Advice did not pertain to the Llama large language models at issue in this case, but to a separate research project. (Dettmers Decl., ¶ 5; Zettlemoyer Decl., ¶ 4.) Mr. Dettmers, as a member of the research team to which the Legal Advice pertained, had access to the request and the lawyers' responses through Meta's "single review tool" ("SRT"), discussed further in III.B, below. (*Id.* ¶ 5.) Mr. Dettmers and the other peer researchers understood that the Legal Advice was privileged and should be kept confidential. (*Id.* ¶ 3; Dettmers Decl., ¶ 12.) Meta never authorized Mr. Dettmers or anyone else to disclose the Legal Advice outside of Meta. (Zettlemoyer Decl., ¶ 7.)

### C.    The Subject Communications

The present dispute concerns Mr. Dettmers's disclosure of Meta's Legal Advice on two Discord channels operated by EleutherAI, a non-profit AI research lab that, at the time, had an invite-only Discord server. (Dettmers Decl., ¶ 8.) EleutherAI is also the creator of "The Pile" dataset, which includes the Books3 dataset at issue in this lawsuit. (ECF 69 at ¶¶ 34, 35; Dettmers Decl., ¶ 6.) The Subject Communications took place on two of EleutherAI's invite-only Discord channels: "#legal" and "#the-pile." It does not appear that the EleutherAI Discord server or channels were indexed by or searchable through internet search engines like Google.

---

[1] Accessible at https://www.supremecourt.gov/DocketPDF/22/22-277/292736/20231207160954224_44412%20pdf%20Tushnet.pdf

Meta has submitted **Exhibits A and B** to the Court for *in camera* review, which are copies of the Subject Communications with highlights reflecting Meta's asserted privilege redactions. These Communications took place between December 2020 and January 2021 between Mr. Dettmers, Stella Biderman, and Leo Gao. (*See* Exs, A, B; Dettmers Decl., ¶ 9.) Ms. Biderman and Mr. Gao were part of the core team at EleutherAI. (*Id.*) The Subject Communications largely comprise Mr. Dettmers's efforts to describe, paraphrase, and in some cases quote from, the Legal Advice of Meta attorneys, as described above. (Exs. A, B.)

That the Subject Communications convey legal advice is plainly obvious from the communications themselves, with Mr. Dettmers repeatedly referring in these messages to things that "lawyers" inside Meta had said. (*Id.*) Mr. Dettmers did not realize at that time that his messages may be viewable by a broader group beyond EleutherAI personnel and those invited to the EleutherAI Discord server. (Dettmers Decl., ¶ 11.) The Subject Communications also include responses from Ms. Biderman that either quote Mr. Dettmers's messages or otherwise reflect the substance of the Legal Advice in them. (Exs. A, B.)

### D. Communications Between the Parties Regarding the Dispute

Meta first learned of the existence of the Subject Communications when Plaintiffs filed their First Consolidated Amended Complaint ("FCAC") (ECF 64) on December 11, 2023, which quoted from and paraphrased some of the Subject Communications. (Zettlemoyer Decl., ¶ 4.) Despite the fact that the Subject Communications plainly revealed the content of attorney-client communications with Meta lawyers, Plaintiffs quoted from them in their publicly-filed FCAC with no prior notice to Meta. After conducting an initial investigation into the matter, Meta promptly notified Plaintiffs of its assertion of attorney-client privilege over the Subject Communications. (Hartnett Decl., ¶ 3 & Ex. 1.) Plaintiffs disputed the privilege assertion but consented to the filing of a redacted version of the FCAC pending resolution of the Parties' dispute. (*Id.* ¶ 4 & Ex. 2.) A redacted FCAC was filed on December 22, 2024, and the unredacted FCAC was locked to prevent public access. (ECF 64, 69.)

At the time it first learned about the Subject Communications in December 2023, Meta did not have possession of or access to the Subject Communications. Meta thereafter learned that the Discord posts had been removed from the EleutherAI server in August 2023 and were not available online. (ECF No. 69, ¶64; Hartnett Decl., Ex. 3.)[2] Meta thus asked Plaintiffs to produce complete copies of the Discord communications they referenced in the FCAC. (Hartnett Decl., ¶ 3 & Ex. 1.) Plaintiffs refused to do so, asserting "attorney work product privilege" over them (an assertion Plaintiffs never explained and with which Meta disagrees). (*Id.* ¶ 6.) Meta subsequently sought and obtained the Subject Communications from EleutherAI. (*Id.* ¶ 7.)

---

[2] EleutherAI apparently removed certain communications from its Discord server after it was contacted by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ who says he complained to EleutherAI about inclusion of their members' books in The Pile. (Hartnett Decl., Ex. 6.) Meta had no knowledge of the Subject Communications, let alone their removal from the EleutherAI Discord server, until after the FCAC was filed in December 2023.

