1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3     Before The Honorable Thomas S. Hixson, Magistrate Judge

4

5   KADREY, et al.,                )  No. C 23-03417-VC
                                   )
6            Plaintiffs,           )
                                   )
7   vs.                            )
                                   )
8   META PLATFORMS, INC.,          )
                                   )
9            Defendant.            )
    _____)
10
                                   San Francisco, California
11                                 Thursday, August 22, 2024

12
    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13              RECORDING 9:07 - 9:40 = 33 MINUTES

14

15  APPEARANCES:

16  For Plaintiffs:
                              Joseph Saveri Law Firm, LLP
17                            601 California Street
                              Suite 1000
18                            San Francisco, California
                                94108
19                    BY:  JOSEPH R. SAVERI, ESQ.
                           HOLDEN J. BENON, ESQ.
20                         AARON CERA, ESQ.

21  For Defendant:
                              Cooley, LLP
22                            1333 2nd Street, Suite 400
                              Santa Monica, California 90401
23                    BY:  BOBBY A. GHAJAR, ESQ.

24        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25

2

1  For Defendant:

2                              Cooley, LLP
                             3 Embarcadero Center
                             20th Floor
3                              San Francisco, California
                                94111
4                      BY:   KATHLEEN R. HARTNETT, ESQ.

5  Transcribed by:           Echo Reporting, Inc.
                             Contracted Court Reporter/
6                              Transcriber
                             echoreporting@yahoo.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Thursday, August 22, 2024</u>                          <u>9:07 a.m.</u>

2                         P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4          THE CLERK:  Good morning, everyone.  We're here in

5  civil action 23-3417, Kadrey, et al., versus Meta Platforms,

6  Inc.  The Honorable Thomas S. Hixson presiding.

7      Counsel, please state your appearances for the record.

8  Let's start with Plaintiff's Counsel.

9          MR. SAVERI:  Good morning, your Honor.  Joseph

10 Saveri on behalf of the Plaintiffs.

11         THE COURT:  Good morning.

12         MR. BENON:  Good morning.  Holden Benon on behalf

13 of the Plaintiffs.

14         THE COURT:  Good morning.

15         MR. CERA:  Good morning, your Honor.  Aaron Cera

16 on behalf of the Plaintiffs.

17         THE COURT:  Good morning.

18         MS. HARTNETT:  Good morning, your Honor.  Kathleen

19 Hartnett on behalf of Defendant, Meta.  And I also just

20 wanted to identify that we have two client representatives

21 here, Nikki Vo and Michelle Woodhouse.

22         THE COURT:  Good morning.

23         MR. GHAJAR:  Good morning, your Honor.  Bobby

24 Ghajar from Cooley, also on behalf of Meta.

25         THE COURT:  Good morning.

4

1     We are here on cross motions.  There's Meta's motion

2  for a protective order and Plaintiffs' motion to compel.  I

3  don't know that it matters, since we're on cross motions, I

4  guess you're -- you're both the moving parties, so I don't

5  know that it matters who goes first.  Let's hear from

6  Plaintiffs.

7          MR. SAVERI:  Good morning, your Honor.  I have

8  some prepared remarks, but if there is specific questions

9  that you would like me to answer, certainly I would be

10 prepared to turn directly to those.

11         THE COURT:  Well, thank you.  Why don't you

12 proceed with your prepared remarks.

13         MR. SAVERI:  Thank you, your Honor.  So, your

14 Honor, we're here today, at least with respect to our

15 motion, on a motion to compel documents that are in the --

16 in the  possession of a third party in this case,

17 EleutherAI.  Our position is that the materials that are

18 sought were not privileged, and if they were privileged that

19 privilege has been waived.

20     Indeed, as we are sitting here today, the materials we

21 seek are available and posted on the internet on a LinkedIn

22 site.  And so, in addition to the claims waiver, there's

23 been really a lack of due diligence in retrieving or trying

24 to protect the privilege.  So, let's -- let's talk for a

25 minute about what the documents are.

5

1       These were materials that were communicated by Mr.

2   Dettmers, who at the time was working for Facebook at the

3   time, now Meta, the Defendant in the case.  These

4   communications were made on a public forum, essentially a

5   chat room.  It was posted on the internet.

