UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, District Judge

KADREY, et al., ) No. C 23-03417-VC
)
Plaintiffs, )
)
vs. )
)
META PLATFORMS, INC., )
)
Defendant. )
_____________________________)

San Francisco, California
Friday, September 20, 2024

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 1:03 - 2:00 = 57 MINUTES

APPEARANCES:

For Plaintiffs:

Joseph Saveri Law Firm, LLP
601 California Street
Suite 1000
San Francisco, California 94108
BY: JOSEPH R. SAVERI, ESQ.
CHRISTOPHER K. L. YOUNG, ESQ.

Cafferty Clobes Meriwether & Sprengel LLP
135 South LaSalle Street
Suite 3210
Chicago, Illinois 60603
BY: ALEXANDER J. SWEATMAN, ESQ.

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

For Plaintiffs:

Matthew Butterick, Attorney at Law
1920 Hillhurst Avenue
Unit 406
Los Angeles, California 90027
BY: MATTHEW C. BUTTERICK, ESQ.

DiCello Levitt, LLP
10 North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
BY: NADA DJORDJEVIC, ESQ.

For Defendant:

Cooley, LLP
1333 2nd Street, Suite 400
Santa Monica, California 90401
BY: BOBBY A. GHAJAR, ESQ.

Cooley, LLP
3 Embarcadero Center
20th Floor
San Francisco, California 94111
BY: KATHLEEN R. HARTNETT, ESQ.
JUDD D. LAUTER, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/
Transcriber
echoreporting@yahoo.com

Friday, September 20, 2024 1:03 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: Now calling solo case 23-3417, Kadrey et al. versus Meta Platforms, Inc.

Will counsel please state your appearances for the record, starting with the Plaintiff?

MR. SAVERI: Joseph Saveri for the Plaintiffs.

THE COURT: Hello.

MR. BUTTERICK: Hello. Good afternoon, your Honor. Matthew Butterick for the Kadrey Plaintiffs.

THE COURT: Hi.

MS. DJORDJEVIC: Good afternoon, your Honor. Nada Djordjevic for Ms. TerKeurst.

MR. SWEATMAN: Good afternoon --

THE COURT: Hi.

MR. SWEATMAN: -- Alex Sweatman on behalf of Plaintiffs, Clobes and Diaz, Hwang, Clam, Snyder, Woods and Greer and Coates.

THE COURT: Hello.

MR. GHAJAR: Good afternoon, your Honor --

MS. HARTNETT: This is Kathleen Hartnett for Defendant Meta.

THE COURT: Hi.

MR. GHAJAR: Good afternoon, your Honor. Bobby

Ghajar on behalf of Defendant.

THE COURT: Hi.

MR. LAUTER: Good afternoon, your Honor. Judd Lauter on behalf of Defendant.

THE COURT: Hi.

Okay. Is that everybody? I think that was everybody. Okay. So, let me -- let me start I guess with the Plaintiffs. This case, at least as I understand it, is mostly about -- or maybe entirely about the question of fair use. So, what -- what information, what facts are you trying to gather that you don't have now that is relevant to the question of fair use?

MR. SAVERI: Your Honor, this is Joseph Saveri on behalf of the Plaintiffs. I think that he -- in terms of the fair use defense, there are four elements.

THE COURT: Well -- sorry. Hold on a second. We're getting some echoing from the court reporters. Okay. Thank you.

Sorry.

MR. SAVERI: Is it me, your Honor? I can't tell.

THE COURT: No, it wasn't you. It was the court.

MR. SAVERI: Okay. So, with respect to the fair use defense, there are four elements, right. Well, one -- with respect to -- we don't really know right now whether the Defendants are going to contest all four elements. I

think one of the things I'd like to get some clarity on is whether they are going to in fact contest the second and elements. I think the factual dispute or the legal dispute centers on the first and the fourth element of the fair use defense.

And with respect --

THE COURT: Not really -- they're more factors than elements, right? It's a non-inclusive list to factors that you consider --

MR. SAVERI: Fair enough, your Honor, but there are --

THE COURT: Anyway. Okay. The first and fourth.

MR. SAVERI: -- four, your Honor. And we don't know if the second and third are really at issue here, and whether he need to prepare a response to them. I think that's really what I'm getting at.

So with respect to the first, one question we generally is, which of the -- which databases were pirated, taken? We have an issue that's come up in discovering last week that the case looks to be bigger than we pled.

But with respect the legal and factual issues, okay, there is information that we need to find out about intent. That's one of the factors that -- one of the facts are part of the first factor. Another is evidence that goes to convertiality. That's another factor under one.

THE COURT: Well, can you be a little more -- could you -- sorry. That's all a little bit vague. Could you be a little bit more specific about what is you're trying to find out that you haven't been able to find out about thus far?

MR. SAVERI: Sure, your Honor. With respect --

THE COURT: Right. Because intent -- I mean, they -- commercial use, I mean we know, right, are you talking about the use of the copyrighted works? I thought everybody sort of agreed about the use of the copyrighted works. That they're -- they were available on a database, and that the database was not authorized to make them available.

That Meta acquired them from that database, then Meta fed the stuff from the database into the large language model. And that of course the large language model is for commercial use.

So, I -- to use utter the phrase "commercial use" or intent, I mean, I -- that doesn't help me understand what information --

MR. SAVERI: Okay.

THE COURT: -- you're trying to find that you haven't been able to find and whether it's relevant to the fair use inquiry.

MR. SAVERI: Okay. So let me try to drill down and be granular and specific about that to answer the

(indiscernible). So, for example, one question that has to do with intent. And that evidence of intent includes, among other things, whether Meta knew that the works that they were using for the large language models were pirated. And that despite that or with that information, they nevertheless said, we're going to go forward and take our clients' copyrighted material.

That evidence of intent goes to the first factor, and it's recognized by the Supreme Court in the most recent Andy Warhol case. So it's that evidence of intent on -- another way to think about it is, scienter. That's another way of thinking about the same idea. That's the subject matter.

