

November 8, 2024

*E-Filed*

The Honorable Thomas S. Hixson
United States District Court for the Northern District of California
San Francisco Courthouse, Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Re:   *Kadrey, et al v. Meta Platforms, Inc.*; Case No. 3:23-cv-03417-VC

Dear Magistrate Judge Hixson:

      Plaintiffs in the above-captioned action ("Plaintiffs") submit this letter brief addressing issues concerning the adequacy of Defendant Meta's ("Meta") amended privilege logs and Meta's assertions of attorney-client privilege and work product.  As explained further in Plaintiffs' accompanying Administrative Motion, the parties were unable to reach agreement on a process for joint filing of this letter brief.

      <u>/s/ *Maxwell V. Pritt*</u>
      Maxwell V. Pritt
      Boies Schiller Flexner, LLP
      *Attorneys for Plaintiffs*

**Plaintiffs' Position**

Meta has a privilege problem: it has improperly redacted and is withholding *hundreds* of documents as attorney-client privileged and as work product that, in reality, are neither. The issues are both procedural and substantive. Procedurally, Meta's privilege logs are deficient. Plaintiffs have spent the past two months seeking from Meta sufficiently detailed privilege logs to allow Plaintiffs to assess whether any privilege applies. While Meta has made partial corrections to the logs, there are still significant unresolved issues, including many log entries reflecting "legal" communications between and among purely non-lawyers where the attorney providing the "advice" is not identified. Substantively, Meta's productions are littered with inconsistent redactions for duplicate documents; redactions that are unsupported, or, at minimum, improperly vague given the surrounding context; and redactions of purely business documents, or, alternatively, redactions that shroud attorney involvement in known, ongoing violations of law, as evidenced by Meta's documents.

The importance of Meta's unsubstantiated privilege assertions—and overall blanketing of its basic business operations in privilege—is profound. For some business custodians, Meta is withholding more documents than it has produced. For example, Mike Clark only appears on just 160 documents in Meta's productions, yet he is the custodian of 155 documents on Meta's "Non-Email" privilege log alone, and he also appears in 90 emails on Meta's "Email" privilege log as the custodian, sender, or recipient. Mike Clark is an engineer and Director of Product Management, not a lawyer.[1] Similarly, Meta has produced 353 custodial files for Joelle Pineau, only 53 of which are emails, Workplace chats, or WhatsApp messages. However, Joelle Pineau is the custodian of 44 documents on Meta's "Non-Email" privilege log and appears in 56 emails on Meta's "Email" privilege log in the Custodian, To, or From fields. Joelle Pineau, similarly, is a research scientist and not a lawyer.[2] The number and extent of issues warrants Court intervention.

I. **Background on Meet-and-Confer Efforts**

Meta served its initial privilege log ("Log") to Plaintiffs on August 30, 2024. Plaintiffs sent Meta a letter on September 18, 2024 identifying several categories of pervasive deficiencies. Pritt Decl., Ex. A.[3] The parties met and conferred ("M&C") on September 24, 2024, and Meta agreed to amend the Log to cure the deficiencies. Meta served amended privilege logs (the "Email Log" and the "Non-Email Log," and together the "Amended Logs") on October 7, 2024, which still contained many of the same deficiencies across hundreds of entries. Exs. E, F. Plaintiffs sent Meta a second deficiency letter on October 23, 2024 (the "October Letter"), further detailing continued deficiencies in the Amended Logs and asking Meta to correct the deficiencies by October 25, 2024. Ex. B. Instead, Meta sent Plaintiffs a letter on November 1, 2024 (the "November Letter") promising to provide, at some unspecified time, some additional information and limited further amendments to its privilege logs. Ex. C. But Meta also refused to make other amendments and sidestepped some of the issues Plaintiffs raised in their October Letter entirely. *Id*.

Plaintiffs engaged in extensive negotiations with Meta trying to reach agreement on the briefing schedule for this letter brief. Those negotiations included offers of expanded page limits

---

[1] Ex. W (disclosing Clark as Director, Product Management).
[2] Ex. W (disclosing Pineau as VP, AI Research).
[3] Unless otherwise noted, all exhibit citations are to the accompanying declaration of Maxwell V. Pritt.

and sequential, rather than joint, briefing, in light of the extensive set of issues to be addressed and the time left for discovery. Unfortunately, the parties were not able to reach an agreement. As explained in Plaintiffs' accompanying Administrative Motion, Plaintiffs are filing this brief unilaterally because they have no other choice. Plaintiffs continue to believe Meta should have an opportunity to respond to this brief with sufficient preparation time. Plaintiffs therefore request that the Court set a November 14, 2024 deadline for Meta to file a 10-page opposition, with a deadline of November 18, 2024, at 9 A.M. P.T. for Plaintiffs to file a 5-page reply.

