UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

KADREY, et al.,                    )  No. C 23-03417-VC
                                   )
          Plaintiffs,              )
                                   )
vs.                                )
                                   )
META PLATFORMS, INC.,              )
                                   )
          Defendant.               )
_____)

                                   San Francisco, California
                                   Thursday, December 19, 2024

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
         RECORDING 11:00 - 12:34 = 94 MINUTES

APPEARANCES:

For Plaintiffs:
                              Joseph Saveri Law Firm, LLP
                              601 California Street
                              Suite 1505
                              San Francisco, California
                                 94108
                         BY:  MARGAUX POUEYMIROU, ESQ.

                              Boies Schiller Flexner, LLP
                              44 Montgomery Street
                              41st Floor
                              San Francisco, California
                                 94104
                         BY:  MAXWELL V. PRITT, ESQ.


          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

2

For Plaintiffs:
                          Boies Schiller Flexner, LLP
                          1401 New York Avenue, NW
                          Washington, D.C. 20005
                    BY:   JAY SCHUFFENHAUER, ESQ.

For Defendant:
                          Cooley, LLP
                          1333 2nd Street, Suite 400
                          Santa Monica, California 90401
                    BY:   BOBBY A. GHAJAR, ESQ.

                          Cooley, LLP
                          3 Embarcadero Center
                          20th Floor
                          San Francisco, California
                            94111
                    BY:   KATHLEEN R. HARTNETT, ESQ.

                          Cooley, LLP
                          3175 Hanover Street
                          Palo Alto, California 94304
                    BY:   MARK R. WEINSTEIN, ESQ.

                          Cleary Gottlieb Steen &
                            Hamilton, LLP
                          1841 Page Mill Road
                          Suite 250
                          Palo Alto, California 94304
                    BY:   ANGELA DUNNING, ESQ.

Transcribed by:           Echo Reporting, Inc.
                          Contracted Court Reporter/
                          Transcriber
                          echoreporting@yahoo.com

*Echo Reporting, Inc.*

3

<u>Thursday, December 19, 2024</u>                              <u>11:00 a.m.</u>

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  All right, everyone.  We are here in Civil Action 23-3417, Kadrey, et al. versus Meta Platforms, Inc.  The Honorable Thomas S. Hixson presiding.

Counsel, please state your appearances for the record. Let's start with Plaintiffs' counsel.

MR. PRITT (via Zoom):  Thank you and good morning, your Honor.  Maxwell Pritt, Boies Schiller Flexner, along with my colleague Jay Schuffenhauer for the Plaintiffs and the putative Class.

THE COURT:  Good morning.

MS. POUEYMIROU (via Zoom):  Margaux Poueymirou from Joseph Saveri Law Firm on behalf of Plaintiffs and the putative Class.

THE COURT:  Good morning.

MS. POUEYMIROU:  Good morning.

MS. HARTNETT (via Zoom):  Good morning, your Honor.  Kathleen Hartnett from Cooley on behalf of Defendant Meta Platforms.

THE COURT:  Good morning.

MR. GHAJAR (via Zoom):  Good morning, your Honor. Bobbie Ghajar from Cooley, also on behalf of Meta Platforms.

THE COURT:  Good morning.

4

MR. WEINSTEIN (via Zoom):  Good morning, your Honor.  Mark Weinstein, also from Cooley and also here for Defendant Meta Platforms.

THE COURT:  Good morning.

MS. DUNNING (via Zoom):  And good morning, your Honor.  Rounding us out, this is Angela Dunning from Cleary Gottlieb, also on behalf of Defendant Meta.

THE COURT:  Good morning.

We're here today on a number of joint discovery letter briefs.  The ones where I've ordered Meta to submit documents for in camera review, I don't think I need to hear argument about this morning.  The parties have submitted written briefing on that, and I just need to perform the in camera review of the documents.  So, I'd like to talk about the other ones, and we might as well just go in numerical order starting with ECF Number 308, and that's where Plaintiffs are moving to compel on Requests for Production 118 and 119.

With respect to 118, Plaintiffs are moving to compel the data mentioned in Sections 3 and 4.2 of Meta's Llama 2 and the data mentioned in Sections 4.2 and 5.4.3 of Meta's Llama 3 paper.  And to make sure that I understand the request, let me first turn to Plaintiffs' counsel.

When you say Section 3 of Meta's Llama 2 paper, are you including with that -- within that 3.1, 3.2, 3.3 and so on

all the subparts of Section 3?

MS. POUEYMIROU:  Yes, your Honor.  So, what we are including in that is specifically the post-training data that Meta identifies in Section 3, inclusive of those sections where it is attempting to mitigate the outputting of copyrighted material from Llama and used training data sets that comprised copyrighted works, including our Plaintiffs' works to help them in those mitigation strategies.

And, so, in this particular section, they reference supervised fine tuning training data sets.  They re -- they reference annotations and other -- other types of data sets and mitigation strategies that were used to prevent the model from outputting copyrighted books, and we are only asking for those specific post-training data sets which Meta's deponents have testified exist and comprise works that are books contained in the very shadow libraries at issue in this case.

THE COURT:  I see.  You I think stepped to one side of my question, and I was asking just more what is the basic ask, whether your request for everything mentioned in Section 3 included all the subparts of Section 3 and what's the --

MS. POUEYMIROU:  So --

THE COURT:  -- answer to that?

6

MS. POUEYMIROU:  Right.  So, Section 3 is a fine tuning section.  And fine tuning includes different components.  And, so, what I was -- what I was trying to say is that across Section 3, there are references to different types of data that are used specifically for copyright mitigations that would fall within some of the internal subsets.  We're not seeking all of the data that's mentioned in all of these sections.  We're seeking specific data that contained copyrighted books used specifically for copyright mitigations.

So, it is a reference to the different subsections here, but it would not encompass everything that is mentioned across all of these pages.  It would be very very discrete.

THE COURT:  So, if I understand you correctly, the reference to Section 3 includes all of the subsections to Section 3, but you're not literally seeking all of the data referenced in all of the subsections, is that correct?

MS. POUEYMIROU:  Absolutely not.  Absolutely not.  For example, in the fine tuning data where they're talking about -- I can point you to a page.

THE COURT:  What I would find helpful is if you could walk me through the various different portions of the papers that were referred to in the letter brief and tell me specifically what data you're looking for, because the joint

7

discovery letter brief did say the data mentioned in these sections, and then I read through their sections, and they sure referred to a lot of data.  So, I -- one purpose of this hearing is to ask did you really want all of that, and it sounds like the answer might be no.  And, so, if you could walk me through those sections with some precision to help me to understand what you're asking for, I would find that helpful.

MS. POUEYMIROU:  So, I can certainly do that.  I -- I think that it might actually be easier for me to follow up and send something on specific points because RFP 118 seeks documents and communications regarding the attempts and measures by Meta to stop the models from outputting copyrighted material, and there are different ways that Meta has done that.  One is supervised fine tuning where they take copyrighted books and use those copyrighted books to generate prompts and responses to teach the model to not -- to identify what is copyrighted material and when an end user prompts the model to output that material, that the model will learn to say, I can't do that.

And, so, in this entire section, they're going through all of the various different mitigation strategies or data that they're using or approaches they're using and fine tuning.  Fine tuning is a much broader category, but within it there are specific aspects that are just copyright

8

focused, and those are the ones --

THE COURT: Let me ask you a question. The joint discovery letter brief as it exists right now asks for all of the data referred to in these sections, and I'm not going to grant that request as written because it seems like it's an ocean of data, but it also sounds like Plaintiffs are not actually asking for all of that, and let me ask Plaintiffs should I ask the parties to file a supplemental joint discovery letter brief where Plaintiffs identify with precision the particular things that you want from these sections because, as you've indicated, the -- the fine tuning discussions touch on a number of different issues such as whether the response is toxic or other -- things unrelated to copyright.

MS. POUEYMIROU: Right.

THE COURT: And, as I was reading through the papers, I thought I can't believe that Plaintiffs even will want this. So --

MS. POUEYMIROU: Yes.

THE COURT: Okay.

MS. POUEYMIROU: Yes, that --

THE COURT: So --

MS. POUEYMIROU: -- that would be great. I mean, one example is there is a discussion of supervised fine tuning data or human evaluations or annotations. These are

9

different aspects of Section 3, and within that, as you pointed out, you know, there are other mitigations that Meta cares about.  It doesn't want personally identifying information from being outputted from the model.  It doesn't want the model to output obscenity or things that it finds concerning.  That -- that is knowledge we're interested in seeing.

