# EXHIBIT E

```
1              12/17/2024 - MARK ZUCKERBERG

2              UNOFFICIAL DRAFT TRANSCRIPT

3

4    ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

5

6              This draft transcript is unedited and

7    uncertified.  It may contain untranslated

8    stenographic symbols, an occasional reporter's note,

9    a misspelled proper name and/or nonsensical word

10   combinations.  These and any other errors will be

11   corrected in the final transcript.

12                  It contains raw output from the court

13   reporter's stenotype machine translated into English

14   by the court reporter's computer, without the

15   benefit of proofreading.  Since this transcript has

16   not been proofread, the court reporter cannot assume

17   responsibility for any errors therein.

18                  This draft transcript is intended to

19   assist attorneys in their case preparation and is

20   not to be construed as the final transcript.  It is

21   not to be duplicated or sold to other persons or

22   businesses.  It is not to be read by the witness or

23   quoted in any pleading, or for any other purpose,
```

8      little bit more.
9              For example, YouTube, I think, may end up
10     hosting some stuff that people pirate for some
11     period of time, but YouTube is trying to take that
12     stuff down.  And the vast majority of the stuff on
13     YouTube, I would assume, is kind of good and they
14     have the license to do.  So would I want to have a
15     policy against people using YouTube because some of
16     the content may be copyrighted?  No, that doesn't
17     seem reasonable.  But I understand the question that
18     you're asking.
19     BY ATTORNEY BOIES:
20         Q.   Yeah.  The question I'm asking really is
21     if you have a website or source that contains
22     copyrighted materials that they do not have a
23     license for and they intentionally are making
24     unlicensed copyrighted materials available to the
25     public, would you agree, as the CEO of Meta, that

                                                       98

1      Meta should not be downloading materials from
2      websites like that?
3              ATTORNEY GHAJAR:  Objection.  Vague.  Also

4    an incomplete hypothetical.  Assumes facts.

5            THE WITNESS:  Yeah, I mean, it's -- I

6    think it's -- it's --

7            You know, I mean the way that you frame

8    it, it seems like that's something that we should be

9    pretty careful about, but I think when you get into

10   the nuances, it's hard to assess what people's

11   intent is.

12           You know, I mean, going back to the

13   YouTube example before, where I think that there's

14   some percent of the content is probably stuff that

15   they don't have copyright or don't have the license

16   to distribute.  Early on, I think that people did

17   make some assertions about YouTube's intent on this,

18   and they were less mature about developing their IP

19   rights management.

20           But even then, I don't think that I

21   would've said that I wouldn't want people at Meta

22   not to use YouTube, at that point.  So -- so I don't

23   know.

24           I just think it's -- I think what you're

25   saying -- I think it kind of -- the way you're

99

1  characterizing it, it sort of broadly seems like,
2  yes, that seems like a bad thing.  But I just am --
3  I want to be caution about making a blanket
4  statement about policies, and this is why we have
5  teams who think through this carefully because there
6  are often more nuances than is kind of apparent the
7  first -- in, like, when you just think about it, at
8  first blush.
9  BY ATTORNEY BOIES:
10      Q.   When you say "that seems like a bad
11  thing," what are you referring to?
12      A.   Your characterization of it.  You know,
13  if -- if there's a -- somebody who's providing a
14  website and they're intentionally trying to violate
15  people's rights, than, yeah.  I mean, I think that
16  the behavior that you're describing, obviously,
17  seems like it's something that we would want to be
18  cautious about or careful about how we engaged with
19  it or maybe prevent our teams from engaging with it.
20           But I just think it requires a little bit
21  further analysis before I can issue sort of like a
22  blanket assessment of what our policy should be,
23  because I think -- you know, this is the example I
24  was giving around YouTube right now.
25           I think even just a couple minutes of

100

1    thinking through what's cases might be around that
2    highlights why there are cases where having such a
3    blanket ban might not be the right thing to do.
4         Q.   I'm trying to focus not on YouTube, which
5    you keep coming back to.  I'm trying to focus on
6    websites like LibGen, and I'm trying to talk about
7    it generally, because you say you've never heard of
8    LibGen.
9              And what I'm asking about is, if you've
10   got a website that, on its face, purports to
11   distribute copyrighted materials for which there is
12   no license -- which, obviously, is not what YouTube
13   does -- would you agree that either as a matter of
14   law or ethics, you would not want Meta trafficking
15   with that website?
16             ATTORNEY GHAJAR:  Objection.  The
17   question's vague.  Incomplete hypothetical.
18             THE WITNESS:  Yeah, I mean, I get that
19   you're trying to get me to give an opinion on
20   LibGen, which I haven't really heard of.
21   BY ATTORNEY BOIES:

22       Q.   No I'm saying you haven't heard of
23  LibGen --
24       A.   No, things like it.  Things like it.  I
25  understand what you're saying.  It's just a little

                                                    101

1   hard for me to weigh in on that without looking at
2   the nuances of that case.
3            And the YouTube example, I just keep
4   raising because it's an example of a thing that --
5   of a product that over time I think people have
6   alleged have been potentially willful and not doing
7   enough to suppress or kind of clean up copyrighted
8   content and -- so I'm just trying to be careful,
9   because rather than having a conversation in some
10  sort of like absolute about how we would handle that
11  kind of case, I think I'd -- I just would want to
12  have some more time to think through it.  I'd want
13  our policy team to think through it.  And I also
14  think it makes sense to look at the specifics of the
15  case because -- I mean, I think some people may
16  allege that YouTube fits the characteristics of what
17  you're saying too, and that's an example of the type
18  of website that I would probably not think that we

19    should bend from using.

20         But I get that you're trying to ask about

21    something different.  It's just that I don't have

22    knowledge of that specific thing.

23    Q.   I am asking a different question, and you

24    know perfectly well that YouTube does not purport to

25    be in the business of distributing copyrighted

102

1    materials for which it has no license; correct, sir?

2    A.   Yes.  So you're saying that another

3    website goes out of its way to communicate that it's

4    distributing illegal materials?

5    Q.   Yes, sir.

6         And you certainly agree you don't want to

7    do business with somebody like that; right?

8         ATTORNEY GHAJAR:  Objection.  Assumes

9    facts and incomplete hypothetical.

10        THE WITNESS:  I mean, in general if

11   someone is broadcasting loudly that they're doing

12   something that is illegal, that would be a pretty

13   big red flag that I'd want us to look at carefully

14   before engaging with them in any way.