# EXHIBIT M

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

RICHARD KADREY, et al.,　　)
　　　　　　　　　　　　　　　)
　　　Individual and　　　　)
　　　Representative　　　　)
　　　Plaintiffs,　　　　　　)
　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　)　Case No. 3:23-cv-03417-VC
　　　　　　　　　　　　　　　)
META PLATFORMS, INC.,　　　)
　　　　　　　　　　　　　　　)
　　　Defendant.　　　　　　)
_____)


** HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER **

Videotaped Deposition of SY CHOUDHURY

San Francisco, California

Thursday, December 5, 2024


Reported Stenographically by

Michael P. Hensley, RDR, CSR No. 14114

_____

DIGITAL EVIDENCE GROUP

1730 M. Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 100

1  had outreached to many different types of content

2  types, including literary types, as you would

3  describe it.

4      Q.   And including copyrighted literary works;

5  right?

6          ATTORNEY HARTNETT:  Object to form.

7          THE WITNESS:  Our -- our outreach was not

8  specifically about copyrighted or uncopyrighted

9  literary works.  It was to explore what was

10 available from different companies in a variety of

11 categories, which included everything from the

12 stickers we talked about all the way through to

13 textbooks.

14 BY ATTORNEY PRITT:

15     Q.   Mm-hmm.

16     A.   Both scientific and nonscientific, and

17 what you describe as literary works.  Fiction, let's

18 say.

19     Q.   Did your team not consider whether works

20 it was seeking to use in its training data was

21 copyrighted?

22     A.   I'm sure that, as we engaged with every

Page 101

1   partner, we -- the -- part of the conversation
2   would've been whether they had the rights to license
3   the data. And so if that incorporated the -- the
4   discussion of copyrights, it may have; right?
5           But in every deal that we do at some
6   point, if it -- if after the evaluation is
7   completed, that there is a decision to move forward,
8   clearly we need to -- we need to make sure and --
9   from a business perspective -- to make sure that the
10  licensor has the ability to, you know, truthfully
11  and lawful -- legally license the data.
12      Q.   And you must have also considered whether
13  Meta had the right to use those copyrighted works;
14  correct?
15          ATTORNEY HARTNETT: Object to form.
16          THE WITNESS: We were working on
17  engagements, external engagements, to determine what
18  content was out there. It's our legal team that
19  focuses on how to use the content. I'm not a
20  lawyer.
21  BY ATTORNEY PRITT:
22      Q.   So your legal team determines what content

Page 102

1  goes into the training data for use in Meta's large
2  language models?
3           ATTORNEY HARTNETT:  Objection to form.
4           THE WITNESS:  I think our product and
5  engineering work with a large cross-functional team,
6  including legal; and so I'm not privy to those
7  discussions or decisions.  I just know that the --
8  the parts that are about the -- the third-party
9  engagements and deals that we need to explore.
10 BY ATTORNEY PRITT:
11      Q.  So what was your involvement,
12 specifically, in trying to license text training
13 data from publishers?
14      A.  So in the spring of 2023, we were -- we
15 had outreach to many different companies for
16 different modalities of data, as I mentioned.  One
17 of those was -- was textbooks.  Let's call it
18 nonfiction, mostly STEM.  And one of those was an
19 area of -- of fiction books.  And so some of my team
20 members, you know, we -- we divided up some of the
21 work -- work we had to -- in order to just be
22 efficient.

Page 103

1         And some of our -- my team members reached
2    out to companies in each category.  Many of the --
3    you know, the -- the diaspora of companies reacted
4    in different ways.  Everybody has different goals
5    and objectives of their company.  It's not a
6    surprise in any of -- in any new work stream that
7    we're working on, when you reach out to a set of
8    type of companies, there are some companies who will
9    engage and some companies who won't.
10            And so -- yeah.  That's the -- that was
11   the involvement in the spring of 2023.
12       Q.   So that involvement was common, your
13   experience in terms of trying to license --
14            ATTORNEY HARTNETT:  Objection to form.
15            THE WITNESS:  The -- involvement was
16   common from the way we did the outreach?
17   BY ATTORNEY PRITT:
18       Q.   Correct.
19       A.   Yeah.  It's -- yes, it's typical that you
20   have to reach out to a broader set of companies than
21   what you may end up engaging with.
22       Q.   Mm-hmm.