# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

RICHARD KADREY, et al.,          )

                                 )

          Individual and         )

          Representative         )

          Plaintiffs,            )

                                 )

v.                               )     Case No. 3:23-cv-03417-VC

                                 )

META PLATFORMS, INC.,            )

                                 )

          Defendant.             )

_____)


** HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER **

Videotaped Deposition of SY CHOUDHURY

San Francisco, California

Thursday, December 5, 2024


Reported Stenographically by

Michael P. Hensley, RDR, CSR No. 14114

_____

DIGITAL EVIDENCE GROUP

1730 M. Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 104

1          When you say "nonfiction," do you include

2      biographies in that?

3          A.   That was not our -- I mean, I think as a

4      intellectual, I would include biographies as

5      nonfiction, but our -- the focus was more on -- on

6      STEM and -- like, "textbooks" I think, is a better

7      way to say it.

8          Q.   Did you make the decision to stop pursuing

9      licenses for text data in the spring of 2023?

10          ATTORNEY HARTNETT:  Objection to form.

11          THE WITNESS:  No.  I was in a meeting

12      where we, as a group, made that decision; so I did

13      not unilaterally make that decision.

14      BY ATTORNEY PRITT:

15          Q.   Did you participate in making that

16      decision?

17          A.   There was a few of us in that decision,

18      yes.

19          Q.   And who else participated in making that

20      decision?

21          A.   My boss, Marc Shedroff.

22          Q.   Well, how do you spell that?

Page 105

1       A.   Marc.  His last name is Shedroff,

2   S-h-e-d-r-o-f-f.

3            And our in-house counsel.

4       Q.   Is who was that?

5       A.   Natasha, N-a-t-a-s -- wait.

6            N-a-t-a-s-c-h-a [sic].

7            Why do I forget Natasha's last name?  I

8   was about to say "White" who's on my team.

9            What's Natasha's last name?

10      Q.   That's okay.  We can find out later.

11      A.   Okay.

12      Q.   So this meeting it was you, Marc, and

13  Natasha.  Is that all?

14      A.   Correct.

15      Q.   Okay.  And you made the decision, in that

16  meeting with Marc and Natasha, to stop pursuing

17  licensing deals for text data, including literary

18  works for use in Llama?

19      A.   That's correct.

20      Q.   And what is Marc's title?

21      A.   Vice president of business development.

22      Q.   Was he your boss?

Page 106

```
 1        A.    No.   He was my boss's boss.

 2        Q.    Boss's boss.

 3              Do you know who he reports to?

 4        A.    Ash Jhaveri.

 5        Q.    Sorry, can you spell that?

 6        A.    A-s-h -- A-s-h J-h-a-v-e-r-i.

 7        Q.    Were you given any direction from anyone

 8   else, or any input from anyone else in connection

 9   with the decision to stop pursuing licensing deals

10   for text data?

11        A.    No.

12        Q.    And so why did you make that decision?

13        A.    That's under attorney-client privilege.

14        Q.    Well, your counsel hasn't instructed you

15   not to answer.  The question was just why did you

16   decide to stop pursuing licensing deals for text

17   data for Llama?

18              ATTORNEY HARTNETT:  And I appreciate the

19   witness recognizing that, but I -- to the extent

20   that that requires you to reveal attorney-client

21   privileged information, I would ask you not to

22   answer.
```

Page 107

1          THE WITNESS:  Yeah, I choose not to

2     answer.  All I'll say is that we had a conversation,

3     and we agreed that we would pause -- at that time

4     pause licensing discussions.

5     BY ATTORNEY PRITT:

6          Q.   Were you instructed by in-house counsel to

7     pause licensing discussions?

8          ATTORNEY HARTNETT:  I would object to the

9     question as it calling for attorney-client privilege

10    and would instruct the witness not to answer.

11         ATTORNEY PRITT:  Can we go off the record.

12         THE VIDEOGRAPHER:  Do you want to go off

13    the record?

14         ATTORNEY HARTNETT:  We can go off the

15    record.

