# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

RICHARD KADREY, et al.,          )
                                 )
          Individual and         )
          Representative         )
          Plaintiffs,            )
                                 )
v.                               )    Case No. 3:23-cv-03417-VC
                                 )
META PLATFORMS, INC.,            )
                                 )
          Defendant.             )
_____)


** HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER **

Videotaped Deposition of SY CHOUDHURY

San Francisco, California

Thursday, December 5, 2024



Reported Stenographically by

Michael P. Hensley, RDR, CSR No. 14114


_____

DIGITAL EVIDENCE GROUP

1730 M. Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 104

1           When you say "nonfiction," do you include

2     biographies in that?

3           A.   That was not our -- I mean, I think as a

4     intellectual, I would include biographies as

5     nonfiction, but our -- the focus was more on -- on

6     STEM and -- like, "textbooks" I think, is a better

7     way to say it.

8           Q.   Did you make the decision to stop pursuing

9     licenses for text data in the spring of 2023?

10          ATTORNEY HARTNETT:  Objection to form.

11          THE WITNESS:  No.  I was in a meeting

12    where we, as a group, made that decision; so I did

13    not unilaterally make that decision.

14    BY ATTORNEY PRITT:

15          Q.   Did you participate in making that

16    decision?

17          A.   There was a few of us in that decision,

18    yes.

19          Q.   And who else participated in making that

20    decision?

21          A.   My boss, Marc Shedroff.

22          Q.   Well, how do you spell that?

Page 105

1          A.    Marc.   His last name is Shedroff,

2    S-h-e-d-r-o-f-f.

3              And our in-house counsel.

4          Q.    Is who was that?

5          A.    Natasha, N-a-t-a-s -- wait.

6              N-a-t-a-s-c-h-a [sic].

7              Why do I forget Natasha's last name?   I

8    was about to say "White" who's on my team.

9              What's Natasha's last name?

10         Q.    That's okay.   We can find out later.

11         A.    Okay.

12         Q.    So this meeting it was you, Marc, and

13    Natasha.   Is that all?

14         A.    Correct.

15         Q.    Okay.   And you made the decision, in that

16    meeting with Marc and Natasha, to stop pursuing

17    licensing deals for text data, including literary

18    works for use in Llama?

19         A.    That's correct.

20         Q.    And what is Marc's title?

21         A.    Vice president of business development.

22         Q.    Was he your boss?

Page 106

1      A.    No.  He was my boss's boss.

2      Q.    Boss's boss.

3            Do you know who he reports to?

4      A.    Ash Jhaveri.

5      Q.    Sorry, can you spell that?

6      A.    A-s-h -- A-s-h J-h-a-v-e-r-i.

7      Q.    Were you given any direction from anyone

8   else, or any input from anyone else in connection

9   with the decision to stop pursuing licensing deals

10  for text data?

11     A.    No.

12     Q.    And so why did you make that decision?

13     A.    That's under attorney-client privilege.

14     Q.    Well, your counsel hasn't instructed you

15  not to answer.  The question was just why did you

16  decide to stop pursuing licensing deals for text

17  data for Llama?

18          ATTORNEY HARTNETT:  And I appreciate the

19  witness recognizing that, but I -- to the extent

20  that that requires you to reveal attorney-client

21  privileged information, I would ask you not to

22  answer.

Page 108

1    talking about a -- a meeting you were involved in

2    where a decision was made not to enter -- not to

3    continue to pursue licensing arrangements for text

4    for use in Meta's large language models.

5          Do you recall that?

6    A.    Yes.

7    Q.    Okay.

8          Aside -- and I -- I don't want to know

9    about any legal advice you were given in that

10   meeting with respect to that decision.

11         Were there any business reasons for

12   deciding to stop pursuing licensing agreements for

13   using text data in Meta's large language models?

14   A.    No.

15   Q.    Were there any reasons, other than legal

16   advice, for deciding not to continue pursuing

17   licensing agreements for text data for use in Meta's

18   large language models?

19   A.    You know, we never got to the stage of

20   doing --

21         ATTORNEY HARTNETT:  And I just caution you

22   again to be careful about not -- please don't reveal

Page 110

1    you get some representative dataset, and -- and test

2    actually to see whether it will -- the efficacy goes

3    up.  And so then you might want to consider doing

4    the deal; right?

5        Q.   So are you saying that Meta never got to

6    the evaluation stage with any publishers?

7                ATTORNEY HARTNETT:  Objection to form.

8                THE WITNESS:  We did not get to the actual

9    technical evaluation stage.

