# EXHIBIT B

```
1              12/17/2024 - MARK ZUCKERBERG

2              UNOFFICIAL DRAFT TRANSCRIPT

3

4       ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

5

6              This draft transcript is unedited and

7       uncertified.  It may contain untranslated

8       stenographic symbols, an occasional reporter's note,

9       a misspelled proper name and/or nonsensical word

10      combinations.  These and any other errors will be

11      corrected in the final transcript.

12                 It contains raw output from the court

13      reporter's stenotype machine translated into English

14      by the court reporter's computer, without the

15      benefit of proofreading.  Since this transcript has

16      not been proofread, the court reporter cannot assume

17      responsibility for any errors therein.

18                 This draft transcript is intended to

19      assist attorneys in their case preparation and is

20      not to be construed as the final transcript.  It is

21      not to be duplicated or sold to other persons or

22      businesses.  It is not to be read by the witness or

23      quoted in any pleading, or for any other purpose,
```

11    although, I'm not sure I could name any specific

12    ones right now.

13        Q.   In terms of Meta's policy, does Meta have

14    a policy against downloading materials from websites

15    that are known to contain copyrighted materials for

16    which they do not have licenses?

17             ATTORNEY GHAJAR:  Objection.  Lacks

18    foundation.  Vague.

19             THE WITNESS:  I'm not sure if we have a

20    specific policy around that or if it's just a

21    broader ethics policy around how we should think

22    about using data and who we work with more broadly.

23    BY ATTORNEY BOIES:

24        Q.   Would you agree, as the CEO of Meta, that

25    Meta should not be using websites that web -- that

                                                      97

1    Meta knows contains illegally pirated copyright

2    materials?

3             ATTORNEY GHAJAR:  Objection.  Vague.  Also

4    assumes facts not in evidence.

5             THE WITNESS:  I mean, on its face, that

6    seems like a reasonable thing to say, but I think

7    you would want to think through the nuances of it a

8    little bit more.

9         For example, YouTube, I think, may end up

10   hosting some stuff that people pirate for some

11   period of time, but YouTube is trying to take that

12   stuff down.  And the vast majority of the stuff on

13   YouTube, I would assume, is kind of good and they

14   have the license to do.  So would I want to have a

15   policy against people using YouTube because some of

16   the content may be copyrighted?  No, that doesn't

17   seem reasonable.  But I understand the question that

18   you're asking.

19   BY ATTORNEY BOIES:

20   Q.   Yeah.  The question I'm asking really is

21   if you have a website or source that contains

22   copyrighted materials that they do not have a

23   license for and they intentionally are making

24   unlicensed copyrighted materials available to the

25   public, would you agree, as the CEO of Meta, that

98

1    Meta should not be downloading materials from

2    websites like that?

3         ATTORNEY GHAJAR:  Objection.  Vague.  Also

4       an incomplete hypothetical.  Assumes facts.

5               THE WITNESS:  Yeah, I mean, it's -- I

6       think it's -- it's --

7               You know, I mean the way that you frame

8       it, it seems like that's something that we should be

9       pretty careful about, but I think when you get into

10      the nuances, it's hard to assess what people's

11      intent is.

12              You know, I mean, going back to the

13      YouTube example before, where I think that there's

14      some percent of the content is probably stuff that

15      they don't have copyright or don't have the license

16      to distribute.  Early on, I think that people did

17      make some assertions about YouTube's intent on this,

18      and they were less mature about developing their IP

19      rights management.

20              But even then, I don't think that I

21      would've said that I wouldn't want people at Meta

22      not to use YouTube, at that point.  So -- so I don't

23      know.

24              I just think it's -- I think what you're

25      saying -- I think it kind of -- the way you're

99

1     characterizing it, it sort of broadly seems like,

2     yes, that seems like a bad thing.  But I just am --

3     I want to be caution about making a blanket

4     statement about policies, and this is why we have

5     teams who think through this carefully because there

6     are often more nuances than is kind of apparent the

7     first -- in, like, when you just think about it, at

8     first blush.

9     BY ATTORNEY BOIES:

10        Q.   When you say "that seems like a bad

11    thing," what are you referring to?

12        A.   Your characterization of it.  You know,

13    if -- if there's a -- somebody who's providing a

14    website and they're intentionally trying to violate

15    people's rights, than, yeah.  I mean, I think that

16    the behavior that you're describing, obviously,

17    seems like it's something that we would want to be

18    cautious about or careful about how we engaged with

19    it or maybe prevent our teams from engaging with it.

20             But I just think it requires a little bit

21    further analysis before I can issue sort of like a

22    blanket assessment of what our policy should be,

23    because I think -- you know, this is the example I

24    was giving around YouTube right now.

25             I think even just a couple minutes of

1    thinking through what's cases might be around that

2    highlights why there are cases where having such a

3    blanket ban might not be the right thing to do.

