1               IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4   RICHARD KADREY, ET AL,              3:23-CV-03417-VC
                        Plaintiffs
5                                       FEBRUARY 27, 2025
                VERSUS
6                                       SAN FRANCISCO, CA
    META PLATFORMS, INC.,
7                       Defendants

8

9

10          BEFORE THE HONORABLE VINCE CHHABRIA
                UNITED STATES DISTRICT JUDGE

11

12          TRANSCRIPT OF MOTION TO DISMISS HEARING

13

14

15

16

17

18

19

20

21

22   --------------------------------------------------------
             BETH A. KRUPA, RMR, CRR (VIA ZOOM)
23              United States Court Reporter
                 401 West Evans Street
24                Florence, SC  29501
                Beth_krupa@scd.uscourts.gov
25

             (Stenotype/Computer-Aided Transcription)

```
 1    A P P E A R A N C E S:

 2    For the Plaintiffs:
                      MAXWELL V. PRITT, ESQUIRE
 3                    JOSHUA MICHELANGELO STEIN, ESQUIRE
                      BOIES SCHILLER FLEXNER LLP
 4                    44 MONTGOMERY STREET
                      SAN FRANCISCO, CA 94104
 5                    mpritt@bsfllp.com

 6                    DANIEL M. HUTCHINSON, ESQUIRE
                      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
 7                    275 BATTERY STREET, 29th FLOOR
                      SAN FRANCISCO, CA 94111-3339
 8                    dutchinson@lchb.com

 9                    MARGAUX POUEYMIROU, ESQUIRE
                      JOSEPH SAVERI LAW FIRM
10                    601 CALIFORNIA STREET
                      SAN FRANCISCO, CA 94108
11                    mpoueymirou@saverilawfirm.com

12                    NADA DJORDJEVIC, ESQUIRE
                      DICELLO LEVITT LLP
13                    10 NORTH DEARBORN STREET
                      CHICAGO, IL 60602
14                    njordjevic@dicellolevitt.com

15

16

17

18

19

20

21
      --------------------------------------------------------
22              BETH A. KRUPA, RMR, CRR (VIA ZOOM)
                   United States Court Reporter
23                    401 West Evans Street
                      Florence, SC  29501
24                 Beth_krupa@scd.uscourts.gov

25          (Stenotype/Computer-Aided Transcription)
```

```
 1    For the Defendants:      KATHLEEN R. HARTNETT, ESQUIRE
                               COOLEY LLP
 2                             3 EMBARCADERO CENTER
                               SAN FRANCISCO, CA 94111-4004
 3                             khartnett@cooley.com

 4                             BOBBY A. GHAJAR, ESQUIRE
                               COOLEY LLP
 5                             1333 2ND STREET
                               SANTA MONICA, CA 90401
 6                             bghajar@cooley.com

 7                             JUDD D. LAUTER, ESQUIRE
                               MARK WEINSTEIN, ESQUIRE
 8                             COOLEY LLP
                               3175 HANOVER STREET
 9                             PALO ALTO, CA 94304
                               650-843-5000
10                             jlauter@cooley.com

11                             TERESA LAUREN MICHAUD, ESQUIRE
                               COOLEY LLP
12                             355 SOUTH GRAND AVENUE
                               LOS ANGELES, CA 90071
13                             tmichaud.@cooley.com

14

15

16

17

18

19

20

21
      ------------------------------------------------------
22              BETH A. KRUPA, RMR, CRR (VIA ZOOM)
                   United States Court Reporter
23                    401 West Evans Street
                      Florence, SC  29501
24               Beth_krupa@scd.uscourts.gov

25          (Stenotype/Computer-Aided Transcription)
```

```
 1                SAN FRANCISCO, CA, FEBRUARY 27, 2025
 2                HONORABLE VINCE CHHABRIA, PRESIDING
 3                            *  *  *
 4          (Proceedings commence at 10:25 a.m.)
 5              THE CLERK:  Now calling civil case 23-3417,
 6      Kadrey, et al., versus Meta Platforms, Inc.  Would
 7      counsel please come forward and state your appearances
 8      for the record starting with the plaintiff.
 9              MR. PRITT:  Thank you, Your Honor.  Maxwell
10      Pritt, Boies, Schiller, Flexner for the plaintiffs and
11      the punitive class.
12              THE COURT:  All right.
13              MS. DJORDJEVIC:  And also Nada Djordjevic from
14      DiCello Levitt also for plaintiffs and the punitive
15      class.
16              THE COURT:  Hello.
17              MR. STEIN:  Good morning, Your Honor.  Joshua
18      Michelangelo Stein, Bois Schiller Flexner, plaintiffs
19      class.
20              THE COURT:  All right.
21              MS. POUEYMIROU:  Good morning, Your Honor.
22      Margaux Poueymirou, Joseph Saveri Law Firm.
23              THE COURT:  All right.
24              MR. HUTCHINSON:  Good morning, Your Honor
25      Daniel Hutchinson, Lieff, Cabraser, Heimann & Bernstein
```

Beth A. Krupa, RMR, CRR

```
1    for plaintiffs and the proposed class.
2              THE COURT:  Good morning.
3              MS. HARTNETT:  Good morning, Your Honor,
4    Kathleen Hartnett for defendant Meta Platforms, Inc.
5              THE COURT:  Good morning.
6              MR. GHAJAR:  Good morning, Your Honor, Bobby
7    Ghajar from Cooley also on behalf of defendant Meta
8    Platforms.
9              THE COURT:  Good morning.
10             MR. LAUTER:  Good morning, Your Honor, Judd
11   Lauter on behalf of defendant Meta Platforms.
12             THE COURT:  Hi.
13             MS. MICHAUD:  Good morning, Your Honor.  Teresa
14   Michaud also with Cooley for Meta.
15             THE COURT:  All right.
16             MS. HARTNETT:  Your Honor, today we have in
17   the -- just so you know, in the courtroom we have Meta's
18   head of litigation, Scott Tucker.  We also have Meta
19   in-house counsel, Nikki Vo and Michelle Woodhouse.
20             THE COURT:  Great.  Thank you.  Okay.  What to
21   talk about first?  Maybe we could just talk briefly about
22   the motion to dismiss first, because I don't think we
23   need to spend all that much time on that.
24             On the DCMA -- DMCA claim -- I always get that
25   mixed up -- maybe I'll talk to Meta about that first.
```

```
1              You know, this is one of those weird situations
2    where you have allegations in a complaint, but you've
3    already had a chance to look at a lot of evidence.
4              And I guess my -- regarding the DMCA claim, I'm
5    really skeptical that they're going to win on that claim.
6    I'm really skeptical that they're going to -- I think
7    you're going to likely be going to be able to knock it
8    out on summary judgment.
9              But in terms of dismissing the claim, I have
10   to, like, pretend I haven't looked at the other evidence
11   and look at what's in the allegations and it just seems
12   like, I, you know, it seems like they've alleged a
13   violation, not based on -- not based on the theory that
14   the, what's it called, CMI.
15             MS. HARTNETT:  Correct.
16             THE COURT:  Not based on the theory that the
17   CMI was removed to make the -- to improve the learning
18   process, right, but on the theory that the CMI was
19   removed to conceal copyright infringement.
20             Like I said, I haven't seen any evidence of
21   that and I've looked at a fair amount of evidence.  I
22   haven't looked at all the evidence, maybe there is some
23   evidence of it.
24             But -- but just looking at the allegations in
25   the complaint, it seems like they've alleged that and so
```

1    why should I be dismissing this claim now as opposed to

2    dealing with it on summary judgment?

