# GHAJAR EXHIBIT 25

```
 1                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
 2                   SAN FRANCISCO DIVISION
 3
     RICHARD KADREY, ET AL.,        )
 4                                  )
         Individual and             )
 5       Representative Plaintiff,  )
                                    )
 6            v.                    )  3:23-cv-03417-VC
                                    )
 7   META PLATFORMS, INC., a        )
     Delaware corporation,          )
 8                                  )
         Defendant.                 )
 9
10           The discovery deposition of DANIEL
11   SPULBER, taken in the above-entitled cause, before
12   Deborah A. Thompson, a Certified Shorthand Reporter
13   in the State of Illinois, taken pursuant to the
14   Federal Rules of Civil Procedure of the United
15   States District Courts at 10 North Dearborn Street,
16   Chicago, Illinois, on the 3rd day of March, 2025, at
17   9:30 o'clock a.m.
18
19
20
21
22
23
24
```

Page 1

1  that.
2      Q    Let's talk about that segment, the segment
3  of AI training.  When you talk about licensing,
4  licensing training data, right, is that segment both
5  for copyrighted and non-copyrighted material or only
6  copyrighted?
7      A    I'm not sure.  I think there may be some
8  data that's licensed that may not be protected by
9  copyright.  I really don't know.  I think my focus is
10 on licensing of copyrighted books.  But it's possible
11 that I'm paying a license to use data that is subject
12 to other protections and ownership and so on.  I
13 can't tell you every possibility.  So there may be
14 some that's not.
15     Q    So in your market segment of licensing for
16 AI training, the agreements in that segment could be
17 for material that has no IP protection at all?
18     A    I didn't say that.  I said it may be
19 subject to other kinds of IP protection.
20     Q    So let me ask the question directly.  For
21 agreements governing data that has no IP protection
22 at all, do you consider that to be part of the market
23 for licensing data for training an LLM?
24          MS. GEMAN:  Objection.

Page 142

1          THE WITNESS:  So this is a vast market, and
2    it includes all sorts of stuff, including stuff
3    that's not copyrighted.  So there may be exchange of
4    data under some terms or others that don't look like
5    traditional licenses.  So I would prefer to be
6    inclusive rather than not because there's so much --
7    so many transactions in this marketplace.  But by and
8    large, I would expect that licenses would be for
9    copyrighted material, but there could be other kinds
10   of data that's protected, for example, by trade
11   secrets and so on.
12   BY MR. BRIGHAM:
13       Q    Right, they could be paying for a license
14   other than for copyrighted material because the
15   market is so broad?
16       A    Yes.  They could be paying to license
17   material that's not necessarily protected by
18   copyright.  There might be other protections like
19   privacy.  For example, trade-secret type data or data
20   that's been produced as a work product, this kind of
21   thing.
22       Q    Or there may be no protections at all;
23   right?  They might be just paying for access out of
24   convenience?

Page 143

1       A       That's also possible.
2       Q       So if we go back to your opening report,
3   page 14.
4       A       Yes.
5       Q       That Table 1 -- there's a number of open AI
6   agreements on here.  Do you see those?
7       A       I see some of them, yes.  There's a lot of
8   them here.
9       Q       Do you recall reviewing any of those
10  agreements?
11      A       I don't recall.  I may have.  I don't
12  recall.
13      Q       You mentioned collective agreements before
14  or collective arrangements.  Are you relying on the
15  details of any existing collective arrangements as
16  somewhere that Meta could go license plaintiffs'
17  works right now?  Or are you just offering the
18  opinion that they could exist in the future?
19              MS. GEMAN:  Objection.
20              THE WITNESS:  So there are various
21  collective rights organizations.  I list many of
22  them.  And one particular one is very important, and
23  that's the CCC, the Copyright Clearance Center.  They
24  have experience in collective rights management.

