# GHAJAR EXHIBIT 40

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

RICHARD KADREY, et al.,       )
                              )
         Individual and       )
         Representative       )
         Plaintiffs,          )
                              )
v.                            )   Case No. 3:23-cv-03417-VC
                              )
META PLATFORMS, INC.,         )
                              )
         Defendant.           )
_____)

** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

Videotaped Deposition of SERGEY EDUNOV

San Francisco, California

Wednesday, November 6, 2024

Reported Stenographically by

Michael P. Hensley, RDR, CSR No. 14114

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 15

1　name is Mike Hensley.  I am a California Certified

2　Shorthand Reporter, CSR #14114.  Today's proceedings

3　are being captured by stenographic means.

4　　　　　　　SERGEY EDUNOV,

5　having been first duly sworn, was examined and

6　testified as follows:

7　　　　　　　EXAMINATION

8　BY ATTORNEY STEIN:

9　　　Q.   Thank you.

10　　　　   Good morning.

11　　　A.   Good morning.

12　　　Q.   Please state your full name.

13　　　A.   Sergey Edunov.

14　　　Q.   How do you spell that?

15　　　A.   E-d-u-n-o-v.

16　　　Q.   And what is your home address?

17　　　[REDACTED]

18　　　Q.   Are you presently employed?

19　　　A.   Yes.

20　　　Q.   By whom?

21　　　A.   Meta.

22　　　Q.   What is your current title?

Page 16

1   A.   Director of engineering.

2   Q.   Have you testified before?

3   A.   No.

4   Q.   Okay.  I'm sure your counsel has gone over
5   all the rules of the deposition, the same as mine,
6   but I just want to reiterate a couple things.  If I
7   ask you a question that you find confusing, you can
8   ask me to clarify it.  If you need a break, that's
9   completely fine.  We'll try to do regular breaks,
10  but if there's a question pending, let's try to
11  answer that question before we take that break.
12       Do you understand that you are under oath?
13  A.   Yes, I do.
14  Q.   Is there any reason that you cannot
15  testify truthfully today?
16  A.   No.
17  Q.   Do you understand that you are on video
18  and being recorded?
19  A.   Yes, I do.
20  Q.   When did you first learn about this
21  lawsuit?
22  A.   Couple of months ago.

Page 37

 1      A.   Yes.
 2      Q.   What's your responsibility, with respect
 3   to developing the Llama model?
 4           ATTORNEY MORTON:  Object to form.  Vague.
 5           THE WITNESS:  Responsibilities in what
 6   sense?
 7   BY ATTORNEY STEIN:
 8      Q.   Do you do any coding, with respect to the
 9   Llama model?
10      A.   I do not.
11      Q.   Do you do any product design?
12           ATTORNEY MORTON:  Object to form.
13           THE WITNESS:  I don't think so.
14   BY ATTORNEY STEIN:
15      Q.   Do you do any project management?
16      A.   Project management in what sense?
17      Q.   What would you say you do, with respect to
18   developing Llama?
19           ATTORNEY MORTON:  Object to form.
20           THE WITNESS:  I manage the team that works
21   on Llama.
22                        ///

Page 51

1  the next token in a sequence, what is a token?

2           ATTORNEY MORTON:  Objection.  Asked and

3  answered.

4           THE WITNESS:  A token, it can be a subword

5  unit, or it can potentially span multiple words

6  in -- in a sequence in case of text -- in case of

7  text input.

8  BY ATTORNEY STEIN:

9       Q.   And how does pretraining help the model do

10  that?

11      A.   So during the pretraining, you are

12  optimizing the model to reduce the loss on the next

13  token prediction; so after the pretraining, model

14  can -- can more confidentiality predict the next

15  token in a sequence given an input sequence.

16      Q.   And what type of data do you look for when

17  you are looking for pretraining data?

18          ATTORNEY MORTON:  Object to form.

19          THE WITNESS:  They are looking for text

20  data, images data.

