# GHAJAR
# EXHIBIT 43

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

IN RE MATTER OF:                        )

RICHARD KADREY, et al.,                 )

Plaintiff,                              )

vs.                          ) C.A. NO.:

META PLATFORMS, INC.,                   ) 3:23-cv-03417-VC

Defendant.                              )

_____)


VIDEOTAPED DEPOSITION OF YANN LeCUN, Ph.D.

Palo Alto, California

Thursday, November 21, 2024

** HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY **

UNDER THE PROTECTIVE ORDER

Stenographically Reported by:

HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR

Realtime Systems Administrator

California CSR License #11600

Oregon CSR License #21-0005

Washington License #21009491

Nevada CCR License #980

Texas CSR License #10725

_____

DIGITAL EVIDENCE GROUP

1730 M. Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 9

```
 1            Would you please state your business

 2   address for the record.

 3      A.   Business address is the Farley Building in

 4   New York City.

 5      Q.   And is there a more specific address street

 6   number?

 7      A.   I believe it's on 33rd Street, but I can't

 8   remember the number.

 9      Q.   Fair enough.

10           And what is your current title?

11      A.   Chief AI scientist.  That's one of my two

12   jobs.  I'm also a professor at New York University.

13      Q.   And when we say -- you're a chief AI

14   scientist for Meta Platforms, Inc.; is that right?

15      A.   Yes.

16      Q.   And can we refer to it today as "Meta"?

17      A.   Yeah.

18      Q.   All right.

19           And you're also a professor at NYU.  Is

20   that also a full-time job?

21      A.   They're both part time.

22      Q.   Have you had your deposition taken before?
```

11/21/2024         Richard Kadrey, et al. v. Meta Platforms, Inc.         Yann LeCun, Ph.D.
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

Page 81

```
 1       Q.    Have you provided your attorneys with any

 2    documents in this case?

 3       A.    No.

 4       Q.    Okay.

 5             Have you been asked to provide your

 6    attorneys with any documents?

 7       A.    No.

 8       Q.    And have you had the same job at Meta the

 9    whole time you've been there?

10       A.    No.  I had two jobs.

11       Q.    Okay.

12             Let's go through that.  What -- what was

13    the job you were hired to do?

14       A.    My first job title was director of AI

15    research, so director of the FAIR organization which

16    at the time, in Facebook AI Research, which I had

17    for four years, from late 2013 to early 2018.

18             And then since then, I've been chief AI

19    scientist so I'm no longer a manager.  I'm actually

20    what's called an individual contributor and so I

21    don't have any reports, at least no permanent

22    full-time employees such as students and things like
```

Page 82

1    this, but no -- no direct reports so -- so my impact

2    on the company is purely intellectual, not

3    managerial or operational.

4        Q.    And to whom do you report?

5        A.    Chris Cox, Chief Product Officer.

6              (Stenographer clarification.)

7        Q.    (By Ms. Geman)  Has that been true for the

8    last four years?

9        A.    No, that's only been true for the last

10   year.

11       Q.    Okay.

12       A.    Before that, my direct manager was Michael

13   Abrash who's in charge of reality --

14             (Stenographer clarification.)

15             THE WITNESS:  -- labs research, RLR,

16   because FAIR was under reality labs research and

17   then a year ago, FAIR was moved to Chris Cox's

18   organization which is called FOA, family of apps.

19             And then before that, I was reporting to

20   Jerome Pesenti --

21       Q.    (By Ms. Geman)  Um-hum.

22       A.    -- who was VP of AI.

11/21/2024          Richard Kadrey, et al. v. Meta Platforms, Inc.          Yann LeCun, Ph.D.
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

Page 118

 1    agree that that's consistent with the idea that

 2    books are useful to LLaMA for cultural relevance?

 3              MR. WEINSTEIN:   Object to form.

 4              THE WITNESS:   I mean, they can -- they

 5    could be useful for a lot of different things, but,

 6    again, what precisely is not clear.

 7       Q.    (By Ms. Geman)  So let me ask this

 8    question:  You say books could be useful to LLaMA

 9    for lots of different things.  What is your

10    understanding of how books, in fact, have been

11    useful for LLaMA?

12       A.    I don't know.

13       Q.    Okay.

14              You received the Turing Award; correct?

15       A.    Correct.

16       Q.    And what was that for?

17       A.    This was for fundamental contributions to

18    deep learning, particularly --

19              (Stenographer clarification.)

20              THE WITNESS:   -- convolutional neural

21    networks.  It's an exotic word.

22              But more generally for essentially showing

Page 216

```
 1            MR. WEINSTEIN:  Object to form.

 2       Q.   (By Ms. Geman)  Okay.  All right.

 3            And have you -- have you been in any

 4  discussions at Meta about outreach to or agreements

 5  with companies that possess large swaths of data for

 6  use for Meta's LLMs?

 7            MR. WEINSTEIN:  Object to form.  Lacks

 8  foundation.

 9            THE WITNESS:  No.

10       Q.   (By Ms. Geman)  And do you ever -- are you

11  ever in meetings about the -- about -- well, let me

12  back up.

13            What sort of regular meetings do you have

14  at Meta?  Like, I don't think we've kind of gone

15  through what your current functions are as opposed

16  to your job title.

17       A.   Maybe we should have started with this.  So

18  I'm a chief AI scientist which means I'm a

19  scientist, so I don't deal with products.  I work

20  with various research teams within FAIR, which means

21  now fundamental AI research, and what we work on

22  primarily is the next generation AI systems.  So
```

Page 217

1    we're not working on LLMs.