Honorable Thomas S. Hixson
June 28, 2024
Page 4

After receiving the Subject Communications from EleutherAI, Meta conducted a detailed investigation into the underlying circumstances. (*Id.* ¶ 8.) Meta shared the results of its investigation and the full basis for its assertion of privilege on a meet and confer video call with Plaintiffs, which was memorialized in a letter dated April 8, 2024. (*Id.* ¶ 8 & Ex. 3.) Plaintiffs responded by disputing Meta's position and making several requests for additional information. (*Id.* ¶ 9 & Ex. 4.) On April 29, 2024, Meta sent Plaintiffs another letter, re-asserting its position and providing the additional information requested. (*Id.* ¶ 10 & Ex. 5.) Following a further meet and confer, the parties exchanged further correspondence, including attempts to resolve the dispute via stipulation. (*Id.* ¶ 14.) On June 21, the Parties agreed that they had reached an impasse. (*Id.*) Meta understands that Plaintiffs wish to (at least) use the Subject Communications in this action without restriction, include excerpts in a Second Consolidated Amended Complaint ("SCAC"), and depose Mr. Dettmers regarding the Subject Communications. (*Id.* ¶ 15.) Meta objects to any use of the Subject Communications on the basis of attorney-client privilege.

## II. The Subject Communications Are Privileged

The Subject Communications are Meta's privileged material. "The attorney-client privilege applies to communications between corporate employees and counsel, made at the direction of corporate superiors in order to secure legal advice. *U.S. v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 390–94 (1981)). This is because "it will frequently be employees beyond the control group ... who will possess the information needed by the corporation's lawyers," and often the "attorney's advice will also frequently be more significant to noncontrol group members than to those who officially sanction the advice." *Toranto v. Jaffurs*, 2018 WL 3546453, *5 (S.D. Cal. Jul. 24, 2018) (quoting *Upjohn*, 449 U.S. at 391–92). Here, the Subject Communications describe and reflect legal advice that was provided by Meta's in-house attorneys to Mr. Dettmers and to other Meta researchers. (Zettlemoyer Decl., ¶ 4.) This renders the Subject Communications privileged. *Chrimar Sys. Inc v. Cisco Sys. Inc*., 2016 WL 1595785, at *3 (N.D. Cal. Apr. 21, 2016) ("[A] document that is not communicated between an attorney and a client may still be privileged as long as the document by its nature and contents memorializes and reflects legal advice rendered in a privileged conversation" (citations omitted)). Plaintiffs' contention that the Subject Communications disclosed facts, not legal advice, is also unfounded. As noted, the Subject Communications on their face make clear they convey legal advice from "lawyers" at Meta, and do not merely convey underlying facts.

## III. Meta's Privilege Was Not Waived By Mr. Dettmers's Unauthorized Disclosure

### A. Mr. Dettmers Cannot Waive Meta's Privilege

Mr. Dettmers' disclosure on two of EleutherAI's invite-only Discord channels did not waive Meta's privilege. "The power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Chen*, 99 F.3d at 1502 (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)). In *Chen*, the Ninth Circuit held that attorney-client privilege was not waived because "a corporate employee cannot waive the corporation's privilege" absent authorization by the employer to do so,

and the employee lacked that authority. *See Chen*, 99 F.3d at 1502.

*Chen* controls here. Mr. Dettmers lacked authority to waive privilege for Meta because he was a low-level, part-time researcher who was simultaneously pursuing his PhD. He was not part of Meta's management, and his disclosure was not authorized by management personnel at Meta. (Zettlemoyer Decl., ¶¶ 3, 7.) Indeed, Mr. Dettmers's Discord communications were specifically prohibited and unknown to Meta until Plaintiffs filed their FCAC in December 2023. (*Id.* ¶¶ 6, 7.)

Citing *Lockwood v. Wolf Corp.*, 629 F.2d 603 (9th Cir. 1980), Plaintiffs—now making an argument they never made during the parties' lengthy conferral process—argue that Mr. Dettmers could waive Meta's attorney-client privilege if he had "apparent authority" to do so, even if he lacked actual authority. *Lockwood* is not a case about the waiver of attorney-client privilege and has no application here. *Lockwood* instead involved a president of a corporation and whether he had apparent authority to enter into a settlement agreement binding on the corporation. *Id.* at 605, 608-09. Plaintiffs cite no authority for the proposition that a low-level employee's unilateral actions can create authority to waive a corporation's attorney-client privilege when, as here, no such authority existed. Further, there is no support for Plaintiffs' assertion that Mr. Dettmers "held himself out" as a representative of Meta in the Subject Communications. Mr. Dettmers at best identified himself as an employee of Meta (then Facebook) in his messages with EleutherAI personnel; he did not hold himself out as the spokesperson for the company or otherwise suggest he had authority to speak with third parties on Meta's behalf.

Plaintiffs also rely on *Vans, Inc. v. Walmart, Inc.*, 2023 WL 4291986 (C.D. Cal. June 5, 2023), but this case involved corporate employees who were *authorized* to communicate with the third-parties to whom privileged material was disclosed. In *Vans*, the court recognized *Chen* but found that privilege had been waived because the disclosing Walmart employee's superior specifically authorized him to work with a third-party to implement legal advice provided by Walmart's counsel, and he forwarded privileged communications to the third-party based on that direction. 2023 WL 4291986 at *6.

In short, unlike the employees in *Vans*, Mr. Dettmers's role at Meta was that of part-time researcher—not someone tasked with communicating with third parties about legal issues. (Zettlemoyer Decl., ¶ 3.) Nobody at Meta directed Mr. Dettmers to reach out to EleutherAI and discuss or disclose the confidential legal advice of Meta lawyers. (*Id.* ¶ 7.) Instead, Mr. Dettmers reached out to EleutherAI and conveyed Meta's Legal Advice of his own accord, without authorization. (Dettmers Decl. ¶ 12.) Nobody at Meta was aware at the time that Mr. Dettmers was sharing the Legal Advice conveyed by Meta's lawyers. (Zettlemoyer Decl., ¶ 6.)

Plaintiffs also rely on *Truckstop.net, L.L.C. v. Sprint Corp.*, 2005 WL 8166195 (D. Idaho July 28, 2005) ("*Truckstop I*"), which is inapposite. As an initial matter, that case is based on Idaho privilege law, and the court's reasoning in that case was rejected by at least one California district court. *See Toranto*, 2018 WL 3546453, at *5 n.2. Moreover, like the disclosing employees in *Vans* and *Great American*, the employee in *Truckstop I* was the "designated point of contact between Sprint Communications and TSN." *Truckstop I*, 2005 WL 8166195, at *8. Mr. Dettmers, in contrast, was not designated by Meta to be a point of contact between Meta and EleutherAI and

Honorable Thomas S. Hixson
June 28, 2024
Page 6

certainly was not designated to share Meta's privileged communications with Eleuther AI or anyone else. (Zettlemoyer Decl., ¶¶ 3, 7.) In short, *Truckstop I* does not apply here.

### B. Meta Has Taken Reasonable Efforts to Protect Its Privilege

Meta has also taken reasonable efforts to protect its attorney-client privilege. "[W]hen there has been an involuntary disclosure, the privilege will be preserved if the privilege holder has made efforts reasonably designed to protect the privilege." *Gomez v. Vernon*., 255 F.3d 1118, 1131–32 (9th Cir. 2003). Meta has made those efforts. Meta had safeguards in place to limit who at Meta had access to legal advice provided through its SRT tool. (Zettlemoyer Decl., ¶ 5.) Only employees that have been added to a particular SRT request are able to access the communications from the Meta attorneys assigned to the request. (*Id.*) Since the legal advice at issue here applied to the specific project on which Mr. Dettmers's team was working within Meta, those specific researchers were given access to the SRT request. (*Id.*) Meta employees, including Mr. Dettmers, were also trained to not disclose legal advice or other confidential information to third parties, and it was commonly understood, including by Mr. Dettmers, that legal advice, including the Legal Advice at issue here, was not to be shared externally. (*Id.* ¶ 3; Dettmers Decl., ¶ 12.) Mr. Dettmers made a mistake both in communicating with EleutherAI personnel on these issues and in believing his communications were private and not (at least technically) publicly accessible. (*Id.*)

Moreover, there was no reason for Meta to have looked for or found the Subject Communications prior to their disclosure by Plaintiffs in the FCAC. The Discord channel was not part of Meta's business, and others at Meta had no reason to investigate it for unauthorized disclosures. (Zettlemoyer Decl., ¶ 6.) Indeed, at the time of the Subject Communications, AI training was a niche field and discussions of The Pile on EleutherAI's Discord were not heavily trafficked. (Dettmers Decl., ¶ 8.) Moreover, although EleutherAI's Discord server was technically accessible to persons outside EleutherAI, users are still required to accept an invitation and log in to access the server. *See* https://discord.com/invite/eleutherai. It also does not appear that the EleutherAI Discord server or channels were ever indexed by or searchable through internet search engines. Notably, although Plaintiffs suggest that Mr. Dettmer's Discord messages were widely available on the Internet, they identify only a single place on the Internet where those posts were retained after they were removed by EleutherAI—a LinkedIn post by a third party who is hostile to Meta and is apparently working with Plaintiffs' counsel, as discussed further below.

Once Meta learned of the disclosure in the FCAC, it sought to seal the relevant portions of the FCAC and to prevent any further disclosure. (Hartnett Decl., ¶ 3.) And, as noted above, the Subject Communications at issue were already inaccessible to the public as of August 2023. (ECF No. 69, ¶64.) Separately, the legal advice reflected in the Subject Communications has not otherwise been disclosed by anyone at Meta. (Zettlemoyer Decl., ¶ 6.)

Plaintiffs' reference to *Estate of Bennet v. Altec Industries, Inc.*, No. 05-CV-34-J, 2005 WL 8155489 (D. Wy. Dec. 16, 2005) does not support their waiver argument. The defendant in that case had disclosed the privileged information to third parties "on at least two separate occasions, in addition to the internet site," *id.* at *2, and the disclosure on the internet site (Lexis CourtLink) was *because* the defendant "previously produced the drawings in the course of discovery in two

other lawsuits." id. at *1. There also was no suggestion in *Estate of Bennet* that any of the defendant's disclosures were unauthorized. Similarly, in *Stern v. O'Quinn*—unlike here—disclosures were made on multiple occasions by an authorized agent with the ability to generate work-product protected materials. 253 F.R.D. 663, 681–82 (S.D. Fla. 2008).

Just last week, in connection with preparing the joint stipulation requesting this letter brief, Meta learned of Plaintiffs' intention to rely for their waiver argument on a LinkedIn post by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*see* fn.2), which includes screenshots of some of the Subject Communications ("LinkedIn Post"), to argue that Meta has not taken reasonable steps to prevent disclosure of the Subject Communications. If Plaintiffs intended to use the LinkedIn Post as evidence of waiver by Meta, they had numerous opportunities to raise it as the parties exchanged their positions over the past several months. (Hartnett Decl., Exs. 1–5).

Regardless, the LinkedIn Post does not change the analysis. If anything, it raises questions regarding Plaintiffs' connection to that post. According to the LinkedIn Post, ▓▓▓▓▓▓▓ supplied Plaintiffs with the Subject Communications in the first place (Hartnett Decl., Ex. 6.) And the LinkedIn Post was made in or around April 2024, many months after the Parties' privilege dispute arose. (*Id.*) Meta asked Plaintiffs to describe their relationship with ▓▓▓▓▓▓▓, preserve all communications with him, and inform Meta what involvement, if any, Plaintiffs had in the LinkedIn Post. (*Id.* ¶ 12 & Ex. 5.) Plaintiffs never responded to these requests and, as noted, refused to provide Meta with the Subject Communications in their possession based on a claim of "work product privilege." (*Id.* ¶ 11.) To the extent Plaintiffs have an attorney-client relationship with ▓▓▓▓▓▓▓, they should have notified ▓▓▓▓▓▓▓ of Meta's assertion of privilege over the Subject Communications and instructed ▓▓▓▓▓▓▓ against further disclosure.

Upon learning of the LinkedIn Post, Meta investigated options for having the post removed and determined that there were no viable options. Meta's counsel contacted an in-house attorney at LinkedIn, who advised that Meta would need to convince ▓▓▓▓▓▓▓ to remove the post from his LinkedIn profile. (*Id.* ¶ 13.) After careful consideration, it became clear that doing so would have been futile and likely counterproductive. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and is not subject to United States laws or courts. He is also plainly hostile to Meta and its position in this litigation. (*See, e.g., id.* Ex. 6 (stating he provided Plaintiffs the Subject Communications so they would be ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); Ex. 7 (▓▓▓▓▓▓▓ LinkedIn profile, which criticizes Meta and other generative AI companies).) Given this public hostility and alignment with Plaintiffs, and his clear *intention* to have the Subject Communications disseminated so they could be used in this litigation, any attempts to call upon him to remove the posts from his LinkedIn profile would not have constituted "efforts reasonably designed to protect the privilege," *Gomez*, 255 F.3d at 1131–32, but rather, would likely have only resulted in further acts of dissemination by ▓▓▓▓▓▓▓.[3]

---

[3] Although the LinkedIn Post does not change the analysis, if the Court is inclined to consider it at all, the Court should order Plaintiffs and their counsel to produce all communications with ▓▓▓▓▓▓▓ so that those communications can be considered in any waiver analysis.

V.     **Conclusion**

For the foregoing reasons, the Court should enter a protective order (1) holding that the Subject Communications are protected by the attorney-client privilege; (2) holding that Meta's privilege over the Subject Communications has not been waived;[4] (3) preventing Plaintiffs from using the Subject Communications in this litigation or otherwise; and (4) requiring the destruction or return to Meta of all documents and communications reflecting or discussing the Legal Advice.

**PLAINTIFFS' POSITION**

This dispute centers around Meta's claim of privilege over communications by Tim Dettmers, a Meta AI Researcher, to Stella Biderman and Leo Gao. Biderman and Gao were affiliated with EleutherAI, a separate entity that performed certain activities related to AI research. Mr. Dettmers made the communication using EleutherAI's Discord server. This dispute is not about private communications within Meta. The communications are not confidential communications within Meta. They are not messages stored on Meta's servers or that are otherwise in Meta's possession, custody, or control, but rather EleutherAI's. Further, Mr. Dettmers posted these messages with the intent and purpose of disseminating that information to Biderman and Gao, two high-level researchers at EleutherAI at the time, and otherwise unaffiliated with Meta. Mr. Dettmers did so for the commercial purpose of assessing and obtaining training data for use in Meta's AI research projects. Indeed, Mr. Dettmers freely admits that his team within Meta was considering using The Pile to further their research into its use for training large language models ("LLMs"). In other words, Meta is attempting to assert privilege over arms'-length commercial communications its employee made within the scope of his actual or apparent authority on a public internet forum to individuals with no ties to Meta. Setting aside whether those messages are privileged at all, whatever privilege may have attached has been waived.

I.     Relevant Factual and Procedural Background

On December 11, 2023, Plaintiffs filed their First Consolidated Amended Complaint (ECF No. 64) ("FCAC"). The FCAC contained allegations describing a public Discord[5] exchange between

---

[4] If the Court concludes that Meta's privilege over the Subject Communications was waived, the scope of that waiver should be narrow and limited to the communications themselves. During the parties' discussions over this dispute, Plaintiffs have indicated they seek a waiver only as to the Subject Communications themselves, and they are not arguing that the Court should find a broader waiver. (Hartnett Decl. ¶ 15.) Indeed, in the various letter exchanges, Plaintiffs never provide any legal authority supporting a broader waiver, and under the circumstances here, doing so would be inappropriate.

[5] *See Riot Games, Inc. v. Suga PTE, Ltd.*, 638 F. Supp. 3d 1102, 1116 (2022) ("Discord . . . is a platform through which individuals can participate in public or private text or voice chats.").

Honorable Thomas S. Hixson
June 28, 2024
Page 9

Mr. Dettmers, a Meta AI researcher, and employees of EleutherAI. ¶[6] 48. Mr. Dettmers's responsibilities at Meta included "work[ing] on a number of AI projects . . ., some of them relating to Large Language Models or 'LLMs.'" Dettmers Decl., ¶ 4. EleutherAI is a third-party research organization that developed The Pile, a dataset that includes copyrighted fiction and nonfiction books (including Plaintiffs') assembled for the purpose of training LLMs. *See* ¶¶ 34-36. The Discord server hosted by EleutherAI is public. EleutherAI, to this day, confirms the Discord server, including communications on it, are public. *See* https://www.eleuther.ai/about.

In November 2020, Mr. Dettmers initiated a public conversation on the EleutherAI Discord server about Meta's interest in using The Pile as training data for its generative AI LLMs. Mr. Dettmers freely admits that his team at Meta was "consider[ing] using The Pile to further our [Meta's] research." Dettmers Decl., ¶ 6. It was plainly apparent that Mr. Dettmers was interested in using The Pile as training materials for his work at Meta. Mr. Dettmers said: "It is really great work that you are doing with The Pile. Having a large public dataset that is easily accessible was long overdue!" ¶ 49. Mr. Dettmers added, "[a] colleague of mine and I wanted to use [The Pile] dataset in our research and wondering what would be the best way to build on your research efforts." *Id.*[7] Further, based on Mr. Dettmers's choice to use the pronoun "we" and to identify his organizational affiliation, it was clear that he was holding himself out as a representative of Meta. *E.g.*, ¶¶ 55, 57, 60. Following that outreach, and through January 2021, Mr. Dettmers and the EleutherAI representatives exchanged dozens of other public messages regarding Meta's interest in using The Pile. Mr. Dettmers admits this disclosure was voluntary. Dettmers Decl., ¶ 10. For the substance of those communications, Plaintiffs refer the Court to paragraphs 48-63 of the unredacted FCAC and copies of the Discord Messages ("Subject Communications"), both of which have been submitted *in camera*.

During the same period, Meta was discussing these third-party communications internally as evidenced by other communications found on Meta's internal single-review tool ("SRT"). Hartnett Letter at 3 (Apr. 29, 2024). Meta produced a privilege log reflecting the SRT Thread communications ("SRT Privilege Log"), which are not the subject of this dispute. *See* Benon Decl., Ex. A. Mr. Dettmers continued to exchange messages with EleutherAI through EleutherAI's Discord until January 2021. ¶ 61. The Subject Communications remained publicly available until August 2023, when EleutherAI hid the posts from public view. ¶ 64. Meta says it had nothing to do with EleutherAI's decision to make the Subject Communications private.

After Plaintiffs filed the FCAC, Meta asserted privilege over the Subject Communications, claiming that the FCAC was the first time it was made aware of the relevant Discord exchange. Plaintiffs disputed the privilege assertion, but agreed not to oppose a motion to replace the FCAC with a redacted version while the Parties' dispute the privilege issue. ECF No. 69.

---

[6] "¶ __" citations are to the FCAC unless otherwise indicated.
[7] Meta argues that the Subject Communications reflect advice pertaining to a separate research project. That is irrelevant. The topic of interest is The Pile dataset, which Plaintiffs allege was used to train Meta's LLMs. The contents of the Subject Communications reflect this.

Thereafter, Plaintiffs sought the Subject Communications from non-party EleutherAI because they were in EleutherAI's exclusive possession. Meta objected to that production based on Meta's assertion of attorney-client privilege.[8] Meanwhile, EleutherAI has no objection to producing the Subject Communications aside from Meta's claim of privilege and is prepared to produce them. Benon Decl., ¶ 2. Plaintiffs hereby move for production from EleutherAI.

The Parties have since engaged in an extensive meet-and-confer process to try to resolve the dispute for over six months. As part of that process, Meta provided information to Plaintiffs and privilege logs for the SRT Thread and the Subject Communications themselves. Meta's counsel has also called Plaintiffs' attention to a LinkedIn Post by a third-party journalist containing screenshots of some of the Subject Communications. As of the date of this filing, the LinkedIn post remains publicly viewable, and Meta has not asked to have it taken down. Benon Decl., ¶3.

## II. Argument

### A. Mr. Dettmers's Voluntary Disclosure to EleutherAI Waived the Privilege

Assuming, *arguendo*, the Subject Communications are protected (they are not, *see* Part B, *infra*), any privilege has been waived because these documents have been disclosed to a non-party outside of the attorney-client relationship. This disclosure was done intentionally and purposefully. Further, Mr. Dettmers was acting within the scope of his authority (whether actual or apparent) when he disclosed the information to EleutherAI for a commercial purpose, namely, to further Meta's development of generative AI systems by soliciting and evaluating The Pile for use as training data. Dettmers Decl., ¶¶ 4, 6, 9-10. Meta has failed to exercise reasonable diligence in order to prevent the continued disclosure of the Subject Communications. Indeed, the Subject Communications are still publicly available and accessible for all to see.

### 1. Any Privileged Material Was Intentionally and Purposefully Disclosed While Mr. Dettmers Was Acting Within His Scope of Authority

It is well settled that voluntary disclosure to a third-party waives any attorney-client privilege of that communication and covers communications concerning the same subject matter. *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012); *Phx. Sols., Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 576 (N.D. Cal. 2008). Courts in the Ninth Circuit have found the privilege may be waived by lower-level employees who "inadvertently yet voluntarily disclose privileged material while acting within the scope of their authority." *See, e.g.*, *Vans, Inc. v. Walmart, Inc.*, 2023 WL 4291986, at *5 (C.D. Cal. June 5, 2023). Further, "[t]he disclosing person need not be aware that the communication was privileged, nor specifically intend to waive the privilege." Restatement (Third) of the Law Governing Lawyers § 79 cmt. g. (Am. L. Inst. 2020).

---

[8] Plaintiffs have also served Requests for Production on Meta for Mr. Dettmers's non-privileged communications with other Meta employees concerning The Pile and EleutherAI. Meta has thus far refused to produce any materials in response to Plaintiffs' requests.

Honorable Thomas S. Hixson
June 28, 2024
Page 11

It is hornbook law that the action of an agent may bind a corporation if its agent acts within their apparent authority, although the action may be beyond the scope of the agent's actual authority. *Lockwood v. Wolf Corp.*, 629 F.2d 603, 609 (9th Cir. 1980). Apparent authority may be inferred from acts and conduct of the principal. *Id.* Ratification of an agent's action can be by affirmative acts or by an omission to act. *Id.*

A cursory examination of Mr. Dettmers's Discord messages reveals they were made intentionally and purposefully rather than involuntarily or inadvertently, within the scope of his actual or apparent authority. *United States v. Plache*, 913 F.2d 1375, 1380 (9th Cir. 1990) (explaining disclosure not inadvertent when disclosure was done "purposefully"); Dettmers Decl., ¶ 8. Mr. Dettmers's responsibilities at Meta included AI projects related to training LLMs. *See* Dettmers Decl., ¶ 4. His team at Meta was "consider[ing] using The Pile to further our [Meta's] research." *Id.* ¶ 6. Mr. Dettmers held himself out as a representative of Meta, consistently using the pronoun "we" and referring to his employer by name. *E.g.*, ¶¶ 55, 57, 61. He knew Biderman and Gao were not affiliated with Meta, but with EleutherAI. Dettmers Decl., ¶ 9. Mr. Dettmers made multiple communications to Gao and Biderman, along with many other posts on EleutherAI's Discord over a period of three months. ¶¶ 48–63. He expressed he expected to be ███████████████████████████ before following up weeks later. ¶¶ 57, 60. And he freely admits he did so intentionally and voluntarily. Dettmers Decl., ¶ 8.

Under these circumstances, it is reasonable for the recipient of the messages to rely on Mr. Dettmers's actual or apparent authority. While Mr. Dettmers now disavows authority, the contents of the posts evidence that they were made voluntarily, that Mr. Dettmers held himself out as a representative of Meta, and that any reliance on those representations was reasonable.

Further, Mr. Dettmers could have communicated privately, e.g., via email or through direct messages within Discord, but he did not, evidencing an intent to disseminate the information. *See Stern v. O'Quinn*, 253 F.R.D. 663, 682 (S.D. Fla. 2008) (finding work product protection waived because "it is difficult to conceive of how Vicedomine could not have intended that her Internet statements be made available to anyone who wished to view them"); *see also* Dettmers Decl., ¶ 8 ("I sought to communicate . . . with EleutherAI"). Meta claims that the Discord server was "invite-only," but this matters little, particularly with respect to communications with Gao and Biderman, who Dettmers knew were outside of Meta. Dettmers Decl., ¶ 9. Even if these communications were not directed to Gao and Biderman, posting communications where others could view them is enough to waive any arguable protection over formerly privileged information. Indeed, the Subject Communications were disseminated far and wide. They remain accessible on LinkedIn—to date, the post has received 116 "likes" and it has been reposted 26 times. Benon Decl., ¶ 2. The cat is out of the bag. *See Estate of Bennet v. Altec Indus.*, 2005 WL 8155489, at *2 (D. Wyo. 2005) ("[I]t is inconceivable that every copy could reasonably be returned or destroyed since the documents were available to anyone with access to the internet. For these reasons, the Court believes the attorney-client privilege has been waived.").

Meta attempts to recharacterize Mr. Dettmers as a low-level employee who may have happened on this information. Dettmers was Meta's agent, acting within actual or apparent authority, as demonstrated by the facts surrounding the communication. This includes the fact he held himself

out as a representative for Meta. It is also demonstrated by the fact he was soliciting EleutherAI for a commercial purpose, namely, to obtain or use The Pile for use in training Meta's generative AI models. Tellingly, even Dr. Zettlemoyer, Mr. Dettmers's supervisor, does not claim that Mr. Dettmers's communications were unauthorized, but only that he does not know the contents. Zettlemoyer Decl., ¶ 6. Further, as the withheld SRT communications show, Mr. Dettmers was one of only ten people on the SRT request. Mr. Dettmers was a member of a select group of Meta researchers. He was one of the few intended recipients of the relevant communication from Meta lawyers. He participated in at least one other meeting with one attorney and two researchers. *See* Benon Decl., Ex. A, 2021-2-17T10:30:50. Indeed, his messages to EleutherAI themselves suggest others at Meta knew he was communicating with EleutherAI. ¶¶ 57, 60.

*Vans*, 2023 WL 4291986, at *6-7, is instructive. In *Vans*, the court found that an employee who was neither an officer nor a director had the authority to waive privilege and did so when he intentionally disclosed legal advice to a supplier for it to consider in the design process. In so ruling, the court determined that the employee "forwarded the legal advice to the third-party supplier" and "[h]e intended to disclose the legal advice so that the supplier would consider it," evidencing that the disclosure was done "intentionally, not inadvertently." *Id.* at *6. The court reasoned if employees of a sufficiently low status were unauthorized to waive the privilege, then "corporations would have no responsibility to monitor how their low-level employees handle privileged communications even though those employees are covered by modern expansions of the attorney-client privilege." *Id.* at *7. The law regarding privilege makes no such distinction.

Other courts are in accord. In *Truckstop.net, L.L.C. v. Sprint Corp.*, No. CV-05-138-S-BLW, 2005 WL 8166195, at *8 (D. Idaho July 28, 2005),[9] the court held that a low-level employee waived the attorney-client privilege by disclosing to a third-party a memo labeled "Attorney-Client Privilege Information." The disclosure was made "without the knowledge or consent of his supervisors or [counsel]." *Id.* The court reasoned: "a corporation cannot enjoy the benefits of the privilege without likewise accepting the consequences that the privilege may well be waived by an employee who is outside of the 'control group.'" *Id.*, citing *Upjohn v. United States*, 449 U.S. 383, 396 (1981). Further, the argument that there was no waiver because the disclosing person was a "low level employee without the authority to waive attorney client privilege" was discarded because the employee was entitled to receive the privileged memorandum. *Id.* at *8.

*Vans* and *Truckstop* are on all fours with the instant case. Here, Mr. Dettmers did not stumble upon the attorney-client communications. *See Truckstop*, at *8. Rather, Mr. Dettmers was part of a select group comprising researchers and attorneys invited to participate in the internal Meta communications. *Id.*; *Vans*, at *7. Like in *Vans*, Mr. Dettmers disclosed the Subject Communications to outsiders intentionally. *Vans*, at *6; *Truckstop*, at *8. Likewise, "[Mr. Dettmers] intended to disclose the legal advice so that [] [EleutherAI] would consider it . . . ." *Id.*; Dettmers Decl., ¶¶ 8-10. Further, like in *Vans*, "[n]othing . . . shows that anyone more senior . . . ever instructed [Mr. Dettmers] to keep the [Subject Communications] confidential. No one

---

[9] Meta attempts to distinguish *Truckstop* by arguing that *Truckstop* involves the application of Idaho privilege law; but the court relied on federal authorities in analyzing privilege. *See Truckstop*, 2005 WL 8166195 at **7-8.

instructed him not to provide the legal advice . . . to [EleutherAI]." *Vans*, at *6. Mr. Dettmers communicated to Gao and Biderman because he determined that EleutherAI, a third-party host of training data, could understand Meta's concerns regarding the data, and EleutherAI could use the information to "perform [Meta's] work." *Id.* at *7; *see also* Dettmers Decl., ¶¶ 4, 9-10. The disclosure occurred within the scope of Mr. Dettmers's authority from Meta. *Id.*

A finding of waiver here would be consistent with the public policy principles enunciated by the courts in *Vans* and *Truckstop*. Meta should not be entitled to claim protection over communications within a select group of employees and then avoid the consequences of waiver when a member of that group voluntarily discloses legal advice within the scope of his authority.

Meta relies on *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996). But *Chen* is inapposite. *Chen* involved a disgruntled *former* employee who had a "stolen [a] box of documents," which included privileged correspondence between a company's general counsel and outside counsel. *Id.* at 1498. In *Chen*, the former employee "started a competing company with another sister, while trying to damage [the company] and lure away its customers." *Id.* The former employee then disclosed the stolen documents to the government. *Id. Chen* is distinguishable. Unlike the former employee in *Chen* who obtained copies of legal communications through unscrupulous means, Mr. Dettmers was the intended recipient of the legal advice at issue. Dettmer's disclosure was not accidental but made in the course of performing his duties on behalf of the corporation. This case is more analogous to *Vans*, where the employee in question, like Mr. Dettmers, was entitled to the purported advice he had disclosed. Indeed, the *Vans* court recognized *Chen* was distinguishable on these grounds. *Vans*, 2023 WL 4291986, at *6.

With respect to *Chen*, one other point is worth mentioning—the *Chen* ruling largely rests on a single sentence from *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985). *Weintraub* involved the question of whether a bankruptcy receiver can waive the privilege or whether it rests with the management of the now-bankrupt company. *Id.* But even *Weintraub* recognized that "the power to waive the attorney-client privilege . . . is **normally** exercised by its officers and directors." *Id.* at 348. (emphasis added). And *Vans* and the cases like it do not depart from *Weintraub*; they merely apply the law. *See Vans*, 2023 WL 4291986, at *6.

## 2. Meta Failed to Exercise Reasonable Diligence to Preserve Confidentiality

Courts deem the privilege waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter. *United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992); Fed. R. Evid. 502(b). The Subject Communications remain publicly viewable due to Meta's failure to exercise reasonable diligence.

For over **two years** before they were taken down, the Subject Communications were publicly viewable on Discord. Meta attempts to downplay this fact by arguing the EleutherAI Discord server was invite-only when Mr. Dettmers made the Subject Communications. Even if this is true (a point Plaintiffs do not concede), the EleutherAI Discord server was publicly accessible as late as the end of 2023. *See* Dettmers Decl., ¶ 8 ("I joined the EleutherAI server in late 2020; **at that time**, an invitation was required.") (emphasis added). Irrespective of whether the Discord Server

Honorable Thomas S. Hixson
June 28, 2024
Page 14

was invite-only and how long it may have remained so, Meta knew or should have known about communications for years. Meta used The Pile dataset to train its LLMs subsequent to the Subject Communications. Mr. Dettmers's team at Meta itself was "consider[ing] using The Pile," Dettmers Decl., ¶ 4. It is not reasonable to conclude that Meta employees did not access and review the EleutherAI Discord, including the Subject Communications. Meta does not contend otherwise. And the Subject Communications remain publicly available on LinkedIn. "This type of disclosure and lack of expeditious steps to remedy the disclosure are inconsistent with maintaining the confidential nature of the attorney-client relationship." *Estate of Bennet*, 2005 WL 8155489, at *2.

The Subject Communications themselves make clear that Meta knew or should have known at the time that Mr. Dettmers was communicating on the EleutherAI Discord server. Indeed, Mr. Dettmers revealed to EleutherAI that he was communicating with colleagues at Meta. ¶ 57. From this, it can be inferred that Mr. Dettmers reached out to EleutherAI for Meta's commercial purpose of using The Pile for Meta's LLMs with Meta's knowledge.

What is more, the Subject Communications are still publicly available. Indeed, Meta pointed this out to Plaintiffs months ago. Hartnett Letter at 4 (Apr. 29, 2024). Meta could have pursued reasonable means to have the posts removed.[10] The failure to do shows an absence of diligence.

B.    **The Subject Communications Are Not Privileged in the First Instance**

Beyond waiver, the Subject Communications are not privileged in the first instance. It is well settled that the "attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020). The privilege "protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]" *Upjohn*, 449 U.S. at 395. In the corporate context, statements made by an employee of a corporation are protected by the corporation's attorney-client privilege only if the employee is a member of the control group of the corporation or if the employee made the communication at the direction of superiors and the subject matter dealt with in the communication was the performance of the employee's duties of employment. *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D. Cal. 1978). The privilege is construed narrowly. *Wadler v. Bio-Rad Lab'ys, Inc.*, 212 F. Supp. 3d 829, 850 (N.D. Cal. 2016).

Here, the Subject Communications are not privileged for at least two reasons. First, Meta has not shown that the Subject Communications were "made for the purpose of giving legal advice." *Sanmina Corp.*, 968 F. 3d at 1116. The Subject Communications plainly show that the Discord messages in question do not include confidential requests for legal advice. *See generally*, Subject Commc'ns. Quite the opposite. It is facially apparent from Subject Communications that they were neither made to obtain legal advice nor were they an attorney's response thereto, but instead to solicit aid from EleutherAI. *Id.*; *see United States v. Ruehle*, 583 F.3d 600, 607 (9th

---

[10] Plaintiffs' counsel has no attorney-client relationship with the author of the relevant LinkedIn post or the Danish Rights Alliance.

Cir. 2009). Second, the Subject Communications disclose underlying facts not entitled to privilege protection. *Upjohn Co.*, 449 U.S. at 395; s*ee generally*, Subject Commc'ns. The communications are summaries of the fact that Meta had reservations about the legality of The Pile generally and Books3. *Id*. As such, the Subject Communications are not privileged in the first instance.

### III. Conclusion

The Court should issue a finding that Meta has waived the attorney-client privilege over all of the Subject Communications and compel EleutherAI to produce the Subject Communications.

      */s/ Joseph R. Saveri*
Joseph R. Saveri
Joseph Saveri Law Firm, LLP
Attorneys for Plaintiffs RICHARD KADREY, SARAH SILVERMAN, and CHISTOPHER GOLDEN


      */s/ Bobby Ghajar*
Bobby Ghajar
Cooley LLP
Attorneys for Defendant META PLATFORMS, INC.


      */s/ Bryan L. Clobes*
Bryan L. Clobes (*pro hac vice*)
Cafferty Clobes Meriwether & Sprengel, LLP
Attorneys for Plaintiffs MICHAEL, CHABON, TA-NEHISI COATES, JUNOT DIAZ, CHRISTOPHER GOLDEN, RICHARD GREER, DAVID HENRY HWANG, MATTHEW KLAM, LAURA LIPPMAN, RACHEL LOUISE SNYDER, AYELET WALDMAN, and JACQUELINE WOODSON