6           THE COURT:  Was it invitation only at the time?

7   There seems to be a dispute about that between the parties.

8           MR. SAVERI:  I think there are a -- and if we go

9   down that road, there are some facts that perhaps need a

10  little bit more elucidation.  There was some mechanism where

11  people had to do something affirmatively to be admitted into

12  the space.  Saying it was an invitation implies some, I

13  guess, rigor or requirements that -- it was basically an

14  open door that they were allowed to, essentially, click

15  through.  If someone said I want to be -- want to

16  participate, they were allowed to.  There wasn't any

17  invitation process.  There wasn't an invitation committee.

18  There wasn't anything like that.  And, indeed, we know that

19  there was really no impediment to entry, because right now

20  these materials that are on LinkedIn, were obtained in the

21  very same way.  They were obtained by entry into this public

22  space.  They were downloaded and now they are posted.

23      So, the idea that there was some kind of real

24  limitation for outsiders to visit or to enter to participate

25  in, is really -- is really not the case.  This was a -- this

6

1  was a public forum.  It was free for everybody to see.

2  These materials were -- communications were made a number of

3  years ago and then they were essentially left there.

4          THE COURT:  Two of the cases that Plaintiffs

5  relied on Vans and Truck Stop.

6          MR. SAVERI:  Yes.

7          THE COURT:  In those decisions, the courts seemed

8  to focus on whether there was delegated authority to have

9  certain types of communications.  And, in Vans it seemed

10 that there was a lower-level employee who was having

11 communications and that --

12         MR. SAVERI:  Correct.

13         THE COURT:  -- authority was delegated to him.

14 And in Truck Stop, it looked like the employee at issue was

15 an enterprise account executive who served as the main point

16 of contact.

17    And so, if we focus on that analysis, what evidence do

18 we have here that Facebook had delegated to Mr. Dettmers'

19 authority or responsibility for having communications?

20         MR. SAVERI:  Thank you, your Honor.  So, we're

21 talking about this kind of idea of agency or authority here,

22 and I would say that there's -- under the agency law, one --

23 one theory, or one way of having authority would be to

24 have the authority be expressly given to an agent.  Also,

25 agents can act under apparent authority.

7

1    So, there are kind of two different ways of

2  establishing agency, but with respect to the first, which is

3  whether there was -- what's the evidence of authority or

4  delegation?

5    So, Mr. Dettmers was employed by Facebook at the time.

6  He was part of a group that was charged with trying to

7  assist or reach out to EleutherAI, which had in its

8  possession, a number of databases, including pirated

9  databases which contained ebooks and other materials that

10 were subject to copyright protection.

11   Dettmers, as part of his job, and he held them out --

12 he held himself out to the public in his particular

13 participation in this forum in this way, was a

14 representative of Meta or Facebook at the time.  I get a

15 little tripped up, because there's a name change.  So it was

16 Facebook at the time.  He held himself out a representative

17 at Facebook.  He was negotiating or discussing with

18 representatives of EleutherAI.  It's apparently a nonprofit.

19 There were -- there's a gentleman named Gao (phonetic),

20 there's a woman named Biderman -- and they were having a

21 back and forth about what EleutherAI had on its databases

22 and particular issues or characteristics of that

23 information.

24   So that whole conversation -- that whole conversation

25 was not some kind of chance meeting.  Mr. Dettmers went into

8

1  this chat room with a purpose.  It was clear from the

2  context who he was representing and that his -- that his

3  employer had a commercial interest in obtaining that

4  information.

5       THE COURT:  So I get that Mr. Dettmers personally

6  intentionally disclosed this information and that he was

7  having these communications with EleutherAI, but it seems to

8  me that under the cases you've relied on, the relevant

9  inquiry is, did Facebook delegate some kind of authority to

10  him to have those communications?  And that's where I'm

11  struggling a little bit with your argument.

12       MR. SAVERI:  And let me -- let me address that.

13  So, one, the -- I think it's a reasonable conclusion and a

14  reasonable supposition from the context that I described,

15  that Facebook certainly had delegated Mr. Dettmers the

16  authority to do this, to have these communications.  I think

17  that Dettmers was not operating in secret.  I think it is a

18  fair assumption that -- and conclusion from this context

19  that Facebook was aware, or should have been aware, of

20  Dettmers' activities.  Indeed, he was a part of a group that

21  was negotiating and having discussions about obtaining this

22  information.  He was going back and forth.  He was having

23  communications about this.  Dettmers had no other job but

24  this, and so it's a reasonable assumption and a reasonable

25  conclusion that -- that Facebook knew he was doing this,

9

1  that he received this information from the lawyers and that

2  it was -- it was likely being communicated.

3      Here's --

4          THE COURT:  Have you sought to take Mr. Dettmers'

5  deposition?

6          MR. SAVERI:  I beg your pardon?

7          THE COURT:  Have you sought to take Mr. Dettmers'

8  deposition.

9          MR. SAVERI:  No, your Honor.  I mean, the way this

10 has come up has been in a context of a third-party subpoena,

11 and we filed the motion to compel and they filed the

12 protective order motion to retrieve it.  In our case

13 discovery -- deposition discovery has not really begun.

14 We're just beginning to talk about that.  So we really

15 weren't at that stage.  I would say, your Honor, that a lot

16 of the facts that are the predicate of the -- of Facebook's

17 or Meta's position, have been untested.

18      You know, in the context of this motion, we've relied

19 exclusively on the -- you know, the five page -- or the

20 limited motion to compel, I guess, restrictions.  It was

21 really a short form kind of exercise.

22      There were a number of actual issues that, were the

23 Court to want to get more information about this, or

24 subjects that could be tested -- these include the untested

25 declarations of Mr. Dettmers.  Also, there's another

10

1  declaration in the record from someone named, Zettlemoyer,

2  who also describes from the -- I guess the Facebook side --

3  what was known, what was not known.  All of that hasn't been

4  tested.

5      But, I guess I would also go back to the point that the

6  agency -- the agency can also be established based on the

7  apparent authority, and not just on express authority.  And

8  we think the facts support them -- support them both.

9      The other thing I would say is that, the Defendant's --

10 part of the Defendant's argument is about issues that have

11 to do with control group, and the Supreme Court's decision

12 in Upjohn and some of the subsequent cases that came after

13 that.  And one of the things that Upjohn and the cases that

14 we cite, Vans and Truck Stop recognizes, that in fact lower-

15 level employees outside of the control group -- or the

16 traditional control group, can be protected by the

17 privilege, but at the same time can waive it.

18         THE COURT:  On the legal argument, I thought that

19 you had the better view of that subject, that there were --

20 you cited Vans -- certainly acknowledged the Supreme Court

21 decision and the Ninth Circuit's decision in Chen and then

22 went on to say, that as other courts have held level-lower

23 employees who have sufficient authority can waive the

24 privilege.  I don't know that you've met that standard, but

25 I agree with you that that seems to be the prevailing view

1  under the case law.

2          MR. SAVERI:  And, your Honor, just to maybe push

3  back on the last comment.  I do think the evidence strongly

4  shows that this individual, Mr. Dettmers, did have

5  sufficient authority.  And, again, that's based on the way

6  he presented himself to this group.  What we know

7  objectively about what his -- his hiring and his employment

8  obligations were, were in fact to do this very thing.  He

9  was -- he was charged with that.

10         You know --

11         THE COURT:  How do we know that his job

12  responsibilities included dealing with EleutherAI, or if you

13  don't want it to be that specific, involved communicating

14  with people outside of Facebook about AI?

15         MR. SAVERI:  As I understand it, and this is based

16  on some of the communication that's in the letter and also

17  things that are in the declaration, for both Zettlemoyer and

18  from Dettmers himself, it was -- it was his job, from all we

19  can tell, as part of the group, to try to go out and obtain

20  and solicit and understand the availability of -- of

21  material used for training of the developing Facebook

22  generative AI parts.  It was -- as far as I can tell, there

23  was no -- and I think this is in the record -- there was no

24  other responsibility that Mr. Dettmers had.  This was his

25  job.  He was part of a group that's -- responsibility of

1  which was this very exercise.

2     And so, from that, your Honor, I think it's reasonable

3  to conclude that this was within the scope of his

4  responsibility and his charge, because in fact we have no

5  evidence that there was anything else he was asked to do.

6  And that evidence is supported by the communications

7  themselves.

8     I mean, the communications are about this subject,

9  which ties directly to what we understand to be the scope of

10  his job and what his charge was by Facebook.  This wasn't as

11  if someone at Facebook had a job and this was some kind of

12  unauthorized, you know, exercise that no one knew about

13  because Mr. Dettmers thought it was a good idea and he

14  cocked it up himself.  This was entirely consistent with

15  what we -- what we know his job was and what his

16  responsibility was.  And, indeed, it wasn't just a

17  communication of one piece of information.

18     I mean, the chat reflects a back and forth.  There was

19  a communication between Mr. Dettmers on one hand and others

20  in the chat room, including the representatives EleutherAI,

21  and those communications not only reflect a back and forth,

22  but also reflect that Mr. Dettmers was going back to

23  Facebook and Meta and asking them questions and returning to

24  the group with some of the information.

25     So, if you put that altogether, I think that the

13

reasonable conclusion from that, and indeed, probably the
only conclusion that one could reasonably draw from that, is
that he was acting entirely within the scope of what his job
was at Facebook.  It was entirely within the scope of what
he was charged with.  It was entirely within the scope of
his authority and all of the communications were part of it
and consistent with that.

Now, we don't have, I will agree, because we haven't
taken the deposition of anyone, a plain direct admission
about the communications, or that part of it.  What we know
is -- we know because this material was in the public forum
and we sought it from the third party that possesses it.

We haven't had any opportunity to test any of the -- of
the declarations that were submitted, but -- but I don't
believe we have to go there and I also -- we have this other
situation which has to do with the fact that -- and, you
know, we cite the <u>Bennet</u> case for this proposition -- that
these materials are now on the internet.  I mean, and we've
showed that this material has been spread virally, copied
and sent throughout the internet a couple of dozen times.
One hundred and twenty people have looked at it.  It's still
there.  It's still there, your Honor, and we have no
explanation for that.  I mean, and I do think one of the --
the -- no good explanation for it -- I do think one of the
important parts about the privilege is some requirement that

14

1  due diligence is exercised to protect it, and from the

2  record, we have Meta agreeing -- admitting -- that they

3  haven't tried to get it back from the individual who posted

4  a LinkedIn.

5      And I think the <u>Bennet</u> case, which we cited, stands for

6  the proposition that, you know, at this point, when it's on

7  the internet, it's been there, I don't know what metaphor

8  you prefer, the cat is out of the bag, the horse has left

9  the barn, or the genie is out of the bottle, but

10 nonetheless, it's out there for everybody to see.

11     So, with that, maybe I'll take a breath and see if

12 there are other questions you would like me to address.

13         THE COURT:  No, I think I have asked the questions

14 that focused on the issues that were of concern to me.

15         MR. SAVERI:  Okay.  Thank you, your Honor.

16         THE COURT:  All right.  Why don't I hear from

17 Meta, please.

18         MS. HARTNETT:  Thank you, your Honor.  I'd like to

19 just address a couple of the points that counsel for

20 Plaintiffs made, and then obviously would like to answer any

21 questions you have.  I think the record is clear, and in

22 fact is sort of being ignored by the presentation before you

23 about what has happened here.

24     For example, I think we heard from the Counsel that Mr.

25 Dettmers' job was to just do this.  That's completely wrong.

15

1  It's not actually his job.  I think the way that Counsel

2  described it as an unauthorized exercise that noone knew

3  about and was his idea, exactly is what happened here.  And

4  we have a declaration from Mr. Dettmers in the record and

5  his supervisor, Doctor Zettlemoyer.

6       Mr. Dettmers explains in paragraph five that his job

7  was not what is engaged in here, contacting other companies

8  to talk about legal issues.  His work involved researching

9  how to make LLMs more efficient using a procedure called

10  LLM.int8, et cetera, et cetera.  So, there's -- he is a PhD,

11  a researcher.  His job was to help develop LLM models.  As,

12  sort of an unauthorized exercise, he apparently reached out

13  to folks he knew at EleutherAI, just two people on this

14  obscure Discord server, and disclosed the legal advise to

15  them.  But that was not part of his job and his declaration

16  makes that clear.  His supervisor's declaration also makes

17  that clear.

18       And, I would also point the Court to the representation

19  made in the letter to you on page 12, that it says here

20  Plaintiffs say that tellingly, "Doctor Zettlemoyer does not

21  claim that his communications were unauthorized..." --

22  Dettmers -- "but only that he does not know the contents."

23  Citing paragraph six of the Zettlemoyer declaration.  This

24  ignores that in paragraph seven of the Zettlemoyer

25  declaration, Mr. Zettlemoyer,-- again, Mr. Dettmers'

16

1  supervisor -- said that Mr. Dettmers and others on her (sic)

2  team -- on his team, were not authorized by Meta to disclose

3  legal advise.

4      So, we agree that --

5      THE COURT:  Well, sure, they weren't authorized to

6  disclose legal advice, but in Vans and Truck Stop, those

7  employees weren't specifically authorized to disclose

8  privileged information either.  It seemed like in those

9  cases the court's analysis was a little bit broader, namely

10 were the employees delegated authority to have

11 communications?  And I think that's what we need to focus on

12 here with Mr. Dettmers.

13      MS. HARTNETT:  Agreed.  And I think that in that

14 case -- and we don't disagree.  You had stated the

15 proposition that lower-level employees could both be

16 protected the privilege and also that they can waive it if

17 they're given authority.  We agree with that, we just

18 dispute that that happened here.

19      I think in Truck Stop -- well, let's start with Vans.

20 I think there, and I think you had pointed this out in your

21 question, the court made clear that a management-level

22 employee, "had delegated authority..." -- to the employees

23 who made the disclosure -- "asking him to work with the

24 supplier to implement McCarter's (phonetic) legal advise."

25 So in Vans, we have a direct delegation regarding the legal

17

1   advice at issue.  I think <u>Truck Stop</u> is a little different.

2       I would note that <u>Truck Stop</u> is a diversity case and

3   governed by Idaho privilege law, and so it doesn't cite the

4   Ninth Circuit's decision in <u>Chen</u>.  And -- as other circuits

5   -- other courts have recognized the <u>Truck Stop</u>-type of

6   analysis under Idaho law is not actually consistent with

7   <u>Chen</u>.  But even there, you did have an employee that was

8   specifically delegated to work on a particular matter, and

9   here the record makes clear that was not actually Mr.

10  Dettmers' job or delegation, even aside from the legal

11  advice.

12      I did want to draw the Court's attention to one other

13  concern we had with this notion that somehow this has gone

14  viral, or is far and wide, which is what the representations

15  that Plaintiffs' Counsel have been making.  To our

16  knowledge, this information was limited seemly to this

17  obscure Discord chat with two people, apparently other than

18  Mr. Dettmers, at a minimum, until they filed the first

19  amended complaint on public record.  That was when there was

20  a first set of press.  It wasn't viral or massive, but there

21  was some press --

22          THE COURT:  Is that when Meta first discovered

23  this information?

24          MS. HARTNETT:  Yes, your Honor.

25          THE COURT:  Okay.

1       MS. HARTNETT:  Thereafter, we brought it to their

2  attention promptly.  The parties agreed to lock the

3  unredacted version.  They filed a redacted version on the

4  public record.  Now they're not relying on the initial run

5  of publicity, because that is directly traceable to their

6  putting this into the public, they are relying on a LinkedIn

7  post that was made in April of 2024, in the middle of this

8  dispute.

9       Importantly, and I think this comes clearly through,

10 but I'd like to make sure that the Court's aware, this post

11 is made by a Danish activist, who is the person that

12 apparently gave Plaintiffs' Counsel the Discord post in the

13 first place.  And so, initially when we had learned of these

14 -- that these posts existed, we asked Plaintiffs' Counsel,

15 can you please give us the post, we'd like to assess them to

16 make sure we understand our claim.  They did not give them

17 to us, claiming there was work product protection with their

18 interactions, I guess, with this Danish activist.  We didn't

19 know at the time that is who it was.  Thereafter, we got the

20 post from Eleuther and made -- which made clear that they

21 are are privileged content.  And then since then, the

22 LinkedIn post, which they're now citing to as the source of

23 this apparent viral content, which is, again, not viral,

24 that is, you know, related to them.  It's their contact in

25 Denmark, apparently, who is continuing to publicize this.

19

1      So --

2           THE COURT:  Are the Discord posts still around or

3  are those gone?

4           MS. HARTNETT:  Those, to our understanding, were

5  taken off from public access in August of 2023, we believe

6  by EleutherAI.  So we had never -- Meta never had knowledge

7  of the posts during the period they were available on

8  Discord.

9           THE COURT:  All right.  And I gather from the

10  evidence submitted, Meta asked LinkedIn to take down the

11  post and they declined.  Is that correct?

12           MS. HARTNETT:  We contacted -- this is in my

13  declaration -- we contacted a representative of LinkedIn who

14  informed us that the step would be to go ask the person who

15  had posted it to take it down.

16           THE COURT:  Well, presumably, he is not going to

17  be very helpful, because he intentionally posted it.

18           MS. HARTNETT:  Right.  And so, our understanding

19  is that we'd actually need a court order at this point, or

20  some recognition of the privileged nature of the content, to

21  go back to LinkedIn.  Under their rules, you can ask for

22  objectionable content to be taken down, but not based on a

23  parties say so.  At least that's out understanding.  So

24  that's why we're having this dispute.

25           THE COURT:  I see.

20

1          MS. HARTNETT:  So, you know, I'm happy to answer

2    any other questions, but in short -- and I don't think I

3    agree with the Plaintiffs' Counsel that more discovery is

4    not needed here.  This is just a clear cut case of

5    privileged information that came into their possession.

6    They should have told us about it before they filed it on

7    the public record.  They didn't.  It was that filing that's

8    created the -- any "publicity", but this was a mistake.  It

9    was a mistake made by a lower-level part-time Meta employee,

10   who was also a student.  Meta didn't know it at the time.

11   As soon as we knew, we took action to stop the harm.  We

12   substantiated our privilege claim.  We provided all of this

13   information to them in the course of our meet and confer,

14   and yet they persist in seeking to use it here.

15        And one final note.  I think they mention that they're

16   arguing it's not privileged.  I don't read their letter

17   brief to actually contend that vice was not privileged in

18   the first time.  It's sort of an argument that by repeating

19   it, somehow it loses the privilege character.

20          THE COURT:  Well, no, at the end they say that.

21   It's not their first argument, I believe it's towards the

22   end of their brief.

23          MS. HARTNETT:  No, and I looked at this closely

24   too, but they seem to actually be focusing less on the fact

25   as to whether Mr. Dettmers was receiving privilege from

21

1 Meta's attorneys.  And more, they make their point in their

2 brief, it is their secondary argument that it's not

3 privileged and they say for two reasons.  And, one, they say

4 it's because the Discord messages do not include the request

5 for legal advice.  In other words, some notion that once

6 you're kind of repeating illegal advice, it loses its legal

7 privilege character.  And I just wanted to point the Court

8 to our authority in the -- there's a case that we've cited

9 that that's not the case.  When you repeat something, even

10 if it's not between the lawyer and the client, if it's the

11 legal advice, it's still privileged.

12          THE COURT:  Okay.  Well, thank you.

13          MS. HARTNETT:  Thank you.

14          THE COURT:  Any rebuttal on arguments form

15 Plaintiffs?

16          MR. SAVERI:  Just briefly, your Honor.  I think

17 it's -- I'd make two points.  I think that when Counsel

18 stood up and addressed the issues, there were two important

19 omissions.  Counsel never addressed or disagreed with the

20 fact that there was back and forth with Mr. Dettmers and

21 with his employers, or his superiors, about -- at Meta and

22 Facebook  -- about -- about this.  So that implies to me

23 that there was, at a minimum -- and they could have done

24 that, because they had access to the witnesses that we

25 don't --

22

1          THE COURT:  Well you just asserted that, but
2     there's nothing to show that that's actually the case.
3          MR. SAVERI:  That's absolutely -- well, what we do
4     know is that Dettmers was -- and the communications
5     themselves reflect the fact that there was communication
6     back and forth between Mr. Dettmers and someone at Meta and
7     Facebook.  And there's also a representation in, I think
8     it's Exhibit five to the filing, that Dettmers was part of a
9     group, and this was communication, and he communicated back
10    and forth to the group.  So I think the inability to
11    controvert that statement is telling also.
12         THE COURT:  I mean, sure he communicated with his
13    colleagues.  I would expect that an employee would do that,
14    and he apparently received legal advice.  That doesn't
15    really seem to be disputed.  I think the issue is more, did
16    other people at Facebook know that he was communicating
17    externally in connection with this job.
18         MR. SAVERI:  I think that is an important issue.
19    I think the other issue that has to do with agency is to
20    what extent he was charged as part of his job with the
21    responsibility to go out and negotiate and discuss that,
22    because that also -- that fact also goes to some of the
23    agency issues, either actual authority or apparent
24    authority.  But I agree with your Honor.
25         The other point is, I think there was a question about

23

1  whether Dettmers had some kind of explicit delegation to

2  communicate attorney/client privilege information.  Of

3  course there's not going to be any of --

4           THE COURT:  I agree with you.  It doesn't have to

5  be explicit and it doesn't have to be specific

6  attorney/client information.  It can be implied and its

7  communications, generally.  Obviously, the -- a corporation,

8  unless there were a very unusual situation, wouldn't

9  delegate to a lower-level employee the authority to disclose

10  attorney/client privileged information.  That wouldn't make

11  any sense.

12           MR. SAVERI:  Except in this context, and I guess

13  I'd -- you know, this is not unlike a situation where

14  someone is charged by a company with negotiating a contract

15  or doing some kind of activity like that.  And they

16  encounter in that discussion, at arms length, a counter

17  party.  And in that discussion, there's a discussion of,

18  well, we'd like to do this and can I do that, and then the

19  counter party asks, well, you know, can you do that?  Or can

20  we do this or can we do that?  And in that context,

21  sometimes and frequently so, the first party says, well, I

22  can't do that.  Why not?  They ask.  It's because my

23  attorney told me I can't or I shouldn't.  And when that

24  communication is made, in the context of that discussion,

25  you can't very well say, well, that's still protected.

24

1  Because that -- that communication, that communication of

2  what they got from the lawyer is -- has been -- has been

3  waived.

4          THE COURT:  Well under <u>Vans</u> and <u>Truck Stop</u>, I

5  think --

6          MR. SAVERI:  And that's --

7          THE COURT:  -- the situation you've described, I

8  agree with you about that situation.

9          MR. SAVERI:  And, your Honor, I think that's

10 really what happened here.  And because Mr. Dettmers had

11 this as part of his job, and it -- we don't have a job -- we

12 don't -- we have some representations about a job

13 description, but we've never had an opportunity to talk to

14 any of these individuals -- it was clear that this

15 communication -- while he wasn't charged with, go and

16 disclose our attorney/client communication, he was charged

17 with going out and trying to obtain this information.  And

18 in the context of that, he was armed with information that

19 -- or that he had received from attorneys at the company.

20 When he was allowed, and permitted, and authorized, and

21 instructed to go out and have that communication, and was

22 provided this kind of background, Mr. Dettmers' had the

23 authority in the context of that, because he was charged

24 with that responsibility, to make these communications.  And

25 maybe in retrospect they regret that that had been done, but

25

1  at the time, he had that information, he had it because it
2  was connected to his job, and he went out and exercised his
3  job functions and this was disclosed in a communication with
4  an at lengths counterpart.  And consistent with <u>Truck Stop</u>
5  and <u>Vans</u>, that -- at that moment, in that communication,
6  there was a waiver.

7       And, in fact, with Facebook or Meta had the obligation
8  to do, what they had the obligation to do was to protect
9  that.  And, the fact that he was able to do this without, I
10  guess -- I think the discovery would likely show that they
11  knew he was doing this and they gave him the information for
12  a reason -- but the fact that they never made any efforts to
13  apparently restrict it, to monitor it, to ask him what he
14  said, to monitor his communications, which after all were in
15  a public forum, and not do anything about it, I think all of
16  that objective evidence would lead any objective person --
17  or a reasonable person -- to conclude that he had the
18  authority to do that.  There was no other reason for him to
19  do that.

20       And so, I think when you think about that in that
21  context, we don't need to have, in order to prevail here,
22  someone at Facebook saying, yes, I in fact authorized him to
23  disclose this information.  He was authorized to have the
24  communication.  He was armed with this information.  There
25  was back and forth with lawyers.  And so I think under the

26

1  cases, your Honor, that's sufficient.  And if it's not, if

2  it's not, your Honor, I think we're entitled to actually

3  take the depositions and actually test this, because we

4  haven't had the opportunity to do that in the limited, kind

5  of short form that this has arisen.

6       Thank you.

7            THE COURT:  Well, thank you, Counsel, I appreciate

8  the arguments from both sides.  I will issue a written order

9  resolving the dispute.

10           MR. SAVERI:  Thank you very much, your Honor.

11      (Proceedings adjourned at 9:40 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

27

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16

17        Echo Reporting, Inc., Transcriber

18             Saturday, August 24, 2024

19

20

21

22

23

24

25