I think that the information that goes to that comes from -- from what I -- basically two sources. Business records will evidence that, and there's (indiscernible) testimony that will evidence that. Of course those two should be (indiscernible), and one of the things that's important, your Honor --

THE COURT: Well, I'm -- Mr. Saveri is coming in and out for me. Is he coming in and out for everybody else?

MR. SAVERI: -- evidence of intent --

MR. BUTTERICK: Yes, your Honor.

MR. SWEATMAN: Yeah.

THE COURT: Mr. Saveri, you're cutting in and out, unfortunately.

MR. SAVERI: Limited to (indiscernible) --

THE COURT: Mr. Saveri, you're going to have to find a different connection, because you're cutting in and out.

MR. BUTTERICK: Until mister -- your Honor, I can pick up where Mr. Saveri was speaking as far as his first factor, right. I mean, as you mentioned, commercial use, good faith --

MR. SAVERI: Go ahead, Mr. Butterick.

MR. BUTTERICK: Yeah. Under the Harper and Row v. Nation Enterprises, right, good -- fair use presupposes good faith. So as Mr. Saveri was saying, evidence of intent of the actions that were undertaken, how did these datasets arrive in Meta in the first instance?

And then, as he was alluding, transformative use, right, which is the Warhol case and the intended type of use of (indiscernible) material.

THE COURT: Well, transformative use, I mean there's not going to be a dispute about that, is there?

MR. BUTTERICK: Can you elaborate?

THE COURT: I mean, you're not -- you're no longer pursuing a claim that the output from the large language model resembles the -- the works that your clients have protected, are you?

MR. BUTTERICK: That's true. That's not a part of

the infringement claim. The infringement claim focuses on the making of copies at the input stage, at the training stage. And I think there is very much a question of whether that's a transformative use. Obviously, it would not -- cases out there be -- excuse me. I'm pulling it up right here.

The -- yeah, I think there is an open question though about whether this is -- you know, taking all of these works and turning it into sort of copyright sausage in the form of these language models is transformative because it's -- you know, it has nothing to do with the original works. It doesn't add to them. It doesn't critique them. It doesn't add to their value at all.

THE COURT: But do you need any discovery on that? I mean, do we -- we know what -- to use your phrase, turning it into copyright sausage. I mean, we know that your clients works with gazillions of other works, are going in and making this copyright sausage. I mean, do -- is there any discovery that you need to better understand that? And, if so, what is it?

MR. SAVERI: Your Honor --

MR. BUTTERICK: I think that we are -- go ahead, sir.

MR. SAVERI: Your Honor, I'm sorry about my connection. So there are -- there are documents, right?

And just so we're clear about where we are on the documents, the ESI that we've received from the custodians that we received, were entirely chosen by Meta. Under the ESI protocol, which we negotiated, it took some time, but in the first instance Meta gets to choose whose documents were searched. Under that protocol and under that agreement, we have the opportunity now to suggest additional custodians and additional search terms.

THE COURT: And when did you suggest additional custodians?

MR. SAVERI: Several weeks ago, your Honor.

THE COURT: Several weeks ago? When is --

MR. SAVERI: I think -- well, I think it was August 22nd. Your Honor --

THE COURT: -- the discovery cutoff?

MR. SAVERI: I beg your pardon, your Honor?

THE COURT: When is the discovery cutoff?

MR. SAVERI: The discovery cutoff's at the end of this month, your Honor.

THE COURT: So, August 22nd you proposed additional custodians when the discovery cutoff was September 20th?

MR. SAVERI: Yes, your Honor. That's because the substantial --

THE COURT: I'll tell you -- Mr. Saveri, let me

cut you off, okay? I'll tell you why it's because. It's because --

MR. SAVERI: I'm sorry. What, your Honor?

THE COURT: You said, "that's because." I'll tell you why. It's because and your -- whatever team you've assembled, has not been litigating this case as if the December 30 cutoff is a real cutoff. You are not doing your job in this case.

MR. SAVERI: Your Honor --

THE COURT: This is an important case, and the -- you are teed up to get a ruling that I think would be the first ruling on whether this is fair use. And you're not -- you're not doing your job to work the case up.

MR. SAVERI: Your Honor --

THE COURT: You're not -- you have not even come close to moving the ball forward in this case.

MR. SAVERI: Your Honor, if I may?

THE COURT: Yeah.

MR. SAVERI: I think that's 100-percent wrong, your Honor. I think that we had a -- when we agreed and you ordered a not -- the discovery cutoff to end at the end of September, at that time we -- we had -- it was December, and in January and February we propounded discovery requests.

Now, from that point forward, there was a substantial completion deadline which you set, which is in the middle of

July. We -- from that -- from the time we produced -- we propounded the discovery in December, we didn't get any documents from the Defendants until, I believe, if my notes are right, until -- excuse me, until -- until August 9. That's when we got the first (indiscernible) --

THE COURT: Say that -- can you say that one more time? You propounded the --

MR. SAVERI: August 9th, sir. August 9th, your Honor.

THE COURT: You made document requests in December, and you didn't get any documents until August 9th, is that what you said?

MR. SAVERI: It is what I'm saying, your Honor. And then we received subsequent productions. They trickled in August 9th again, August 15th again, August 29th, August 30, August 30 again, September --

THE COURT: So now -- so are --

MR. SAVERI: Excuse me, your Honor. There's more.

THE COURT: I think you -- I think you need to be really careful about the representations that you're making, because I'm -- you know, I'm concerned that what you're saying is not accurate.

MR. SAVERI: Okay.

MS. HARTNETT: Your Honor, we can also (indiscernible) --

MR. SAVERI: Your Honor, I did --

THE COURT: Mr. Saveri -- Mr. Saveri, can you hold on just a second?

MR. SAVERI: Yeah. Absolutely.

THE COURT: I'm concerned that you might be sort of reaching, you know, sanctions territory here in what you're saying.

MR. SAVERI: Well, I --

THE COURT: I want you to -- I want to urge you to be careful.

Ms. Hartnett, go ahead.

MS. HARTNETT: Thank you, your Honor. And I -- my colleague, Mr. Lauter or Mr. Ghajar should also jump in. But we've produced I believe 16,998 documents by July 15th, the substantial completion date, out of approximately 20,000 documents produced to date.

And so that means that several -- there was a productions -- productions were made before July, including in April when we -- we shipped the drive with the dataset that Mr. Saveri was saying he was deprived of, we shipped that in May, May 9th for delivery May 10th.

So I can -- we have provide a more exhaustive list, but the main point here is that we met the substantial completion deadline in July. We made productions before that, and there's been a bit of production since then to

address a couple of issues they had identified about some documents that did not fully reproduce, and some other follow-ups. So --

MR. SAVERI: Your Honor --

MS. HARTNETT: -- that's just wrong.

MR. SAVERI: Your Honor?

THE COURT: Yes.

MR. SAVERI: The dates that I gave you, the two August 9ths, the August 15th, the August 29, the two August 30ths, the two September 10ths, and the one last week were all after the original substantial completion. It is true when --

THE COURT: Hold on a second. But that's not what you said. I believe you, that they may -- other additional documents may have come in after the substantial completion deadline, but that's not what you said. You said that you didn't receive any documents until August something.

MR. SAVERI: Your Honor, if I said that, I did misspoke -- misspeak.

THE COURT: Okay. So we've got a real -- we have a real problem here, right? And here's the problem. It's very -- it clear to me from the papers, from the docket and from talking to the Magistrate Judge, that you have brought this case, and you have not done your job to advance it. It's very clear, okay. And now you're in court making false

representations about the -- when you first received documents in the case. I don't know, maybe you're doing this because I previously sanctioned Meta and its lawyers for discovery abuses. Maybe you're somehow like thinking that you could take advantage of that.

But I assure you, Mr. Saveri, that I'm going to look at every case individually. And it's obvious in this case, that Meta has been litigating the case as if September 30th is an actual discovery cutoff. And you and your team have barely been litigating the case. That's obvious.

And so, here's what I'm going to tell you, all right. And, moreover, this is an important case, right? This is not -- this is not your typical proposed class action. This is an important case. It's an important societal issue. It's important for your clients. It's important for the proposed class members. It's important for society.

And, you know, you and your team appear to have taken on a case that you are either unwilling or unable to litigate properly. And so, I will tell you right now that if this case gets to the class certification stage, I will not certify class represented by this legal team based on -- based on the way you've litigated the case so far.

I think what you need, frankly, is to bring in -- bring in somebody who can help you litigate the case. Who has the resources and the wherewithal to move this case forward.

Somebody like Sussman Godfrey or somebody like that who actually has the ability to take on a complex matter like this and litigate it properly. I think you need to reconstitute your legal team.

And I will tell you, that I -- based on what I've seen so far, there is no way that I will -- that I would grant class certification. There is no way that I would find adequacy of representation based on the representation that I've seen take place thus far, okay.

I feel like I'm in a little bit of a bind here, because -- and I don't know if maybe the Defendants can speak to this. And, you know, the Defendants don't need to convince me that we are here today because the Plaintiffs have failed to move the case forward. I understand that.

But I'm in a little bit of a difficult position because it is such an important case, and, you know, I -- if I deny the motion to extend the discovery cutoff, right, it may be that, you know, I am not going to be able to adjudicate the question that is presented at summary judgment on a proper record, right.

So maybe the answer is, fine, I deny the motion to extend the discovery cutoff, and then I -- if there's no proper record, that's the Plaintiff's fault, and so they lose their case and some other plaintiffs are going to have to bring a case against Meta, right, on this issue. Maybe

that's the answer.

But, you know, I -- you know, courts, district courts have a responsibility to proposed class members, to make sure that their interests are protected. I'm not sure their interests have been protected thus far, and I don't -- I don't know if I'm protecting the interests of the proposed class if I, you know, simply deny the, you know, the motion to extend the cutoff and to alter the case schedule, and then we barrel towards summary judgment on a totally inadequate record.

So, what -- I still don't -- I'm left wondering what I should do, how I should handle this.

MS. HARTNETT: Your Honor, I would be happy to address that. This is Kathleen Hartnett.

THE COURT: Could I -- before you address that, let me ask one question. There's somebody named Christopher Young raising their hand. Is that a member of the legal team?

MR. SAVERI: I believe so. He's one of our team, your Honor, and he's got --

THE COURT: What do mean, you believe so?

MR. SAVERI: He -- I don't know if he -- I can't see whose hands are raised, your Honor.

THE COURT: But Christopher Young is a member of your legal team?

MR. SAVERI: Yes, sir.

THE COURT: Okay. So, Bob, now you can go ahead and let him into the courtroom.

All right. Sorry, Ms. Hartnett.

MS. HARTNETT: Thank you, your Honor. And we appreciate not repeating the points about diligence. I think that in the debate between the parties about that, what may have gotten lost a little bit in translation is the substance, which is that this case will be properly discovered if we have a short extension or just allowance for a few depositions to take place the first week of October.

We've been trying to work that out with Plaintiff's counsel. I think they are delaying fully responding to our proposal until this hearing today, but we basically have been able to, despite these challenges that we've explained in our briefing, complete depositions.

We've had three of the Plaintiff's already taken. We are -- have, I believe four of them set, and three need to be scheduled, too, because of illness shortly before the deposition. Defense depositions have been taking place and are currently. We're preparing our witnesses to complete those within the discovery period or shortly thereafter.

And so, just from my client's perspective, which has truly worked hard and in good faith to try to make the

production that will allow this Court to adjudicate the important you note.

Our strong recommendation would be to make the slight modification to the schedule that will be necessary to allow the depositions to complete. There's been no showing of need for more than the 10 depositions normally allotted, and we are actually willing to forego two Plaintiff depositions to adhere to the, you know, the default allotment and to the schedule.

And then the point you raise about adequacy and class cert, that obviously is an important point that should be addressed in due course. But just from my client's perspective, we'd prefer not to have to re-litigate the whole case, because we have been doing it properly. And notwithstanding some of these challenges, we have produced a record that will allow you to make your decision on a full record.

And so we would respectfully --

THE COURT: What's hard for me -- I guess for me sitting here right now, it's hard for me to know whether that's true or not, right. I mean, I -- that's something that I would have to access. But what happened -- what happens if we -- you know, if I grant the short extension that you're contemplating, we get to summary judgment, and all of the sudden I conclude that there are a bunch of

unanswered questions?

MS. HARTNETT: Well, I do think at that point that you would grant us -- I mean, we believe we'd be -- if there's a deficiency in the record due to Plaintiff's failure to prove its case, then we should win at summary judgment. I don't think this is going to be so below the standard that it's going to be an absence of counsel for the Plaintiffs.

And so, you know, we are -- we are having normal depositions now that we're having them. That we finally kind of got into the mode of actually listening to the schedule and responding to it. We're getting ready for all those. We're all flying around to complete them. And so, I do think the message has gotten through, that this actually has to be litigated as a case.

And so I guess my main point is just that my client's undertaken a lot of time and effort to make sure that we are being responsive. I don't think there's any -- I don't believe, and my colleagues can step in, there are just no massive gaps in information that are going to be in the discovery record. It's all been overblown just to be able to try to get more time to complete depositions they didn't want to take.

MR. YOUNG: Good afternoon, your Honor. Christopher Young for the Plaintiffs. Would you mind if

jump in for a second and just -- just briefly expand upon what Mr. Saveri was kind of gesturing at earlier.

So we do believe that additional discovery is going -- need to be taken. Partially because of the inadequate protection as is. So, the original substantial completion deadline was July 2nd. In accordance with the Professional Guideline Rules in the Northern California, we graciously gave Meta a two-week extension. Since then over 12,000 pages of documentary evidence have been produced.

This case is going to involve a lot of data. We've had 6.6 terabytes of data produced in the last three -- three weeks alone. That stuff will need to be examined by our experts. Our current opening report deadline is October 11th. So it -- but there's a lot of pressure being put on --

THE COURT: Have you hired experts yet?

MR. YOUNG: Yes. We have retained experts. We have disclosed experts consistent with the protective order, your Honor.

We have been thoroughly litigating this case. The production itself is insufficient. We have received a privilege log which does not identify, for example, attorneys, does not identify Bates numbers of the documents that are being redacted. Many of the documents are redacted. And having sat -- having taken a deposition just

three days earlier, your Honor, it does seem that legal advice may become an issue in this case.

So, we will have to tee up -- we potentially may have to tee up a privilege log challenge, your Honor. And we are -- we have -- we have sent letters and we are currently in the process of meeting and conferring about the privilege log.

With respect to the document production itself, there have been serious deficiencies that have been systemic throughout Meta's production. Meta has recently this week committed to rear-viewing all of the redactions in their production because the production has been so deficient. It has seriously inhibited our efforts to take these depositions, because we do not know what is being properly redacted and what needs to be challenged and rear viewed.

MS. HARTNETT: Your Honor, if I may. What -- I mean, with respect, those accusations are unfounded and overblown and inappropriate. They're not supported by what's happening right now. There have been some relatively minor privilege log consistency of redaction issues that we have resolved for the Plaintiffs when they've identified them.

There is no systematic issue with our document production. There's also some Google Docs, NGC Docs that don't print out exactly like you might see on the printout,

but that we've been able to make sure they have the actual underlying data.

So I -- I'm surprised to hear this, especially in light of your Honor's admonitions about accuracy on the record, because that is just untrue. I don't believe any -- we have any indication of any deposition being impaired to date, other than, frankly, the Plaintiff's failure to produce privilege logs for all but two of their -- two of the Plaintiffs. But, again, we're going through this, and I do, I just think there's nothing in the record.

And again, I do seek my colleagues input if I'm overlooking something that will prevent you from making a decision on this record. What they're seeking are just, honestly, quibbling with the small things that happen in any litigation. There's nothing of moment here, and Judge Hixson has promptly resolved each dispute that's been brought to him so far.

We're not sure exactly why they're doing this, but there really is just not an issue here, other than completing these depositions in the next two weeks.

MS. DJORDJEVIC: Your Honor, may I say something?

THE COURT: Sure.

MS. DJORDJEVIC: Thank you. This is Nada Djordjevic for Plaintiff Lisa TerKeurst. I need to point out, my client is in a slightly different position than the

others. Her claims were consolidated into this case in July. Magistrate Judge Hixson has ruled that her responses to everything have been timely, appropriate. We are producing documents in this case. And Meta is aware and Ms. Hartnett is aware that we have -- Plaintiffs generally have raised issues with their production that are still being hashed out. So I don't think it's fair to suggest that anyone is misrepresenting --

THE COURT: Sorry. You said your client joined the case in July?

MS. DJORDJEVIC: Yes, sir.

THE COURT: So, you filed a separate lawsuit in another --

MS. DJORDJEVIC: Separate lawsuit, yes, that was consolidated in July.

THE COURT: Consolidated into this in July of 2024?

MS. DJORDJEVIC: Correct, your Honor.

THE COURT: And was that pursuant to stipulation? How did that happen? I'm not remembering that.

MS. DJORDJEVIC: I believe it was pursuant to stipulation. Months' worth of negotiations were required for that stipulation, but it was pursuant to stipulation, yes.

So I just want to make sure that my client's interest

are -- are, you know, protected. And to the extent that your Honor is considering an extension, I understand that Meta would prefer to only be a week, but given how recently my client has come into the case --

THE COURT: But why would you -- I guess I'm confused. Like why would you stipulate -- if you filed a separate lawsuit on behalf of your client, and it's a -- when did you file the lawsuit?

MS. DJORDJEVIC: So, we filed the lawsuit, I believe in 2023. I wasn't on it yet. Actually, in New York against Bloomberg and Meta. Meta then had that -- the Meta specific portion of that lawsuit transferred over to California.

THE COURT: Okay.

MS. DJORDJEVIC: It was related with this case, but the consolidation did not actually happen until July.

THE COURT: Okay. I mean, if you were --

MS. DJORDJEVIC: But we have not had the same opportunity yet to --

THE COURT: So when it was --

MS. DJORDJEVIC: -- flip as much as we can, but we've not had the same opportunity to push this case (indiscernible).

THE COURT: It is -- it was -- when was the -- your case -- when did your case come here and when was it

related to the --

MS. DJORDJEVIC: I believe it was related on July 7th. Don't quote me on the date --

THE COURT: Of 2024?

MS. DJORDJEVIC: -- but early July of 2024. Yes, your Honor.

THE COURT: So why would you -- why would you agree to have your case consolidated into this case if there was a discovery deadline two months later in this case?

MS. DJORDJEVIC: I mean, our understanding at the time was the discovery was proceeding as appropriate. The cases were related, I believe, back in January.

MS. HARTNETT: If I may? Their stipulation -- it was well-known that Ms. TerKeurst would be part of this litigation for months before the stipulation actually finally got finalized and filed. It was just a long process for various reasons to negotiate that.

Being the person that's taking Ms. TerKeurst's deposition in Charlotte, she's actually producing thousands of pages throughout this week, which is a major burden to us. We're getting through them. We will get ready to take her deposition, but I'm really unclear on what points are being raised here with respect to Meta's production. There's been nothing in Meta's production that I believe has raised any issue for Ms. TerKeurst.

MR. GHAJAR: And if I could add to that, your Honor. Ms. Djordjevic suggests that her client would like an opportunity to do something differently. As far as we're aware, and I'm speaking on behalf of Meta, the discovery that we received from her lone client is the exact same discovery served by the rest of the Plaintiffs. There's no unique discovery. They have access to all of the same thousands of documents we produced months ago, and presumably, had access to them before the consolidation was finalized.

And so, it seems a bit like window dressing or exaggeration to suggest that Ms. TerKeurst hasn't had an opportunity to conduct discovery. She has. She's decided to file the exact same responses and the exact same requests as the rest of the Plaintiffs. So, I think that that excuse doesn't carry any weight.

I want to go back to the top of hearing, if I may, because I'm --

MS. DJORDJEVIC: Can I respond to your comment first?

THE COURT: No.

MS. DJORDJEVIC: -- before you move on to another point, if that's all right?

THE COURT: No.

MR. GHAJAR: I'd like -- thank you, your Honor.

Your Honor is concerned about having a full record. We've produced document sufficient, more than sufficient to show the way the models -- what's in the models. They've had the training data for months. They've hired experts to examine the training data. They finally got around to sending somebody to our offices to inspect the data. They spent a couple of days in our offices doing that.

Your Honor, this is a case where Plaintiffs will have to show that they have valid copyrights. That they have standing, they own the copyrights, and that their works were in a dataset used by Meta or other -- and other companies. They have all the information they need for that.

In fact, they possess information on their own standing and their own copyrights. So it's been like prying -- prying to get that out of them, but we've gotten it out of them. That's our burden. We're going to have a record on that.

As to fair use your Honor has heard argument from counsel about transformativeness, and, your Honor, they don't need any more discovery on that. It is really trying to nibble around the edges to point fingers as an excuse for their own lack of diligence. They have what they need. The record is fulsome.

There is no additional information that they need from our client in order to proceed with the case. And to either

disprove that theories should be applicable here, or to prove their burdens as Plaintiff to show that they have valid copyrights they own and they have standing to assert them, and that their works were used without permission.

THE COURT: Let me -- I'm trying to think -- I'm trying to think about this practically. And we have -- so the current schedule is, discovery -- fact discovery cutoff, September 30th, right? And then you've got expert discovery. And then there -- we scheduled a hearing on summary judgment as to the named plaintiffs. And when is that hearing supposed to be?

MS. HARTNETT: March.

MR. YOUNG: March, your Honor.

THE COURT: And so then, you know, you'll have a ruling in March or April on that.

And, you know, I suppose ones practical way of dealing with this is to say, look, it's obvious that the Plaintiffs have not diligently pursued the case. It -- we're not going to extend the discovery cutoff, except for maybe the short extension that Ms. Hartnett is talking about, and I can ask more about the details of that proposal in a second. We'll go to summary judgment.

And then, you know, if we, you know, if we get to the point where, you know, that at the summary stage, obviously the Plaintiffs are free to make whatever argument they want

about how they've been prevented from getting information that they need, you know, to fight of a summary judgment motion. Or maybe Meta is right, that I have all the information I need to decide it on summary judgment.

And if I, you know, if I decide it on summary judgment and I deny summary judgment, and I say there needs to be a trial on fair use because there are these -- you know, because there are, you know, factual issues that a jury would need to decide before I could I render a ruling on fair use, then we could have a discussion about whether any additional discovery would need to be done before trial. Because we still have -- we would still have the class certification phase. And, you know, if additional merits, discovery needs to be done during that time, that would be fine. But that would have the benefit of not delaying the, you know, the case schedule in the meantime.

MR. YOUNG: Your Honor, if I may?

THE COURT: Sure.

MR. YOUNG: Your Honor, this -- you know, candidly, this kind of puts us in a difficult position, because we kind of feel like we're in this position because we granted Meta time to complete their discovery, and in our view -- and to give us their privilege log. And in our view, even with that additional time, their production and privilege log has been in our view grossly deficient. And

what we're hearing right now is, we're being put in a very difficult situation where we have to litigate to summary judgment on what we believe is an insufficient record.

You know, just to make the record, when Meta has asked for every extension, we, consistent with Northern District of California Practice Guideline Four, gave them the extensions without any question. Perhaps the error was ours in not raising discovery disputes earlier or --

THE COURT: Definitely the error -- to the extent that you have legitimate discovery disputes, and I have no way of telling whether you do, but to the extent that you do, it was definitely your error in not raising them earlier.

MR. YOUNG: Well, your Honor, you know --

THE COURT: And that's part of -- part of how you have failed to adequately and diligently pursue the case.

MR. YOUNG: Well, your Honor, you know, consistent with this Court's, you know, practice guidelines and (indiscernible) on a conference, we've always tried to resort to court intervention, you know, only as a last resort, your Honor. And, you know, part of the (indiscernible) --

THE COURT: Well, I'm quite confident -- knowing Judge Hixson, I'm quite confident that he said to, and I probably also said to you at the outset of this case, don't

wait until the 11th hour to bring discovery disputes to Judge Hixson. And I know that he feels that way, and I'm sure he's admonished to that effect as well. You don't -- you know, you don't wait until the last minute to bring these discovery disputes to the judge.

And I don't even know if you have any legitimate discovery disputes to be honest with you. You know, it doesn't -- as far as I can tell, this has just been a case -- maybe you -- maybe there's an issue with the privilege log, maybe there's not, I don't really know. But, you know, I can't really -- I mean the first thing out of the mouth of the Plaintiffs was that they hadn't received any documents until August 12th or something like that.

So, you're not, you know, you're not exactly -- you know, your assertion that there's a problem with the privilege is not something that I can accept at face value, let's put it that way.

What I -- here's what I will say. What is -- let me just ask the -- and, sorry, Ms. Djordjevic. You wanted to respond very briefly to something about your case. You said that -- you said that your case came in and was related not in July, but in January, right?

MS. DJORDJEVIC: It was related in January, consolidated in July.

THE COURT: You've had since January to do -- to

move discovery forward with respect to your client, right?

MS. DJORDJEVIC: I don't believe that's the case, your Honor.

THE COURT: Why not?

MS. DJORDJEVIC: Because I don't think any discovery was served on us in this case until after we joined in July. There was discovery from the earlier case that was stayed (indiscernible) --

THE COURT: But what about discovery --

MS. DJORDJEVIC: -- about that.

THE COURT: But are you -- you're complaining that discovery was served on you too late, or that you were -- you were unable to get discovery from them relating to your client?

MS. DJORDJEVIC: I'm not complaining about either. That's why I wanted to respond to Mr. Ghajar. And I apologize. I don't know how he actually pronounces his last name.

THE COURT: Ghajar.

MS. DJORDJEVIC: That I'm not trying to make an excuse what we did or didn't do. I just want to protect my client's interests by saying, to the extent that you are willing to grant an extension, that it be more than the week Meta is doing, just because I need -- again, I'm just putting this on the record to protect my client's own

interests, if nothing else, to allow enough time. A number of disputes have been raised with Magistrate Judge Hixson recently, and he's ruled on them under the current deadline, with the caveat that if your Honor didn't grant an extension, he would look at again at some of them.

I think it would at least be fair, because we contend there are some privilege -- not privilege, remaining issues with the production, privilege, whatnot. Meta says not -- to at least allow enough additional time to let Magistrate Judge Hixson and the parties address those on the merits, because right now there's so little time left, it isn't possible to get you the information that would let you know, were there real disputes.

THE COURT: Ms. Hartnett, what is your -- what is -- Ms. Hartnett, what's your proposal for an extension?

MS. HARTNETT: Well, just on that last point, I -- the only -- I believe the only motion that Judge Hixson deferred on was whether to expand the number of depositions, where the Plaintiffs were seeking a massive expansion, and he said, not under the current case schedule.

Otherwise, he's been resolving other disputes based on the current record. I believe the parties have until seven days after the cutoff to bring those motions, if I'm not mistaken. And so, therefore, there's not an issue with any -- we can resolve those things, and if there's additional

production that needs to be made, that will get resolved. So I don't think that's an issue with the current schedule.

The only issue with the current schedule is that technically (indiscernible) after the 30th of September under the current schedule, unless the parties agree. We have tried to reach agreement on that. And so what we would request is to allow depositions to occur, I would say maybe the first two weeks of October, just to make that we are able to actually complete them. That would be our proposal.

And, also, we did look closely at the schedules, with the eye of keeping the March date on calendar, and we believe the expert deadlines could all probably be advanced one week, giving the parties a little bit more time for opening, rebuttal and reply reports. And that would -- so, moving each of those days a week forward would give us a little more room there to get that done.

So we would say, if anything, two weeks for depositions, not additional fact discovery, just the finishing of depositions, and the one week for those three expert deadlines.

MR. GHAJAR: If I could --

THE COURT: Okay.

MR. GHAJAR: Could I -- could I add to my colleague's remarks? It's the depositions, your Honor, the reason we're in this situation is some of the Plaintiffs are

not available during the discovery cutoff. So it's to complete the depositions identified, not new depositions.

So, for example, I'm in New York right now. I was to -- I was supposed to take Mr. Coates' deposition today. He fell ill and cancelled the morning of. And I'm -- we're trying to find another date. It may be beyond the discovery cutoff. So that's the type or rescheduling we're talking about.

The same thing happened with Ms. Silverman, scheduled to take her deposition last Friday. The day before she fell ill. The only dates offered to us are after discovery cutoff. So when my colleague, Ms. Hartnett, is talking about additional time for depositions, we want to make clear it's for the depositions that have been noticed, not a new swath of them.

MS. HARTNETT: Correct.

THE COURT: Okay. So here's what I'm going to do. For now, I'm going to -- I'm going to extend the discovery -- fact discovery cutoff by 14 days for the purpose of taking depositions that couldn't be scheduled before the discovery cutoff.

I will extend the expert -- what is it, the expert disclosure and rebuttal expert disclosure dates by seven days. Is that what you're proposing?

MS. HARTNETT: Yes. It's opening, rebuttal and

rely.

MR. SAVERI: Yeah. Your Honor, I -- we have set it up so there's two dates. Each party does it at the same time, and then there's simultaneous rebuttal. So it's those days.

THE COURT: So it seems like you -- the two of you just said inconsistent things. It seems like Ms. Hartnett was saying there's opening and opposition and rebuttal and -- or opening and rebuttal and reply. And you were saying that there was simultaneous opening and simultaneous rebuttal. Which is it?

MR. SAVERI: I understand it's on the -- the opening opinions would be on the issues that we have the burden of proof.

THE COURT: Okay. Well, what's the answer? Somebody -- this a --

MS. HARTNETT: Yeah. I just pulled this from the scheduling order.

THE COURT: -- this a provable issue. There shouldn't a dispute of fact on this issue.

MR. SAVERI: In any event, your Honor, we're fine with slipping the dates to that interval that we're talking about.

THE COURT: And, Ms. Hartnett, sorry. You said you were just -- you just pulled the deadlines. What is it?

MS. HARTNETT: The case schedule is docket 87. And I'm just trying to make sure I didn't lose something here in translation. One second, please. Docket 87 has -- this is your case schedule that you've entered. It has opening report --

THE COURT: Read it again.

MS. HARTNETT: Yes. Opening reports, October 11th, rebuttal reports, November 8th, reply reports, November 22nd. So we -- for those three deadlines, we would propose moving them a week forward.

THE COURT: I don't see in the -- on the docket on -- I'm sorry, what docket number?

MR. SAVERI: Eighty-five.

MS. HARTNETT: Eighty-seven.

MR. SAVERI: Eighty-seven.

THE COURT: That's funny. I don't see reply reports on there. I see only opening and rebuttal reports on there, at least in the minute entry.

MS. HARTNETT: Yeah. It's in the Exhibit A, the schedule that you so ordered.

THE COURT: Okay. All right. So, anyway, so the deadlines are -- sorry.

MS. HARTNETT: Sorry.

THE COURT: October 11th, November 8th, and what?

MS. HARTNETT: November 22nd.

THE COURT: So you're saying move each of those dates back by seven days?

MS. HARTNETT: Yeah. Although for the 22nd one, if you do that, it may be better to make that December -- sorry, December 2nd, because seven days would be --

THE COURT: The holiday?

MS. HARTNETT: Yeah, but we get the day after Thanksgiving.

THE COURT: Okay. That's -- so, I going to -- I will move those dates as you have proposed. Those dates will be moved as you've proposed.

And I -- you know, you heard what I said about adequacy of representation. That's relevant at the class certification stage, but it -- you know, if -- I will say that if I -- if, you know, Mr. Saveri, if you come in with a newly constituted team and can articulate clearly what it is you're missing that is critical for the resolution of the fair use issue, and you want to file a renewed request for an extension of time, I'll consider it. But it has to make -- it has to make very clear, you know, sort of what's missing that is important to the resolution of the fair use issue at summary judgment.

But I'm not -- I have no confidence in the team that exists right now to justify pushing this back and doing a ton more discovery. So I'm -- if you want to file a renewed

motion, it has to be with a newly-constituted legal team.

MR. SAVERI: Okay. Your Honor, thank you. I do take your criticism seriously, and I'm confident that I'll -- we'll be able to address it. But the proof of the pudding's in the eating. And so, I hear you, your Honor, 100-percent.

THE COURT: Okay. But if when you say I'm confident we'll be able to address it, if what you're saying is that I'm confident we'll be able to convince you --

MR. SAVERI: No, your Honor.

THE COURT: -- of adequacy of representation --

MR. SAVERI: Yes, yes --

THE COURT: -- at the last stage with this team?

MR. SAVERI: Yeah. Yes.

THE COURT: I would not feel --

MR. SAVERI: Not necessary with this team, your Honor.

THE COURT: -- I would not feel confident with that. Yeah. Okay.

MR. SAVERI: I hear you loud and clear. The most important thing to me that you said -- well, I wouldn't rank it, but the criticism of the work we've done I take very seriously. And I -- and the only way I'm going to be able to prove that is to demonstrate it to you. And I'm not going to try to tell you that, I aim to prove that to you.

And so, I hear on you that, your Honor. That's -- that's all I would say on that point.

THE COURT: Okay.

MR. SAVERI: Can I ask -- your Honor, can I ask a question about the summary judgment?

THE COURT: Yeah.

MR. SAVERI: So, it's not clear to me based on the discovery that's been taken from some of the Plaintiffs, exactly what the parameters of the summary judgment motion are going to be.

Is it the case that it's limited to the fair use defense, or is there more? And we -- if there's more, we would like to know it now.

THE COURT: It seems like in the interest of sort of moving this case along efficiently and making sure that it's adjudicated properly, it would be nice to hear from the Defendants about what I'm going to have to be dealing with at summary judgment --

MR. GHAJAR: Sure, I'll (indiscernible) it.

THE COURT: -- to the extent that -- to the extent that you're able to do so.

MR. GHAJAR: Yeah, exactly. To the extent I'm able to do so, I can preview at least one issue, and there may be others. And the others are subject to further investigation and deliberations with my team -- the team and

the client.

But one of the issues I previewed earlier in the call is one of standing. Your Honor, just to file a case for copyright infringement, Plaintiffs need to own the copyrights, they need the right to sue on the copyrights. And we believe that that could be an issue with the Plaintiffs here. I'd rather not get into any more detail, but there would be a standing issue that is potentially easily addressed on summary judgment.

And I would reiterate for the Court that it has nothing to do with the discovery Plaintiffs seek from Meta, and everything to do with the discovery we have sought from Plaintiffs.

MR. SAVERI: Your Honor, if I may. I -- if there is a standing issue, I do agree with Mr. Ghajar that that's -- that doesn't require discovery from the other side. That's about what our -- whether our Plaintiffs have copyright protected work and whether they own it.

If there's more, I don't -- and especially if we're proceeding on this kind of advanced schedule, I think it's fair to the Plaintiffs, particularly given where we are in discovery, to be advised what summary judgment motions are intended.

THE COURT: Well, I think that Mr. Ghajar was just -- just going through that, so why don't --

MR. SAVERI: I'm sorry. I thought he was done.

THE COURT: -- you give him a chance --

MR. SAVERI: If there's more, your Honor, I apologize. I thought he was done.

THE COURT: Why don't you give him a chance to finish.

Yeah, go ahead.

MR. GHAJAR: Thank you, your Honor. I -- again, with the caveat that there may be other issues, I'll preview a second issue. This is non-exhaustive, but we believe that these are important potential defects.

The Plaintiffs have alleged to your Honor in the complaint that certain of their works appeared in a dataset, and that Meta used that dataset, so, therefore, there was copying of their works through that dataset in the training of certain large language models.

What we have seen in the context of revising the complaint that was filed with you a couple of weeks ago -- your Honor might have seen there was a corrected second consolidated, amended complaint, is that at least one of the Plaintiffs sought to remove works from that complaint. Perhaps we haven't had a chance to exhaust discovery on this. Perhaps based on a realization, your Honor, that those works did not appear in the accused dataset.

And so I don't think it's groundbreaking to observe

that if a dataset was used that does not contain works that are asserted in the complaint, they cannot form the basis of a copyright infringement claim. So that is another issue on which we may --

THE COURT: All of that stuff -- I mean, all that stuff is going to be -- I mean, that's-- that's plaintiff by plaintiff -- that's going to be a plaintiff-by-plaintiff thing and a work-by-work thing. It sounds like it's not necessarily something that might be dispositive of the entire case, is that right?

MR. GHAJAR: No, but appropriate for --

THE COURT: Yeah, yeah.

MR. GHAJAR: -- partial (indiscernible) judgment.

THE COURT: Yes.

MR. GHAJAR: Yes, your Honor. Yes.

THE COURT: Okay.

MR. SAVERI: And, your Honor, I guess my request is, to the extent that there are summary judgments that are planned or intended, consistent with what we've done in other cases, if we're on this kind of track, for the Defendants to advise us sooner rather than late. We -- instead of playing hide the ball.

I don't -- we propounded discovery on that. We don't know the answer. I thought this would be a good opportunity to raise it. And so I --

THE COURT: Yeah, I know, but you keep -- and then you keep interrupting him as he's talking. So I don't --

MR. SAVERI: I'm sorry, your Honor. I thought he was done. I apologize again.

MR. GHAJAR: Well, I actually was done, your Honor. But they have not asked -- I'm not aware of a discovery request asking us to identify all bases you're considering for summary judgment.

MR. SAVERI: Okay. All right.

THE COURT: Yeah. I'm not sure that would be an appropriate --

MR. SAVERI: We'll -- we'll take that up, your Honor. I'm not going to debate what -- where we are on that.

THE COURT: I'm not -- I'm not sure it's appropriate to make a discovery request about all summary bases you may be considering, but I do think that in the interest of efficiency and moving this case along, and with -- consistent with the position that Meta has taken in its papers, it would be -- it would be very helpful to the Judge and the Magistrate Judge, as well as the parties involved, to identify the issues that we need to get -- be getting ready to deal with at summary judgment.

MR. GHAJAR: Understood, your Honor. Hopefully --

THE COURT: Okay.

MR. GHAJAR: -- hopefully the additional background I gave today was relevant and responsive. We wouldn't normally have --

THE COURT: Yeah.

MR. GHAJAR: -- gotten into that detail this far before summary judgment, but I wanted to be --

THE COURT: Right.

MR. GHAJAR: -- responsive to your Honor.

MR. SAVERI: Your Honor, I have one more issue I want to raise.

THE COURT: Okay. Make it quick because we have a number of parties waiting to --

MR. SAVERI: And I -- so, your Honor, part of our discoveries indicated that the piracy and the copying is limited to the database that we have in our complaint. So we're contemplating an amendment, and we'd like to do that soon. And that's based in part of depositions this week. I don't want anybody to be surprised by it. If -- maybe we just make that motion as soon as we can and take it up, but I certainly wanted to advise everybody about that.

THE COURT: And you're saying the copying isn't limited to the accused databases as it's been referred to?

MR. SAVERI: Yes.

THE COURT: Meaning copying of your -- of the works of your clients?

MR. SAVERI: Yes, your Honor.

THE COURT: And I'm curious. Like is -- would it matter? Like if they -- if they happen to acquire your client's works from two different databases and fed them into the large language model, versus acquiring your client's work from one database and feeding it into the large language model, would that make any difference in the fair use analysis?

MR. SAVERI: Yes, your Honor, in a couple ways. I think the multiplicity of that goes to issues like intent and scienter. Also, this is a statutory damages case, so it would change the arithmetic. And so, those are just two ways off the top of my head.

With respect to fair use, your Honor, probably not, to be fair. I mean, because the -- but I haven't thought that through entirely, but if that's the --

THE COURT: Why did it -- why would it need -- the other question that pops into my mind is, why does it need an amended complaint? I mean, if -- you know, there -- you know, it seems to me that that you have a complaint that alleges, you know, that they have -- you know, they've acquired -- you know, there's these -- unauthorized database that has your client's works. They acquired that. They fed it into the language model. They didn't have permission to do that. It's copyright infringement. Whether it's one or

two, it's not obvious to me why that needs an amendment to the complaint. Maybe it does. I'm just saying that I'm -- it's not obvious to me.

MR. YOUNG: Your Honor, if I may? I think it does go into the fair use analysis, particularly with respect to fair use factors one, which deals with elements of good faith, willfulness. If you're caught being illegal works multiple times, that goes to willfulness. That will need discovery.

But it also goes to factor three, substantial -- substantiality of the works. If you're including the same work multiples times willfully and intentionally, I think that goes straight to that fair use factor, your Honor. And also commerciality, your Honor. If you are including more datasets to make your product more profitable, that seems to me to do directly towards the commerciality, which is another fair use (indiscernible).

THE COURT: Okay. Well, I just don't think -- that's fine. I mean, I just wanted to ask some initial questions about that and share my initial reaction to that, to the extent it's helpful. You have to take my questions and comments on that with a grain of salt because I've never thought about it before, but I thought that would be useful. But obviously we're not resolving that issue here today.

MR. SAVERI: And I just -- I'm -- I appreciate

that. We're not -- we wanted to raise it. We didn't anybody to be surprised. We have to consider that.

THE COURT: Okay. All right. Thank you very much.

MR. YOUNG: Thank you, your Honor.

MS. HARTNETT: Thank you.

(Proceedings adjourned at 2:00 p.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Wednesday, September 25, 2024