Plaintiffs further request that the Court order Meta to address the issues Meta said it would address in its November Letter (but has not yet) and confirm that the parties may still raise disputes over issues that are not yet at impasse. Plaintiffs make this request only because Meta has now taken the position that any issue that is not fully resolved by the "existing written discovery" deadline—even if Meta already said it would consider that issue or has not said the issue is at an impasse—is untimely. Plaintiffs disagree but have no choice but to seek this Court's intervention and guidance now given Meta's position.[4]

## II. Hundreds of Entries in Meta's Amended Logs Suffer from Deficiencies.

It is a basic maxim of privilege law that the privilege is strictly construed, and thus, the requirements for a privilege log are exacting. It "must identify (a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated. The failure to substantiate privilege in a log also may waive the privilege." *Apple Inc. v. Samsung Elecs. Co.*, 306 F.R.D. 234, 237 (N.D. Cal. 2015) (quotations omitted). Meta, as the party asserting privilege, bears the burden of proving the attorney-client privilege applies. *Vasudevan Software, Inc. v. IBM Corp.*, 2011 WL 1599646, at * 1 (N.D. Cal. Apr. 27, 2011). Meta fails to satisfy its burden here.

In their October Letter, Plaintiffs identified numerous categories of procedural deficiencies in Meta's Amended Logs. Ex. B at 2–11. As noted above, Meta represented that it would address some, but not all, of Plaintiff's concerns, and Plaintiffs should not be time-barred from raising any issues with the Court if Meta's promised corrections remain insufficient and an impasse is reached.

Thus, Plaintiffs raise only those procedural issues that Meta did not agree to resolve, and where the parties clearly are at an impasse:

***Failure To Specify the Lawyers Giving Advice***. Meta's Amended Logs contain a column labeled "Legal Source," which Meta says it used to "identify the attorney or attorneys on each document who either provided or were being contacted to provide legal advice." Ex. C at 2. Yet in 367 entries in the Amended Logs, the "Legal Source" is identified only by the general categories of "MPI In-House Legal Counsel" and/or "External Legal Counsel." App. A I. This is insufficient. General references to "counsel" cannot make out a prima facie claim of privilege—attorneys must be identified by name. *See, e.g.*, *Laatz v. Zazzle, Inc.*, 2024 WL 3849348, at *2 (N.D. Cal. Aug. 15, 2024) (prima facie showing requires "identif[ying] the attorney involved").

---

[4] The parties removed "Priv. Logs" from the proposed deadline for "Letter Briefs re: Existing Written Discovery/Priv Logs" in their ultimate agreement while negotiating the stipulation to set the case schedule. *See* Ex. V at 6, 8. The parties filed that stipulation as Dkt. 227 without any reference to a deadline for privilege briefing.

In its November Letter, Meta says it identified the Legal Source simply as "MPI In-House Legal Counsel" "[w]here it was clear from the face of the document that a non-attorney was explaining legal advice received from an unnamed in-house counsel or where the document references or notes a request for legal advice from unnamed in-house counsel." Ex. C at 2. A general reference to some communication with an unnamed in-house counsel is insufficient to meet Meta's burden to withhold documents under the attorney-client privilege. *See Elan Microelectronics Corp. v. Apple, Inc.*, 2011 WL 3443923, at *5–6 (N.D. Cal. Aug. 8, 2011) (privilege logs deficient when they fail to identify attorneys by name).

Meta refuses to investigate further regarding the entries with "MPI In-House Counsel" as the "Legal Source." Because Meta has failed to substantiate its privilege claims, <u>Plaintiffs respectfully request that the Court order Meta to produce those documents identified in the Amended Logs where the only "Legal Source" is "MPI In-House Counsel."</u>

***Business Documents Where the Role of Attorneys Is Neither Apparent Nor Specified***. There are multiple entries in the Amended Logs where it is impossible to tell if or how the identified "Legal Source" interacted with the document, including whether they did so in a legal or non-legal capacity. Without this information, Plaintiffs cannot properly assess Meta's privilege claims and Meta cannot satisfy its burden to establish its privilege claims over those documents.

For example, there are entries where the "Author/From" column identifies external legal counsel by name or email, but the "Legal Source" is "MPI In-House Counsel."[5] In another 147 entries in the Email Log, the persons or entities named in the "Legal Source" column are not included in the "To," "From," "CC," "BCC," or "Custodian" categories; and in 126 entries in the Non-Email Log, there are no attorneys listed in the "Author/From" or "Custodian" columns. App. A II.a, II.b. There are also 63 entries in the Non-Email Log where the people and entities listed in the "Author/From" or "Custodian" columns do not match anyone listed in the "Legal Source" column. App. A II.c.

In their October Letter, Plaintiffs asked Meta to indicate the relationship between the "Legal Source" and the document where that relationship was not apparent, and to fix the other errors/inconsistencies noted. Ex. B at 6. Meta's November Letter does not address this request. Ex. C. <u>Plaintiffs respectfully request that the Court order Meta to amend its privilege log to provide the requested information. For any documents where Meta does not do so, it cannot substantiate its privilege claim as to those documents, and Plaintiffs respectfully request that the Court order Meta to produce those documents.</u>

***Impermissibly Vague Descriptions***. As a related concern, the Amended Logs are rife with descriptions that are too vague to allow Plaintiffs to assess Meta's privilege claims. For example, the Amended Logs include descriptions such as "[d]ocument seeking and containing legal advice concerning open source policy" and "[p]resentation seeking and containing legal advice concerning product release." App. A III. Courts in this District have found that similar descriptions fall far short of the detail needed to assess privilege claims. *See, e.g.*, *LD v. United Behavioral Health*, 2022 WL 4878726, at *6 (N.D. Cal. Oct. 3, 2022) (explaining entries like "[e]mail chain requesting information and reflecting counsel's impressions regarding pricing methodology data" are "uninformative and vague"); *Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 350641, at *3 (N.D. Cal. Feb. 2, 2008) ("A vague declaration that states only that the

---

[5] *See, e.g.*, Ex. E, Non-Email Log Nos. 185, 203.

document 'reflects' an attorney's advice is insufficient to demonstrate that the document should be found privileged.").

Many entries in the Amended Logs also contain descriptions identifying general topics on which "legal advice" was purportedly sought or provided but concern typical business functions, not legal advice. The vast majority of these entries—over 700 of them—list only in-house counsel as a possible "Legal Source." Exs. E, F. As discussed in Section II.A, *infra*, many dual-purpose communications—including those with in-house counsel—are not privileged at all.

<u>Plaintiffs respectfully request that the Court order Meta to amend its Amended Logs to provide sufficiently detailed privilege descriptions. For documents where Meta does not do so, it has failed to substantiate its privilege claim as to those documents, and Plaintiffs respectfully request that the Court order Meta to produce those documents.</u>

### III. Meta Is Withholding Non-Privileged, Business Documents and Communications.

Hundreds of the documents that Meta has withheld as attorney-client privileged are not privileged at all. Meta has asserted privilege over a plethora of documents and communications that concern ordinary business matters. The Court should compel production of these documents to Plaintiffs.

"The purpose of attorney-client privilege is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The privilege is "strictly construed." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002). "It applies only where necessary to achieve its purpose" and "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976). Here, Meta bears the burden to show privilege applies. *See United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010).

### A. Dozens of Meta's documents are not privileged because they reflect business advice.

Meta has redacted or fully withheld hundreds of business documents and communications under the guise of attorney-client privilege, including emails, presentations, and memoranda. These documents—overwhelmingly prepared by research scientists and other non-lawyers—facially fail to demonstrate the criteria for privilege. Communications reflecting both business and legal advice are only privileged if the "primary purpose" of the communication was seeking or rendering legal, as opposed to business, advice. *See In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2022) (nature of test is that "a dual-purpose communication can only have a single 'primary' purpose"). Where a document makes passing references to legal review, or even communicates legal policies within the context of business recommendations, the document is not privileged. *See, e.g.*, *Walker v. AIU Ins. Co.*, 2024 WL 4364149, at *4 (D. Ariz. Oct. 1, 2024) ("summaries of legal activities, such as depositions and initial hearings, do not equate to legal advice"); *Illumina Inc. v. BGI Genomics Co.*, 2021 WL 2662074, at *4 (N.D. Cal. June 29, 2021) (a "businessperson's statement that the company needs to assess legal risk as part of its SWOT analysis is not privileged" and a "slide deck that mentions potential legal risk twice in passing is not how a company asks for legal advice"). Similarly, or alternatively, that Meta embedded its lawyers in the regular business process of reviewing unlawfully-obtained training data does not blanket material portions of the basic documents relevant to this case in privilege.

B. **Documents involving in-house counsel.**

The attorney-client privilege does not protect advice from in-house counsel regarding business matters. *Oracle America, Inc. v. Google, Inc.*, 2011 WL 3794892, at *4 (N.D. Cal. Aug. 26, 2011) (email relaying a business discussion was not protected by attorney-client privilege); *see also Phoenix Techs. Ltd. v. VMware, Inc.*, 195 F. Supp. 3d 1096, 1105 (N.D. Cal. 2016) (dual purpose documents were not protected work product because they served a business purpose independent of litigation). "Corporations may not conduct their business affairs in private simply by staffing a transaction with attorneys." *United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002). In fact, privilege assertions involving in-house counsel "warrant[] heightened scrutiny," beyond the strict construction of privilege generally, because "in-house counsel may act as integral players in a company's business decisions or activities, as well as its legal matters." *Oracle America*, 2011 WL 3794892, at *4.

Meta appears to assert privilege over a plethora of business documents, which contain—at best—mere passing references to legal advice. The Court should order these documents to be produced. Notably, Meta already has voluntarily produced a multitude of business documents that contain detailed discussions of privacy laws and regulatory compliance. *See, e.g.*, Ex. U, Meta_Kadrey_101508 (business presentation with slides discussing the legal risks of training LLMs on various sources of content, including WhatsApp and Messenger). Presumably, these documents were produced because their overall purpose, despite containing *some* discussion of laws, was to advise Meta on business strategy. That said, Meta appears to have withheld or redacted many similar business documents solely because in-house counsel was involved in their production. *See, e.g.*, Exs. R, S, O, T, H, Meta_Kadrey_79062–67; Meta_Kadrey_93927–30.00002; Meta_Kadrey_64494–509.00011; Meta_Kadrey_94284–92; Meta_Kadrey_47085–97.

Here, the Amended Logs suggest that Meta is withholding dozens of nonprivileged business documents as attorney-client privileged. In its November Letter, Meta suggests that Plaintiffs' criticisms of Meta's descriptions "ignores the first part of the description, which recites 'seeking and containing legal advice,'" and ignores that the privilege extends to documents being used to "facilitate" legal advice. Ex. C at 4, 5. But the primary purpose of a communication is not legal advice just because Meta includes that phrase in a log description. *See, e.g.*, *Monroe v. United Air Lines, Inc.*, 1981 WL 96653, at *6 (N.D. Ill. Feb. 9, 1981) ("[Defendant] persists in characterizing every document that finds its way to a lawyer among other distributees as involving a legal problem in a way that triggers the privilege. . . . [I]f information serves a dual purpose, providing both input to lawyers for such legal advice *and* input to non-lawyer management for the policy decision, the privilege does not attach to such information.") (emphasis added).

For example, descriptions like "[d]ocument seeking and containing legal advice concerning copyright, data privacy, and safety issues" are insufficient without more to make the required "clear showing" that the primary purpose of the communication was legal advice— copyright, privacy, and safety issues are often just business concerns. Descriptions that appear multiple steps removed from the provision of legal advice are also insufficient.[6] *See, e.g., Fed.*

---

[6] *See, e.g.*, Ex. E, Non-Email Log No. 168 ("Document providing information for the purpose of facilitating legal advice concerning copyright and data privacy issues"); Ex. F, Email Log Nos. 444 and 445 ("Image providing information for the purpose of facilitating legal advice concerning contract issues"), 757 ("Document providing information for the purpose of facilitating legal advice concerning research review."). *See also id.*, Ex. F, Email Log Nos. 37, 57, 159, 163, 169, 176, 177, 178, 179, 184, 429, 440,

*Trade Comm'n v. Qualcomm Inc.*, 2018 WL 11420853, at *3–4 (N.D. Cal. Mar. 16, 2018) (finding insufficient descriptions such as "'email chain reflecting a request for legal advice' regarding some topic, 'email chain reflecting legal advice' regarding some topic, or 'email chain disclosing a request for legal advice regarding QC business plans,'" and requiring those descriptions "to elaborate on: (1) the subject matter of each individual communication, and (2) the attorneys involved in the communication, and how their involvement renders the communication privileged").

### C. Redacted business documents and communications.

Meta also has produced a plethora of business documents containing redactions. In so doing, Meta warps the "primary purpose" test, applying it to each compartmentalized communication within lengthy business documents without any regard for the overall purpose of the *documents*. The problem with Meta's approach is that "[n]o privilege can attach to . . . any communication that would have been made because of a business purpose." *McCaugherty v. Siffermann*, 132 F.R.D. 234, 238 (N.D. Cal. 1990) (citation omitted). Put differently, Meta cannot argue that ***individual sentences*** here and there within lengthy business documents reflect entirely discrete "legal advice" that does not advance the business purpose of the rest of the document.[7]

For this reason, courts in this District overwhelmingly conduct the "primary purpose" analysis in the context of *entire* documents, particularly where the documents are lengthy presentations with multiple contributors. *See Wisk Aero LLC v. Archer Aviation Inc.*, 2023 WL 2699971, at *4 (N.D. Cal. Mar. 29, 2023) (holding if the "environment in which the purportedly privileged communications . . . occurred" contained "a clear business purpose," redactions for privilege are warranted "only if there is a clear evidentiary predicate for concluding that each communication in question was made primarily for the purpose of generating legal advice") (cleaned up)); *Hynix Semiconductor*, 2008 WL 350641, at *3 (fully rejecting privilege claim over a presentation that discussed "a business plan and strategy," even where that strategy "may have taken into account advice . . . as to [the company's] legal positions"). And the burden of justifying privilege is particularly exacting where a party seeks to redact small portions of business documents. *See, e.g.*, *Wisk Aero*, 2023 WL 2699971 at *6 (rejecting attempt to redact two slides of a presentation because a review of the "entire" presentation showed that the redacted material merely "effectuate[d]" the business purpose).

Plaintiffs note the following egregious examples of privilege redactions within Meta's business documents:[8]

- **Exhibit N, Meta_Kadrey_55255.** This presentation is a business document discussing the establishment of an integrated workstream for the Llama4 model containing

---

460, 523, 565, 566, 567, 569, 570, 571, 589, 590, 591, 603, 604, 721, 742, 722, 734, 749, 753, 756, 759, 761, 767; Non-Email Log Nos. 58, 59, 60, 168, 171, 172, 215, 316, 330, 340, 414.

[7] For example, in the October 2022 conversation referenced below, one employee suggested training Llama on the pirated LibGen dataset. Ex. Q, Meta_Kadrey_74729–31 at 74729–30. There is a redacted response thereafter. Another employee then responded saying she "do[es]n't think [Meta] should use pirated material." *Id.* at 74730. Based on the context, the redacted message is part and parcel of a business discussion.

[8] There are dozens of additional examples of improperly redacted business documents. Plaintiffs submit a subset of these documents for judicial efficiency and to obtain representative rulings that can be applied to other, similar documents.

- comment bubbles from at least five different Meta employees. Only two of the comment bubbles are redacted. It is entirely unclear why these two comments—both authored by research scientists—are redacted. Although the "Scope" of one redacted comment is listed as "legal mitigations and responsible data collections," this is not enough. Ex. N at Meta_Kadrey_55263.00005. Other comments on the exact same page are described as "Scope: legally compliant," but those comments were not redacted for privilege. The mere use of the word "legal," written by a non-lawyer in a comment bubble of a business document, is plainly insufficient to assert privilege.
- **Exhibit I, Meta_Kadrey_51427.** This document, also prepared by a coalition of non-attorneys and plainly for a business purpose, contains redactions each time "safety mitigations" are discussed. It is unclear why a rote recitation of "safety mitigations" would be attorney-client privileged, particularly when the author of those sections of the document is unclear.
- **Exhibit S, Meta_Kadrey_93927.** This document contains partial redactions in response to a question that asks specifically about the "business risk" of releasing an LLM. There is no indication that these statements were ever made to or by an attorney, and even if they were, a response to a question about "business risk" is the quintessential non-privileged communication.
- **Exhibit O, Meta_Kadrey_64494.** This document contains two comments on a heading about how Stable Signature, Meta's AI watermarking process, works. The first comment is entirely redacted. The second, responsive comment tags a Meta research scientist and is unredacted. It is implausible that a research scientist can give a non-privileged answer to an (apparently) privileged question. In all likelihood, the question itself is not privileged and should not be redacted.

### D. Request for *in camera* review.

Plaintiffs respectfully request that the Court conduct an *in camera* review of a sampling of documents that Plaintiffs believe were improperly redacted as privileged because they are business documents or communications and do not satisfy the primary purpose test. App. B I. Plaintiffs further respectfully request that the Court order Meta to produce those documents without redaction and to review its remaining logged documents for other documents similarly withheld or redacted, and to produce them without redaction.

### IV. Alternatively, Dozens of Meta's Documents Are Subject to the Crime-Fraud Exception.

Even if Meta could satisfy the primary purpose test for business documents or communications (which it cannot), those documents nonetheless must be produced under the crime-fraud exception as communications with counsel in furtherance of copyright infringement. The attorney-client privilege is not absolute. *See Clark v. United States*, 289 U.S. 1, 15 (1933) ("The privilege takes flight if the relation is abused."). Attorney-client communications lose protection "when the client consults the attorney to further the commission of a crime or fraud." *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996). In the Ninth Circuit, a party can invoke the crime-fraud exception if it shows (1) that "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme" and (2) that the communications are "in furtherance of" and "sufficiently related to" the illegality. *Id.* at 380–81 (citations omitted). Courts in this Circuit have routinely applied the exception even in

cases where no crime or fraud is directly alleged in Plaintiffs' claims. *See, e.g.*, *In re Animation Workers Antitrust Litig.*, 2016 WL 8198907, at *3 (N.D. Cal. Mar. 23, 2016) (applying the crime-fraud exception to a civil antitrust claim); *Lewis v. Delta Air Lines, Inc.*, No. 2:14-cv-01683, 2015 WL 9460124, at *4 (D. Nev. Dec. 23, 2015) (same to a Title VII employment discrimination claim).

"To invoke the crime-fraud exception successfully, the [party attempting to pierce the privilege] has the burden of making a *prima facie* showing that the communications were in furtherance of an intended or present illegality and that there is some relationship between the communications and the illegality." *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir. 1996). "[T]he crime-fraud exception does not require a *completed* crime or fraud but only that the client have consulted the attorney in an *effort* to complete one." *In re Grand Jury*, 87 F.3d at 381 (citing *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984) (holding that the "assumption that the [crime-fraud] exception applies only if the seeker of the documents proves that a crime (or fraud) has actually taken place is doubly defective. The crime or fraud need not have occurred for the exception to be applicable; it need only have been the objective of the client's communication.")). The test for crime-fraud therefore is a lower bar than that for an underlying claim: it asks only whether there is "reasonable cause to believe that the attorney's services were utilized . . . in furtherance of the ongoing unlawful scheme." *In re Grand Jury*, 87 F.3d at 381 (quotations omitted). And the standard for *in camera* review is even lower. It requires only "a minimal showing that the crime-fraud exception could apply." *United States v. Christensen*, 828 F.3d 763, 800 (9th Cir. 2015) (citation omitted).

Further, the application of the crime-fraud exception does not require that the attorney intends for the crime to go through; in fact, the attorney need not even be aware that his "advice may further an illegal purpose." *United States v. Laurins*, 857 F.2d 529, 540 (9th Cir. 1988) (citing *United States v. Hodge & Zweig*, 548 F.2d 1347, 1354 (9th Cir. 1977)). The client's intent to violate the law and reliance on counsel in furtherance of the violation are sufficient to break the privilege. *See In re Grand Jury*, 87 F.3d at 381.[9]

### A. Meta was engaged in or planning a scheme to infringe copyrighted works for use in its LLM.

Meta knowingly infringed Plaintiffs' copyrights—a fact that even Meta cannot meaningfully dispute. First, Meta knew the contents of the pirated datasets included copyrighted works. On October 19, 2022, Eleonora Presani, Program Manager for Responsible AI at Meta, acknowledged that "LibGen and SciHub . . . are illegal pirated websites" and pushed back against using them to train Llama. Ex. Q, Meta_Kadrey_74729–31 at 74730. Guillaume Lample, a former AI Research Scientist at Meta, disagreed, arguing other AI companies were "using lib-gen." *Id.* Ms. Presani continued to push back: "I mean everyone is doing a lot of things, it doesn't mean it's the right thing to do, that's pirated material." *Id.* Xavier Martinet, a Research Engineer in Generative AI at Meta, however, argued that Meta nonetheless should use the pirated material in

---

[9] Meta's fair use defense is not relevant to the crime-fraud inquiry. Meta made a business determination to pursue what it believed was copyright infringement. *See In re Grand Jury*, 87 F.3d at 381. Its argument that this could constitute fair use after the fact cannot negate a prima facie showing of crime-fraud. If the mere fact that Meta raised an affirmative defense to Plaintiffs' copyright infringement claim were sufficient to defeat the crime-fraud exception, then the exception would be overwhelmed. Any abuse of the attorney-client relationship could be concealed by the raising of an affirmative defense.

the interest of time: "[T]o make it happen and not let[] the bad guys win, we need to make a case - fast - and cut some corners here and there." *Id.*

Second, Meta knowingly copied the pirated, copyrighted datasets for training, notwithstanding employees' acknowledgment of its illegality. On October 11, 2022, Jacob Xu, a Software Engineer at Meta, wrote: "books3 is included in the pile, so I took it for free~." Ex. L, Meta_Kadrey_54894–95 at 54894; *see also* Ex. M, Meta_Kadrey_54898–54900 at 54898 (Melanie Kambadur, the Senior Manager of the Llama LLM Research Team, confirming Meta "used the Books data set in Llama 2"). Additionally, Nikolay Bashlykov, a Research Engineer on the Llama Research team at Meta AI, described his plan to scrape book catalogs from the Springer and Pearson websites, but then opted to download from LibGen to avoid licensing the books. *See* Ex. P, Meta_Kadrey_65244–65314.12 at 65314.09. Mr. Bashlykov asked whether he "should we use some vpn" to conceal who was initiating the downloads; and he said that seeding torrents, which would entail sharing the content outside of Meta, "could be legally not OK." Ex. P, Meta_Kadrey_65244–65314.12 at 65314.11, 65304.

A New York Times article produced in discovery, entitled "How Tech Giants Cut Corners to Harvest Data for A.I.," provided an inside look into Meta's attempts to balance costs with a drive to acquire enough data to train Llama, based on recordings of internal meetings that were shared with the newspaper by a Meta employee. Ex. G, Meta_Kadrey_37441–48 at 37446–47. In these internal meetings, Meta employees, including executives, admitted to using copyrighted content, justifying the use because obtaining valid licenses would be too time-consuming and expensive, and because other companies appeared to be doing the same thing. *Id.* "At least two employees raised concerns about using intellectual property and not paying authors and other artists fairly or at all, according to the recordings," but that did not stop Meta from continuing to download and use copyrighted works without a license. *Id.* at 37447–48.

### B. Meta's attorneys were directly involved in the illegal scheme.

Meta repeatedly engaged in-house counsel to bless or otherwise justify the illegal scheme described above. The New York Times article describes significant attorney involvement in Meta's copyright infringement scheme. Ex. G, Meta_Kadrey_37441–48 at 37447–48. The Times explained, "some of the company's business development leaders, engineers and lawyers met nearly daily . . . . [and] talked about how they had summarized books, essays and other works from the internet without permission and discussed sucking up more, even if that meant facing lawsuits." *Id.* at 37447. "One lawyer warned of 'ethical' concerns around taking intellectual property from artists but was met with silence, according to the recordings." *Id.* These recordings of internal meetings make clear that attorneys were not only aware of the fact that Meta was using copyrighted data, but that they were involved in meetings planning how to do so. These conversations with in-house counsel are clearly in furtherance of Meta's copyright violations. *See In re Grand Jury*, 87 F.3d at 382 ("A communication between client and attorney can be 'in furtherance of' the client's criminal conduct . . . even though the communication turns out not to help (and perhaps even to hinder) the client's completion of a crime."). Further, Meta witnesses have testified that Meta's in-house counsel reviewed the data—the pirated copyrighted works—that Meta acquired and used. *See* Ex. D, Kambadur Tr. at 178:14–179:15.

Meta's documents themselves directly reference in-house counsels' knowledge and involvement. For example, in a conversation about Llama's (unsurprising) propensity to reproduce verbatim parts of copyrighted works, Ms. Kambadur reacted, "ah yikes books3 contains

more than i think the lawyers realize." Ex. J, Meta_Kadrey_54433–34 at 54433. Similarly, in a conversation in October 2022, several Meta employees were discussing the use of "pirated material" to train Llama. Ex. Q, Meta_Kadrey_74729–31 at 74729–30. Ms. Zhang said, "[o]ur lawyers really need to look into fair use claims for research." *Id.* at 74730. Asking attorneys to justify illegal conduct after the fact, or during the commission of the violation, is precisely the type of conduct the exception seeks to obviate from the protection of the attorney-client privilege. *Cf. In re Abbott Labs.*, 96 F.4th 371, 384–85 (3d Cir. 2024) (holding district court did not err in applying crime-fraud exception despite petitioners' argument that counsel's analysis "of the merits of potential claims against Perrigo and defenses Perrigo might raise" were not in furtherance of the fraud).

In other documents, the context surrounding redactions Meta applied make clear that any purported legal advice was in furtherance of the copyright violations. For example, in the same October 2022 conversation, one employee suggested training Llama on the LibGen dataset. Ex. Q, Meta_Kadrey_74729–31 at 74729–30. There is a redacted response thereafter. Another employee then responded saying she "do[es]n't think [Meta] should use pirated material." *Id.* at 74730. Based on the context, the redacted message must be advice about the use of the copyrighted dataset, further showing counsel's involvement in the copyright violations. Further, there are redactions on Meta_Kadrey_65314.00011 in response to Mr. Bashlykov's suggestion to conceal Meta's downloading LibGen's data with a VPN, indicating counsel was likely aware of or even involved in this process, as well. Ex. P, Meta_Kadrey_65244–65314.12 at 65314.11.

### C. Request for *in camera* review.

Plaintiffs respectfully request that the Court conduct an in camera review of a sampling of documents Plaintiffs believe are improperly redacted or withheld as privileged because they are subject to the crime-fraud exception. App. B II. Plaintiffs further respectfully request that the Court order Meta to produce those documents without redaction and to review its remaining logged documents for other documents similarly withheld or redacted, and to produce them without redaction (and to order deponents to answer questions for which Meta claimed privilege).

**Appendix A**

The log entries referred to herein are log entries from Meta's Amended Privilege Logs: the Email Privilege Log, attached as Exhibit F, and the Non-Email Privilege Log, attached as Exhibit E.

I. **Source Identified Only by General Category.**

*See* Non-Email Log Nos. 3, 4, 7–17, 23–25, 28, 30, 35, 36, 45, 46, 51, 59–61, 67, 69, 74–79, 81, 85, 87, 91, 93, 114, 115, 117, 118, 120, 121, 125, 126, 128, 131, 136, 142, 154, 158, 160, 163, 165, 166, 169, 172, 173, 176, 178, 181, 182, 184–187, 190, 194, 198, 201, 203, 207–217, 220, 221, 229–231, 234, 236, 238, 240, 242, 244, 245, 250–252, 254, 255, 257, 264, 265, 267, 269–272, 275, 277–279, 281, 282, 286, 288, 290, 291, 293, 294, 302, 309, 311, 314–317, 319, 321, 322, 326–328, 330–333, 335, 337, 339, 341, 342, 345, 346, 349, 354, 357–361, 363–365, 367, 369, 372–377, 380–388, 391–393, 401, 402, 405–407, 410, 412–416, 418–420, 422–425, 428, 429, 431, 434–436, 441, 445–450, 455–458, 461–463, 466 (only "Legal Source" is "MPH In-House Counsel); Nos. 29, 193, 195, 304, 454 (only "Legal Source" is "External Legal Counsel; MPI In-House Legal Counsel"); and Nos. 18, 31, 94, 96, 97, 129, 130, 139, 199, 235, 298, 305, 318, 355, 379, 394 (listing "MPI In-House Legal Counsel" and specific in-house counsel as the "Legal Source"); Email Log Nos. 3, 10, 20, 24, 25, 27, 28, 34, 39, 42, 43, 46, 65, 72, 135, 144, 145, 152, 159, 160, 165, 169, 183, 185, 189, 191, 194, 195, 205, 215, 217, 218, 227, 237, 238, 279, 285, 287, 294, 295, 301, 302, 304, 305, 307, 346, 357, 358, 368, 374, 392, 393, 399, 403, 413, 416, 429, 435, 446, 450, 453, 454, 456, 457, 461, 462, 463, 465, 478, 483, 491, 505, 506, 512, 513, 515, 517, 529, 537, 546, 551, 556, 563, 572, 574, 578, 580, 586, 587, 589, 590, 591, 593, 595, 596, 601, 642, 645, 661, 675, 677, 679, 693, 696, 699, 714, 724, 730, 736, 737, 738, 740, 741, 762, 764 (only "Legal Source" is "MPI In-House Legal Counsel"); Nos. 409, 411, 424, 508, 510, 525, 540, 542 (only "Legal Source" is "External Legal Counsel; MPI In-House Legal Counsel"); Nos. 36, 53, 80, 120, 163, 174, 293, 520, 727 (listing "MPI In-House Legal Counsel" and specific in-house counsel as the "Legal Source").

II. **Source of Legal Advice Not Apparent.**

   a. **Legal Source is Not Reflected in "To," "From," "CC," "BCC," or "Custodian" Columns:**

*See* Email Log Nos. 1–16, 20, 22, 25, 28, 29, 35, 39, 42, 43, 46, 50, 51, 55, 58, 60, 62, 72, 129, 130, 131–143, 145,152, 159, 160, 165, 169, 174, 176–178, 180, 183, 185, 186–188, 190, 191, 194, 195, 205, 215, 217, 218, 227, 237, 238, 279, 285, 287, 293–295, 301, 302, 304, 305, 307, 346, 357, 358, 368, 374, 392, 393, 399, 403, 406, 412, 413, 418, 420, 421, 422, 426, 453, 456, 461, 465, 478, 483, 485, 491, 492, 496, 501, 505, 506, 512, 522, 523, 526, 547, 556, 572, 578, 594, 596, 642, 645, 661, 679, 693, 696, 699, 714, 717, 718, 720, 724, 727, 728, 729, 735, 737, 738, 760, 762, 764.

  **b. No Attorneys are Listed in the "Author/From" or "Custodian" Columns:**

*See* Non-Email Log Nos. 2, 4, 5, 7–9, 27, 28, 37, 44, 45, 57, 58, 59, 69, 74, 75, 77, 78, 84, 87, 96, 112, 118, 121, 126, 135, 144, 154, 168, 169, 173, 177, 182, 183, 190, 191, 192, 193, 197, 198, 200, 202, 204, 207, 208, 209, 210, 211, 213, 216, 220, 222, 235, 238, 247, 249, 250, 263, 264, 267, 271, 278, 281, 286, 319, 329, 334, 337, 338, 339, 341, 342, 344, 346, 34, 348, 350, 351, 355, 356, 357, 358, 364, 365, 367, 371, 373, 374, 376, 378, 379, 380, 381, 383, 391, 392, 396, 402, 403, 404, 406, 407, 408, 410, 412, 413, 414, 415, 418, 423, 425, 426, 428, 429, 436, 441, 443, 444, 445, 449, 454, 455, 456, 457, 458, 459.

  **c. The "Author/From" or "Custodian" columns do not match anyone listed in the "Legal Source" Column:**

*See* Non-Email Log Nos. 1, 3, 12, 25, 26, 29, 30, 36, 40, 41, 42, 46, 56, 67, 70, 76, 89, 94, 97, 109, 110, 140, 143, 155, 166, 184, 194, 203, 224, 225, 227, 231, 232, 244, 258, 259, 260, 261, 262, 265, 273, 276, 291, 294, 296, 300, 303, 322, 323, 324, 325, 326, 327, 345, 360, 363, 388, 390, 419, 422, 438, 439, 465.

### III. Impermissibly Vague Descriptions.

*See* Non-Email Log Nos. 1, 2, 5, 17, 19, 20, 22, 26, 27, 32, 33, 34, 37–44, 47–50, 52–58, 62–66, 68, 70–73, 80, 82–84, 86, 88–90, 92, 95, 98–113, 116, 119, 122–124, 127, 132–135, 137, 138, 140, 141, 143, 144, 146–151, 153 , 155, 156, 159, 164, 167, 168, 170, 171, 174, 175, 177, 179, 180, 183, 188, 189, 191, 192, 196, 197, 200, 204, 205, 218, 219, 222–228, 232, 233, 237, 239, 241, 243, 246–249, 256, 258, 259, 263, 266, 268, 273, 274, 276, 280, 283–285, 287, 289, 295–297, 300, 301, 303, 307, 308, 310, 312, 313, 320, 323–325, 329, 334, 336, 338, 340, 343, 344, 347, 348, 350–353, 356, 362, 366, 368, 370, 371, 378, 389, 395–400, 403, 404, 408, 409, 411, 417, 421, 426, 427, 430, 432, 433, 439, 440, 442–444, 451, 452, 459, 464, 465, 467, 468; Email Log Nos. 1, 16–19, 21–23, 26, 29–33, 35, 37, 40, 50–52, 55–60, 62, 79, 87, 113, 129–134, 136, 140–143, 150, 153–158, 161, 162, 164, 166–168, 170–173, 175–180, 182, 184, 186–188, 190, 406, 407, 412, 417, 419, 420, 421, 422, 425, 426, 427, 430, 431, 432, 438, 439, 440, 441, 442, 443, 445, 446, 455, 458, 459, 460, 471, 473, 485, 492, 496, 501, 511, 522, 523, 526, 527, 530, 532, 533, 534, 535, 538, 543, 544, 547, 553, 564, 565, 566, 567, 568, 569, 570, 571, 588, 594, 602, 603, 605, 606, 607, 611, 618, 627, 639, 640, 715, 716, 717, 718, 719, 720, 721, 722, 723, 725, 728, 729, 731, 735, 733, 742, 743, 744, 746, 748, 749, 750, 752, 753, 755, 756, 757, 758, 759, 760, 761, 766, 767.

**Appendix B**

Plaintiffs request the Court conduct an *in camera* review of the following sampling of documents:

    I. **Redacted Business Documents and Communications.**

Meta_Kadrey_00045251, Meta_Kadrey_00045315, Meta_Kadrey_00047085, Meta_Kadrey_00054415, Meta_Kadrey_00054419, Meta_Kadrey_00054482, Meta_Kadrey_00054654, Meta_Kadrey_00061623, Meta_Kadrey_00064494, Meta_Kadrey_00074344, Meta_Kadrey_00077681, Meta_Kadrey_00077906, Meta_Kadrey_00078073, Meta_Kadrey_00078099, Meta_Kadrey_00079062, Meta_Kadrey_00079787, Meta_Kadrey_00080298, Meta_Kadrey_00081639, Meta_Kadrey_00088838, Meta_Kadrey_00093927.

    II. **Redacted Documents and Communications Subject to the Crime-Fraud Exception.**

Meta_Kadrey_00047085, Meta_Kadrey_00047103, Meta_Kadrey_00048977, Meta_Kadrey_00051427, Meta_Kadrey_00054419, Meta_Kadrey_00054905, Meta_Kadrey_00055255, Meta_Kadrey_00057872, Meta_Kadrey_00061623, Meta_Kadrey_00074729, Meta_Kadrey_00079062, Meta_Kadrey_00080065, Meta_Kadrey_00081124, Meta_Kadrey_00088838, Meta_Kadrey_00089498.