    We are only interested in seeing the post-training data that specifically pertains to copyright, and the deponents to date have testified and the documents are very rich in referencing the fact that there were data sets even coming from Library Genesis, the key shadow library in this case, that were used in this particular moment in time for training specifically with respect to copyright mitigation.  So, I can absolutely follow up and identify what we understand with -- with specificity so that we can narrow it here with respect to the training data that we're looking for.

            THE COURT:  I see.  The close of fact discovery was December 13th.  So, the last day to file motions to compel is tomorrow, December 20th.  Plaintiffs have, however, already filed this motion to compel.  So, you've met that deadline.  I believe that I can ask for supplemental briefing.  Once a dispute is timely filed, I believe I can ask for supplemental briefing even after the

20th if I would find that helpful, provided that the dispute was first raised in a timely fashion.

So, let me first turn to Plaintiffs. And then thank you, Meta, for being patient. I will turn to you in a minute to get your thoughts as well, but let me ask Plaintiffs, when should I set the deadline for a supplemental joint discovery letter brief concerning RFP 118 where Plaintiffs can specify more specifically what exactly you're asking for, and, of course, Meta would have the opportunity to respond?

MS. POUEYMIROU: And, your Honor, I believe that we could file that tomorrow.

THE COURT: And, now, let me turn to Meta. I understand you have legal arguments that none of this should be produced, and I'm not expressing a view either way. Rather, when I looked at the motion to compel and it had this reference to the data referenced in these sections and then I read those sections and saw all the different types of data that are referred to there, this really just seemed like a nonstarter, and I couldn't believe that Plaintiffs wanted any of this or wanted all of this, and now they have confirmed that, in fact, that it is the case. So, I would rather have this dispute be refined and then -- and then in that context, I can evaluate Meta's relevance arguments and other discovery issues like that.

So, let me turn to Meta.  Plaintiffs have proposed a supplemental joint discovery letter brief concerning RFP 118 to be due by tomorrow.  Does that deadline seem workable to Meta?

MS. HARTNETT:  Your Honor, it does not, and thank you for hearing us on this.  They are -- we are currently processing six discovery briefs that they plan to file tomorrow of various -- various sorts, basically seeking to redo a large portion of the discovery in the case, and I can speak to that more if necessary.  It's -- I don't want to get ahead of that in this hearing, and I -- I would respectfully submit on this one.

There isn't actually confusion about what they were seeking.  They were just seeking an overly broad swath of material that is unjustified.  They're clear in their -- I appreciate your -- you know, your reading the papers and your -- your recognizing the issue here, but they were clear in their negotiation with us and as their "compromise" was to actually ask for what they called the data sets in these -- these portions of the meta paper -- of the Llama papers.  There are not specific data sets in these portions.  They're just massive descriptions of various processes, and they never really figured out what they wanted until your Honor helped kind of refine it here today.

So, I -- I think we would just submit that this should

be denied rather than giving them a chance to ask for something specific that they never asked for from us in the meet and confer process, and it is from our perspective just part of a pattern of seeking far more than they're entitled to, including under the plain terms of this RFP.  Just kind of going back to the text of the RFP -- and I'm sure you've done that as well -- it is -- you know, we -- we agreed to conduct a reasonable search and produce documents that were sufficient to show our training data, memorization, mitigations for the Llama models, and we have done that and much more than that.  We've given them code for products incorporating Llama.  We've given them code about post-output filtering.  We've given them documents about our mitigations.  So, I believe we've fully responded, even without any material from these Llama papers, but I think it's -- it's unfair, frankly, for them at this point to take what was a clear but very broad, too broad, request and now try to refine that to something more specific when they don't even know what they want.  Like, they can't point right now to you in the hearing as to what they may want from these sections.

THE COURT:  Well, I appreciate Meta's perspective, but what I have right now is a discovery dispute that is unfocused, and I would like it to be focused so I can issue a thoughtful decision on it, and I think that a supplemental

joint discovery letter brief would -- would help me to do that.  And, so, I am going to ask the parties to file one.

I understand Meta's point that if you have a bunch of other discovery disputes in the works, maybe tomorrow isn't feasible as a deadline.  So, then let me ask an alternative date that Meta would be willing to live with.

MS. HARTNETT:  Let me jut consult with my -- my co-counsel.  I'm assuming early next week would be the best for that.  We have no desire to have this go off long -- I mean, you'll see this as you get the other motions, but this is part of a broader effort to sort of blow open the discovery deadline, but I think Monday or Tuesday would be doable.  It's really just making sure that we don't -- we don't have a jam tomorrow night with the Court.

THE COURT:  Understood.

MS. POUEYMIROU:  If it would help, your Honor, the -- the data -- the post-training data that we're seeking, which we have made very clear to Meta, it is the post-training data that includes our Plaintiffs' works that was used along with the source code they gave us to test memorization and regurgitation, which is the memorization of copyrighted material and the attempts to stop the model from outputting it.

Their deponents in the last two weeks have testified that when trying to teach the Llama model not to out put

14

copyrighted material it was trained on, they have these training data sets, and they store them in a particular place, and in order to understand how the source code Meta has given us now actually functions, we need the data sets that they used.  It is a specific repository, source code repository on memorization, and it is just the copyrighted books data sets that we have been asking for consistently and which Meta has actually made central to their arguments on fair use.

In this particular -- in this particular RFP, one of their claims is this is of ancillary relevance, but when you read their interrogatory response on fair use, they specifically say that part of what makes their Llama models use of this data transformative and fair is that they're able to mitigate from the outputs copyrighted material.

So, they have put the mitigation of copyrighted material central to their fair use defense while then preventing us from seeing the training data sets that contain our Plaintiffs' works.  We already -- we had a deponent a week and a half ago in London say that Library Genesis was used as a training data set for post-training to teach the model not to output copyrighted work.

All we're asking for are those data sets that have been identified by their deponents in the last nine days.  It's a -- it's a very discrete amount of discovery production that

15

we're seeking, and Ms. Hartnett is incorrect.  We actually have been asking for post-training data for months right now.  Post-training data is training data.  This case is about training Llama models.  The -- the distinction that Meta is making between pretraining Llama models and post-training Llama models -- a Llama model is a model that has been pre and post-trained.  And, so, we -- we've actually been seeking this data, and it's relevant data, since the beginning of this case.

MS. POUEYMIROU:  Could I -- could I --

THE COURT:  I -- I understand the Plaintiffs' arguments, and I understand Meta's arguments.  The issue is that the joint discovery letter brief asks for everything referred -- all the data referred to in those sections, and Plaintiffs don't actually want that.  And, so, what I want from the parties is a supplemental joint discovery letter brief in which Plaintiffs present a more focused --

MS. POUEYMIROU:  Absolutely.

THE COURT:  -- request for what they actually want, and then Meta gets a chance to respond to that.  And right now, we're just performing the task of figuring out when this brief should be due.  Meta has proposed December 23rd or 24th.

How about -- what do Plaintiffs think about one of those days as the deadline?

16

MR. PRITT:  I think -- your Honor, this is Maxwell Pritt.  The 23rd would be great, and we could get Meta our portion by say noon tomorrow if that works for you and Meta.

THE COURT:  And does -- and December 23rd I gather works for Meta, is that correct?

MS. HARTNETT:  If we can get the brief by noon tomorrow, and we appreciate that, we would -- could make that work, yes.

THE COURT:  Okay.  Then I will order Plaintiffs to send Meta their half of the joint discovery letter brief by noon tomorrow, and then I'll order the parties to file a supplemental joint discovery letter brief on these issues by December 23rd.

MS. HARTNETT:  Your Honor, just -- not to belabor, I just -- we disagree with a lot of what was just said, but we don't need to argue it here.  I just -- a lot of what was said was not accurate, and I was said to be not accurate, but we can just maybe brief that to you and not -- not have it out right here, if that makes sense.

THE COURT:  I think it would make sense to put additional arguments in the joint discovery letter brief.

MS. HARTNETT:  Thank you.

THE COURT:  I'm not going to rule on the motion to compel here today.

MS. HARTNETT:  I just wanted to be clear for the

17

record that my silence does not mean that I agree with those representations. Thank you.

THE COURT: Okay. Well, thank you for that. Let's turn to RFP 119, and Plaintiffs are moving to compel Meta to produce a bunch of things. One is to produce or identify all copies it made of copyrighted works, which doesn't seem to be limited to Plaintiffs' works, and then to search the custodial files of 15 custodians, plus relevant noncustodial databases which Plaintiffs assert include work email for responsive documents.

And, so, let me ask Plaintiffs, on the first part, are you asking me to order Meta to produce all copies of -- of all -- all copies it made of copy -- produce or identify all copies it made of copyrighted works wholly without regard to whether those copies were used to train the Llama models?

MS. POUEYMIROU: Our -- our position is that Meta has obtained pirated books not only through going on pirated websites to get them but also through its WebCrawler, and we know this because Meta has, to use a technical phrase, deduped its WebCrawler data with its shadow library data. And, so, it is recognized, and we have had deponents testify to this, that material that it has gotten through its WebCrawler mirrors material it had in its shadow libraries, and it had to go through a process of deduping that

18

material.

And, so, what Meta's produced in this case is it's produced a Library Genesis shadow library set.  It's produced a Books 3 shadow library set to us.  But from the discovery that we've gotten in this case, both in documents and in deposition testimony, it is clear to us that Meta has actually been able to source copyrighted material from other places.

And, so, what we want to understand here is -- is where and how and when, what is this material.  So, with respect to the shadow libraries, your Honor, Meta produced a -- they produced a data set on hard drives of Library Genesis to us, and that was dated to November of 2023.  But we know that it downloaded Library Genesis prior to that in October of 20 -- no, November of 2022 and April of 2023, and just a few months ago, in the summertime, it was downloading works out of Library Genesis.

And, so, we don't actually understand how many places and sources it's pooled potentially our Plaintiffs' works from and how many copies it's made of those works.

When our expert went into the source code inspection room of -- of Meta's, which is housed right now at Cooley's office in Palo Alto, they sound something called a relational database, and in that relational database, there was essentially files and files and files of all the books

19

that Meta had pulled out of different shadow libraries, which could have been produced in this case but was not, and so at this stage, we are simply just asking Meta to update either through producing the additional data sets we know it has or just giving us a summary or some sense of additional copies and places in which has obtained copyrighted works that are likely to include our Plaintiff's works because they're in these libraries.

THE COURT:  Well, I don't think this case is about all copyright infringement about everything.  I think it's about training the Llama models, but it sounds like your motion to compel isn't limited to copyrighted materials that were used to train the Llama models.  It's about all copies that Meta has or made.

Is that right?

MS. POUEYMIROU:  So, Llama -- the Llama models were trained on a shadow library called Library Genesis, and we know that, and Meta's produced that -- one version of that library, but we know that it added to that library.  We know that it added works to that library in April of 2024 and through -- and through this past summer because it's in its documents.  But the -- but the actual data set that it produced in this case was dated to November of 2023.  And we also know that it has been sourcing books that contain our Plaintiffs' asserted works most likely from other shadow

20

libraries between April of 2024 throughout this summer because we see it in their documents, but we have not received that data, nor do we have a sense of what that data comprises.  We just know that those shadow libraries likely contain our Plaintiffs' asserted works because they overlap a lot with the Library Genesis data set.

And, so, we -- we are simply just asking for Meta to supplement what it has produced in this case to give us a more fulsome picture of not all copyrighted works that ever exist but specifically, works at issue in this case.

THE COURT:  I see.  And then when you argue that work email is noncustodial, are you asking me to order a company-wide email search?

MS. POUEYMIROU:  So, what we understand and I believe which was confirmed for the first time in early December is that Meta's work email, workplace data, and workplace chats are all on centralized servers at Meta, and -- and I believe what we are -- what we are only asking for is for a search with respect to some very specific topics across those sources.

MR. PRITT:  And, your Honor, if I could just chime in because I've briefed this issue in other letter briefs. It would be limited to Meta's AI employees, and Meta knows who those are.  It's 1,000 or less as they represented to us.  But, you know, having these search terms that they've

provided run against just 15 people, against work email and collaboration tools which are company-wide systems and servers that can all be looked at on the back end and thus, inherently, are not custodial because the custodian does not have the only access to them, by having only 15 custodians in a case like this when you have that many employees who are working on these issues central in this case, that makes the limited documents extraordinarily small.  And, so, respectfully, we would ask, yes, that those do be run against the AI employees who are actually working on the issues central to this case.

THE COURT:  And you would estimate that is that about 1,000 employees do you think?

MR. PRITT:  That is what Meta has represented to us, but Meta has refused to even run the search terms to see what the hit count is.  So, there has been no back and forth because Meta -- you know, right, if we ask them to search and they get back 100, that makes sense.  It's reasonable. It's proportional.  If it comes back with 100,000, we would have had to narrow things, and maybe then have an understanding and address that with custodial discussions and limit it to only individuals within that thousand, but that never took place, unfortunately, in this case because Meta simply refused to do that, and I know they'll come back and say, Well, it was too late.  But now we're talking about

22

only the additional discovery, and we still get to have this discussion with the additional discovery, but they did not want to have that discussion back and forth.

THE COURT:  All right.  Let me turn to Meta for your arguments with respect to RFP 119.

MS. HARTNETT:  Thank you, your Honor.  A lot's been said that is not accurate.  So, I'd like to correct the record and make clear our position here.

First, on the substance, again, this is similar to what we were talking about in the prior one, but different twist on it here.  Their -- their request in the brief to you is crystal clear.  They want to have and they say that we have refused to produce or identify all copies it made of copyrighted works, including Plaintiffs' works, including but not limited to.  And then later in their brief, they want an order for us to "produce or catalog" all copies it made of copyrighted material.  That is their request.  It is not limited to Plaintiffs.  It is not limited to things that were used to train Llama.  So, we understandably objected to this on numerous grounds, including the overbreadth and the irrelevance.

But, moreover, the RFP doesn't even ask for that.  The RFP is about documents about the processing of copyrighted material used in training Llama models, including the storage and deletion.  So, they have a copy of the data sets

that were used to train Llama 1 through Llama 3, which is what they asked for, and we've produced what they've asked for.  And they're now seeking to blow up in discovery again with an overbroad request for all sorts of copies all over the company allegedly, not that those would necessarily exist, but that's what they're asking for.  A lot of the description that you heard about recent testimony is -- is inaccurate but, in any event, does not justify the request.  They don't need this.  There's no relevance.  They have the data sets that they need and have asked for.

And, just moving on to the company-wide nature of the search, that actually would be around 2,000 custodians.  I'm not sure where the 1,000 came from.  And I think I think it's just worth taking a step back here.  We have an ESI order in this case that was negotiated long ago and entered by the Court that is premised on a distinction between custodial discovery and noncustodial.  There were 10 custodians to start for each side.  Your Honor added five more.  We've done that full searching and production from those custodians.

To then say, Oh, your email system and your work chat are actually noncustodial sources based on something allegedly learned now which could have been learned months ago if it hadn't been, would completely annihilate the distinction between custodial and noncustodial discovery.

24

And what we would do, because we do things the right way, if we have 2,000 custodians, we pull -- you would have to pull all that, run the terms, review the -- review and search and actually review the documents.  We can't just assume that there's going to be nothing in there or that we can do some sort of shortcut.

So, it's -- it's a kind of astronomical request.  It's one that never -- there's a way to have proceeded if they wanted this, which was to follow the ASI order, ask us for more custodians, and do some other process.  They didn't do that.  Now they're just trying to transform, you know, noncustodial discovery into custodial discovery.

So, I think that just -- if you add that in with the overbreadth of the request itself that's at issue here, it just shows what an overbroad and unfocused request this is, and that's why, you know, as we explained in our brief, this should be denied, and it's also not depriving them of anything they actually need to litigate this case.  It just, to us, again seems another way to try to perpetuate discovery here where it's unnecessary.

THE COURT:  All right.  Well, thank you.

MR. PRITT:  Your Honor, can we be heard?

THE COURT:  Sure.

MR. PRITT:  Thank you.

In terms of what Ms. Hartnett just said about learned

months ago, I specifically personally have been asking for this and arguing that email with citations is noncustodial, and so is their collaboration tools like Workplace Chat. Since Bois Schiller joined this case and discovery was extended and we served the additional discovery that we are now talking about -- so that has been months ago -- Meta does not need to pull anything.  They confirmed to us a little more than a week ago when we had the meet and confer, after they actually produced documents and we were able to do so under their schedule for meeting and conferring that this can all be done by the back end, that it is, in fact, an administrative capability.  So, all their discovery team needs to do, because they have an internal discovery team, is search, run the search terms.  They don't pull anything.  You just run the search terms and see what the hit count is.  They refuse to even search.

And then I'm sure my colleague has something to say about 119.

MS. HARTNETT:  Actually, just on that specific point, that actually is not -- we did not represent that, and that's not the case.  We would have to actually pull what we would need to do and then run the search terms.  It does not work that way, but it doesn't -- I don't want to interrupt your -- the Defendant -- the Plaintiffs' presentation.

26

THE COURT:  Then let me turn to Plaintiffs' counsel if you wanted to make any additional comments on 119.

MS. POUEYMIROU:  Yeah.  So, I -- I wanted to touch on the CMI stripping issues and the (indiscernible) issues.

MS. HARTNETT:  Your Honor, I would request that we -- that we just had a violation of the protective order, and I would appreciate that the counsel not -- not do that.

MR. PRITT:  Can you be more clear, Ms. Hartnett?

MS. HARTNETT:  There is a redacted brief that contains language that was just referred to by counsel that has not been deemed not subject to the protective order, and I would appreciate counsel respecting the protective order. It's clear in our --

MR. PRITT:  Your Honor --

MS. HARTNETT:  -- brief what --

MR. PRITT:  -- in order to mention basic words, we would have to have this go under seal.

THE COURT:  My understanding is that there is a pending motion before Judge Chhabria on this precise issue. And, so, there isn't an order yet.  I ask that the parties present argument in compliance with the protective order.

MS. HARTNETT:  Yes, your Honor.  And, just to be clear, we recognize that judge Chhabria is making a determination on the Plaintiffs' submission on these points,

27

but until -- unless and until there's been an order removing the seal, we've submitted it under seal, and under the protective order, the parties are to treat it under seal until it's deemed not.

THE COURT:  Okay.  Then let's proceed in that fashion.  If you need to use a synonym or a different word, then please do so.

MS. POUEYMIROU:  Okay.  With respect to -- this RFP is seeking documents and communications regarding the processing of copyrighted material, and the processing of copyrighted material to train Llama models and the storage and deletion of copyrighted material.  And I -- I'm actually -- I'm sorry.  I am not entirely clear what it is that I'm unable to reference right now, Kathleen.

MS. HARTNETT:  It's clear in the brief if you would look at Docket 308, the sealed version.  There is a highlighting where you're not allowed --

MS. POUEYMIROU:  Okay.

MS. HARTNETT:  -- to use certain terms.

MS. POUEYMIROU:  Okay.

MS. HARTNETT:  And that's been consistent throughout all of the parties' briefing.

MS. POUEYMIROU:  Okay.  So, I -- I realize one of the words was -- okay.

28

So, with respect to copyright information, the documents show that as part of processing data, data engineers at Meta removed copyright information.  We did not know that this was done for training Llama models until recently.  The document that Meta has cited was a document that concerned experiments that were done in April of 2023 where copyright information was removed from copyrighted books for training.

It was only until recently that we realized that that process -- that that data process actually was then used in training of Llama models.  And the removal of copyright information from copyrighted books is relevant here.  It is relevant to Meta's knowledge that works were copyrighted.  It is relevant to Meta's attempts to conceal the fact that these works were copyrighted and trained on because, your Honor, by removing copyright information from Books there was on concern then that the model could memorize and regurgitate that copyrighted information and convey to end users that, in fact, Llama models had been trained on it.

We have had testimony in this case, including from 30(b)(6) witnesses that Meta did not want what it referred to as source metadata or copyright information to be removed because it did not want the public to know what it's data sets were comprised of.  And the removal of copyright information is part of Meta's data processing pipeline.  It

29

is literally called the data processing pipeline.  It is a method --

MR. GHAJAR:  (Zoom glitch.)

MS. POUEYMIROU:  -- of data processing.

MR. GHAJAR:  Your Honor, I'm -- I'm really sorry to interrupt, but counsel is quoting from testimony that she understands was designated attorneys' eyes only and confidential.  I mean, that's why we designated it confidential.  And now she's paraphrasing from it.  And, so, again, we'd ask that counsel respect the designation of material confidential or AEO under the protective order without characterizing and mischaracterizing or attempting to quote from deposition testimony or counsel's interpretation of AEO or confidential documents.  I'm gravely concerned with the disregard being shown to the protective order here.

MS. HARTNETT:  I would just add this is not in the actual brief, what she's saying, 308, but it is -- because it -- so, she's also describing -- counsel's describing things that are not part of this motion, but they are in our opposition to the motion to amend, and all of what was being said is -- is highlighted as subject to the protective order in the opposition to the motion to amend.

THE COURT:  Well, I don't have those depositions before me.  So, I don't know what's been designated

30

confidential or AEO and what hasn't been.  It seems to me that since the large majority of ECF 308 was filed in the public record, there shouldn't be any problem in discussing nearly all of it at a hearing, and the small amount of it that has been redacted I think doesn't need to be mentioned.

MS. HARTNETT:  Your Honor, if I --

MS. POUEYMIROU:  And --

MS. HARTNETT:  Just for the record -- and, Ms. Poueymirou, just for your own reference in terms of understanding what we've -- we're asking you not to reference is the material in the -- what you're doing is quoting from documents that were detailed in greater depth in the opposition to the motion for leave to amend the complaint and the quotes and other material that you're quoting which were not at issue in 308, importantly, they shouldn't really be before the Court now in this motion, are quotes that were redacted by us because they are covered by the protective order.

MS. POUEYMIROU:  I'm -- I actually am not -- I don't have anything before me that I'm quoting.  I'm -- I'm more speaking just generally that removal of copyright information was done as part of data processing at Meta, and it was done by folks that worked on the data processing team, and this RFP seeks documents and communications, including source code relating to the processing of

copyrighted material.  So, the removal of copyright information from copyrighted material was method of processing, and -- and that is what this RFP seeks.

THE COURT:  I see.  All right.  Then let me turn to Meta to respond to the CMI issue that Plaintiffs raise.

MS. HARTNETT:  So, what we understand here to be the request is not about the CMI as much as about the scope of the search.  So, they -- as counsel has made clear, documents regarding CMI have been produced as part of other -- you know, as part of responses that included the search terms we already have, including in -- you know, we -- we've briefed this on the motion to amend in -- in July of this year.  They had a significant -- the key document that they -- you know, kind of on this issue, and, so, the idea that this is somehow a late breaking issue that requires blowing open discovery is not well taken.  This has been something that's been in the documents.  It's something that people have discussed at the deposition.  To clear the record, the reason -- you know, this is not a nefarious plot.  But, yet, as the documents -- again, we can't get into it now that it's been -- it -- much of this is under seal, but it's part of a generalized process of removing repetitive information and not some sort of nefarious plot as -- as being argued. But the -- the bottom line --

THE COURT:  What you need to understand, there are

32

really on this issue two different points.  If we turn to the bottom half of page four --

MS. HARTNETT:  Yeah.

THE COURT:  -- ECF Number 8.

MS. HARTNETT:  Right.

THE COURT:  Plaintiffs -- and focus on item two.  Item number one is produce or catalog all copies that Meta may have copy righted material.  We've discussed that.  Now it's item two.

MS. HARTNETT:  Right.

THE COURT:  Which is search custodial files and noncustodial databases for documents concerning subject A and subject B.

MS. HARTNETT:  Right.

THE COURT:  That's really two issues.  One is should Meta have to search the files of the 15 custodians for documents about subject A and subject B, and the other one is should Meta have to search either 1,000 employees or 2,000 employees for communications about subject A and subject B.  I feel like I've heard sufficient argument about whether the additional 1,000 or 2,000 employees' emails should be searched.  I don't need further argument about that.  That leaves us with the question of whether -- whether I should order Meta to search the files of its 15 custodians for documents or communications regarding Llama

and subject A and subject B or -- and is Meta saying you've already done that for the 15 custodians?

MS. HARTNETT:  Not under this RFP.  So, I think our -- our argument -- our point is that they have documents on these topics that have yielded from other RFPs.  We don't believe this RFP -- so, just kind of taking you back -- thank you for focusing the -- the issue here.  This is about processing of copyrighted material, including the storage and deletion of copyrighted material.  It's general.  It doesn't specifically ask for this.  I think on the topic A point, that claim was dismissed a year ago.  They have a motion to amend, but it is not granted.  It is pending.  And, so, we don't think the RFP can or should be read to include this specifically.  But, moreover, it would be inappropriate to add that in because it's not part of the current case.

Part -- part B, likewise, not that -- that method is not at issue in this RFP.  And, moreover, that is also a subject of the motion to amend.  So, it's -- it's something that is tangentially relevant, if at all, to the present claims.  They have some material on that from other RFPs, but we would argue these are both efforts to essentially get the additional discovery that they want -- additional discovery that they're saying they don't actually seek in the  motion to amend but essentially is discovery that they

34

would get for the motion to amend, not on the case that's before your -- your Honor.

THE COURT:  Thank you.

Let me turn now to Plaintiffs and ask for your arguments about why I should order Meta to search the files of the 15 custodians for documents and communications about topic A and topic B.

MS. POUEYMIROU:  Absolutely, your Honor.  So, with respect to the 15 custodians, topic A is about stripping copyright information from pirated books that Meta used for training.

We received early on a document that showed that they were doing that, though it was with respect to experiments that they were running.  It was not evidence at that point of whether they were actually training the models on copyrighted information where they had intentionally stripped all of the ISBN numbers, authors' names, anything that could identify those works as copyrighted.  And it turns out in the discovery we've gotten to date through deposition testimony and just kind of extraneously coming in because other key terms were hit on, we found that, in fact, they methodically -- they methodically stripped copyrighted material from at least one of the shadow libraries that we have in this case for training, but we don't have the discovery on that.  These documents came in by happen --

35

happenstance.  And that is absolutely a part of data processing.  It happened by the data engineers and the data processing team, and it was discussed in data processing meetings.  All of this is memorialized in the discovery that Meta has provided.

With respect to the file sharing methods that we discuss in B, that is also data processing.  The file sharing methods that we are discussing there not only concern how data was acquired but how that data was -- I'm trying to figure out a way to do this in a way that protects the order -- a processing that involves hashing data, encrypting that data, and figuring out a way to reassemble copies of that data.  It is a processing method for acquiring data that deponents in the last two weeks have now testified was how Meta obtained millions and millions and millions of copyrighted works contained in the shadow library sets at issue in this case.  We did not know that that was the method that Meta had used for processing its copyrighted material until deposition testimony started to come out on this point, and there is another -- one of the points Meta raises is, Well, we --

MS. HARTNETT:  Your Honor, I just have to interrupt again.  There's ongoing reference to deposition testimony in a level of detail that is covered by the protective order and was not briefed in this brief, and I'm

36

just really concerned about the level of disclosure here.

MS. POUEYMIROU:  I'm not representing -- I am not -- I have not stated anything about the actual substance of the deposition testimony just now.  I just said that in deposition testimony, we have discovered -- this is new knowledge to us -- that there was a method that was used for data processing that we did not realize, and it was used solely with respect to copyrighted material and solely with respect to the very libraries that we know contain our Plaintiffs' asserted works.

And, so, that is -- that is what we are seeking here.  These are both methods of processing copyrighted materials.  And I did want to add, your Honor, that with respect to number one, we really are only seeking not all copyrighted material.  Again, we're just seeking pretraining and post-training material that contain our Plaintiffs' works.

THE COURT:  All right.  I think I've heard -- well, let me ask about pretraining and post-training that contain Plaintiffs' works.  Is that bringing us back to RFP 118?

MS. POUEYMIROU:  It -- it overlaps with it because we've been seeking the post-training data, but I just -- I just wanted to fit in that with respect to the alleged overbreadth of part one of this RFP that Ms. Hartnett singled out, in the meet and confers, we made clear that we

37

were not seeking all copyrighted works.  We are only interested in the -- the data and the copies that Meta has made of our Plaintiffs' asserted works, because we know they've sourced them or believe we have sourced -- they have sourced them from more places and on more than one occasion. And, so, I -- I did just want to emphasize that part one of this RFP is -- is far more narrow than, Give us a catalog of all your copyrighted works.

THE COURT:  Well, that seemed to be what you were moving to compel in the joint discovery letter brief, and now I don't know what you're moving to compel.

MS. POUEYMIROU:  So, we are -- we -- we are only moving to compel the data or summaries of data, catalogs of data sets, where Meta has acquired our Plaintiffs' asserted works.  We have received some of this data from two different sources that Meta has produced in this case, but we understand there to be more than that, and we just wanted to have a complete picture of all of the places that Meta has acquired our Plaintiffs' works.

MR. PRITT:  If it's helpful, your Honor, this is the same issue that you addressed in Docket 288 in which we were seeking the copies of the data sets, including the copies that Meta itself has told us where they exist in things called Meta Manifold and other servers, and you addressed it.  You went back and forth on what the parties

were.  Then you just said it wasn't covered by those specific RFPs.  So, we're now coming back to this RFP, which we argue it clearly covers, to ask for the exact same thing that we were previously asking for, which was either give us the other copies of these data sets that you've represented you have and we know you have or if you think that's too burdensome because that was the previous argument, because it's a lot of data that includes our Plaintiffs' copyrighted works, just give us the catalog and tell us the dates, the method, and, you know, how much you downloaded.  Very simple, because you've already told us you know where these copies are.  We're not asking you to scour everything.  Just tell us the copies you know of and make a reasonable good faith effort to see if there's any other --

THE COURT:  Is the ask still all data sets that have Plaintiffs' copyrighted works rather than data sets used to train the Llama models?

MR. PRITT:  Well, they're all -- as far as we understand, they're all used to train the Llama models.  So, there aren't two different things.  They're the same thing.  So, all we're asking for are the copies of the data sets or the information about those in use of pretraining and post-training, so, training the Llama models that include Plaintiffs' copyrighted work.

MS. HARTNETT:  Your Honor --

39

THE COURT:  Yeah, go ahead.

MS. HARTNETT:  This is an RFP, not -- not an interrogatory, and they're asking for copies of all -- I mean, their motion, as we briefed it, I went back to look to make suer I wasn't missing something, and it's not like their reply clarified, Oh, no, we're just looking for the Plaintiffs' data sets that are used to train Llama.  They're looking for any copy of any copyrighted work that Meta has.  That's -- that's essentially what the request is, and they should be held to that, and it's overbroad and problematic.

They have -- we have disclosed to them all of the data sets that have been used to train Llama 1 through 4.

MR. PRITT:  Your Honor --

MS. HARTNETT:  We've -- that have their work.  We have -- we have disclosed that to them, and so, they -- what they are doing here is seeking to do make work, which is to go around and scour -- to scour the company and either I guess make a list now or at first it was to actually collect and produce the copies, and there's just no reason for that.  They -- this is just a fact that's -- they had what they need to say whether or not their works were in data used to train Llama, and this appears to be just an effort to have us scour for no apparent purpose, that -- that's our -- that's our submission.

THE COURT:  All right.  I --

40

MR. PRITT:  Your Honor --

THE COURT:  We have a number of other briefs to get to, and we're still only on the first one.  So, we need to wrap this up and move on to the next one.

The other point Plaintiffs raised in ECF Number 308 is the -- the way in which Meta has produced source code for Plaintiffs' expert to review and then Plaintiffs' offer to submit an expert declaration on that issue.  If this is still a dispute, I think I would like to have that expert declaration and then a response from Meta, but let me turn to Plaintiffs.

Is the production of the source code, the -- the state of that still an issue in dispute?

MS. POUEYMIROU:  No.  We're going to -- we are fine moving away from -- from that particular point.  We do still have questions about the source code that are pertinent, which is about two weeks ago, Meta dumped 3.8 terabytes of source code on us.  To give you a sense of that, your Honor, we had received I think four gigabytes prior to that.  And we got 3.8 terabytes, 16 million files.

It appears that Meta gave us all of the source code for Facebook and Instagram.  At least that's what our expert believes happened.  And, so, what we are hoping is that Meta can confirm that it has provided to us the source code pertaining to Meta AI, which is what we had actually asked

41

for, and the source code pertaining to the incorporation of Llama into Facebook and Instagram and WhatsApp, and if it can provide some kind of guidance as to how to figure that out, because the disorganization of the source code is -- is still there, and now with 60 million files given to us, I think on December 4th, it has just been an impossible task to wade through it.  It was far more than we had asked for to identify what we actually need.

So, we don't need them to reorganize anything, but what we would -- we were hoping to have is just a little bit of help finding what we need given the voluminous amount of data that was given to us.

THE COURT:  I just want to make sure that I'm addressing the things in their briefs that have been filed before me.  My understanding based on what you said is that the particular complaint that Plaintiffs raised in ECF Number 308 concerning source code, that particular complaint is no longer live.  Is that correct?

MS. POUEYMIROU:  It's no lover live, but because the amount of data and the organization of the data is so voluminous, we were hoping that Meta would at least identify in it what we had actually asked for, since it says it has not provided it to us.

THE COURT:  It sounds like a new and different dispute from the one that was briefed before me.  So, I'm

42

not going to address it and instead --

MS. POUEYMIROU:  Okay.

THE COURT:  -- to the next brief.  ECF Number 309, I've ordered Meta to provide the documents for in camera review.  So, I don't need further discussion about that. Let's turn to ECF Number 321 which is about the search terms, and I have a concern that Plaintiffs are not following the procedure set forth in the ESI order.  And, so, if I ordered Meta to use these search strings, I don't know if they're any good or not.  Maybe they're wildly overinclusive.  Maybe they're not.  It's just it seems like I have an informational vacuum, and I wouldn't want to order Meta to use certain search terms if I don't know that those are good search terms.

So, let me turn to Plaintiffs and have you speak to that issue.

MR. PRITT:  Thank you, your Honor.  We asked for that in a meet and confer.  Meta refused.  So, I agree that's what should have happened, and we should have been able to understand are the search terms that we proposed after looking at what they had produced in response to the additional discovery only a few weeks ago, we should have had that iterative process, and we tried.  I tried personally to have that iterative process where we looked and we came up with search terms that we thought were narrow

43

and then asked them to run against just 15 custodians.  They refused to do that, to even tell us what the hit count was. So, we couldn't go back and say, Okay, let's narrow it even further.  And, unfortunately, now, we're at the end of discovery having to brief this and put yo in the position of having to say either run them because you refused to engage in that process now or to essentially have them run them, come back to you, and then do a process that is somehow like almost a supplemental process to narrow down those terms. But I certainly would like to run those.

THE COURT:  I guess I don't understand why Plaintiffs raised this issue in a filing on December 9th, which is four days before the close of fact discovery.  You said it took Meta a long time to even tell you which search terms it used.  I would think that's when the discovery letter briefs should have been filed, when you're not getting a fast response, when you're trying to meet and confer and they're not doing that.

The problem with waiting until four days before the close of fact discovery is that, well, it's four days before the close of fact discovery, and then the -- the vetting of the search terms hasn't happened.  That's all stuff I could have ordered to take place sooner than that, but it seems like this dispute was raised not in a -- a very timely fashion.

44

MR. PRITT:  Your Honor, I've been raising the issue of search terms since -- with Meta since early October, and every time they said, We'll do it or we'll only do it -- and we have raised it in previous briefs with the Court I believe.  They did not produce their search terms until November 25th I believe.  And, so, we timely raised the issues and our concerns with those search terms.  Even though the ESI order orders them and requires them to produce those voluntarily, they never provided them.  And I have been raising this since early October, since far before they even ran search terms against the additional discovery. And the additional discovery that they produce wasn't until early November.

So, respectfully, we have been attempting to get search terms nonstop, including before they produced their documents on the additional discovery in early November and then tried to raise this as soon as possible after they finally provided their search terms.

So, just because the additional discovery was served two months ago and it took a while to get it, I don't think is a reason to then prevent us from obtaining discovery to which we're otherwise entitled.

THE COURT:  Well, let me hear from Meta.

MS. HARTNETT:  Your Honor, I -- so, I would just direct the -- so, I looked at the Plaintiffs' reply on this

45

point of like did we withhold -- we did not not timely produce our search terms.  What we told the Plaintiffs was that we would agree to a mutual date for exchange of those, and then we just kept not getting a mutual date for exchange, and I looked at the citation in the brief at page five where they say that they repeatedly asked for them, and we -- we flouted this procedure.  That -- that actual citation is Docket 247, cites to like an email attachment where we basically, as of -- you know, at some point in October, we were saying let's -- we were engaging Plaintiffs in a mutual exchange of search terms.  Let us know when.

So, I think this is not a situation of Meta not -- not complying with the order.  Meta was waiting to do that, and Plaintiffs were actually not agreeable to having a mutual exchange.  So, that's what the holdup was, and I agree with you it should have been brought sooner.

You know, beyond that, you know, your Honor did point out already in ECF 279 that attempting to massively expand the search terms at the late stage in the case does create a -- an issue, and it is not well taken, and we would just, you know, respectfully submit that the rationale in 279 applies again here.

And an additional point we've made in our brief -- I don't need to rehash the brief -- is that when you actually look at the new terms they're asking for, they're largely,

46

if not fully, disconnected from the RFPs, and I think this is part of a theme we're seeing with a lot of what's happening today was -- is taking existing RFPs and trying to stretch them beyond recognition to be able to get more information, and that in a way is an end run around the, you know, two-month limited extension of fact discovery that they received in this case.

So, just to be at a top level, we've provided our search terms. We said we would do so sooner but did not get a response on a mutual date for exchange. The ESI order has a protocol which doesn't involve just running search terms that they asked for. It involves actually a -- a null set review. We did not go through that process, and we believed we should have if -- if at all and that it's too late now. But even if it were not too late, there really is no basis for the terms at a granular level.

THE COURT: All right. Would Plaintiffs like to reply?

MR. PRITT: Yes. Meta refused to engage in that process. I raised that. I could easily submit to you, if you want, many emails in which I am saying, For the third time, please respond to my email about producing your search terms, and I would get no response repeatedly, over and over again, even a meet and confer, about that. There is no mutual requirement of exchanging search terms, and some of

our Plaintiffs did exchange those search terms. But, again, the additional discovery was served in early October. They produced it in November and then provided their search terms. Just because that was later in the discovery period doesn't mean that we've somehow waived our right to inquire about the search terms that they use.

And to suggest that the search terms that we have proposed are massively overbroad or seek to expand discovery is, frankly, untenable because they are very limited that we are based on solely gaps that we have seen from the search terms they did provide.

And, again, we haven't been -- they haven't run them on the back end, and they haven't given us hit counts. So, there simply can be no representation from Meta right now that they're overbroad. They're -- these are search terms against 15 custodians that are narrow. They're not like one word running against even 15 custodians, which, frankly, I don't think is that big. But these are quite, you know, limited search terms based on the gaps we've seen for 15 custodians, based on discovery that was served more recently. We should be able to raise those issues with the Court.

THE COURT: All right. Let's move on to ECF Number 334. The first half of that dispute about the clawback I don't need argument on. I've ordered Meta to

48

submit those documents for an in camera review.

The second one is about Chaudery's (phonetic), and his testimony is not entirely consistent across the two depositions, but it looked to me at various points he was asserting privilege over everything that happened in a meeting or perhaps two meetings rather than just legal advice.

And, so my inclination is to have him be deposed again to give Plaintiffs the relief that they're seeking. And part of that is simply so that there's clarity. I know that Meta argued that he did in other portions of his testimony disclose the business reasons for the decision, but it's not clear to me that all the discussion about business decisions came out or that he -- he wasn't including some of that in his claim of privilege over the meeting. But I'd like Meta to have an opportunity to address that since I'm thinking of -- I'm leaning toward granting Plaintiffs' motion on this issue.

MS. HARTNETT: Thank you, your Honor. I appreciate the chance to address that. I was there at that deposition. There was a 30(b)(1) portion and then a 30(b)(6) portion, as your Honor knows. And I do think you're right there is a little bit of inconsistency or at least facially in a way, and I think part of it was because of how the questions were being asked, and there's a

49

difference between saying was there a business reason that you're aware of supporting a decision versus what business decision -- what business rationales were discussed in a meeting with counsel.

And, so, just to take a step back to make sure we're level set on the sequence there, he was describing a meeting that he was in with counsel where the relevant decision was made. We have disclosed the decision. So, they have that information. The question is was the discussion that he was having with counsel and his boss prior to the decision being made a privileged discussion. And then the second wrinkle is the discussion he had with his boss and his counsel prior to making that decision came after a separate meeting that he was not part of but that did have counsel present and had basically legal advice infused through that meeting. And, so, his boss and the lawyer that he was subsequently talking to had come back from a meeting which included legal advice on the topic, and they were sort of relaying some things to him in the meeting that he was in. And, so, I think if you're asking a question of tell us about the business reasons discussed in that meeting, that is -- that is actually getting into privilege because the business reasons were part of a conversation of seeking and receiving legal -- sorry. Potential business rationales for the -- for the decision were part of a conversation with counsel, Should we

50

do this?  Well, tell me, what are some of the reasons to do it, whatever that theoretical discussion would be.  That's a privileged discussion where a lawyer is providing legal advice and where the employee is seeking the legal advice.

A separate question would be, Mr. Chaudery, sitting here today, are there business reasons that would support this decision?  And that's where he was able to actually answer that.  So, he did elaborate further on that because I was asking him, Please, exclude anything you know as part of legal advice, but if you have responsive information otherwise, you can provide it.

So, I do think the record on the whole between the 30(b)(1) and the 30(b)(6) allowed him to explain his understanding of any business reasons that would support the decision, but he also did not disclose the business reasons, meaning business -- the business employees' input to counsel in the course of receiving the legal advice, and that was what he was appropriately allowed to exclude.

That -- that -- so, I think we tried our best to navigate that based on the questions that were being asked, and it is a tricky area because he was trying to actually answer the questions to the best he could.  The problem here is that the ultimate decision that was at issue was reached by him, and he's put that decision on the record after he had a legally privileged discussion with his lawyer about

51

the various aspects of -- underlying that decision, all of which involved her providing legal advice as she has put in the declaration with the Court.

THE COURT:  It is possible for executives to have a meeting with counsel where the executives say, Here's what we want to do, and -- or here's what we're considering doing.  Counsel, please give us legal advice.  That -- that's the type of meeting that's possible.

It's also possible to have a bunch of people in a room, most of whom are business people, and one of whom is an attorney and the group is collectively deciding what to do.  In that case, it's not true that the whole meeting is shrouded in privilege.  Just putting one lawyer in there who chimes in now and -- with legal advice doesn't cause everything to be privileged.  And the way the witness testified makes me think it was more like the second type of meeting, that there were business discussions being talked about in the meeting and that it wasn't all just running some -- something by counsel.  Counsel was merely part of a group and that two of the three people in that group were -- were not attorneys, and that was my concern, that -- about claiming privilege over the entire meeting.  Certainly, the way he described it didn't make it sound to me like the whole meeting was privileged.  And he said it was a multifaceted decision that took into account a number of

52

different things, including business concerns.

So, the -- the request for legal advice and the provision of legal advice during the meeting, those are privileged, and you can instruct the witness not to talk about those. But the business rationales that were mentioned or discussed, I don't think that's privileged. I understand since it all happened at the same meeting or a couple of meetings there are some fine lines and some parsing, and it -- it's not surprising to me that the deposition testimony was not 100 percent internally consistent because I think that these are difficult lines to draw, but based on his testimony, that's the line that I think needs to be drawn, except the request for legal advice on the provision of legal advice, those are privileged, and he should not talk about those, but that the business considerations that were mentioned or discussed as business considerations during the meeting or meetings, those are things that he has to talk about. And I don't -- I don't get the sense that he did that or was drawing a line in that place, and I think that a further two-hour deposition could help clarify that.

MS. HARTNETT: If I may, your Honor, he did actually -- I think to the extent there's inconsistency is that he actually did later provide the business reasons. He was able to -- you know, he basically I think understood the

53

question to not be calling for the legal advice being given regarding the business considerations but actually the considerations, and he actually has set those forth on the record in the second deposition.  So, I -- it is a matter of I think we would be willing and able to tell -- to, you know, make a representation that whatever he had -- maybe -- I -- I would request that we be allowed to at least proffer the business reasons he gave in the second deposition as being fully applicable to his 30(b)(1) deposition because he did exhaust the business reasons that he was aware of in the second deposition.  It was that in the first deposition, he was not -- I think he believed that giving those in the context of having his discussions with the lawyer was not -- he wasn't able to do that without revealing privilege, but he did exhaust his understanding of the business reasons for the decision.

THE COURT:  You argue that in the letter brief, and you might be correct.  However, as the testimony stands now, I feel like it's not consistent.  Your interpretation might be the right one.  However, as I read the transcript now, the transcripts for the two depositions, I -- I can't see that that is what happened, and I think that having another two hours where he goes in with the correct understanding of what he can talk about and what he can't, rather than having an evolving understanding of that will

54

produce a cleaner record or at least that's my hope, that it produces a cleaner record. So, that's what I'm thinking, but let me turn to Plaintiffs for your comments.

MR. SCHUFFENHAUER: Yes, your Honor. This is Jay Schuffenhauer of Boies Schiller on behalf of Plaintiffs. We -- we agree with much of -- much of the rationale you provided so far, of course. I think our -- the big follow-up question that we'd like some clarity perhaps on or guidance before we do this follow-up deposition is -- is what -- what constitutes business versus legal because one concern I have is that we'll just go back to a redeposition and then immediately draw the same objections when asking what we believe are still business questions. So, I guess the first one that comes to my mind if things like a question that drew an objection in the deposition was what alternatives did you consider to this decision, what was done instead, what were the pros and cons of that alternative versus this decision, now we're speaking in vague terms due to sealing.

So, I guess the -- the alternatives is the only thing that I'd like clarify over whether that would be an appropriate line of questioning. We certainly believe it is, but we just don't want to end up right back in front of the Court with more objections to what we believe are further business questions of Mr. Chaudery.

55

THE COURT:  Well, if the alternatives were proposed by legal, then that sounds like it's likely legal. It's -- but why don't I turn the question to Meta.

What do you think is problematic about the alternatives that Meta considered?

MS. HARTNETT:  I think that the -- so, I think what Mr. Chaudery understood to be business reasons for the decision, if any, are -- sorry -- business reasons that supported the decision, if any, that would be appropriate to have him testify to.

I think the issue here we have is that there is essentially a -- the reason for the decision is privilege. It's legal advice.  And, so, accordingly -- and, to the extent that Mr. Chaudery, who was in the meeting with his boss and the lawyer, he was learning anyone else's view on this decision aside from the legal advice he was receiving. He has his own understanding of what his business reasons might be for the decision.  He has the legal advice he's receiving about the decision, and then he has the lawyer and a boss that came from a meeting with the lawyer that had just had a privileged discussion about the decision making telling -- you know, relaying to him -- that was the one question about what did the Product and Engineering think. And, so, he doesn't know that by talking to Product -- they -- if they asked him, Do you know what Product and

56

Engineering thought about the decision, separate from any conversations you had with a lawyer about that, he did not have an answer to that because he learned, if anything, about that through a lawyer in the course of receiving legal advice.  So, that --

THE COURT:  Yeah, but wait a second.  What Product and Engineering thought is not privileged?  Learning something, learning factual information from a lawyer doesn't make the factual information privileged.  So, if the lawyer's the conduit through which he obtained information, that doesn't make it privileged, which privileged is the request for legal advice or the legal advice, not factual information that he learned.

MS. HARTNETT:  Understood, and I think we -- we instructed him to please answer to the extent you can without revealing the legal advice, and he said he couldn't.  I mean, he -- he tried to parse that, whatever he knew, and -- and that was his answer.  But I -- I appreciate the point, and, you know, that -- we, throughout the deposition attempted to have him -- we told him, You may answer as to information that you -- that does -- excluding any legal advice that you sought or received.  That's what we did.

THE COURT:  But then one of the questions Plaintiffs have asked is what about the question to Meta, Meta, what alternatives do you -- did you consider before

57

you made the decision that you made?  And, so, are there privilege concerns that Meta would have with that question?

MS. HARTNETT:  To the extent that they came from a lawyer, yes.

THE COURT:  Okay.  But then if you instructed the witness -- well, an alternative suggested by counsel would likely involve legal advice, but do you see any impediment to his discussing alternatives that the business people thought of?

MS. HARTNETT:  I think if he knows those without -- I think that the -- the hard thing here is because the business people were having a conversation with the lawyers, they were seeking legal advice.  And, so, when he -- if you're kind of getting the information from the lawyer coming back to you to provide the legal advice about the decisional issue and that lawyer is kind of bringing -- you know, bringing you up to speed based on the lawyer's discussion of a legally privileged meeting that was just had to talk about the alternatives and the decision.  That's just different than having him having had a conversation with the other business people to understand the view on the issue.  I don't think he had conversations outside of the context of the legal advice conversations about the decision.

THE COURT:  I see.  Well, I think I've provided

58

the guidance that I'm willing to provide, which is that the witness testified that this was a meeting that was not just about seeking or obtaining legal advice.  It was a multifaceted decision that also involved business considerations, and I don't think that Meta can shield everything that was discussed in that meeting or meetings because there was an attorney present, at least given how the witness described the meeting.  The legal advice and the request for legal advice, those are privileged, but other business considerations that were talked about, those are not privileged.  That's the line that I'm drawing, and I'm going to order the witness to be deposed again for two hours as Plaintiffs request.

MS. HARTNETT:  Your Honor, may I please be heard on the amount of time on that, please, just because it was -- it didn't take that much -- it's a relatively discrete issue.  It's one meeting -- or one meeting and two -- you know, it's one day.  If we could have an hour, I think that would be appropriate given the amount of time the deponent already sat for.  I'm certain we wouldn't -- we'll be able to cover the issue in that time period.

THE COURT:  What do Plaintiffs think about that?

MR. SCHUFFENHAUER:  Your Honor, I think the biggest issue is -- well, first, I guess a point of clarity. We'd request that an hour of 30(b)(1) and an hour of

30(b)(6) testimony from Mr. Chaudery.  I think one of the bigger issues is Ms. Hartnett has represented a couple of times that Mr. Chaudery has reached the end of his personal knowledge on some of these topics.  But as a 30(b)(6) witness, in an effort to -- well, on that topic I won't say it, to avoid sealing issues, he has a duty to educate himself beyond just his own personal knowledge, and that could lead to a lot more realms of inquiry into things such as Product and Engineering, and that's a fruitful line of questioning that we got nowhere with Mr. Chaudery the first time because, you know, we can make our point about our objection to the privilege assertions.  We're not going to make that point for two hours.  So, I think that two hours is an appropriate amount of time, particularly if we're allowed the full relief of a 30(b)(1) hour and a 30(b)(6) hour.

THE COURT:  All right.  Thank you.

MS. HARTNETT:  I think part of it -- just -- I -- as you're gathering, your Honor, this is about two legal -- these are two conversations with counsel that are the relevant decision points.  That -- that's why to the extent that he -- he did educate himself.  He's educated to the point of it was a heavily -- you know, it was a -- it was a legal advice discussion that led to this decision.  And it was two legal advice discussions.  So, he is limited in what

60

he can provide, even if it were him or anyone else, as to how much he can disclose about the -- the reasoning behind this decision.

I would also just -- they have the decision, which is the relevant point, but we would -- we obviously are willing to -- we appreciate that your Honor would like more time.  I think an hour would be more than sufficient.  This was not a large part of the deposition, not because he wouldn't answer.  They did exhaust his understanding of the business reasons.  It's because it's one point in time over a much longer point in time of this case.

MR. PRITT:  Your Honor, if I could be heard, I -- I --

THE COURT:  Yes.

MR. PRITT:  -- did take the deposition.  This is a key decision point, one of the most critical decision points in this case about why Meta decided to stop doing something that we think it should have been doing and that is the basis of our claims and did something else entirely, which we think is illegal.

So, these decisions and this time period is critical to this case.  So, one hour for a 30(b)(1) and one hour for 30(b)(6) is, frankly, negligible in connection with the importance of this topic.

And Mr. Chaudery testified he did not talk to anyone in

preparation for his 30(b)(6) testimony, including on this issue. So, I have to disagree with counsel. And the one clarification I wanted, you know, we have looked at your Epic order which we think provides very helpful guidance on the lines to draw, and it makes clear that the legal advice is limited to discussions about what is legally permissible and impermissible. And, in fact, that would not include an in house counsel who is just part of the business team, which is how Meta operates, says -- you know, talks about alternatives, without saying, you know, whether those alternatives are legally permissible or not. He's just saying, Here's another alternative thing we could do as a business matter that would not be privileged.

THE COURT: I see. I think I have what I need to rule on this issue, and based on the discussion so far at this hearing, I also feel that I have what I need to rule on the motion at ECF Number 335.

So, then tomorrow is the last day to file motions to compel given the December 13th fact discovery cutoff. Meta alluded to this a little bit earlier, but I -- it would be helpful for me to learn what is likely coming my way. So, why don't I first turn to Plaintiffs. If you're able to preview what is likely to filed, that would be helpful.

MR. PRITT: Yes. Thank you, your Honor.

Meta correctly identified six letter briefs. This does

62

not include the supplemental brief that your Honor ordered, and it does not include whether or not we would file a brief on the issue my colleague raised as to identifying what was produced in the source code room so that we can understand the terabytes of data that were provided just two weeks ago.

The six briefs, one is challenging RFA -- supplemental RFA responses that were provided on Friday.  Another is challenging supplemental ROG responses that was provided on Friday.  Another is a letter brief.  We also received Meta's supplemental -- I'm sorry -- Meta's privilege logs, two of them on Friday and one of them this Tuesday, in connection with the additional discovery.  So, one is another challenge on business communications over which we believe Meta has claimed privilege in her quest for in camera review.  Another is a challenge to the extent there is any privilege after that review under the Crime Fraud Doctrine.  A third is a request for additional deposition time of several fact witnesses and based on documents that we understand were produced on Friday and yet collected in June and September that are central to the issues of both copyright infringement and fair use and that we were deprived of using.  And then the sixth is -- somewhat overlaps with the issues we were discussing earlier today with 309 I think -- 308 or 309, which had the RFPs.  It's additional issues with the responses to requests for production that involve data

63

sets, methods of obtaining materials based on other RFPs. So, it really overlaps with the -- the issue that's before you on some current briefing.

THE COURT: All right. Thank you.

And is there anything Meta wanted to say concerning the forthcoming briefs? Obviously the point is not to argue the merits of briefs that haven't been filed yet. I'm just trying to get a sense of what is likely coming my way. So, if there's more that Meta wanted to say to help me understand what's coming my way, that would be helpful.

MS. HARTNETT: Yes. I will -- I will not preemptively argue, as tempting as it is. I think on our front, we have been seeking to get the Plaintiffs to actually give us their privilege logs. We're hoping not to have to move, but if there are any outstanding privilege logs, we will move for those.

There have been some follow-up production issues that we've been seeking to work through with Plaintiffs. If that's not satisfactorily resolved, we will move on those. And we are loathe to argue for reopening any depositions in this case at this point. We -- we took your Honor's order seriously about go to it and take these depos, whether -- you know, and do the discovery at the same time, but I would say it was a pervasive issue we faced of the Plaintiffs dumping documents on us after their depositions. We would

64

not otherwise complain because we want discovery to be done. It should be done.  But we may reserve our right on that one because they're seeking to blow open discovery our way, and, you know, from our perspective, if anything, it -- it should be the opposite direction.  So, we may file a motion on that issue.

I just would actually make one more point on the source code issue that they apparently may be planning to raise. it's getting, you know, late.  We've never heard anything about this latest problem, which apparently is that we gave them too much source code until the hearing.  I believe that Mr. Bachelokoff (phonetic) at his deposition identified the portion of the source code that contains -- the reason why we gave them the source code is that the Meta application of the source code -- well, we gave it to them in the format that it's kept and to make sure that they had what they needed.  That's why they had that, and I just would -- you know, I didn't say this earlier, but the last time they brought the source code issue to the Court, they accused us of having an unorganized mix of scripts and experimental code, not the organized set of code needed to support a sophisticated LLM.  And then they also pejoratively said that we had a messy sandbox of source code instead of the actual comprehensive well organized code underlying the Llama models.

These are serious allegations against the company apparently that now have yielded no actual dispute, and I would just ask that if we're going to have another dispute about source code, that we meet and confer appropriately and they not make allegations like that against us that are apparently unfounded.

THE COURT:  All right.  I think now is a good time to bring the hearing to a close.  The parties have discussed the necessary points.

Oh, Counsel?

MR. PRITT:  Your Honor, I -- I apologize.  The one place we don't want to be and -- and, so, we were considering whether your Honor would want us to file an administrative motion with Judge Chhabria that's essentially conditional that says -- asks him to be willing to extend discovery for anything you order at least for -- if you do order any additional depositions based on our letter brief, because what we don't want to be is put in a position where we file the letter brief and then your Honor is in a place where you feel like you can't grant the relief because discovery is closed.  This happened the last time around.  And, so, we were thinking we would file this kind of conditional administrative motion saying, you know, you guys can go ahead and take those depositions if your Honor grants that relief.

66

So, I -- I don't know if you think that that's something you would want us to do now or if we should just wait and then if you grant the relief, then we can seek that from Judge --

THE COURT:  You'll have to make your own decisions about what you want to do.  The parties will file disputes in front of me, and I will rule on them, and that's what I'm going to do.

MR. PRITT:  Thank you.

THE COURT:  All right.  Well, thank you, Counsel.  And, with that, the matter is submitted.  I will issue a written order on these joint discovery letter briefs.

We're adjourned for the day.

(Proceedings adjourned at 12:34 p.m.)

67

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Tuesday, December 24, 2024

*Echo Reporting, Inc.*