16         THE VIDEOGRAPHER:  We are now off the

17    record at 11:07.

18         (Discussion off the record.)

19         THE VIDEOGRAPHER:  We are now on the

20    record at 11:10.

21    BY ATTORNEY PRITT:

22         Q.   Just before I went off the record, we were

Page 108

1    talking about a -- a meeting you were involved in

2    where a decision was made not to enter -- not to

3    continue to pursue licensing arrangements for text

4    for use in Meta's large language models.

5              Do you recall that?

6         A.   Yes.

7         Q.   Okay.

8              Aside -- and I -- I don't want to know

9    about any legal advice you were given in that

10   meeting with respect to that decision.

11             Were there any business reasons for

12   deciding to stop pursuing licensing agreements for

13   using text data in Meta's large language models?

14        A.   No.

15        Q.   Were there any reasons, other than legal

16   advice, for deciding not to continue pursuing

17   licensing agreements for text data for use in Meta's

18   large language models?

19        A.   You know, we never got to the stage of

20   doing --

21             ATTORNEY HARTNETT:  And I just caution you

22   again to be careful about not -- please don't reveal

Page 114

1    future.

2        Q.    Right.

3            And that wasn't because it would've been

4    impossible to license text data for use and training

5    LLMs.  It was because it was a business decision to

6    pursue a different path; correct?

7            ATTORNEY HARTNETT:  Object to the form.

8            THE WITNESS:  No.  It was a multifaceted

9    decision of which part of this included technical

10   concerns, business concerns, and legal concerns both

11   for -- you know, and so it was a multifaceted

12   decision.

13   BY ATTORNEY PRITT:

14       Q.    All right.

15            Did anyone at that meeting express

16   reservations about pausing the pursuit of obtaining

17   licenses for text data in connection with training

18   Meta's LLMs?

19       A.    They were --

20            ATTORNEY HARTNETT:  I'd just like to

21   object.

22            And, again, we have a -- we talked on the

Page 115

1    break, and we can have a necessary dispute if we

2    have one with the Court, but the decision meaning

3    that he's been discussing as one with him, his boss,

4    and a attorney where there was legal advice being

5    infused in those deliberations.

6              And so if there is something separate from

7    the legal advice that you can answer, I would ask

8    you to answer it.

9              But I want to ensure we don't have a

10   waiver of privilege to that meeting.  That's not

11   what we intend.

12             ATTORNEY PRITT:  Yes.

13   BY ATTORNEY PRITT:

14        Q.   I'm not asking you anything about what the

15   reservations were yet.  I'm asking if anyone

16   expressed reservations about the decision.

17             ATTORNEY HARTNETT:  I'll let you answer

18   that question.

19             But we just need to be careful about the

20   slippage between a topic and the substance.

21             THE WITNESS:  Yeah, all I'll say is that a

22   variety of factors were discussed, and we made a

Page 116

1    decision to pause at the end of that meeting.

2    BY ATTORNEY PRITT:

3        Q.   So what are the nonlegal advice factors

4    that were discussed?

5        A.   I would like to keep that to that meeting

6    and our attorney-client privilege.

7        Q.   Is it your testimony that there were no

8    nonlegal business decisions that were discussed in

9    connection with the decision to pause pursuing

10   licenses for text data for the use in Meta's LLMs?

11           ATTORNEY HARTNETT:  I would -- sorry.

12           THE WITNESS:  The one thing that I -- I'd

13   like to say is what I've already said is that there

14   was a -- a -- not a realization is the wrong term --

15   a discussion that we had not done a technical

16   evaluation yet.

17   BY ATTORNEY PRITT:

18       Q.   And why does the fact that you had not

19   done a technical evaluation yet support or impact

20   the decision not to -- or to pause the licensing

21   efforts that you were engaged in?

22           ATTORNEY HARTNETT:  And I would just

Page 126

1    you know, what's in the dataset, how the model is

2    created, et cetera.

3    BY ATTORNEY PRITT:

4        Q.   Right.  I'm just trying to understand if

5    you agreed with the decision to pause or if you just

6    went along with it?

7        A.   I was part of a group that made the

8    decision.

9        Q.   Right.  And so then my question is are you

10   saying you made the decision to pause licensing

11   efforts without knowing what the data would be that

12   is used to train Llama?

13           ATTORNEY HARTNETT:  Object to form.

14           THE WITNESS:  I do not know -- did not

15   know then and do not know now all the data that

16   makes up Llama.  I'm not part of the engineering

17   team.  But the considerations we talked about under

18   attorney-client privileges -- privilege led the

19   group to decide -- myself being one of the group --

20   that we would pause.

21   BY ATTORNEY PRITT:

22       Q.   Right.  And I'm not trying to trick you.

Page 216

1       A.    Yep.

2       Q.    Do you recognize this document?

3       A.    Yes.

4       Q.    Yeah, and I'll represent that at .00006,

5    you comment on the document.

6       A.    Okay.  Hold on.

7       Q.    Well, we don't need to look at that now.

8       A.    Yeah.  Okay.  Go ahead.

9       Q.    Just on the first page, kind of under the

10   title, it's in brackets.  It says "WIPMZ version."

11            Do you know what "WIPMZ" stands for?

12      A.    Work in progress, I'm sure.  And MZ is

13   probably because he was going to a review for -- for

14   all of our executive staff.

15      Q.    So what does MZ stand for?

16      A.    It's likely Mark Zuckerberg.

17      Q.    So was this deck being prepared for Mark

18   Zuckerberg to review?

19      A.    Mark and his executive team likely, yes.

20      Q.    Okay.  When you refer to Mark's executive

21   team, who are you referring to?

22      A.    I mean all his direct reports.

12/5/2024          Richard Kadrey, et al. v. Meta Platforms, Inc.          Sy Choudhury
                    Highly Confidential - Subject to Protective Order

Page 220

1        A.    You know, we have yet to see significant

2    contributions to making Llama better -- let's put it

3    that way -- or contributions to making Llama better,

4    but this is a long, long road.

5        Q.    This is a long-term strategy for --

6        A.    For any open-source technology --

7        Q.    Okay.

8        A.    -- or project, I'll say it that way.

9    That's actually the right way to describe it.

10            For any open source project, there is, as

11   I think I mentioned to you earlier, this trajectory,

12   and our -- this group's recommendation here is we

13   should treat LLMs in the same way.

14       Q.    Right.  So it's a -- so you do agree,

15   though, that it is a fair summary of the long-term

16   business strategy for Llama?

17       A.    It was a proposal at this time, but yeah.

18       Q.    Right.  And that's the proposal that Meta

19   adopted; correct?

20       A.    By and large.

21       Q.    Okay.

22            Under "context," if you see down towards

Page 221

1    the bottom of the page --

2         A.    Yeah.

3         Q.    -- it mentions a -- under number 1, goal.

4    And it says:

5              [As Read]  The main goal is to

6              establish Meta as an industry leader in

7              GenAI.

8              Do you see that?

9         A.    Mm-hmm.

10        Q.    And then it says -- well, do you agree

11   with that statement?

12        A.    I don't personally agree with that

13   statement, but the author of this, who was a product

14   manager, took that position.

15        Q.    Do you agree that it was Meta's main goal

16   to establish Meta as an industry leader in GenAI?

17        A.    No.

18        Q.    Do you disagree that others at Meta

19   believed that it was the main goal to establish Meta

20   as an industry leader in GenAI?

21              ATTORNEY HARTNETT:  Object to form.

22              THE WITNESS:  I disagree.  The product

Page 222

1    manager that was brought in to this was not a

2    subject matter expert on either AI or open source,

3    and so was more of a scribe to pull things together.

4    And she wrote this first statement.  I think many --

5    many would -- many within the leadership and GenAI

6    would say that making the product better, which I've

7    reasserted multiple times, which is my belief, is

8    the top priority and is the main goal.  Top priority

9    is main goal.

10            You know, it is -- is it a ancillary

11   benefit?  Yeah, sure.  But it's not the top -- it's

12   not the main goal in my mind.

13   BY ATTORNEY PRITT:

14       Q.   Do you know whether or not that sentence

15   was changed in the version that was finalized in

16   this document?

17       A.   I don't remember.  I doubt it.  I don't --

18   I don't know.

19            Is this the final version of the G doc?

20       Q.   Well, I don't know that.  You can ask your

21   counsel.

22       A.   So --

Page 223

1        Q.   It was what was produced to us.

2        A.   I see.  Okay.  I assume it's probably the

3   final version of the G doc.

4        Q.   Right.

5             So certainly some people, including

6   everyone who commented on this, which would've

7   included you, did not change the statement "The main

8   goal is to establish Meta as an industry leader in

9   GenAI"; correct?

10       A.   There are many people above my pay grade

11  making comments on this; so I don't comment on

12  everything on here.  It's a career-limiting move.

13  So I'm sure some people agreed with that, but I

14  would -- I have high confidence to know many of the

15  folks who even commented on this document and

16  reviewed the document would disagree with that.

17       Q.   Okay.  I'm welcome to have you sit there

18  and look through the comments, but I can represent

19  there's not a single comment expressing disagreement

20  with that sentence.

21       A.   That's fair, but I still stick by my

22  statement.

Page 224

1          Q.   Okay.

2               The next sentence then also refers to:

3                    [As Read]  We also believe that by

4               opening our models up to the ecosystem, we

5               will receive benefits of free

6               experimentation on our model, hopefully

7               helping us close the gap between and us

8               competitors.

9               Do you see that?

10         A.   Yes.

11         Q.   Do you agree that one of the goals to open

12    source Llama was to close the gap between Meta and

13    its competitors?

14         A.   It was one of the minor goals, but

15    production uses of the models in any scenario for a

16    new model, a new release versus, for example, if we

17    were starting with CM3leon or something like that

18    which was unfortunately a smaller model; so it's --

19    you couldn't really use that.  So, yes; I mean, it

20    would help close the gap of the latest generation of

21    models.

22         Q.   You don't dispute at this time that there

Page 225

1   was a gap between Meta and its competitors with

2   respect to large language models; right?

3              ATTORNEY HARTNETT:  Object to form.

4              THE WITNESS:  I'm not the technical

5   expert, but the -- there -- there was a conversation

6   in the market that Meta was behind.

7   BY ATTORNEY PRITT:

8      Q.   Then it also says:

9              [As Read]  We aim to accomplish these

10             goals while minimizing focus required from

11             the core team as they work on future

12             research and product priorities.

13             Do you agree another benefit of the

14  decision to open source or purportedly open source

15  Llama was to minimize the focus required from the

16  core team so they could work on future research and

17  product priorities at Meta?

18     A.   I did -- I am not the author of this.  I

19  don't think I have a strong opinion or subject

20  matter expertise to comment on that.

21     Q.   Okay.  Do you disagree with that

22  statement, sitting here today?

Page 228

```
 1        Q.   I see.

 2        A.   But we, obviously, did choose a -- it's

 3   not really a commercial license.  Commercial and

 4   noncommercial license, that's at no cost; right?

 5        Q.   Yeah.

 6        A.   So Option 2 -- some variant of Option 2

 7   was what was resulted in what you now know as the

 8   CLA.

 9        Q.   Okay.  And then page 93506 refers to

10   several risks for making the model available under

11   Option 2 --

12        A.   Yep.

13        Q.   -- for commercial purposes.

14        A.   Yep.

15        Q.   Do you see that?

16        A.   Yes.  I'm there.

17             ATTORNEY HARTNETT:  I apologize, but this

18   appears to be something I'll need to claw back, the

19   legal risks listed in column 2.  I'm trying to get a

20   clarity on that, as well, but it seems to be, as you

21   just noted, risks, and these seem to be coming from

22   legal.
```

Page 229

1          ATTORNEY PRITT:  Okay.  Well, we'll stop

2     questioning about this section for now.  We will

3     certainly dispute the ability to claw back this

4     document, but -- we'll figure that out.

5          ATTORNEY HARTNETT:  Not to interrupt you,

6     but it's 1:39 so we've been a little bit over an

7     hour.  If you want to take a break, I can resolve it

8     by after lunch.

9          ATTORNEY PRITT:  Yeah.  Let me finish

10    other sections.

11          ATTORNEY HARTNETT:  Do whatever you need

12    to do.

13          Okay.  Thank you.

14          ATTORNEY PRITT:  Mm-hmm.

15    BY ATTORNEY PRITT:

16      Q.   Can you look at -- towards the back.  It's

17    .00013.  It's the list of comments.

18      A.   Sorry.  Oh, it's like --

19      Q.   Yes.

20      A.   -- start in the back and go backwards.

21      Q.   Yeah, pretty much.

22      A.   It's easier --

Page 230

1                Oh, here we go.  Okay.  Yep.

2        Q.    The second comment from the top, by Yann

3    LeCun?

4        A.    Yeah.

5        Q.    It says:

6                [As Read]  An open release will create

7                an entire ecosystem of LLM based products

8                that will undermine OpenAI's current

9                supremacy.

10                Do you see that?

11       A.    Yes.

12       Q.    Was one of the goals for an open release

13   to be able to create an entire ecosystem of LLM

14   based products to undermine OpenAI's current

15   supremacy?

16       A.    I wouldn't -- that was not one of my

17   goals, and I don't think that was one of the overall

18   goals.

19                I think that Yann has strong opinion,

20   being a researcher, and so clearly that was one of

21   his -- what he would say is one of the benefits.

22                I will say, though, that whether it was

Page 231

1    during this time or even now, we did talk about --

2    we continue to be internally and externally vocal

3    about the fact that closed models have certain

4    deficiencies, as well as risks associated with it of

5    which open AI is clearly one of the leading closed

6    models.

7            And Llama's not the only open model.

8    There are quite a few:  There's Gemma, there's Phi,

9    there's Quinn, there's, you know.  But open models

10   have certain, you know, benefits, et cetera.

11           And so -- so when I read, even during this

12   time, recall that there was things like Dall-E and

13   these other open models there, and, I think,

14   Microsoft had just released Phi.

15           So the entire ecosystem of LLM-based

16   products -- he's referring to an open release will

17   be in addition to the other open models versus the

18   closed models of which OpenAI is the leading one.

19   So maybe not a surprise to me that he wrote that.

20       Q.   So one of the goals being discussed by at

21   least some people at Meta at this time was that an

22   open release would create an entire ecosystem of

Page 232

1    LLM-based products to undermine OpenAI's current

2    supremacy; right?

3          A.   I think this was Yann's opinion that it

4    would be a benefit --

5          Q.   Or --

6          A.   -- and that's his input that this would be

7    a benefit.

8          Q.   My apologies.  And, in fact, Meta is

9    developing a suite of LLM-based products; correct?

10               ATTORNEY HARTNETT:  Object to form.

11               THE WITNESS:  We -- we have one very

12   notable LLM-based product that we've been made

13   public.  It was called Meta AI, our assistant.  Yep.

14   BY ATTORNEY PRITT:

15         Q.   And that is also incorporated in other

16   hardware like Meta Ray-Ban; correct?

17         A.   Correct.

18         Q.   And at the bottom of this page -- towards

19   the bottom of this page, the second to the last

20   comment -- you see the last sentence discusses how

21   Meta would be saving significant, then there's three

22   dollar signs, on both OPEX and head count with such

Page 233

1    a fly wheel.

2            Do you see that?

3        A.    That's right.  Yep.

4        Q.    That's a statement in connection with the

5    decision for the proposal to open source Llama at

6    that time; correct?

7        A.    No.  This is -- this is an opinion of

8    Sumit, who does not work on the LLM teams.  Reviewed

9    a document by him earlier, if you recall.  Of how --

10   what he felt would be a benefit.  I don't -- I

11   didn't, at the time, agree that that's actually a

12   valid -- what do you call it -- top main reason or a

13   top main reason or minor reason, but he felt

14   opinionated that that would be a benefit.

15       Q.    Okay.  And you did not comment in response

16   to that to say you disagreed; right?

17       A.    That's correct.

18       Q.    Okay.

19       A.    He's much more my senior.  That would not

20   be a good career move.

21       Q.    Okay.

22            Are you aware of whether OpenAI used

Page 234

1    scraped data for training ChatGPT?

2         A.   I'm not --

3         Q.   Okay.

4         A.   -- aware of anything they've done.

5         Q.   I think I'm done with the document.  Do

6    you want to --

7              ATTORNEY HARTNETT:  Yes.  For the record,

8    I want to make clear we're not going to claw back

9    861, which is the other one we had talked about

10   before.

11             ATTORNEY PRITT:  Oh, okay.

12             ATTORNEY HARTNETT:  We are going to claw

13   back 93506 and 93507, which are the two pages of the

14   862 document that have a legal risk discussion.

15             ATTORNEY PRITT:  Okay.  For the record, we

16   do not agree that it can be clawed back at this

17   time.  Our position is that it has been waived.

18   There's no claw back provision in the protective

19   order; so there is no 502(D) order, that means it is

20   subject to Rule 502(b) on that basis.  Even though

21   we don't think you can claw back a waived document,

22   we will currently sequester it so that it can then

Page 235

1    be raised with the Court.

2              ATTORNEY HARTNETT:  Thank you.

3              THE VIDEOGRAPHER:  Okay.

4              ATTORNEY PRITT:  Yes.

5              THE VIDEOGRAPHER:  We're off the record at

6    1:45.

7              (A break was taken.)

8              THE VIDEOGRAPHER:  We are now on the

9    record at 2:34.

10   BY ATTORNEY PRITT:

11       Q.   Okay.  Let's mark the next exhibit.  I've

12   already forgotten the number.

13             ATTORNEY SCHUFFENHAUER:  863.

14             ATTORNEY PRITT:  863.

15             This is Exhibit 863.

16             (Exhibit 863 was marked for

17             identification.)

18   BY ATTORNEY PRITT:

19       Q.   So this is a compilation of documents that

20   were produced together.

21       A.   Okay.

22       Q.   Starting with Meta_Kadrey_00171374 and

Page 291

1    executives said OpenAI seemed to have used

2    copyrighted material without permission?

3         A.    Yeah, I don't recall.

4         Q.    And then it goes on to say:

5               [As Read]  It would take Meta too long

6               to negotiate licenses with publishers,

7               artists, musicians and the news industry

8               according to the recordings.

9               Do you see that?

10        A.    Yeah.

11        Q.    Do you recall being present at any such

12   meeting?

13        A.    Not -- not specifically, no.

14        Q.    Do you recall generally any meetings in

15   which there was discussion that it would take too

16   long to negotiate licenses with publishers, artists,

17   musicians, or the news industry?

18              ATTORNEY HARTNETT:  I would just object to

19   the extent that it calls for attorney-client

20   privilege without validating that any meeting

21   existed.

22              You can answer.

Page 292

1              THE WITNESS:  Yeah, I'll -- I'll just say

2    attorney-client privilege on that one.

3    BY ATTORNEY PRITT:

4         Q.   All I asked was whether you recall any

5    meetings taking place in which there was a

6    discussion that it would take too long to negotiate

7    licenses with publishers, artists, musicians, and

8    the news industry.  It's a yes or no answer.

9              ATTORNEY HARTNETT:  And I would -- it's

10   asking -- to the extent that that was content

11   discussed in the context of getting legal advice

12   that would be attorney-client privilege and I would

13   ask him not to answer.

14             If he has content that's not

15   attorney-client privileged he can answer.

16             THE WITNESS:  I choose not to answer.

17   BY ATTORNEY PRITT:

18        Q.   Are you instructing the witness to refuse

19   to answer whether or not there was a -- such a

20   meeting?

21             ATTORNEY HARTNETT:  There's very specific

22   description of the meeting and the content of the