10   BY ATTORNEY PRITT:

11       Q.   Okay.

12            Did you agree with the decision to stop

13   pursuing licenses for text data for use in Meta's

14   LLMs?

15       A.   You know, I was part of our group that

16   discussed and agreed upon that; so we -- we agreed.

17       Q.   Did you have any reservations about doing

18   that?

19       A.    No.  I thought it was the appropriate

20   thing at the time, to pause the discussions.

21       Q.   Why did you think it was the appropriate

22   thing at the time to pause the discussions?

Page 116

1    decision to pause at the end of that meeting.

2    BY ATTORNEY PRITT:

3         Q.   So what are the nonlegal advice factors

4    that were discussed?

5         A.   I would like to keep that to that meeting

6    and our attorney-client privilege.

7         Q.   Is it your testimony that there were no

8    nonlegal business decisions that were discussed in

9    connection with the decision to pause pursuing

10   licenses for text data for the use in Meta's LLMs?

11             ATTORNEY HARTNETT:  I would -- sorry.

12             THE WITNESS:  The one thing that I -- I'd

13   like to say is what I've already said is that there

14   was a -- a -- not a realization is the wrong term --

15   a discussion that we had not done a technical

16   evaluation yet.

17   BY ATTORNEY PRITT:

18        Q.   And why does the fact that you had not

19   done a technical evaluation yet support or impact

20   the decision not to -- or to pause the licensing

21   efforts that you were engaged in?

22             ATTORNEY HARTNETT:  And I would just

12/5/2024              Richard Kadrey, et al. v. Meta Platforms, Inc.              Sy Choudhury
                    Highly Confidential - Subject to Protective Order

Page 120

1              ATTORNEY PRITT:  I'm not seeking a --

2              ATTORNEY HARTNETT:  Yeah, I just have to

3      make my record.

4              ATTORNEY PRITT:  -- legal advice.

5              ATTORNEY HARTNETT:  Yeah, so please

6      exclude any legal advice.

7              THE WITNESS:  Yeah.

8              ATTORNEY HARTNETT:  And if you can't

9      answer a question without regard to legal advice,

10     just tell Mr. Pritt that.

11             THE WITNESS:  Yeah.  So I recall that we

12     had -- some of the things we talked about was the

13     lack of being able to -- the lack of scaleability

14     and being able to reach out to -- not reach -- reach

15     out is the wrong term.

16             Lack of scaleability in even being able to

17     do deals with publishers that actually resulted in

18     them being able to license the works to us.

19     BY ATTORNEY PRITT:

20         Q.  I'm sorry to interrupt.  I think we're

21     mixing up the pros and cons.

22             So what were the -- what were the cons of

Page 121

1    stopping, pausing the licensing efforts?  It sounds

2    like you are talking about a pro.

3         A.    No.  It's -- oh, I see.  Got it.  Yeah.

4         Q.    Right.  Might be a double-negative.

5         A.    Yeah.  Yeah, yeah.  Exactly.

6               Part of the cons was the unknown nature

7    of -- of, you know, how data and models -- the legal

8    relationship between those two.  And we're not

9    lawyers, you know, the BD team.  But clearly, we

10   read about things.  And so I'm sure that we talked

11   about that as -- as humans.  But that was not our

12   area of expertise; so we could postulate but not

13   exactly have a -- postulate that, it's a -- it's a

14   thing -- it's a consideration, but it's not

15   something that we are experts in.

16              So that would be, I guess you could say, a

17   pro, right?

18        Q.    Well, a con of stopping pursuing

19   licensing --

20        A.    Yeah.

21        Q.    -- as opposed to using data some other

22   way.

Page 122

1        A.   So we -- we -- I'm sure we discussed that.

2   We also discussed, as you mentioned, the other

3   topic of -- sorry -- as I mentioned, the other topic

4   of -- as -- as we started to engage with different

5   types of publishers to understand better and to

6   educate ourselves, educate our product and

7   engineering teams of what we heard, right, including

8   that fiction category, I'll say.  Publishers many

9   times were -- did not have the rights to even

10  license to us, even though the conversation started

11  that way.

12            And, again, not -- not -- it's not

13  100 percent either ways.  The -- a lot of the

14  nonfiction publishers, some of them did have rights

15  because they were aggregators, et cetera.

16            And so that's another major learning --

17  not learning, a conversation thread that -- that we

18  had, I recall at that time.

19       Q.   What were the pros of -- and I'm not

20  seeking legal advice -- of deciding to pause

21  licensing efforts?

22       A.   I mean, I think really from a -- at that

Page 123

1    time, my main focus was there were a slew of other

2    deals we were also doing for different teams on the

3    AI team.  There was a slew of outbound engagements

4    at that time on technologies, such as PyTorch, which

5    is a really important tools platform.

6            So our BD team -- a big pro was just my BD

7    team's bandwidth to work on other things.

8        Q.    Sorry.  When was the meeting that you had

9    with Marc and Natasha?

10            Do you recall the date?

11       A.    No, I don't recall the date.  But -- this

12   is all such a blur because last -- it's a year and a

13   half ago.

14            April -- April?  April?

15       Q.    Aprilish?

16       A.    That's --

17       Q.    Do you remember within April?  Early

18   April?

19       A.    Oh, no.  Definitely not.  And I could even

20   be wrong by -- it could be February or it could be

21   May for --

22       Q.    And did you convey this decision to your

Page 124

1    team?

2          A.    Yes.

3          Q.    And how did you convey it to your team?

4          A.    I told them to pause.

5          Q.    Did you -- what was the method of

6    communication you used to convey it to your team?

7          A.    I was having one-on-ones on a weekly basis

8    with -- at that time the entire team was reporting

9    to me that basically, you know -- actually for those

10   team members reported to me directly; so in my

11   one-on-ones.

12         Q.    Did you convey it orally?

13         A.    Yes.

14         Q.    Did you convey it in writing?

15         A.    I may have.

16         Q.    If you conveyed it in writing, how would

17   you have done so?

18         A.    Probably Workchat.  I use -- I try to use

19   Workchat for all of our internal communications.  I

20   use email for external because obviously it's a

21   common medium.

22         Q.    Would you have conveyed the decision to

Page 125

 1    each of your direct reports?

 2        A.    The folks who were working on it.  But

 3    then later in our team meetings, we talked about

 4    this as a -- you know, we always update workstreams,

 5    and I'm sure in different Work Chats I've referred

 6    to that decision.

 7        Q.    And so you agreed with the decision to

 8    pause licensing efforts without knowing what the

 9    alternative was for obtaining data to use to train

10    Llama?

11            ATTORNEY HARTNETT:  Objection to the form.

12    And to the extent attorney-client privilege would be

13    the basis for any of your knowledge.

14            THE WITNESS:  You know, the -- I wouldn't

15    say "agree" or "disagree."  Our team works with

16    third parties to source, in this case -- we don't

17    just do this, but to explore and source data when

18    needed.

19            And so, you know, we -- we basically --

20    the decision was that our team was going to pause on

21    our work.  Product and engineering made the

22    overall -- makes the overall decisions of what's --

Page 215

1    BY ATTORNEY PRITT:

2        Q.   86 --

3            ATTORNEY HARTNETT:  Do you have more

4    questions on that if we have more?

5            ATTORNEY PRITT:  I don't think so, no.

6            ATTORNEY HARTNETT:  Okay.  I'll tell you

7    if I have a answer on that.

8            ATTORNEY PRITT:  Okay.  Yep.

9            Exhibit -- we'll mark Exhibit 86 --

10           What you did say?  3?

11           ATTORNEY SCHUFFENHAUER:  2.

12           ATTORNEY PRITT:  862 down here.

13           (Exhibit 862 was marked for

14           identification.)

15           ATTORNEY PRITT:  Thank you.  This document

16   has the Bates number Meta_Kadrey__00093499 through

17   93513.00016.

18           The title of this document is "Llama:  A

19   new industry platform."

20           THE WITNESS:  Mm-hmm.

21   BY ATTORNEY PRITT:

22       Q.   You see that?

Page 226

1        A.   The core -- the -- you know, "core team"

2    is a vague term.  The team that does engineering of

3    the models is not in any way so form responsible in

4    any engineering organization -- not just AI, not

5    just LLMs -- the team that does the core engineering

6    does not get involved in enabling the models with

7    partners like AWS or IBM, as you said.

8             So -- so it's almost -- it's a null

9    statement.  It's not even a valid statement.

10   BY ATTORNEY PRITT:

11       Q.   Okay.  But at least at the time of this

12   document, when you commented on it, you did not say

13   that you disagreed with any of those statements?

14       A.   I did not -- I probably found those

15   statements to be not worthy of comment, but I did

16   not comment on them.

17       Q.   Okay.

18            Can you go to --

19            Can you go to page 93506.

20            Well, actually, go to page -- sorry.

21   There's a big chart that starts at page 93502.  It

22   says "trade off-summaries."

Page 227

1          A.    Okay.

2          Q.    And it lists three options.

3          A.    Yep.

4          Q.    Are these options for the -- are these

5     options that are being presented to Mark Zuckerberg

6     and the executive team as to, you know, the release

7     of Llama?

8          A.    These were options that pertained to

9     should we have a commercial license to a version of

10    Llama, and if we have a commercial license, should

11    we or should we not?  Hence you see the Option 1 is

12    no change, don't -- so it was really around that.

13              And then, in addition to that, you know,

14    should we stand up an API service as part of that,

15    yep.

16         Q.    And which option was selected?

17         A.    I mean this -- when this document went

18    out, I think there were multiple other conversations

19    that happened after.

20         Q.    Oh.

21         A.    So I don't know if this is exactly

22    Option 2.

Page 228

1          Q.    I see.

2          A.    But we, obviously, did choose a -- it's

3    not really a commercial license.  Commercial and

4    noncommercial license, that's at no cost; right?

5          Q.    Yeah.

6          A.    So Option 2 -- some variant of Option 2

7    was what was resulted in what you now know as the

8    CLA.

9          Q.    Okay.  And then page 93506 refers to

10   several risks for making the model available under

11   Option 2 --

12         A.    Yep.

13         Q.    -- for commercial purposes.

14         A.    Yep.

15         Q.    Do you see that?

16         A.    Yes.  I'm there.

17              ATTORNEY HARTNETT:  I apologize, but this

18   appears to be something I'll need to claw back, the

19   legal risks listed in column 2.  I'm trying to get a

20   clarity on that, as well, but it seems to be, as you

21   just noted, risks, and these seem to be coming from

22   legal.

Page 229

 1          ATTORNEY PRITT:  Okay.  Well, we'll stop

 2    questioning about this section for now.  We will

 3    certainly dispute the ability to claw back this

 4    document, but -- we'll figure that out.

 5          ATTORNEY HARTNETT:  Not to interrupt you,

 6    but it's 1:39 so we've been a little bit over an

 7    hour.  If you want to take a break, I can resolve it

 8    by after lunch.

 9          ATTORNEY PRITT:  Yeah.  Let me finish

10    other sections.

11          ATTORNEY HARTNETT:  Do whatever you need

12    to do.

13          Okay.  Thank you.

14          ATTORNEY PRITT:  Mm-hmm.

15    BY ATTORNEY PRITT:

16      Q.   Can you look at -- towards the back.  It's

17    .00013.  It's the list of comments.

18      A.   Sorry.  Oh, it's like --

19      Q.   Yes.

20      A.   -- start in the back and go backwards.

21      Q.   Yeah, pretty much.

22      A.   It's easier --

Page 230

```
 1                  Oh, here we go.  Okay.  Yep.
 2        Q.   The second comment from the top, by Yann
 3    LeCun?
 4        A.   Yeah.
 5        Q.   It says:
 6                  [As Read]  An open release will create
 7             an entire ecosystem of LLM based products
 8             that will undermine OpenAI's current
 9             supremacy.
10             Do you see that?
11        A.   Yes.
12        Q.   Was one of the goals for an open release
13    to be able to create an entire ecosystem of LLM
14    based products to undermine OpenAI's current
15    supremacy?
16        A.   I wouldn't -- that was not one of my
17    goals, and I don't think that was one of the overall
18    goals.
19             I think that Yann has strong opinion,
20    being a researcher, and so clearly that was one of
21    his -- what he would say is one of the benefits.
22             I will say, though, that whether it was
```

Page 231

1    during this time or even now, we did talk about --

2    we continue to be internally and externally vocal

3    about the fact that closed models have certain

4    deficiencies, as well as risks associated with it of

5    which open AI is clearly one of the leading closed

6    models.

7            And Llama's not the only open model.

8    There are quite a few:  There's Gemma, there's Phi,

9    there's Quinn, there's, you know.  But open models

10   have certain, you know, benefits, et cetera.

11           And so -- so when I read, even during this

12   time, recall that there was things like Dall-E and

13   these other open models there, and, I think,

14   Microsoft had just released Phi.

15           So the entire ecosystem of LLM-based

16   products -- he's referring to an open release will

17   be in addition to the other open models versus the

18   closed models of which OpenAI is the leading one.

19   So maybe not a surprise to me that he wrote that.

20      Q.   So one of the goals being discussed by at

21   least some people at Meta at this time was that an

22   open release would create an entire ecosystem of

Page 232

1    LLM-based products to undermine OpenAI's current

2    supremacy; right?

3          A.   I think this was Yann's opinion that it

4    would be a benefit --

5          Q.   Or --

6          A.   -- and that's his input that this would be

7    a benefit.

8          Q.   My apologies.  And, in fact, Meta is

9    developing a suite of LLM-based products; correct?

10               ATTORNEY HARTNETT:  Object to form.

11               THE WITNESS:  We -- we have one very

12   notable LLM-based product that we've been made

13   public.  It was called Meta AI, our assistant.  Yep.

14   BY ATTORNEY PRITT:

15         Q.   And that is also incorporated in other

16   hardware like Meta Ray-Ban; correct?

17         A.   Correct.

18         Q.   And at the bottom of this page -- towards

19   the bottom of this page, the second to the last

20   comment -- you see the last sentence discusses how

21   Meta would be saving significant, then there's three

22   dollar signs, on both OPEX and head count with such

Page 233

1    a fly wheel.

2              Do you see that?

3        A.    That's right.  Yep.

4        Q.    That's a statement in connection with the

5    decision for the proposal to open source Llama at

6    that time; correct?

7        A.    No.  This is -- this is an opinion of

8    Sumit, who does not work on the LLM teams.  Reviewed

9    a document by him earlier, if you recall.  Of how --

10   what he felt would be a benefit.  I don't -- I

11   didn't, at the time, agree that that's actually a

12   valid -- what do you call it -- top main reason or a

13   top main reason or minor reason, but he felt

14   opinionated that that would be a benefit.

15       Q.    Okay.  And you did not comment in response

16   to that to say you disagreed; right?

17       A.    That's correct.

18       Q.    Okay.

19       A.    He's much more my senior.  That would not

20   be a good career move.

21       Q.    Okay.

22              Are you aware of whether OpenAI used

12/5/2024        Richard Kadrey, et al. v. Meta Platforms, Inc.        Sy Choudhury
Highly Confidential - Subject to Protective Order

Page 234

1    scraped data for training ChatGPT?

2        A.    I'm not --

3        Q.    Okay.

4        A.    -- aware of anything they've done.

5        Q.    I think I'm done with the document.  Do

6    you want to --

7            ATTORNEY HARTNETT:  Yes.  For the record,

8    I want to make clear we're not going to claw back

9    861, which is the other one we had talked about

10   before.

11           ATTORNEY PRITT:  Oh, okay.

12           ATTORNEY HARTNETT:  We are going to claw

13   back 93506 and 93507, which are the two pages of the

14   862 document that have a legal risk discussion.

15           ATTORNEY PRITT:  Okay.  For the record, we

16   do not agree that it can be clawed back at this

17   time.  Our position is that it has been waived.

18   There's no claw back provision in the protective

19   order; so there is no 502(D) order, that means it is

20   subject to Rule 502(b) on that basis.  Even though

21   we don't think you can claw back a waived document,

22   we will currently sequester it so that it can then

Page 235

1    be raised with the Court.

2              ATTORNEY HARTNETT:  Thank you.

3              THE VIDEOGRAPHER:  Okay.

4              ATTORNEY PRITT:  Yes.

5              THE VIDEOGRAPHER:  We're off the record at

6    1:45.

7              (A break was taken.)

8              THE VIDEOGRAPHER:  We are now on the

9    record at 2:34.

10   BY ATTORNEY PRITT:

11        Q.  Okay.  Let's mark the next exhibit.  I've

12   already forgotten the number.

13             ATTORNEY SCHUFFENHAUER:  863.

14             ATTORNEY PRITT:  863.

15             This is Exhibit 863.

16             (Exhibit 863 was marked for

17             identification.)

18   BY ATTORNEY PRITT:

19        Q.  So this is a compilation of documents that

20   were produced together.

21        A.  Okay.

22        Q.  Starting with Meta_Kadrey_00171374 and

Page 396

1              CERTIFICATE OF SHORTHAND REPORTER

2

3          I, Michael P. Hensley, Registered Diplomate

4      Reporter for the State of California, CSR No. 14114,

5      the officer before whom the foregoing deposition was

6      taken, do hereby certify that the foregoing

7      transcript is a true and correct record of the

8      testimony given; that said testimony was taken by me

9      stenographically and thereafter reduced to

10     typewriting under my direction; that reading and

11     signing was not requested; and that I am neither

12     counsel for, related to, nor employed by any of the

13     parties to this case and have no interest, financial

14     or otherwise, in its outcome.

15

16

17

18

19

20

21                 Michael P. Hensley, CSR, RDR

22