4        Q.   I'm trying to focus not on YouTube, which

5    you keep coming back to.  I'm trying to focus on

6    websites like LibGen, and I'm trying to talk about

7    it generally, because you say you've never heard of

8    LibGen.

9            And what I'm asking about is, if you've

10   got a website that, on its face, purports to

11   distribute copyrighted materials for which there is

12   no license -- which, obviously, is not what YouTube

13   does -- would you agree that either as a matter of

14   law or ethics, you would not want Meta trafficking

15   with that website?

16           ATTORNEY GHAJAR:  Objection.  The

17   question's vague.  Incomplete hypothetical.

18           THE WITNESS:  Yeah, I mean, I get that

19   you're trying to get me to give an opinion on

20   LibGen, which I haven't really heard of.

21   BY ATTORNEY BOIES:

22          Q.   No I'm saying you haven't heard of

23     LibGen --

24          A.   No, things like it.  Things like it.  I

25     understand what you're saying.  It's just a little

                                                        101

1      hard for me to weigh in on that without looking at

2      the nuances of that case.

3               And the YouTube example, I just keep

4      raising because it's an example of a thing that --

5      of a product that over time I think people have

6      alleged have been potentially willful and not doing

7      enough to suppress or kind of clean up copyrighted

8      content and -- so I'm just trying to be careful,

9      because rather than having a conversation in some

10     sort of like absolute about how we would handle that

11     kind of case, I think I'd -- I just would want to

12     have some more time to think through it.  I'd want

13     our policy team to think through it.  And I also

14     think it makes sense to look at the specifics of the

15     case because -- I mean, I think some people may

16     allege that YouTube fits the characteristics of what

17     you're saying too, and that's an example of the type

18     of website that I would probably not think that we

19    should bend from using.

20         But I get that you're trying to ask about

21    something different.  It's just that I don't have

22    knowledge of that specific thing.

23    Q.   I am asking a different question, and you

24    know perfectly well that YouTube does not purport to

25    be in the business of distributing copyrighted

                                                        102

1    materials for which it has no license; correct, sir?

2    A.   Yes.  So you're saying that another

3    website goes out of its way to communicate that it's

4    distributing illegal materials?

5    Q.   Yes, sir.

6         And you certainly agree you don't want to

7    do business with somebody like that; right?

8         ATTORNEY GHAJAR:  Objection.  Assumes

9    facts and incomplete hypothetical.

10         THE WITNESS:  I mean, in general if

11    someone is broadcasting loudly that they're doing

12    something that is illegal, that would be a pretty

13    big red flag that I'd want us to look at carefully

14    before engaging with them in any way.

15          Now, if in the context of building like a

16   web crawler or something like that, you know,

17   it's -- I don't expect the web crawler to understand

18   the context of each of the -- the websites and maybe

19   some of it would be included in that so I just want

20   to be careful about having some kind of, like,

21   blanket statement on this.

22          But, yes, if someone is generally

23   broadcasting and saying "we're doing something

24   illegal," then I would want my teams to, you know,

25   be very careful and not just default into using that

                                        103

thing.

1    thing.

2    BY ATTORNEY BOIES:

3         Q.   I'm talking a little bit more about just

4    being very careful?

5         A.   About what?

6         Q.   And I'm trying --

7               I'm talking a little bit more about

8    just -- than just being careful.

9               I'm asking you, as the CEO of Meta, what

10   nuance do you see in downloading materials from a

11   site that intentionally, and outwardly, says that it

12    is providing copyrighted works for which it has no

13    license?

14          What's the nuance there, sir?

15          ATTORNEY GHAJAR:  Objection.  Vague.

16    Assumes facts.

17          THE WITNESS:  You know, I just want to be

18    careful because in my experience running the company

19    and dealing with different content policies and

20    things like that, a lot of things which seem obvious

21    immediately, upon further inspection and looking at

22    it from different angles, there are -- there is more

23    nuance to it.  So I'm just sort of saying that in

24    response to your hypothetical, I think it deserves

25    more than a knee jerk response even though the way

                                                        104

1     that you are characterizing it is certainly

2     something that would be predisposed to look at and

3     think, "Hey, that looks negative.  I'd want to dig

4     into this."

5           But one example that I just gave a moment

6     ago is what -- what Spidermate does in crawling.

7     And we covered this earlier; right?  So I think that

8    there's a probably somewhat of a different between

9    the team making an intentional decision to go out

10   and engage with, or partner with, a website that

11   is -- purports to be, kind of, blatantly doing

12   something illegal as opposed to something like

13   Spidermate where the goal of it is crawl the web.

14   And it's not -- it's not making an assessment of

15   whether the content on any given website is legal or

16   harmful or anything.  It basically is downloading

17   and making -- doing a web crawl.  And then it's kind

18   of up for maybe for us later to filter some things

19   out but in that case we may have a system that is

20   engaging with a website like that and downloading

21   that content and that may be something that at least

22   for the first round of how that product or

23   technology works you would want it to go crawl that

24   website even if were doing something that were

25   illegal and then it would be up the product teams

105

1    later to decide whether they would want to include

2    it in some way.

3           But this is all just sort of an example

4    of -- I think these things can sometimes end up

5    being more nuanced than they initially seem is

6    basically the main point that I'm making, but I

7    agree with your basic point that it seems

8    problematic and I would look at it with a general,

9    you know, prejudice or bias up front thinking that

10   was probably bad, but I think it deserves a little

11   bit more thought just a, you know, me opining on a

12   hypothetical here.

13   BY ATTORNEY BOIES:

14        Q.   I want to the come back to my question,

15   but you mentioned Spidermate in this context.  And

16   you mentioned Spidermate crawling the web, including

17   going to these websites that have the illegal

18   pirated materials.

19             You could tell Spidermate not to go to

20   those websites, could you not, sir?

21             ATTORNEY GHAJAR:  Objection.  Assumes

22   facts.

23             THE WITNESS:  Yes.  There are ways --

24   BY ATTORNEY BOIES:

25        Q.   Okay.

1      A.   -- to tell Spidermate to not crawl

2   specific things --

3      Q.   Okay.

4      A.   -- including things like, you know,

5   robots.txt that, you know, when Spidermate is -- or

6   any web crawler is crawling, it can read something

7   in a very specific format that says "Hey, is this

8   supposed to be crawled or not?"

9           But I don't think, as it is built today,

10  Spidermate makes any assessment of the content or

11  tries to understand the content or summarize it

12  enough to make a judgment about whether the content

13  is worthy of being included other than, you know,

14  whether we basically put it on a block list or

15  whether some robots.txt says that it shouldn't be

16  crawled.

17     Q.   When you -- when you refer to the "block

18  list," what are you referring to?

19     A.   I'm referring to your hypothetical.  I'm

20  not aware that anything like that makes sense.  You

21  were just asking whether we could block something,

22  and I think that, in theory, it would probably be

23  easy to make list of domains that we didn't want

24  Spidermate to crawl, but then we would've needed to

25  have gone and done that analysis in advance and put

1          So I -- in this I think there is this

2     question about, like, an author or a copyright

3     holder may not want something to be shared -- I

4     don't know.  I think that that's -- it's an

5     interesting question about whether there's any kind

6     of public interest in that.

7          I mean, I think -- and these are -- these

8     are interesting copyright questions overall that I

9     think will be maybe resolved through this case, but,

10    like -- but, you know, as a -- just to take an

11    analog example -- and I can cut off at any point

12    that you want.

13    BY ATTORNEY BOIES:

14        Q.   Any time would be good.  Because I'm going

15    to run out of time.

16        A.   Okay.  Go for it.  I'll stop.

17        Q.   What I'm trying to do is I'm trying to

18    focus here on --

19          I accept that you want to have as much

20    data to train your models as you can, and I accept

21    that the more data that you have, the better the

22    models are going to be, and I accept having good

23    models is productive.  Okay?

24            What I'm asking you is whether there are

25    certain standards that you would expect your company

                                                        172

1    to adhere to in terms of sourcing that data.

2            I mean, just for example, you saw one of

3    the Meta people saying "we shouldn't use pirated

4    datasets as a source."

5            Do you agree with that as the CEO?

6            ATTORNEY GHAJAR:  Objection.  First, the

7    preamble misstates prior testimony.  Second, asked

8    and answered.  Third, vague.

9            THE WITNESS:  I think I'd need to

10   understand it more, but, I mean, in general if

11   someone's characterizing something as pirated, that

12   seems like at a minimum a pretty big red flag to

13   understand whether it's a useful thing.

14           But I just -- I want to avoid a kind of

15   wholistic, you know, absolute response to this

16   because I think that there's all these exceptions

17   where things may be in the public good or you --

18   and, like, you want to -- you know, even if someone

19   doesn't want a specific dataset about them or

20    something that they produced to be out there,

21    there's just a lot of precedent, both in copyright

22    law and -- just in society more broadly about why it

23    might be good to use those things.  So I guess in

24    general my view is, yeah, if someone thinks that

25    something is pirated, that's in general a pretty

173

1    negative connotation and a red flag that we should

2    look into it, and I would want us to do that.

3              Can I sit here right now and give, like, a

4    wholistic response that I would want to immediately

5    ban our use of that without more thorough

6    consideration of the -- of the pros and cons, of the

7    nuances of that?  I just think that my experience on

8    this stuff is that this -- sometimes there's more

9    nuance.  Sometimes there isn't and sometimes you

10   kind of dig in further and you're like, no, this is

11   just really bad, we shouldn't do it.  I'm not saying

12   that, like, we justify anything.  I mean, obviously

13   there are a lot of things that we decided not to do,

14   but I guess I just want to be careful about giving

15   too quick of a knee-jerk reaction to that.