3           MS. HARTNETT:  Thank you, Your Honor.  I think

4    for two reasons, and we can talk about the standing

5    briefly, if you would like, just because we haven't had a

6    chance to respond to The Intercept case, the supplemental

7    authority.

8           So I think Judge McMahon, as you saw, came out

9    one way on whether there was sufficient harm under

10   TransUnion to actually have standing here and found that

11   because this is actually not a DMCA claim, it's not akin

12   to a common law property type claim, that would not be an

13   appropriate basis for standing.

14          THE COURT:  I don't really understand that.

15   I'll be honest with you, I haven't read that decision,

16   but I don't really understand that line of reasoning.  I

17   mean, the -- if you steal my book and you remove the CMI

18   to increase the chances that you're not going to get

19   caught stealing my book and then you won't have to pay a

20   license, why is that not an adequate injury?

21          MS. HARTNETT:  Well, the question under

22   TransUnion is whether there's a sufficiently analogous

23   common law right, and I think Judge Rakoff's opinion and

24   Intercept acknowledges that there is some force to the

25   argument, that it's actually an attribution right.

1          But then he goes on to say beyond the bundle of

2    rights that's in the copyright back, the DMCA should be

3    seen as sort of an adjunct property right as opposed to

4    sort of an attribution right.

5          And I think our point is just that we think

6    that even though Judge Rakoff's opinion is longer,

7    Judge McMahon has the better of the argument there.

8    Also, another key point, though, for Your Honor, and I

9    would commend the Raw Story opinion to you, because it

10   does -- short and sweet, but it does touch on legislative

11   history, like the Congressional purpose to show that it

12   wasn't the same as the rights under the Copyright Act.

13          But I think Intercept also doesn't help them,

14   and this is probably my most key point from that case,

15   because there when you move to the 12(b)(6) inquiry, it

16   was important to the court that there was an allegation

17   in that case, that at least some of the time -- I'm

18   quoting from the Judge Rakoff opinion -- that there was

19   an ability to provide responses that regurgitated

20   verbatim or nearly verbatim, copyright protected works of

21   journalism, and therefore, I think he found that you're

22   alleging something of a removal that was likely to lead

23   to a --

24          THE COURT:  Right, but they -- they are arguing

25   that feeding the material into the model is itself

1    copyright infringement and we have -- that's a question
2    we need to decide and it sort of begs the question.
3                MS. HARTNETT:  They're alleging that the
4    reproduction of the works in the course of training is
5    the infringement so that we can get to that, but I think
6    Judge Rakoff in an intercept rejected the notion that it
7    would be enough just to say, oh, you're putting this in
8    for training and it could spit out something that doesn't
9    have CMI.
10                He -- important to him there that they had
11    stated a claim, was that it actually had examples and
12    those are aren't here, so I think that --
13                THE COURT:  Well, I will read those two cases
14    and look at the standard.
15                MS. HARTNETT:  Okay.  Because I think
16    intercept, if you want to say, okay, it's a draw on
17    standing.  Intercept helps us in the end on 12(b)(6).
18                THE COURT:  Okay.
19                MS. HARTNETT:  But also on the 12(b)(6) points
20    also, I think there's the concealment theory and then
21    there's the, you know, enable theory.  I think important
22    for both of those is that it has to actually be an
23    allegation of a reasonable grounds of knowing, of some
24    level of intent, that it would be inducing, enabling,
25    facilitating.

1          So I don't want to over read the intent
2  requirement, but it's certainly there.  And I think you
3  said, oh, I have to turn my eye to the discovery, but the
4  question is, do they have a plausible basis and so that
5  includes the discovery they've taken, so maybe on a sheer
6  record --
7          THE COURT:  But I have to read the complaints
8  and I have to assess whether the allegations are
9  plausible, and it -- or give rise to a plausible
10  inference.
11          And if it turns out that the evidence clearly
12  is to the contrary, then the -- the remedy is not to
13  grant your motion to dismiss now, it's to decide whether
14  they had a basis under Rule 11 for asserting this later.
15          MS. HARTNETT:  That's -- we would say they
16  could not plausibly allege -- if the facts known to them
17  now which are the facts that they are, they're not the
18  facts without knowing discovery, every single document
19  that touches on this issue that goes to why is about
20  making it -- making the machine, making the AI tool --
21          THE COURT:  I think you may be right about
22  that, but I'm not sure that's a basis for granting your
23  motion to dismiss this claim.
24          MS. HARTNETT:  Okay.  I do think that the lack
25  of an output harm, though, when you go back to 12(b)(6)

1    point, I would commend the intercept rationale there,

2    because I think that does help us.

3         I think the final point I would make is that it

4    really does need to be enabling the unlawful infringement

5    and you've already struck the claim that the model itself

6    is infringement, it has to be the copying.

7         And there is no allegation that what -- the

8    removal of the CMI is enabling the copying, the copying

9    was either the taking it --

10         THE COURT:  Right.  I think it's the -- I think

11   what they -- where they stated claim, probably, even if

12   I'm skeptical of it, is the concealment.

13         MS. HARTNETT:  I think they haven't, you know,

14   I -- they've kept saying that, but it's not clear how

15   that would be, LLaMA 1, it was already known and then

16   since LLaMA 1, they've been in litigation and they've

17   been able to -- you know, they've -- there's been no

18   concealment.

19         There could not have been an intent to conceal

20   on these facts because you had public disclosure of the

21   datasets.  And since then, they've been able to see

22   everything we're doing.

23         So I think in that case, they're just -- in the

24   situation we find ourselves, where they have the benefit

25   of the discovery and we have the record we do, there's

1    just no way to plausibly allege that the reason for this

2    was to conceal infringement.

3            THE COURT:  Okay.  Let me ask the plaintiffs

4    about the CDAFA claim for a minute.  I guess I'll just

5    say that I didn't understand your argument for why it

6    wouldn't be preempted and so I'll give you one more shot

7    to articulate that to me.

8            MR. PRITT:  Of course.  Thank you, Your Honor.

9    Would you like me to address or correct any of the

10   misstatements?

11           THE COURT:  No.

12           MR. PRITT:  Okay.  So on CDAFA, when we're

13   discussing the extra element that renders preemption an

14   opposite, there are two.  One is the accessing pirated

15   data using torrent protocols as opposed to, for example,

16   a direct download, which would, in fact, probably

17   insulate the innocent, so-called innocent individual from

18   taking pirated works.

19           The other is that when you're torrenting, you

20   are also knowingly using your own computer hardware, and

21   other bandwidth resources to participate in the illegal

22   peer-to-peer file sharing networks of pirated data.

23           THE COURT:  You're saying that's not copyright

24   infringement?

25           MR. PRITT:  That is not copyright infringement.

1   The downloading and the subsequent use and subsequent

2   reproduction, that is copyright infringement.  But when

3   you're just focused on the first part, the use of

4   torrenting protocol for -- to access pirated data, so you

5   have the access and then, two, you have the contributing

6   computer resources of bandwidth, which essentially --

7           THE COURT:  You're saying this is the

8   particular way they engaged in copyright infringement.

9           MR. PRITT:  Well, sure.  But CDAFA is about

10  access and it defines access differently.  All you have

11  to do is look at the CACI jury instructions to understand

12  that there's a completely different definition of access

13  under the state law versus the federal Copyright Act.

14          So they are two distinct phases and they are

15  two distinct rights that are being granted and addressed.

16  So, you know, it -- it's just like ignoring the pirated

17  and the -- the online network, both the access and the

18  contribution expansion enabling a pirated network to

19  essentially grow massively and allow people to download

20  pirated works faster.  That's what you're doing for weeks

21  on end.  That is not a copyright violation.

22          THE COURT:  Okay.  I understand your argument.

23  Let's talk about, I guess where we are with the privilege

24  stuff and the -- I guess there is, you know,

25  you've -- you're asking now to do more discovery in light

1    of the revelation about the sequestered documents and all

2    of that.  Where are we on that?

3            MR. PRITT:  Would you like to hear from us

4    first?

5            THE COURT:  Sure.

6            MR. PRITT:  Okay.  Well, you have a binder of

7    slides that will explain the prejudice that we believe we

8    are suffering.  If Meta is going to argue fair use as to

9    its torrenting of pirated data, the downloading, that

10   infringement, that specific infringement, there are many

11   other acts of infringement that we allege in this case.

12           If they are going to argue fair use as to that,

13   we would request that the Court entertain -- issue

14   sanctions preventing Meta from raising it as to that act

15   of infringement.  And so we would ask that the Court then

16   allow us to brief it in addition to requesting --

17           THE COURT:  I thought you said that torrenting

18   wasn't an act of infringement?

19           MR. PRITT:  The downloading by torrenting.  Not

20   the actual use of the torrenting protocol vis-a-vis

21   pirated data.

22           THE COURT:  Sorry.  Go ahead.

23           MR. PRITT:  It is an important distinction,

24   Your Honor.  If they are going to argue fair use as to

25   that act of infringement, the downloading and then

1    sharing, because when you -- one thing that we'll get

2    into, we've talked about seeding.  The use of torrenting

3    involves two aspects of sharing data.

4            One is during the leeching phase, which is the

5    downloading, which is actually the most massive time in

6    which you are sharing, reuploading the data,

7    simultaneously to what you're downloading.

8            And then seeding is what happens after the

9    download is fully complete, so there are two acts of

10   sharing.

11           So if they're going to argue fair use as to

12   that, you'll see in the slides, the majority of documents

13   just produced, torrenting, pirated, illegal, those are

14   the terms they hit on more than the documents produced

15   previously in the months before the extended discovery

16   period closed, meaning, we did not have any of that as to

17   depositions, we did not have any of that as to our expert

18   reports, so we are quite --

19           THE COURT:  Can you give me an example of

20   something new that you learned that we didn't know before

21   from the new set of documents?

22           MR. PRITT:  Absolutely, Your Honor.  In

23   addition to some of the documents involving the same

24   players, the same date, the same threads, we appear to

25   have only gotten the more benign versions of discussions

1    between those same players on those same dates.  And

2    instead, what was produced more recently, setting aside

3    there are many questions about whether the sequestration

4    was, in fact, inadvertent are -- they're much worse.

5              THE COURT:  Sorry.  Are you implying that the

6    sequestration was intentional?

7              MR. PRITT:  I'm implying that there are

8    factually false statements in the declaration by

9    Lighthouse made to this Court and that there are

10   questions about the actual sequestration because we just

11   learned this morning, less than an hour before this

12   hearing, that, in fact, there was not a single

13   sequestration, there were multiple sequestrations over

14   more than a month long period apparently.

15             We don't know anything about that because we've

16   just been met with silence and obfuscation when we tried

17   to meet and confer with Meta's counsel on these issues.

18             THE COURT:  You know, Mr. Pritt, I just want to

19   give you a piece of advice.  Your letters, you know, I

20   read the string of letters about the sequestration, your

21   letters were really over the top and the rhetoric that

22   you've been using in these hearings and in the letters

23   are, you know, on a scale of 1 to 10, they are an 11, and

24   you need to dial it back to like a 3.

25             Because you're -- you're going to lose your

1    credibility very quick.  To the extent you haven't

2    already, you're going to lose your credibility with the

3    Court very quickly if you don't dial it back.

4         So the, you know, and the words that are

5    constantly coming out of your mouth of false statements,

6    misrepresentations, misstatements, you know, intentional,

7    concealment, all that kind of stuff and you're just

8    throwing those words around without a -- without being

9    careful, I think, and so I just urge you to dial it back

10   for the sake of your own case.

11        MR. PRITT:  I appreciate your advice, Your

12   Honor.  I -- my statements are backed up by the evidence

13   and I appreciate your timing.  For example, if you look

14   at the --

15        THE COURT:  Well, for example, you kept

16   referring to privileged documents as the crime-fraud

17   documents.  What kind of -- I mean the -- how do you know

18   they're crime-fraud documents?

19        MR. PRITT:  They're the documents subject to

20   the crime-fraud exception that we're challenging.  It's

21   just a --

22        THE COURT:  By the way, I'll take this

23   opportunity to say that I've reviewed all of the

24   documents submitted in camera and I did not see any

25   evidence of Meta using its lawyers to facilitate a crime,

1    so the crime fraud issue is over.

2           MR. PRITT:  Would you like me to address that?

3           THE COURT:  No.

4           MR. PRITT:  Okay.  Should I go back to the

5    declaration and the false statement?

6           THE COURT:  Sure.

7           MR. PRITT:  So for example, one false statement

8    would be that light -- it says, Lighthouse does not

9    control the timing or nature of updates of third-party

10   tools like Relativity.

11          We have learned from Meta that that is not

12   true.  The actual update at issue in this case was

13   released in September 2023 and Lighthouse simply decided

14   not to apply it until mid review in this case a year

15   later.

16          Then the explanation was, well, it was going to

17   expire, because it was a year long, but, in fact, it was

18   actually extended as well.  So when I'm referring to a

19   false statement, it's something like that.

20          As to the other issues, we've simply asked many

21   questions, and instead, we either don't get a response or

22   the response we get is, We've already said what we're

23   going to say to the Court, or this is discovery on

24   discovery.  Well, of course, it's discovery on discovery.

25   This is a discovery issue.

1    If anything, after discovery on discovery, it
2  is an issue like this.  I'm sorry, Your Honor, I had a
3  cold for a long time, but I appreciate Your Honor's
4  advice with respect to toning down rhetoric.
5    THE COURT:  Do you want to get back to the
6  answering the question that I asked a little bit ago
7  which is, can you show me not just with rhetoric, but
8  with an actual document what is an example of something
9  that, you know, is revelatory in these new --
10    MR. PRITT:  Sure.
11    THE COURT:  -- this new group of sequestered
12 documents?
13    MR. PRITT:  Thank you, Your Honor.  One of the
14 issues would have been something that was in our
15 crime-fraud document, which was the reference to being
16 arrested if you are using a torrenting file to download
17 pirated works.  There is more.
18    THE COURT:  But what document was that?
19    MR. PRITT:  It was in our last letter.  It was
20 the first bullet, my team --
21    THE COURT:  What is it?  Who said it?  What did
22 they say?  What was the context?
23    MR. PRITT:  If I recall, it was Todor Mihaylov,
24 who was one of the early deponents in this case, who we
25 did not understand had any role or involvement in

1    torrenting and he quotes a Quora article that links and
2    then talks about how torrenting pirated data is illegal.
3    We have nothing like that early on.
4              THE COURT:  Well, there were a lot of
5    expressions of concern early on by -- in the earlier
6    documents by Meta employees that, you know, downloading a
7    pirated dataset was illegal and unethical and all that
8    kind of stuff.
9              MR. PRITT:  Well, the only document we had, if
10   you recall, was the 650-B document by an individual named
11   Nikolay Bashlykov where Meta said that that document
12   showed that they were using torrents.
13             And, in fact, that document which was the only
14   document that mentioned torrenting said they were not
15   going to do that because of the question -- questionable
16   illegality of doing so.
17             THE COURT:  Okay.  So there -- so there's this
18   statement by somebody whose first name was Todor, I
19   think --
20             MR. PRITT:  Todor, yes.
21             THE COURT:  -- who said -- cited a Quora
22   article that said you could get arrested for torrenting?
23             MR. PRITT:  Sure.  There's that one.  I mean,
24   if you look at slides 9 through 25, we actually identify
25   documents for each of the individuals that we have

1    requested for in connection with their depositions or

2    further depositions in which we have proposed limited

3    time for further depositions of, you know, two and a

4    half, three and a half hours, many references to stolen

5    pirated unauthorized with respect to LibGen.

6              THE COURT:  Right.  But this is stuff in the

7    sequestered documents?

8              MR. PRITT:  Yes, in the sequestered documents.

9              THE COURT:  Okay.  Where?  Show me -- give me

10    an example of a slide, show me what you're talking about.

11             MR. PRITT:  To see an actual document or the

12    percentages of documents?

13             THE COURT:  I'm asking you to point me to

14    examples of things from the sequestered documents that

15    were revelatory, that were unlike anything that we saw in

16    the other documents.

17             MR. PRITT:  If you look at Page 17, for

18    example, if you --

19             THE COURT:  Hold on.  Let me get there.  The

20    folder I have has 14 pages.

21             MR. PRITT:  Are you looking at the 18,000

22    document folder?  There's two-folders.  One on motion to

23    dismiss, one on 18,000 documents.

24             THE COURT:  I only have one binder.  That is

25    18,000, quote, sequestered, unquote, documents and

```
 1    failure to comply with discovery deadlines.
 2              MR. PRITT:  That's the one.
 3              THE COURT:  That's the one.  Okay.
 4              MR. PRITT:  Slide 17.
 5              THE COURT:  Okay.
 6              MR. PRITT:  So this one refers, if you recall,
 7    to the MZ escalation, the escalation of the decision of
 8    whether or not to use pirated works.  This one
 9    specifically says it was also about fair use.
10              Now, if you recall, we did not receive any
11    documents about this escalation until the last day of
12    discovery and Mr. Zuckerberg at his deposition didn't
13    even recall hearing about LibGen.
14              We have since received, in addition to the
15    in-camera challenges, many additional documents around
16    that meeting and its contents.
17              THE COURT:  Okay.  What else?
18              MR. PRITT:  You can see on slide --
19              THE COURT:  This is from the sequestered
20    documents?
21              MR. PRITT:  Yes, all of these are from the
22    sequestered documents.
23              THE COURT:  Okay.
24              MR. PRITT:  If you go to slide 19, this is the
25    one about Todor, this is one of the ones about
```

1   Mr. Mihaylov, where he's talking about how it would not

2   be trivial to download LibGen and then he quotes the

3   Quora article that talks about how illegal it is to

4   pirate IP and it also talks about the use of Amazon web

5   services to do the torrenting instead of using Facebook's

6   infrastructure.

7           There are many more documents from, if you look

8   at slide 20 from Mr. Ahmad Al-Dahle who was the head of

9   GenAI about LibGen.  At his deposition, Mr. Al-Dahle said

10  he did not recall any specifics about ever hearing of

11  LibGen.  Clearly he was integrally involved in the

12  decision to use LibGen and take books from --

13          THE COURT:  Based on this exchange?

14          MR. PRITT:  No, no, there are many.  This

15  is just -- we've given you one example per person.  But

16  if you, for example, look at slides -- go back to

17  slide 3, you'll see the keywords that come up in these

18  documents, the late produced documents.

19          And then the next couple of slides show you the

20  percentage of these late produced documents with respect

21  to these sorts of keywords.

22          THE COURT:  Okay.

23          MR. PRITT:  Again, these are just a single

24  example for each of these witnesses.  But for

25  Mr. Al-Dahle, there were a number of documents discussing

1    this.

2            THE COURT:  And so what are -- what are you

3    asking for?  Based on this, what are you asking for by

4    way of additional discovery?  I mean, I know you asked

5    for a lot of things in that flurry of letters including

6    appointing a special master to review all of the

7    documents that Facebook asserts are privileged and stuff.

8            But in terms of getting at the LibGen

9    torrenting issue, what additional discovery are you

10   proposing?

11           MR. PRITT:  We have proposed discovery to

12   opposing counsel that contains -- there's two aspects to

13   it.  One is some discovery into the sequestration.  So

14   that would be -- we proposed a three-hour deposition of

15   Lighthouse and a 30(b)(6) of Meta on its E-discovery

16   practices.

17           And then as to the substance of the thousands

18   of new documents that were produced, we have asked

19   for -- I want to say it's 6 or -- 6 depositions, but like

20   two and a half to three hours, three and a half hours of

21   the individuals that are listed in this slide, or in this

22   slide deck.

23           We've also asked if you recall, and maybe you

24   don't, we had served some specific torrenting discovery

25   in January.  We pared that down into a single

1    interrogatory and it's probably 20 RFPs.  We would ask to

2    be able to serve that as well along with your leave to

3    have a rebuttal expert report on torrenting which we

4    served last night on Meta.

5            All of that could be done within the Court's

6    current summary judgment briefing schedule, because it

7    would allow us, if that occurred in the next month, to

8    have that discovery before our second summary judgment

9    brief.

10           Because our summary judgment brief due on

11   March 10th, partial summary judgment directed to the

12   infringement by the torrenting of pirated data, so,

13   again, in the -- really under the case law, it usually

14   appears that it's -- the ability to seek and get issue

15   sanctions and monetary sanctions or it's monetary

16   sanctions and additional discovery to cure the prejudice.

17           THE COURT:  Well, what would the monetary

18   sanctions be for?

19           MR. PRITT:  For having to respond to the late

20   produced discovery.  I mean, you'll see cases that are

21   cited, even when it's just a handful of documents that

22   are late produced --

23           THE COURT:  I don't think your side is really

24   in a position to be seeking monetary sanctions for

25   mistakes that have been made over the course of this

1  litigation, so I'm not going to be imposing monetary

2  sanctions for what appears to be an inadvertent mistake.

3         MR. PRITT:  Yeah, I --

4         THE COURT:  And, you know, we are -- we are

5  behind the eight ball in this case largely because of the

6  way your side has handled it.  So that's another reason

7  why I think you need to be dialing back your rhetoric is

8  you seem as if you've forgotten that.

9         MR. PRITT:  Well, I wasn't involved at that

10 time, if you recall, but you did sanction --

11        THE COURT:  I'm not attributing it to the time

12 that you weren't involved.

13        MR. PRITT:  You did sanction us for failure to

14 miss a deadline, so...

15        Sorry.  So those are -- those requests, there

16 are other issues, though, with respect to discovery, but

17 they're not as keyed into the 18,000 documents.

18        THE COURT:  Okay.  Ms. Hartnett, anything you

19 want to say in response to all that?

20        MS. HARTNETT:  Thank you, Your Honor.  I will

21 try to keep it brief, but I do want to respond just

22 because we're in this public forum.  We don't need to --

23 we've submitted, I think you know, and probably didn't

24 want to read every detail of it, but a declaration on

25 February 12th that explained the inadvertent error.

1          We do apologize.  We, obviously, took the

2     Court's orders about scheduling in this case very

3     seriously.  We made representations that we believe were

4     true.  There was a Relativity upgrade that had an

5     expiration date in November.

6          I think, unfortunately, my -- the counsel for

7     plaintiffs did not actually fully summarize for you, even

8     this morning, we've been trying to answer their

9     questions.

10          The reason why it did not happen immediately,

11     but happened in November was because that was the

12     deadline for the upgrade and Lighthouse, as we told them

13     this morning, typically -- that's our vendor -- spends 6

14     to 7 months preparing for the annual upgrade.

15          It's not something you just do.  You have to

16     get your systems ready for it.  So they have in their

17     correspondence with us, said the alleged sequestration,

18     whether it was purposeful, it would be -- there's no

19     basis for that.

20          And moreover, it would have been probably

21     the -- anyway, I don't need to dwell on it, but it was

22     not purposeful.  It was a mistake that no one wanted to

23     happen.

24          We brought it to the Court's attention

25     immediately.  We worked around the clock to go through

```
 1    the 18,000 documents.  That, also, number they know
 2    because we've told the Court and them.  It's not the
 3    actual number at the end of the day.
 4          It was about 1,300 documents that were newly
 5    produced and many of those were duplicates, so when you
 6    get down to it, it's about 805 new documents, and so we
 7    appreciate that does disrupt the schedule a bit --
 8          THE COURT:  Don't look at me and shake your
 9    head while your opposing counsel is talking.  That's
10    not --
11          MR. PRITT:  I didn't mean to --
12          THE COURT:  -- it's unprofessional.
13          MR. PRITT:  I did not mean to look at you, Your
14    Honor.
15          THE COURT:  But don't look anywhere and shake
16    your head while opposing counsel is talking.
17          MR. PRITT:  You're right.  I certainly should
18    not.  Thank you.
19          MS. HARTNETT:  Prior to this February
20    production, we have produced 31,309 documents excluding
21    code, so at the end of the day, 805 new documents, we
22    appreciate is not -- is an error, but one that we think
23    is not massive.
24          We also don't think there is anything
25    particularly -- there are additional documents they can
```

1    use in the case, but nothing that would have changed the

2    calculus that the Court already made in January where it

3    denied -- Judge Hixson denied some new depositions based

4    on documents that came in in December, and Your Honor

5    then overruled their objections to that.

6            So we think we're actually in the same place we

7    were, which is that the way this case schedule happened

8    was that depositions occurred before all the documents

9    were produced.

10           There was no deliberate withholding of any

11   documents, and this was an error that affected some

12   subset of work chats and it's been corrected.

13           In terms of the actual, what they're asking

14   for, I think that also was not, perhaps as clear as it

15   could have been in terms of the presentation,

16   yesterday -- Tuesday.  Forgetting the day.

17           Only on Tuesday did they tell us what they were

18   asking for and it -- it amounts to 38 new deposition

19   hours.  There's already going to be that renewed 30(b)(6)

20   that you had ordered on Monday.  That's all set for this

21   coming Monday.

22           Three hours on torrenting, two hours on

23   mitigations, so they have five hours to use on Monday

24   with our 30(b)(6) witness and yet are asking for 38 more

25   hours, three new custodians.

1          They have 27 new written discovery requests and

2    a new expert report and they actually just served that on

3    us yesterday without authority under the case schedule.

4          The case schedule had an earlier rebuttal

5    deadline and we asked them on the meet and confer

6    yesterday, are you planning to seek leave to do that.

7    And they said, no, we're just going to send it to you

8    tomorrow, so -- or last night, I guess, so they did.

9          So with respect, we've tried to have a meet and

10   confer with them to understand.  We actually had a call

11   with them yesterday at our initiation to ask what the

12   basis was for these additional discovery requests, and

13   some specifics.

14         We actually asked for each witness, can you

15   tell us why you need them.  They provided us no

16   specifics, when they gave us this binder right before the

17   hearing this morning with their specifics.

18         And we would -- we don't want to be in a

19   position of -- we want to be as -- in essence, it was a

20   bit of a sandbag today and we still, having heard what we

21   heard today, I don't believe there's anything

22   substantially new here that requires the additional

23   discovery.

24         And just reminding Your Honor that, I think it

25   was in your January order that was docket 406, you

1    already had rejected, essentially, the same requests.

2    And in particular, the new torrenting expert that they

3    served without authority, they could have made all of

4    those -- they could have done that expert report sooner,

5    they just chose not to and that's not our -- that

6    shouldn't be on us to have another round of expert

7    discovery.

8            At the end of the day, I know what's most

9    important to the Court is that you have an adequate

10    record to make the determination of fair use, and we

11    would respectfully submit that that record is before you.

12            These documents can all be used as they see fit

13    in the fair use briefing, and they certainly haven't made

14    any particularized showing at this point of need, it

15    would still be a good cause standing for more discovery.

16            And, again, they're just kind of presenting

17    this live to you, so at a minimum, we would want to brief

18    that, because we don't believe there's any specific

19    showing of need.  We want to be reasonable.  It just has

20    been either everything or nothing.

21            One final point, I would be remiss, I'm not, I

22    tried to steep myself in the documents to be as helpful,

23    but once you get rid of the duplicates, like, slip sheets

24    and images that are not substance, it was 805 documents.

25            Some of those are actually not responsive,

1    they're just like -- when there's an email, you also

2    produce the attachments, so some of these are actually

3    like the parent email, but one of the attachments was

4    responsive.

5         So we had about a 42 percent responsiveness

6    rate.  So even looking at -- it's essentially 805 new

7    documents and 40 percent of that which would be

8    around -- well, 338 new documents.

9         And so it really is not a lot different.  It's

10   not really materially different than where we were on

11   December 13th with the production that came at the end,

12   because that's just how the schedule in this case worked.

13        THE COURT:  Anything you want to say?  It

14   seemed like you wanted to disagree with some stuff that

15   Ms. Hartnett was saying.

16        MR. PRITT:  Apologies, again, for myofascial

17   expressions.  My wife also gets onto me.  Ms. Hartnett

18   and I have worked together --

19        THE COURT:  Just answer -- just -- I don't care

20   how long you've worked together, just get to the point.

21        MR. PRITT:  Thank you, Your Honor.  We have

22   attempted to meet and confer starting immediately when we

23   learned about the sequestration.  Meta refused to meet

24   and confer until after they finished their review.

25        And then when we did, it was neither

1    Ms. Hartnett or Mr. Ghajar and again, they said -- we

2    said what we're going to say to the Court and we're not

3    really going to answer your questions.

4           They answered a few questions, but then said,

5    it's discovery on discovery.  We continually repeatedly

6    followed up as much as possible to understand what was

7    going on.

8           These documents were collected in June before

9    the substantial completion deadline.  They are all the

10   same people, all the same key terms, and key terms like

11   LibGen, illegal, copyright.

12          They undeniably would have been on our

13   deposition outlines and on our expert reports.  As for

14   the expert report, we did not say we would not seek leave

15   for a rebuttal report.

16          We said we were going to serve it and then talk

17   to the Court about it at the hearing.  It is a rebuttal

18   report to the expert report that Meta served on

19   February 10th that goes far beyond what our source code

20   expert had said about the evidence of torrenting in

21   Meta's source code.

22          In terms of the discrepancies that we are

23   pointing out, you know, slides 28 to 31 show just some of

24   the discrepancies that we have identified and that we are

25   trying to get to the bottom of, including questions that

1    we have repeatedly asked Meta and its counsel about, but

2    have not gotten an answer.

3         When Ms. Hartnett refers to what she's now

4    saying are just several hundred documents that were

5    produced, she's leaving out 11,000 documents or the

6    majority of 11,000 documents that were claimed to have

7    been reviewed and tagged nonresponsive before

8    November 9th or 11th when the alleged sequestration

9    occurred.

10         Again, now we know that there were multiple

11   sequestrations and some sort of --

12         THE COURT:  What is this position you said, we

13   learned an hour before this hearing that there were

14   multiple sequestrations.  I didn't -- I meant to ask you

15   about that, too, but I didn't understand what you were

16   referring to.  Is it something that was filed with me an

17   hour ago?

18         MR. PRITT:  No, Your Honor.  It was an email

19   that we got from Ms. Hartnett's colleagues, one of the

20   colleagues.

21         MS. HARTNETT:  Your Honor, we had a meet and

22   confer yesterday at which plaintiffs' counsel raised a

23   couple of questions regarding the sequestration and we

24   responded this morning, because our Lighthouse people are

25   on a different time zone and were not able to respond

1        tonight -- or last night.

2                MR. PRITT:  So now we understand despite what

3        we understood from the letters and the prior questions we

4        had asked that there were multiple sequestrations at

5        unknown times over a course of a month, month and a half,

6        both in terms of deduplication, even though the ESI order

7        talks about global deduplication.  It's uncertain why

8        that occurred at these very --

9                THE COURT:  Are you saying that there were

10       multiple sequestrations that involves more than the

11       18,000 documents or are you saying that they're -- these

12       18,000 documents were sequestered as part of different

13       sequestrations as opposed to one sequestration?

14               MR. PRITT:  It appears to be the latter.

15       That's on slide 28, because it -- they conflate to two

16       terms, right, there's deduplication and there's

17       sequestration.  They're not the same.

18               We normally when you dedupe, it's only

19       identical hash value duplicates, not near dupes.  You

20       only sequester the hash value, but here what we have,

21       these are all what are called WP chats, and you have this

22       massive WP chats that were all subject to a near

23       deduplication process and sequestered, which almost never

24       happens unless you're not producing your duplicates,

25       which you're supposed to do.

1        And then it shows that there were many WP chats

2   that were not subject to this sequestration in early

3   November and instead, were actually produced all the way

4   up until the last night of discovery.

5        So it's just unclear what's going on, and we're

6   trying to get to the bottom of that in addition to then

7   dealing with the substance of the communications and

8   their importance as indicated earlier in these slides.

9        MS. HARTNETT:  Your Honor --

10       THE COURT:  Go ahead.

11       MS. HARTNETT:  I just want to make sure there's

12  an accurate record here, but it was on Thursday of last

13  week, the 20th that we wrote a relatively long email to

14  them responding to their various questions about

15  sequestration.

16       And that we did note that we believed that some

17  of the questions about how we actually did the document

18  review were discovery on discovery and we believed it was

19  protected by work product or attorney-client.

20       And then we asked them last Thursday, could you

21  please tell us what discovery you're seeking and we got a

22  list of 13 more questions back and suspicion that we had

23  purposefully done the sequestration.

24       And then it wasn't until Tuesday of this week

25  we got the schedule.  I know you don't want to hear all

1    of this back and forth, but the point is we then met and

2    conferred at our -- we suggested having a live meet and

3    confer yesterday with them.

4          They provided no substantiation for what

5    they -- other than just the documents are all what we

6    need, but then they did ask these couple of specific

7    questions including, why was there -- be a document that

8    was produced in the February sequestration production

9    when it would have also been produced sooner.

10          And that -- okay, the answer to that question,

11   so it was a duplicate.  It's a duplicate of something

12   previously produced and we tried to explain today in the

13   answer is that the sequestration began on November 11th.

14          That's when the vendor began running this

15   process that, unfortunately, didn't deduplicate things,

16   but put them in an area we couldn't access and that

17   happened more than one time between November and -- it

18   was just an ongoing process of when the deduplication

19   operation was run, the sequestration occurred.

20          And so that is why there are at some periods of

21   time, we were able to continue reviewing.  We didn't know

22   at that point that those were ultimately going to be

23   sequestered, and therefore, not available to us when we

24   pushed run for the production in the end of discovery.

25          So, again, we are happy to answer questions

1    that are in good faith asking us to try to explain the

2    technicalities here, but we have confirmed, we have a

3    sworn declaration from our vendor, that there was a

4    universe of 18,000.

5              We figured out which of those were ones that

6    were duplicates or a null set and excluded those.  They

7    now say the null set is not believable.  Well, that's

8    what we're swearing in our declaration and we've informed

9    the Court and then we from there looked through the

10   remaining 11,000 and triaged them to figure out how to

11   most quickly get them what would be responsive.

12             And so we produced responsive documents and we

13   rereviewed and quality controlled ones that were in the

14   nonresponsive markings consistent with the way we had

15   conducted discovery to date.

16             And so the basic bottom line is, we apologize

17   that this was a error, but we've run it to ground and

18   there's just nothing -- this is just a distraction from

19   trying to complete the discovery in this case, because

20   there really is no good faith basis at this point to

21   believe that we are purposefully or allegedly doing

22   anything other than trying to fix which is the super

23   unfortunate mistake that happened.

24             THE COURT:  So I'm trying -- this is -- I'm

25   thinking out loud here, so take it with a grain of salt,

1    but just trying to figure out how to keep moving this

2    forward.  And, you know, obviously, I don't, you know, we

3    have some, he said, she said stuff going on here and I

4    don't have nearly the visibility into what's happening

5    that you-all do and I -- it's virtually impossible for me

6    to gain the visibility that I would need to, you know,

7    have a, you know, full understanding of what would be the

8    best way forward.

9            But here's -- here's kind of the thought that

10   just came to me, that may not be well thought out.  But I

11   haven't seen all of these new discovery requests, right,

12   these 20 or 27 RFPs and the interrogatories and even this

13   binder that I've been given which is asking for a bunch

14   of new hours with people who have already been deposed or

15   whatever.

16           I haven't -- I mean other than just glancing

17   through it in this hearing, I haven't really taken a look

18   at that.  I have a pretty strong suspicion that the

19   totality of what the plaintiffs are asking for is

20   overreach.

21           But I -- I'm not totally convinced at this

22   moment given the small amount of time that I've had to

23   look at this stuff that, you know, no discovery is

24   warranted, right.

25           So -- and, you know, I'm trying to figure out a

1    way to resolve the question without having both sides

2    just tearing each other's throats out in a way that's not

3    helpful to me to figure out what the right answer is.

4            And so what I was thinking of doing is maybe

5    inviting the plaintiffs to -- maybe even inviting both

6    sides, like I said, I'm thinking out loud here.

7            Inviting both sides to make a proposal

8    regarding additional discovery in light of the newly

9    disclosed documents and in light of the arguments they

10   were making, you know, combine the newly disclosed

11   documents with the arguments they were making before and

12   you know, I made a decision about no further discovery, I

13   thought it was a close question then, right.

14           So let's look at the totality of everything,

15   and let's have each side make a proposal for how to

16   handle additional -- what additional discovery should be

17   done.

18           And Meta could decide to propose that there

19   should be none.  And the plaintiffs could decide to

20   propose all of the stuff that we just talked about, the

21   additional 30 whatever hours you mentioned and the 27

22   RFPs.

23           But what I would do is just adopt the most

24   reasonable proposal in a baseball arbitration type of

25   process and you could -- each side can make their

1    proposal about what additional discovery should be done.

2            You can prioritize, you know, the plaintiffs

3    can prioritize what they think is most important and

4    the -- Meta can decide whether they think it would be

5    reasonable to do any additional discovery in light of

6    these, you know, the new documents combined with the

7    prior arguments.

8            And you can both make a proposal and I'll just

9    adopt one of them in a baseball arbitration style thing

10   and I will not -- I will not take -- I will not meet in

11   the middle.

12           I will not make any changes.  I will just -- if

13   one side's proposal is like totally unreasonable, I'll

14   just adopt the other side's.  I suppose if both side's

15   proposals are totally unreasonable, I'll figure out what

16   to do.

17           But I'm guessing that I would just adopt

18   one's -- I would adopt the less unreasonable proposal in

19   that situation.  So what about that?  Is that a good way

20   to get this -- get all this mess behind us and start

21   focusing on the actual question of whether Facebook has a

22   fair use defense here?

23           MS. HARTNETT:  Your Honor, my backup proposal

24   had been to at least have a written submission, so you

25   could assess more rationally the need, especially after

1    yesterday where we didn't get the information that we're

2    starting to get a sense of what the alleged need is.

3              So we certainly would be open to submitting a

4    written proposal.  We also have, honestly, tried to think

5    through what a counterproposal would be, but it was hard

6    to assess that when it was just that we need all of this

7    and there wasn't more of a specific --

8              THE COURT:  Okay.  So I think I -- I think

9    that's what -- that's what I would be inclined to do, is

10   do it -- do this by way of baseball arbitration, and have

11   you each submit some -- submit a proposal and the

12   proposals are not going to be due at midnight, because

13   then I know you're both going to file them at 11:59 p.m.

14             So we'll -- they'll be due at 5:00 p.m. on

15   whatever date we decide, and what -- how much time do you

16   think you need to submit your proposals?  What do you

17   think?

18             MS. HARTNETT:  I'm not good at gambling, but

19   next -- I think maybe next Wednesday.

20             THE COURT:  Next Wednesday?  You need that long

21   to submit your proposal for what additional discovery

22   should be done?  I guess the idea is that you're wanting

23   to go through all of these documents and see what's

24   justifiable.

25             MS. HARTNETT:  At this point, we have not

1  engaged in -- I mean we have reviewed the documents, but

2  we don't -- in terms of tailoring them to their request

3  on Tuesday of all these things they need, we have not

4  fully mapped that onto it.

5           THE COURT:  Right.  And I'm -- I'm proposing a

6  system here where you don't need to do any more meeting

7  and conferring.  You can just make your proposal.  I

8  mean, you can meet and confer if you want, but --

9           MS. HARTNETT:  Your Honor, I don't mean to not

10  agree with your proposal, but another option would be to

11  do this more normally and try to meet and confer and if

12  we can't resolve it, go to Judge Hixson with a competing

13  proposal for leave to file additional depositions.

14          THE COURT:  No, we're going to get this done

15  quickly.

16          MS. HARTNETT:  Okay.  That's fine, too.  It's

17  not about you as much as kind of having a reasonable

18  middle ground if one is not evident.  Our client wants to

19  be --

20          THE COURT:  No middle ground.  Baseball

21  arbitration.

22          MS. HARTNETT:  Understood.

23          THE COURT:  So -- and I'm going to pick one of

24  your proposals.

25          So Mr. Pritt, anything you want to say about

1    that?

2          MR. PRITT:  I agree if Your Honor wants

3    additional information that would be the way to go.  I

4    would just say, you know, the longer we delay, I think

5    the more prejudice it is given the current court schedule

6    on summary judgment, and the more unlikely it is that the

7    Court would say yes, you do get what you're asking for,

8    because there's then less time to complete that

9    discovery.

10         THE COURT:  Well, and then you may want to take

11   that into consideration when you're putting together your

12   proposal.

13         MR. PRITT:  We have done that, Your Honor.

14         THE COURT:  You may want to do more of that.

15         MR. PRITT:  Yes.  You're right.

16         MS. HARTNETT:  Your Honor, on Monday, we have

17   the 30(b)(6) for five hours, so I think we were just

18   figuring out what made sense that will hopefully inform

19   whether we can cover.  I mean, like I said, the topics

20   are torrenting and mitigations.

21         THE COURT:  Okay.  So Wednesday 5:00 p.m. your

22   letters are due proposing what discovery.  And by the

23   way, to the extent that -- to the extent that the

24   plaintiffs are proposing certain document requests, I

25   want to see the document requests.

```
 1              I don't want to see them now.  I want to see
 2     what you're proposing on Wednesday after you go back and
 3     think about everything that we've discussed today.
 4              So -- and to the extent that Meta is proposing
 5     interrogatories or decides that it wants to include as
 6     part of its proposal interrogatories or RFPs, draft them
 7     and include them in your submission.
 8              And they'll be due on Wednesday at 5:00 p.m.
 9     and then I will very promptly decide which proposal for
10     additional discovery to adopt.
11              MS. HARTNETT:  Thank you, Your Honor.  Just for
12     the record, too, we haven't had a chance to respond to
13     these binders which are argument, could we --
14              THE COURT:  You can respond however you want in
15     your submission on Wednesday to the extent that you feel
16     that it's necessary to do so.  I mean, you're welcome to
17     justify your proposal with argument.
18              MS. HARTNETT:  I didn't just fully rebut
19     everything in the binder, but we would have a rebuttal to
20     a lot of these pages and the things are presented, it's
21     not -- we have a rebuttal to most of this, just for your
22     awareness.
23              THE COURT:  Okay.
24              MS. HARTNETT:  Including, like for example,
25     they -- there are 14 documents that mentioned torrenting
```

1    only in this last production, not the massive amount they

2    were suggesting to the Court.

3            THE COURT:  Okay.  All right.

4            MR. PRITT:  I'm sorry, Your Honor.  Can I raise

5    another issue?

6            THE COURT:  Sure.

7            MR. PRITT:  Real quick on the 30(b)(6) that is

8    already scheduled that was ordered by Your Honor.  When

9    Your Honor discussed it in your order, you had said

10   seeding.

11           Ms. Hartnett now says torrenting.  We just want

12   to make sure that it is torrenting, so that would

13   include, for example, the distribution or uploading

14   during the leeching phase.

15           Because, again, the seeding phase is just what

16   happens at the very last part after the entire torrent

17   chunks have been downloaded.  And so most of the actual

18   redistribution or sharing of the files occurs during that

19   other phase.  I just want to make sure that the

20   deposition would include that subject, because we have

21   had no testimony on that.

22           MS. HARTNETT:  Your Honor, that has never been

23   requested as a 30(b)(6) testimony.  That apparently is

24   their new expert theory that they gave us last night that

25   had just --

1           THE COURT:  This will -- I will say that

2    description that I just heard, I don't remember hearing

3    it before.  It's possible that I did hear it before and

4    I'm not remembering, but I --

5           MS. HARTNETT:  You did not.  This is a -- I

6    would object to the expert report we received without any

7    authorization.  They are trying to use the February

8    production, the unfortunate February production as a

9    pretext to bring in a theory of leeching that was not in

10   this case, that was not part of the earlier orders or

11   briefing.  It was not part of 30(b)(6) notice and it's

12   not appropriate.

13          MR. PRITT:  Just, can I -- I'm sorry, Your

14   Honor.  I apologize.  Leeching is part of torrenting.

15   Torrenting is part of this case.  Torrenting, you're

16   right, the last time we were just talking about seeding,

17   shouldn't have, but we were talking about seeding as a

18   general matter.

19          It's just the uploading.  Sometimes it's called

20   uploading during a leeching phase, which is part of the

21   torrent.  Sometimes it's after the download.  So it is

22   clearly relevant and it's clearly something that we only

23   learned late in discovery.

24          THE COURT:  Well, I mean, the -- the question

25   is, we have this 30(b)(6) deposition scheduled on Monday.

```
1    I don't remember what I said about the 30(b)(6)
2    deposition.  Like I said, I don't remember the issue
3    being described to me in the way that you're describing
4    it to me now.
5             I, you know, so I -- I mean, maybe it makes
6    sense to, you know, include that within this 30(b)(6)
7    deposition or maybe it doesn't and you need to argue for
8    it in your -- in your Wednesday letter.  I just don't
9    know.  I don't feel that I have the ability to answer
10   that right now.
11            MR. PRITT:  Then I guess we should just meet
12   and confer about whether or not to move that 30(b)(6)
13   deposition.
14            MS. HARTNETT:  Yeah, and I don't have the
15   person here that's defending that, so I think maybe the
16   parties should just meet and confer to make sure we're on
17   the same page about the scope of Monday's deposition.
18            THE COURT:  Okay.  Sounds good.  Anything else?
19            MR. PRITT:  Yes, Your Honor.  Well, there is
20   the issue of the rebuttal report to their rebuttal on
21   torrenting, but I guess you would like us to just address
22   that in Wednesday --
23            THE COURT:  You can address that in your
24   Wednesday submission.
25            MR. PRITT:  There were also numerous -- not
```

1  numerous, there were documents and witness interviews

2  including of individuals that were not deposed in this

3  case for which there are notes that were taken by Meta's

4  rebuttal experts and are in the rebuttal reports.  We've

5  now been asking Meta to produce those for weeks.  We have

6  gotten nothing.

7          THE COURT:  I'm sorry.  Could you say that

8  again?

9          MR. PRITT:  So in Meta's rebuttal reports,

10  including its torrenting report, it cites new documents

11  from Meta that were never produced in discovery.  It

12  cites witness interviews including of individuals who

13  were never deposed and we know that there were notes

14  taken that are not privileged during those interviews.

15          Meta has refused to produce those.  We have now

16  had some of these expert depositions without those notes

17  and we feel like this is another area where we're being

18  unduly prejudiced.

19          MS. HARTNETT:  I'm generally aware of this

20  issue, but it was not raised as something that was going

21  to be raised today.  There was one expert where we -- I

22  think notes were in the -- we didn't have notes to

23  provide.

24          There's another expert that I think we were

25  reviewing it.  She was sick and had to have her

```
1    deposition moved.  We're happy to confer with them, and I
2    would submit that the right thing to do is if there's a
3    dispute, they should bring a motion.  I don't -- I'm not
4    that familiar with this issue.
5              THE COURT:  Okay.
6              MR. PRITT:  We have been emailing repeatedly.
7              THE COURT:  Mr. Pritt.
8              MR. PRITT:  I know.  I don't want to argue,
9    but, you know, we can bring a motion before Judge Hixson
10   if that's what Your Honor would like us to do.
11             THE COURT:  That is what I would like you to
12   do.
13             MR. PRITT:  Okay.
14             THE COURT:  And I would like you to be very
15   careful in the allegations you're making about the
16   conversations you're having with them and their intent
17   and all that kind of stuff, because it's only hurting
18   your credibility at this point.
19             Okay.  Anything else to discuss?
20             MS. HARTNETT:  No, thank you, Your Honor.
21             MR. PRITT:  Well, Your Honor, is there anything
22   you want to discuss with the privilege assertion
23   withdrawals?
24             THE COURT:  I don't think so.  So I don't -- so
25   you -- you withdrew a bunch of stuff.  I have not yet
```

1    gone back to look at the stuff that I flagged for you

2    that you chose not to withdraw.

3            MS. HARTNETT:  Correct.

4            THE COURT:  I have not -- I have not gone back

5    and looked at that yet.  So I mean a lot of those were

6    judge -- like you said, a lot of that is -- those are

7    difficult.  Those are judgment calls.

8            And it's hard to decide what to hold, withhold

9    for privilege and what not to.  And I -- so I -- I have

10   not gone back to look at the stuff that I flagged that

11   you decided not to withdraw your privilege assertion for.

12   I can go do that and then if I have any concerns about

13   it, I'll let you-all know.

14           MS. HARTNETT:  Thank you, Your Honor.  I mean,

15   we did look very carefully.  I think I would just,

16   without going into all of it now, I think the main

17   reasons for not withdrawing were that there was either

18   decision makers talking about legal advice, but that's

19   one where we pared a little bit off, that was

20   introductory for context, but we were using a scalpel

21   now -- I mean, a more sharp scalpel.

22           And then there was three documents, 26, 27 and

23   28 that we did not withdraw because that was work

24   performed at legal's request to collect information and

25   we have case law for that, but you wouldn't necessarily

1    have known that just from looking at the documents,
2    that's 26 through 28.
3            We revised slightly our redactions in 32 and
4    33, but made sure that we were still protecting the
5    direct communications between attorney and client.  I
6    think that was also where there was a little context from
7    the comment, but the comment bubble was where the advice
8    was.
9            And then finally, there were two other, 41 and
10   59, you wouldn't, again, not necessarily know this from
11   the face of the document, but one of the people that was
12   a nonlawyer was the conduit between the legal team and
13   the rest of the engineering team.
14           And so they were summarizing the legal advice,
15   kind of coming back and forth as they were trying to
16   prepare for further legal advice.  So that was the basis
17   for the retention of the privilege assertions in those.
18           THE COURT:  Okay.  I'll go back and look at
19   those and let you know if I have any concerns about it,
20   but if you don't hear from me, you can just assume that
21   we're all square on that.
22           MS. HARTNETT:  Thank you, Your Honor.
23           MR. PRITT:  Your Honor, our concern was just
24   that it seems --
25           THE COURT:  Look, I have another hearing.  I'm

1    guessing that -- I'm telling you that I don't have any

2    concerns about the privileged documents.

3              MR. PRITT:  Understood.  Thank you, Your Honor.

4              THE COURT:  All of the bluster about that was

5    not well-founded.

6              MR. PRITT:  Thank you, Your Honor.

7              THE COURT:  Okay.

8              MS. HARTNETT:  Thank you.

9         (Proceedings adjourned at 11:27 a.m.)

10        **********************************************

                    CERTIFICATE OF REPORTER
11        I certify that the foregoing is a correct transcript
     of the proceedings taken from my stenographic notes in
12   the above-entitled matter.

13    /S/ Beth A  Krupa_          __March 4, 2025____
     Beth A. Krupa, RMR, CRR          Date
14   Official Court Reporter
     U.S. District Court
15   District of South Carolina

16

17

18

19

20

21

22

23

24

25

Beth A. Krupa, RMR, CRR