Page 144

```
 1   copies also wasn't relevant to your opinion; right?
 2        A    I believe that making a copy is harm.
 3        Q    But you don't know whether they lost any
 4   sales --
 5             MS. GEMAN:  Objection.
 6   BY MR. BRIGHAM:
 7        Q    -- as a result of the copy; right?
 8        A    It's not possible to quantify that effect.
 9   They lost the sales of the copy.  In other words, if
10   Meta made one copy or two or a million, those are
11   lost sales.
12        Q    And those are the only lost sales that you
13   believe occurred?
14        A    No.  If, in addition, Meta's products lead
15   to diminished usage and sales of their work by
16   providing substitutes, that's another loss of sales.
17        Q    So we'll get to that.  But you have not
18   looked at plaintiffs' sales numbers?
19        A    That is correct.
20        Q    You haven't looked at them; right?
21        A    That's correct.
22        Q    And so therefore you have not determined
23   whether there was a drop in sales or lost sales after
24   the alleged copying; correct?
```

Page 242

1                MS. GEMAN:  Objection.  Misstates
2    testimony.
3                THE WITNESS:  So I have not looked at
4    whether plaintiffs had lost sales other than the fact
5    that, when Meta made copies, they lost sales.  I can
6    tell you that making copies of copyrighted works and
7    putting them online through torrent sites or
8    downloading or making copies, that is the essence of
9    lost sales.
10   BY MR. BRIGHAM:
11        Q    In your opinion, Llama wouldn't lead to the
12   discovery of plaintiffs' works; right?
13               MS. GEMAN:  Objection.
14               THE WITNESS:  I don't know.
15   BY MR. BRIGHAM:
16        Q    You don't have an opinion one way or the
17   other whether Llama would lead to the discovery of
18   plaintiffs' works?
19        A    Could you explain what you mean by "the
20   discovery of plaintiffs' works"?  I'm not sure I
21   understand your question.
22        Q    If I use Llama asking questions about
23   books, do you believe that Llama could be beneficial
24   and that it will direct traffic toward plaintiffs'

Page 243

```
 1            So my impression is, as I've been asked to
 2   assume and take as a given, that Meta is infringing
 3   on plaintiffs' works, and that infringement is not
 4   designed in any way to benefit the authors, but
 5   rather it's designed to create benefits to Meta.
 6   BY MR. BRIGHAM:
 7       Q    Have you personally seen any instances
 8   where the Meta LLM outputted correct information
 9   about plaintiffs' books?
10       A    I have not looked at output of Meta.
11       Q    So you don't know whether output of Meta
12   regurgitates parts of books?
13            MS. GEMAN:  Objection.
14            THE WITNESS:  I don't know.  It's possible,
15   but this is for experts.
16   BY MR. BRIGHAM:
17       Q    That's not part of your opinion?
18       A    No.  It is possible.  And it's something
19   that would be factored into the creation of economic
20   substitutes for authors' works.  So I can't provide
21   evidence for that because that's not my job.  My job
22   is to provide an economic analysis of this.  But if
23   indeed it outputs something about authors' works, it
24   may create substitutes.  Or it can harm authors'
```

1  reputations as I explain in my statement.
2      Q    But that's hypothetical; right?  You have
3  no proof that infringing content was actually
4  generated by a Llama model?
5           MS. GEMAN:  Objection.
6           THE WITNESS:  This is beyond my analysis,
7  but there is certainly a risk -- and that's not
8  beyond my analysis.  There's a risk that it may
9  output content that affect's authors' sales.
10 BY MR. BRIGHAM:
11     Q    I understand why you think it may, but you
12 have no proof that it has?
13          MS. GEMAN:  Objection.
14          THE WITNESS:  That's correct.
15 BY MR. BRIGHAM:
16     Q    So for the third type of harm,
17 substitution, how many sales were lost for each
18 plaintiff due to substitution by LLM generated works?
19 You didn't calculate that; right?
20          MS. GEMAN:  Objection.  Misstates
21 testimony.
22          THE WITNESS:  So I did not calculate lost
23 sales, but I provide evidence that leads me to
24 believe that there my be lost sales.

Page 246

```
 1   BY MR. BRIGHAM:
 2        Q    But you don't know how many sales, if any,
 3   were lost due to substitution?
 4        A    I believe I've answered that question.
 5        Q    And the answer was you don't know?
 6             MS. GEMAN:  Objection.  Misstates
 7   testimony --
 8   BY MR. BRIGHAM:
 9        Q    Is the answer "I don't know"?
10             MS. GEMAN:  Sorry.  I wasn't done with my
11   objection.  Misstates testimony about the meaning of
12   lost sales.
13             THE WITNESS:  So I've mentioned lost sales
14   in terms of the fact that Meta made copies.  I've
15   mentioned the risk of substitution or economic
16   substitution due to the output of Meta.  But I have
17   not quantified those amounts.
18   BY MR. BRIGHAM:
19        Q    And you're not aware of any instance of
20   substitution?
21        A    You have to flesh that out a little bit.
22        Q    You're not aware of any instance where an
23   output generated by Meta AI acted as a substitute for
24   one of plaintiffs' books?
```

Page 247

1    A    No, I am not.
2    Q    Did you compare the sales of each book of
3  plaintiffs before introduction of a Llama model and
4  then after?
5    A    No, I did not.
6    Q    Why not?
7    A    It wasn't necessary for my analysis.
8    Q    You could have, though?
9         MS. GEMAN:  Objection.
10        THE WITNESS:  I'm not sure that information
11 is available.
12 BY MR. BRIGHAM:
13   Q    Adequate information from plaintiffs was
14 not available?
15        MS. GEMAN:  Objection.
16        THE WITNESS:  To fully do this, I need a
17 little bit longer time horizon, and I would need
18 sales data for other books and so on to make a
19 complete analysis.  You can't just look at one or two
20 or a few books.  What you can do is you can say that,
21 you know, licensing didn't occur.  Authors were
22 deprived of licenses from sales from absence of
23 licensing in other words.  Or I can say that many
24 copies were made, and authors were deprived of

Page 248

```
 1   order.
 2              MR. LAUTER:  In the protective order.
 3              MR. STEIN:  Because open AI, in making its
 4   production, expressed -- and I'll say this on the
 5   record -- expressed concerned that anyone but outside
 6   counsel would see their documents.  And we told them
 7   that the protective order is what it is.  So I just
 8   wanted to see if there had been any further
 9   discussions between you and AI to this effect.
10              MR. LAUTER:  We're just following the
11   protective order.
12              MR. STEIN:  Okay.  Thank you.
13              THE VIDEOGRAPHER:  Off the record at 5:49.
14                  (Recess taken.)
15              THE VIDEOGRAPHER:  Back on the record at
16   6:05.
17   BY MR. BRIGHAM:
18       Q      Have you ever seen a book generated by an
19   LLM?
20              MS. GEMAN:  Asked and answered.
21              THE WITNESS:  I believe I indicated to you
22   that I don't know.  I don't think so, but I don't
23   know.
24
```

Page 263

```
 1   BY MR. BRIGHAM:
 2       Q    Do you know how many books generated by an
 3   LLM exist?
 4       A    No, I don't know.
 5       Q    Do you know how many books generated by an
 6   LLM have been sold?
 7       A    I don't know.
 8       Q    Are you aware of a single instance in which
 9   someone used Llama instead of reading one of
10   plaintiffs' books?
11       A    I don't know.
12       Q    Are you aware of a single instance in which
13   someone read a Llama output instead of reading one of
14   plaintiffs' books?
15       A    I don't know, but it doesn't affect my
16   opinion.
17       Q    Are you aware of a single instance in which
18   someone wrote a book using Llama?
19            MS. GEMAN:   Objection.
20            THE WITNESS:   I am aware of people using AI
21   LLMs to write books, and I've read reports that
22   there's a flood of them.  But I don't know which, if
23   any, have been done with Llama.
24
```

Page 264

1  BY MR. BRIGHAM:
2      Q    So you can't tell me of a single instance
3  in which someone wrote a single book using Llama?
4      A    Again, I've read reports that there's a
5  flood of books written with AI LLMs, but I don't know
6  if any of those are from Llama.
7      Q    Are you aware of a single instance in which
8  someone used any AI model instead of reading the
9  plaintiffs' books?
10          MS. GEMAN:  Objection.
11          THE WITNESS:  Again, I don't know.  And
12  you're just referring to plaintiffs' books.  I don't
13  know.
14  BY MR. BRIGHAM:
15      Q    Are you aware of a single instance in which
16  someone read any AI model output instead of reading
17  plaintiffs' books?
18      A    I don't know.  I'm not aware.
19  BY MR. BRIGHAM:
20      Q    When you say that authors face the risk
21  that Llama outputs could substitute for plaintiffs'
22  books, you're speculating or guessing about something
23  that might occur; right?
24          MS. GEMAN:  Objection.

Page 265

1            THE WITNESS:  I'm examining the risk of
2    substitutes based on my observation of AI LLM models
3    generally.
4    BY MR. BRIGHAM:
5        Q    But you're saying it might occur in the
6    future, fair?
7        A    Yes.  I think that's one interpretation of
8    the word "risk."
9        Q    And it might not occur; right?
10       A    That's possible as well.
11       Q    Okay.  You talk about Meta's market
12   capitalization in your report.  Do you recall that?
13       A    Yes, I do.
14       Q    Did Meta's market cap impact the damages
15   amount that you calculated?
16       A    No, it did not.  And as you know, I
17   calculated the damages based on the market price of
18   books used as LLM training data.
19       Q    You're not opining that Llama was the cause
20   of the increase in the market cap, are you?
21       A    No.  I'm not making a causation statement,
22   but I am pointing out that during the period that
23   Meta developed its AI LLM models, it's market
24   capitalization rose by over a trillion dollars, I

Page 266

```
 1   right?
 2        A    So these types of projections have to do
 3   with revenue.
 4        Q    So you don't believe that anyone would
 5   benefit from the trillions of dollars?
 6             MS. GEMAN:  Objection.
 7             THE WITNESS:  I never said that.
 8   BY MR. BRIGHAM:
 9        Q    Can the growth -- you point to this growth
10   to trillions of dollars.  Can that growth be achieved
11   without the use of plaintiffs' books in training?
12             MS. GEMAN:  Objection.
13             THE WITNESS:  I believe that the training
14   and development of AI models, such as Meta's Llama
15   models, requires extraordinarily large amounts of
16   data, and there are reports that more and more data
17   will be required in the future.  For example,
18   companies have suggested that they need nuclear power
19   plants to be established to run their computers.
20   That will be used to process and compute with that
21   data that's being fed into these artificial
22   intelligence models.  So I believe that a lot more
23   data is going to be required.
24             Now, of that data, I believe that the
```

```
1   STATE OF ILLINOIS   )
                        ) SS:
2   COUNTY OF C O O K   )
3
4           I, Deborah A. Thompson, a Certified
    Shorthand Reporter within and for the State of
5   Illinois, do hereby certify:
6           That previous to the commencement of the
    examination of the witness, the witness was duly
7   sworn to testify the whole truth concerning the
    matters herein;
8
            That the foregoing deposition was reported
9   stenographically by me, was thereafter reduced to a
    printed transcript by me, and constitutes a true
10  record of the testimony given and the proceedings
    had;
11
            That the said deposition was taken before
12  me at the time and place specified;
13          That the reading and signing by the
    witness of the deposition transcript was agreed upon
14  as stated herein;
15          That I am not a relative or employee or
    attorney or counsel, nor a relative or employee of
16  such attorney or counsel for any of the parties
    hereto, nor interested directly or indirectly in the
17  outcome of this action.
18          IN WITNESS WHEREOF, I do hereunto set my
    hand at Chicago, Illinois, this 10th day of March,
19  2025.
20
21          [signature: Deborah A. Thompson]
22
                  Certified Shorthand Reporter
23                State of Illinois
                  CSR License No. 084-003487
24
```

Page 285