21  BY ATTORNEY STEIN:

22      Q.   With respect to text data, what are the

1   attributes of that text that you look for
2   pretraining?
3           ATTORNEY MORTON:  Object to form.
4           THE WITNESS:  They are looking for size
5   and quality.
6   BY ATTORNEY STEIN:
7       Q.   What does "quality" mean?
8       A.   There's no specific definition that I am
9   aware of, but generally, you would consider certain
10  type of text higher quality and certain type of text
11  lower quality.
12      Q.   And what's the difference between lower
13  quality and higher quality?
14          ATTORNEY MORTON:  Object to form.
15          THE WITNESS:  An example of lower-quality
16  text can be some junk page on the Internet or
17  pornography; so you wouldn't want to train on this
18  kind of data.
19  BY ATTORNEY STEIN:
20      Q.   Why is that?
21          ATTORNEY MORTON:  Object to form.
22          THE WITNESS:  Typically, where the lower

Page 54

1   Like, if you read it as a human, it makes sense to
2   you.
3   BY ATTORNEY STEIN:
4        Q.    What does "make sense" mean?
5        A.    Like, you read the content and you
6   understand what it is about, and it has valuable
7   information in it.
8        Q.    And what types of data that you have come
9   across would you call higher quality?
10       A.    Typically, research articles, blog posts,
11  conversational data that is available online are
12  high-quality data.
13       Q.    Would you include books --
14       A.    Mm-hmm.
15       Q.    -- in that group?
16             ATTORNEY MORTON:  Object to form.
17             THE WITNESS:  Books are high-quality data
18  as well, yes.
19  BY ATTORNEY STEIN:
20       Q.    And within books, are some books
21  higher-quality data than other books?
22             ATTORNEY MORTON:  Object to form.

Page 55

 1              THE WITNESS:  Hard for me to tell.  I
 2     never measure it, the importance of different books.
 3     BY ATTORNEY STEIN:
 4          Q.   You discussed two different datasets
 5     involving books:  Books3 and LibGen.
 6          A.   Mm-hmm.
 7          Q.   Did either of those datasets have more
 8     quality than the other?
 9               ATTORNEY MORTON:  Object to form.
10               THE WITNESS:  I do not know.  I never
11     measured that.
12     BY ATTORNEY STEIN:
13          Q.   As part of your role in pretraining, did
14     you or anyone under you ever measure differences in
15     quality between datasets?
16          A.   Me or anyone under me?
17               I -- I personally definitely didn't.
18               I do not know if anyone under me did.
19          Q.   Is there any difference in size between
20     books and LibGen datasets?
21          A.   I don't know.
22          Q.   Is there any differences in content

Page 56

1   between Books3 and LibGen?

2        A.   I don't know that either.

3        Q.   Did you ever dedup the Books3 and LibGen

4   datasets?

5        A.   Me, like, personally?  No.

6        Q.   Did anyone who you supervised do that?

7        A.   I do not know, actually.  It's possible,

8   but I'm -- I don't know.

9        Q.   Do you know what deduping is?

10       A.   Yes, I do.

11       Q.   Is there any reason it would be useful to

12  dedup between two datasets?

13       A.   Yeah.  There could be reason for that.

14       Q.   Why would someone dedup two datasets?

15       A.   You generally want higher diversity data

16  when you train those models; so repeating similar or

17  the same data multiple times may not be helpful.

18       Q.   Why do you want higher diversity data?

19       A.   It's an empirical result that we are aware

20  of.  The models are better when they're trained on

21  more diverse data.

22       Q.   What does "better" mean?

Page 383

```
 1              CERTIFICATE OF SHORTHAND REPORTER

 2

 3        I, Michael P. Hensley, Registered Diplomate

 4   Reporter for the State of California, CSR No. 14114,

 5   the officer before whom the foregoing deposition was

 6   taken, do hereby certify that the foregoing

 7   transcript is a true and correct record of the

 8   testimony given; that said testimony was taken by me

 9   stenographically and thereafter reduced to

10   typewriting under my direction; that reading and

11   signing was requested; and that I am neither counsel

12   for, related to, nor employed by any of the parties

13   to this case and have no interest, financial or

14   otherwise, in its outcome.

15

16

17

18

19

20

21                      Michael P. Hensley, CSR, RDR

22
```