2          In fact, I've said -- I've said publicly

3    multiple times in recent months that my advice to

4    people getting into the field is to not work on

5    LLMs.  The reason being that LLM is now a topic of

6    product developments and technology and is in the

7    hands of large industry players, like Meta and

8    Google, Microsoft, OpenAI, et cetera, and if you are

9    a researcher or scientist particularly in academia,

10   there's no point actually you working on this at

11   all.

12          And at FAIR, we are not working on LLMs.

13   We used to.  We got the -- the LLaMA project started

14   in late 2022, but since then, it's been in the hands

15   of the newly created product group called GenAI and

16   that has allowed FAIR to refocus its efforts on

17   longer term research which does not include LLM.

18          So my day-to-day work is to talk to

19   individual scientists, talk to groups of scientists

20   that are working on particular projects and then

21   more generally advise the scientists and engineers

22   at FAIR generally, but particularly broadly in the

Page 218

1    company, to focus on projects that I think are

2    promising for the future and I largely stay out of

3    anything related to LLM and, in fact, natural

4    language processing as a whole.

5        Q.    When did you last work on LLaMA?

6        A.    I never worked on LLaMA.

7        Q.    Didn't you say you worked on LLaMA 1?

8        A.    No, I didn't.

9        Q.    Okay.

10       A.    FAIR worked on LLaMA 1.

11       Q.    FAIR worked on LLaMA 1.  Okay.

12       A.    But -- but I was already chief scientist

13   and not involved in this.

14       Q.    Okay.

15             And have you ever been part of GenAI?

16       A.    No.

17       Q.    Okay.

18             You report to -- you presently report to

19   Chris Cox though; correct?

20       A.    Correct.

21       Q.    Okay.

22             Who else reports to him regarding AI

Page 267

```
 1   a copy of that?

 2            MS. GEMAN:   Oh, yeah.

 3       Q.   (By Ms. Geman)  Who is Nikolay Bashlykov?

 4       A.   I don't know.

 5       Q.   Have you ever met him?

 6       A.   I don't think so.

 7       Q.   Do you know who Hugo Touvron is?

 8       A.   Oh, yes.

 9       Q.   Who is he?

10       A.   He's a research scientist at -- formerly at

11   FAIR and now at GenAI in Paris.

12       Q.   What's the sort of relationship between the

13   Paris FAIR and GenAI and the U.S. FAIR and GenAI?

14       A.   Well, I created FAIR Paris.  The history of

15   it, so FAIR was created in late 2013.  FAIR Paris

16   was created in spring 2015 and grew to about 100

17   people.

18            And then in early 2023 when GenAI was

19   created, the -- the nucleus of the engineering team

20   from GenAI was formed by something like 60 or 70

21   people from FAIR who were moved to GenAI, basically

22   were asked to join GenAI as the nucleus of the
```

Page 268

1    engineering team, and Hugo was part of that.

2            I believe Hugo did his Ph.D. thesis at FAIR

3    in Paris in residence and -- and then became a

4    research scientist and then transferred to GenAI

5    when GenAI was created.

6        Q.    And what work does he do with LLMs, if you

7    know?

8        A.    Well, so he was part of the original team

9    for LLaMA 1 and I believe he's actually the first

10   author of the -- one of the papers.  I'm not sure if

11   he's the first author of --

12           (Stenographer clarification.)

13           THE WITNESS:   -- LLaMA 1 or LLaMA 2.  I

14   know he's the first author on one of the -- on the

15   technical papers for one of the LLaMA -- early LLaMA

16   LLMs, but I can't remember if he's the first author

17   for LLaMA 1.  He was certainly part of the team.

18       Q.    (By Ms. Geman)  And have you worked with

19   him personally?

20       A.    No.

21       Q.    Okay.

22           So have you seen earlier what's been marked

Page 323

1           I, HEATHER J. BAUTISTA, CSR No. 11600,

2    Certified Shorthand Reporter, certify:

3         That the foregoing proceedings were taken

     before me at the time and place therein set forth,

4    at which time the witness declared under penalty of

     perjury; that the testimony of the witness and all

5    objections made at the time of the examination were

     recorded stenographically by me and were thereafter

6    transcribed under my direction and supervision; that

     the foregoing is a full, true, and correct

7    transcript of my shorthand notes so taken and of the

8    testimony so given;

9     (XX) Reading and signing was not requested/offered.

10        I further certify that I am not financially

11   interested in the action, and I am not a relative or

12   employee of any attorney of the parties, nor of any

13   of the parties.

14        I declare under penalty of perjury under the

15   laws of California that the foregoing is true and

16   correct.    Dated:    November 26, 2024

17

18

19

20

21

22   _____
     HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR