**COBLENTZ PATCH DUFFY & BASS LLP**
Thomas A. Harvey (SBN 235342)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5781
Ef-tah@cpdb.com

**OPPENHEIM + ZEBRAK, LLP**
Michele H. Murphy (*pro hac vice* pending)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
michele@oandzlaw.com

*Counsel for Amicus Curiae The International Association of Scientific, Technical and Medical Publishers*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| RICHARD KADREY et al.,<br><br>  Individual and Representative Plaintiffs,<br><br>  v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>  Defendant. | Case No. 3:23-cv-03417-VC-TSH<br><br>**BRIEF OF THE INTERNATIONAL ASSOCIATION OF SCIENTIFIC, TECHNICAL AND MEDICAL PUBLISHERS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge: Hon. Vince Chhabria<br><br>Date: May 1, 2025<br>Time: 10:00 am<br>Dept: Courtroom 4, 17th floor<br>Judge: Vince Chhabria<br>Trial Date: None<br>Date Action Filed: July 7, 2023 |

# TABLE OF CONTENTS

INTERESTS OF *AMICUS CURIAE* .................................................................................................. 1

PRELIMINARY STATEMENT .......................................................................................................... 2

FACTUAL BACKGROUND ............................................................................................................... 2

    I.    Z-Library Was Indicted for Criminal Copyright Infringement. ........................................ 4

    II.    Library Genesis Is a Notorious, Illegal Collection of Pirated Material. ........................... 5

    III.    Sci-Hub Is a Repository for Millions of Pirated Scientific Articles. ................................ 7

    IV.    Internet Archive's Books Database Was Adjudged Infringing. .......................................... 9

    V.    Anna's Archive Aggregates Illegal Websites' Infringing Files. ...................................... 10

ARGUMENT ..................................................................................................................................... 11

    I.    Each Act of Alleged Infringement Must Be Independently Considered. .......................... 11

    II.    Use of Stolen Copies Should Not Be Conflated with Choosing Not to License. ............ 11

CONCLUSION .................................................................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**

*American Chemical Society v. John Does 1-99, et, al.*,
  Case No. 17-cv-00726-LMB-JFA (E.D. Va. Nov. 11, 2017) .................................................. 7, 8

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
  598 U.S. 508 (2023) ................................................................................................................ 13

*Atari Games Corp. v. Nintendo of America, Inc.*,
  975 F.2d 832 (Fed. Cir. 1992) .......................................................................................... 13, 14

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) .................................................................................................... 11

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
  881 F.3d 293 (4th Cir. 2018) ................................................................................................. 2, 3

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) .......................................................................................................... 12, 13

*Cengage Learning Inc. et al. v. Does 1-50 d/b/a Library Genesis*,
  Case No. 23-cv-08316-CM (S.D.N.Y. Sept. 24, 2024) ............................................................. 6

*Elsevier Inc. v. Sci-Hub*,
  2017 WL 3868800 (S.D.N.Y. June 21, 2017) ........................................................................ 6, 7

*Elsevier Inc. v. Sci-Hub*,
  Case No. 15-cv-04282-RWS (S.D.N.Y.) .............................................................................. 7, 8

*Fioranelli v. CBS Broadcasting Inc.*,
  551 F. Supp. 3d 199 (S.D.N.Y. 2021) ..................................................................................... 14

*Glacier Films (USA), Inc. v. Turchin*,
  896 F.3d 1033 (9th Cir. 2018) ................................................................................................. 11

*Hachette Book Grp., Inc. v. Internet Archive*,
  115 F.4th 163 (2d Cir. 2024) ................................................................................................. 3, 9

*Hachette Book Grp., Inc. v. Internet Archive*,
  664 F. Supp. 3d 370 (S.D.N.Y. 2023) ....................................................................................... 9

*Harper & Row Pub., Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) .......................................................................................................... 12, 14

*Los Angeles News Serv. v. KCAL-TV Channel 9*,
  108 F.3d 1119 (9th Cir. 1997) ................................................................................................. 14

*NXIVM Corp. v. Ross Institute*,
  364 F.3d 471 (2d Cir. 2004) .................................................................................................. 14

*Oracle v. Google*,
  493 U.S. 1 (2021) .................................................................................................................. 13

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014) .............................................................................................................. 11

*United States v. Napolsky and Ermakova*,
  Case No. 22-cr-525-NRM-CLP (E.D.N.Y. Oct. 21, 2022) ....................................................... 4

**Statutes**

17 U.S.C. § 107 ............................................................................................................................ 12

**Other Authorities**

2017 Out-of-Cycle Review of Notorious Markets, OFFICE OF THE UNITED STATES TRADE
  REPRESENTATIVE, EXECUTIVE OFFICE OF THE PRESIDENT, 16 (2017)
  https://ustr.gov/sites/default/files/files/Press/Reports/2017%20Notorious%20Markets%20List
  %201.11.18.pdf. ....................................................................................................................... 7

Andy Maxwell, *Z-Library Admins "Escape House Arrest" After Judge Approves U.S.
  Extradition*, TORRENTFREAK (July 8, 2024), https://torrentfreak.com/z-library-admins-escape-
  house-arrest-after-judge-approves-u-s-extradition-240708/. .................................................... 5

Anna's Archive Frequently Asked Questions, https://annas-archive.org/faq (last visited Apr. 3,
  2025). ..................................................................................................................................... 10

Anna's Archive Torrents, https://annas-archive.org/torrents (last visited Apr. 3, 2025). .............. 10

Anna's Archive, https://annas-archive.org/ (last visited Apr. 3, 2025) ......................................... 10

Blake Brittain, *Textbook publishers sue 'shadow library' Library Genesis over pirated books*,
  REUTERS (Sept. 14, 2023), https://www.reuters.com/legal/litigation/textbook-publishers-sue-
  shadow-library-library-genesis-over-pirated-books-2023-09-14/ ............................................ 7

Ernesto Van der Sar, *Court Orders Shutdown of Libgen, Bookfi, and Sci-Hub*, TORRENTFREAK
  (Nov. 2, 2015), https://torrentfreak.com/court-orders-shutdown-of-libgen-bookfi-and-sci-hub-
  151102/ ..................................................................................................................................... 7

*Introducing the Pirate Library Mirror (EDIT: moved to Anna's Archive)*, Anna's Blog (July 1,
  2022), https://annas-archive.org/blog/blog-introducing.html. ............................................... 10

John Annese, *Two Russians charged with running Z-Library book piracy website*, NEW YORK
  DAILY NEWS (Nov. 16, 2022), https://www.nydailynews.com/2022/11/16/two-russians-
  charged-with-running-z-library-book-piracy-website/. ........................................................... 5

iii   CASE NO. 3:23-CV-03417-VC-TSH
BRIEF OF THE INTERNATIONAL ASSOCIATION OF SCIENTIFIC, TECHNICAL AND MEDICAL PUBLISHERS
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

John Timmer, *Science paper piracy site Sci-Hub shares lots of retracted papers*, ARS TECHNICA (Jan. 7, 2025) https://arstechnica.com/science/2025/01/science-paper-piracy-site-sci-hub-shares-lots-of-retracted-papers/.................................................................................................. 9

Jon Brodkin, *US seizes Z-Library login domain, but secret URLs for each user remain active*, ARS TECHNICA (May 5, 2023), https://arstechnica.com/tech-policy/2023/05/us-seizes-z-library-login-domain-but-secret-urls-for-each-user-remain-active/............................................ 5

*Library Genesis Project update: 2.5 million books seeded with the world, 80 million scientific articles next*, REDDIT, INC. (last visited Apr. 6, 2025) https://www.reddit.com/r/libgen/comments/eo0y2c/library_genesis_project_update_25_million_books/...................................................................................................................... 3

r/Libgen, Reddit.com (last visited Apr. 6, 2025), https://www.reddit.com/r/libgen. ...................... 7

Shane Harris and Devlin Barrett, *Justice Department investigates Sci-Hub founder on suspicion of working for Russian intelligence*, WASHINGTON POST (Dec. 19, 2019), https://www.washingtonpost.com/national-security/justice-department-investigates-sci-hub-founder-on-suspicion-of-working-for-russian-intellengence/2019/12/19/9/9dbcb6e6-2277-11ea-a153-dce4b94e4249_story.html. ....................................................................................... 8

*Two Russian Nationals Charged with Running Massive E-Book Piracy Website*, U.S. ATTORNEY'S OFFICE, EASTERN DISTRICT OF NEW YORK (Nov. 16, 2022), https://www.justice.gov/usao-edny/pr/two-russian-nationals-charged-running-massive-e-book-piracy-website. ............................................................................................................. 4

# INTERESTS OF *AMICUS CURIAE*[1]

The International Association of Scientific, Technical and Medical Publishers ("STM") is the leading global trade association for academic and professional publishers. STM members represent learned societies, university presses, and private companies of all sizes in the academic and professional publishing industry. STM fosters collaboration and innovation among its roughly 150 members and the wider scholarly community. Its members collectively publish over 60 percent of all English language journal articles and tens of thousands of monographs and reference works. Based on the publicly available evidence in this case, STM members' works include tens of thousands, if not millions, of the scientific articles, academic textbooks, and professional reference books implicated by Defendant Meta Platforms, Inc.'s ("Meta") conduct on BitTorrent.

The works STM members publish, including many peer-reviewed works, are especially valuable to training generative artificial intelligence ("AI") systems. They provide high quality expression that results in commercially valuable, expressive output. STM has been actively representing the interests of its members as they relate to AI issues and engaged in the ongoing discussion around generative AI and its relationship with, and impact on, publishers and the scholarly community. As its members manage the review, editing, curation, enrichment, distribution, and financing of such high-quality content, STM champions a vision of truthful, responsible, and reliable AI systems that use STM members' content in AI training only with authorization, compensation, and attribution.

STM is also dedicated to education and advocacy efforts related to protecting its members' copyrighted works from copyright infringement. These efforts extend to online digital piracy and its highly damaging impact on the economic sustainability of STM members as they work to disseminate research advances for the benefit of the public and scholarly community.

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person other than STM or their members made any monetary contribution intended to fund the preparation or submission of this brief.

BRIEF OF THE INTERNATIONAL ASSOCIATION OF SCIENTIFIC, TECHNICAL AND MEDICAL PUBLISHERS
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**PRELIMINARY STATEMENT**

Fair use does not legitimize the commercial-scale copying of infringing material from illegal sources. Nor does fair use justify distributing that material to countless others worldwide.

The illegal websites that Meta used to purloin a trove of copyrighted works have been the repeated subject of enforcement. Collectively, they have been found by multiple courts to be illegal and against the public interest; investigated by the FBI and the U.S. Department of Justice, including for potential espionage; had their domains shut down; and had their operators arrested. However, the sites and their enormous collections of infringing material are controlled by overseas pirates and supported by foreign intermediaries who openly and brazenly defy the rule of law. Thus, they remain a significant and persistent problem for copyright holders. Their mass infringement is antithetical to the core principles of copyright, including the incentive to create.

Meta, a multibillion-dollar business, has embraced these so-called "shadow libraries" as part of its supply chain despite knowing and acknowledging their illegality. Hoping to avoid liability, Meta argues for an unprecedented expansion of the fair use doctrine. No case has found fair use in analogous circumstances. Contrary to Meta's approach, each alleged act of infringement requires its own analysis, and use of stolen content matters. The implications of Meta's logic are astounding – anything goes in sourcing copyrighted content as long as the final end-use is supposedly non-infringing. As long as you're "just learning from it," why ever buy a copyrighted work? Instead, go to a piracy hot-spot and copy at will. This is not the law.

**FACTUAL BACKGROUND**

Meta used BitTorrent to download *hundreds of terabytes* of copyrighted works from the illegal websites known as Z-Library, Libgen, Sci-Hub, Internet Archive, and Anna's Archive. *See* Pls.' Mot. for Partial Summ. J., Dkt. 482 ("Pls.' Mot.") at 13; Mot. for Relief from Non-Dispositive Pretrial Order of Magistrate Judge ("Mot. Pretrial Order") Ex. D, Dkt. 417-7 at 2. BitTorrent is infamous for widespread unauthorized distribution of copyrighted materials. *See, e.g.*, *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 299 (4th Cir. 2018). Based on the way that BitTorrent works, while Meta was downloading these pirated works en masse, it was also

2    Case No. 3:23-cv-03417-VC-TSH
Brief of The International Association of Scientific, Technical and Medical Publishers
as *Amicus Curiae* in Support of Plaintiffs' Motion for Partial Summary Judgment

simultaneously uploading them to others in the BitTorrent swarm (i.e. all users downloading and/or distributing a certain file or set of files at the same time). *See, e.g., id.* at 25.

These so-called "shadow libraries" are not in fact "libraries." Libraries acquire works through lawful channels that compensate the efforts of publishers and authors. *See Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 174-75 (2d Cir. 2024) (explaining publishers' ebook licensing to libraries). In contrast, these infringing websites make illicit digital copies of works that are available for purchase or rental or by subscription; actively encourage their users to upload the same; and make these copies available for free to those willing to risk infringing themselves. *See, e.g.*, *id.* at 197.[2]

The evidence shows that Meta knew the "shadow libraries" are not legal sources of written works and took multiple steps to hide its activity. *See, e.g.,* Pls.' Mot. at 12-13. While Meta attempts to label them "publicly available datasets," they are only "publicly available" because those perpetuating their existence are breaking the law. *See id.* at 9. The reality is that Meta took a calculated risk to put its own competitive interests ahead of millions of copyright holders' rights. And its use of illegal websites to steal copyrighted works flies in the face of the court orders imposed and government action taken against the websites. Meta cannot gloss over its own illegal conduct by pointing to the benefits of generative AI. The ends do not justify the means.

The harm caused by these illegal websites is massive and viral. The works at issue are not in the public domain and are not supposed to be available "for free" and "for anyone to use however they want." Indeed, infringing copies of copyrighted works distributed online deny publishers legitimate sales, deny authors recognition, and undermine future investments in scholarly writings. These illicit copies also contain no Digital Rights Management or other protections applied to legitimate works, so there is no limit to the number of times an infringing file can be shared. Thus,

---

[2] *See also Library Genesis Project update: 2.5 million books seeded with the world, 80 million scientific articles next*, REDDIT, INC. (last visited Apr. 6, 2025) https://www.reddit.com/r/libgen/comments/eo0y2c/library_genesis_project_update_25_million_books/.

when Meta downloaded and distributed infringing material through BitTorrent, Meta's conduct not only extended to those in the BitTorrent swarm at that time – it enabled further downstream dissemination *ad infinitum* of the works, through torrenting and otherwise. Further, these notorious infringing websites are known sources of misinformation, which is especially problematic in the scientific and medical context. Because they do not deal in legitimate copies, they lack controls on, and do not take responsibility for, what content might be missing, inaccurate, or have been retracted or updated.

### I. Z-Library Was Indicted for Criminal Copyright Infringement.

Z-Library operates as a series of illegal websites through which a vast array of written material is stolen and shared widely online with no remuneration to copyright holders. *See* Compl. and Aff. in Supp. Appl. for Two Arrest Wrnts., *United States v. Napolsky and Ermakova*, Case No. 22-cr-525-NRM-CLP (E.D.N.Y. Oct. 21, 2022), Dkt. 1 ("Z-Library Aff.") ¶¶ 3, 6. In 2022, after a year-and-a-half long investigation, the FBI seized dozens of Z-Library websites, and the U.S. Attorney for the Eastern District of New York brought criminal charges against two individuals it determined were operating Z-Library. *Id.* ¶ 6. A grand jury issued an indictment for criminal copyright infringement, wire fraud, and money laundering. *Id.;* Indictment, *Napolsky*, Case No. 22-cr-525-NRM-CLP (E.D.N.Y. Nov. 16, 2022), Dkt. 4.

As the FBI explained, the "central purpose of Z-Library is allowing users to download copyrighted books for free in violation of U.S. copyright law," which "Z-Library has no right or license to distribute." Z-Library Aff. ¶ 4. As a result, Z-Library has "devastating effects on all manner of victims, including authors, publishers, authors' estates (including ones that donate their proceeds to charity), independent bookstores, large commercial bookstores, and legitimate ebooks sellers." *Id.* ¶ 5.

The two individuals indicted for operating Z-Library were arrested in Argentina in 2022.[3]

---

[3] *Two Russian Nationals Charged with Running Massive E-Book Piracy Website*, U.S. ATTORNEY'S OFFICE, EASTERN DISTRICT OF NEW YORK (Nov. 16, 2022), https://www.justice.gov/usao-edny/pr/two-russian-nationals-charged-running-massive-e-book-piracy-website.

After an Argentine court ordered their extradition to the United States, they escaped from house arrest.[4] The story regarding the criminal action against Z-Library was well-publicized.[5] The first page of search results for "Z-library" on Google links to the U.S. Attorney's press release.

Despite the government resources dedicated to the Z-Library website seizures and arrests, Z-Library became active again, including on the dark web.[6] And Z-Library's millions of infringing files can be accessed via torrent files through Anna's Archive. That is where Meta went to source infringing copies of copyrighted works long after this government action took place. *See* Pls.' Mot. at 10-11. By using BitTorrent, Meta also distributed as it was downloading, not only committing infringement, but fueling the Z-Library piracy network (as it did with the other so-called "shadow libraries" it torrented).

## II.   Library Genesis Is a Notorious, Illegal Collection of Pirated Material.

Libgen is one of the world's largest and most notorious infringement operations. It has been included in the Office of the U.S. Trade Representative's Review of Notorious Markets for Counterfeiting and Piracy since at least 2016.[7] Operating as a group of websites controlled by anonymous overseas pirates, reportedly from Russia, Libgen maintains an enormous collection of stolen works, including non-fiction (including textbooks and professional reference books), fiction books, and scientific articles. *Id.*

Two U.S. federal courts have found Libgen liable for willful copyright infringement and issued broad permanent injunctions. *See* Default J., Permanent Inj., and Post-J. Relief Order,

---

[4] *See also* Andy Maxwell, *Z-Library Admins "Escape House Arrest" After Judge Approves U.S. Extradition*, TORRENTFREAK (July 8, 2024), https://torrentfreak.com/z-library-admins-escape-house-arrest-after-judge-approves-u-s-extradition-240708/.

[5] *See, e.g.,* John Annese, *Two Russians charged with running Z-Library book piracy website*, NEW YORK DAILY NEWS (Nov. 16, 2022), https://www.nydailynews.com/2022/11/16/two-russians-charged-with-running-z-library-book-piracy-website/.

[6] *See* Jon Brodkin, *US seizes Z-Library login domain, but secret URLs for each user remain active*, ARS TECHNICA (May 5, 2023), https://arstechnica.com/tech-policy/2023/05/us-seizes-z-library-login-domain-but-secret-urls-for-each-user-remain-active/.

[7] *See, e.g.*, *2024 Review of Notorious Markets for Counterfeiting and Piracy*, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, EXECUTIVE OFFICE OF THE PRESIDENT, 27 (2024), https://ustr.gov/sites/default/files/2024%20Review%20of%20Notorious%20Markets%20of%20Counterfeiting%20and%20Piracy%20(final).pdf ("USTR 2024 Review").

*Cengage Learning Inc. et al. v. Does 1-50 d/b/a Library Genesis*, Case No. 23-cv-08316-CM (S.D.N.Y. Sept. 24, 2024) ("Cengage Judgment"), Dkt. 36; *Elsevier Inc. v. Sci-Hub*, 2017 WL 3868800 (S.D.N.Y. June 21, 2017). Further, courts in multiple European countries have ordered internet service providers to block access to Libgen websites as a result of infringement actions under laws in those countries allowing for such blocking orders. *See* Cengage Judgment at 3; USTR 2024 Review at 17. This is in addition to the myriad notices of infringement that publishers, including STM members, send to Libgen (and other illegal websites), only to have them ignored.

In June 2015, STM member Elsevier Inc., which publishes textbooks and scientific journal articles, brought suit against Libgen and Sci-Hub in the Southern District of New York. The court issued a judgment against the defendants, finding them liable for willful copyright infringement, and entered a permanent injunction. *Elsevier*, 2017 WL 3868800, at *2. The injunction restrains the defendants and those in active concert or participation with them "from unlawful access to, use, reproduction, and/or distribution of Elsevier's copyrighted works." *Id.* at *2-3 The court also awarded Elsevier $15,000,000 in statutory damages and ordered the transfer of the Libgen and Sci-Hub domains to Elsevier. *Id.* While certain Libgen domains were transferred and shut down at the time, Libgen found ways to continue operating.

In September 2023, months before Meta torrented Libgen's nonfiction collection, four additional U.S. educational publishers, including STM member McGraw Hill, brought suit against Libgen for copyright infringement in the Southern District of New York. Cengage Judgment at 1. The court held defendants liable for willful copyright infringement and awarded plaintiffs $30,000,000 in damages, making clear that Libgen is illegal: "Libgen is a so-called 'shadow library,' which enables users to unlawfully download for free a wide array of copyrighted content." *Id.* at 2, 4-5. The court also issued a permanent injunction, explaining that "the public has an interest in protecting the integrity of copyright holders' copyrights." *Id.* at 4. The injunction restrains the defendants and those in active concert or participation with them from "[c]opying, reproducing, manufacturing, importing, downloading, uploading, transmitting, [or] distributing any of Plaintiffs' Copyrighted Works"; "enabling, facilitating, permitting, assisting, soliciting,

encouraging, or inducing others to engage in such activities"; and "using a file sharing network to enable [or] facilitate the infringement of Plaintiffs' Copyrighted Works. *Id.* at 4-5 (cleaned up). The court also ordered that the Libgen domains be transferred to the plaintiffs. *Id.* at 5-6. While some domains were transferred by domain registrars, others are controlled by non-cooperative intermediaries, and Libgen continues to operate.

Libgen's illegal conduct has been well-publicized online.[8] Its supporters make no effort to conceal its illegal nature.[9] Meta knew that Libgen violates the law but chose to make Libgen (and the other illegal websites) part of its supply chain. *See* Pls.' Mot. at 12-14.

### III. Sci-Hub Is a Repository for Millions of Pirated Scientific Articles.

Sci-Hub is a group of pirate sites that unlawfully reproduce and distribute millions of scientific articles. Like Libgen, Sci-Hub has been included in the Office of the U.S. Trade Representative's Review of Notorious Markets for Counterfeiting and Piracy since at least 2017.[10] Also like Libgen, two federal courts have found Sci-Hub liable for willful copyright infringement and issued permanent injunctions. *See Elsevier*, 2017 WL 3868800, at *1; Order, *American Chemical Society v. John Does 1-99, et, al.*, Case No. 17-cv-00726-LMB-JFA (E.D. Va. Nov. 11, 2017) ("ACS Judgment"), Dkt. 36; Am. Permanent Inj., Dkt. 44 ("ACS Am. Permanent Inj."). Most, if not all, of Sci-Hub's stolen works are linked and available through Libgen's "Sci-Mag" collection, which Meta torrented. *See* Pls.' Mot. at 13.

Sci-Hub was founded by Alexandra Elbakyan, a Kazakhstani citizen. Sept. 15, 2015 Letter from Elbakyan, *Elsevier Inc. v. Sci-Hub*, Case No. 15-cv-04282-RWS (S.D.N.Y.), Dkt. 50.

---

[8] *See, e.g.*, Blake Brittain, *Textbook publishers sue 'shadow library' Library Genesis over pirated books*, REUTERS (Sept. 14, 2023), https://www.reuters.com/legal/litigation/textbook-publishers-sue-shadow-library-library-genesis-over-pirated-books-2023-09-14/; Ernesto Van der Sar, *Court Orders Shutdown of Libgen, Bookfi, and Sci-Hub*, TORRENTFREAK (Nov. 2, 2015), https://torrentfreak.com/court-orders-shutdown-of-libgen-bookfi-and-sci-hub-151102/.
[9] *See, e.g.,* r/Libgen, Reddit.com (last visited Apr. 6, 2025), https://www.reddit.com/r/libgen.
[10] *See* 2017 Out-of-Cycle Review of Notorious Markets, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, EXECUTIVE OFFICE OF THE PRESIDENT, 16 (2017) https://ustr.gov/sites/default/files/files/Press/Reports/2017%20Notorious%20Markets%20List%201.11.18.pdf.

Elbakyan admitted to a federal court that she created Sci-Hub after pirating research articles so that "via sci-hub.org website anyone can download, absolutely for free, a copy of research paper[s] . . . ." *Id.* By 2019, Elbakyan and the Sci-Hub servers were likely located in Russia and the U.S. Justice Department was investigating Elbakyan for links with Russian intelligence.[11]

In response to Sci-Hub's rampant infringement, STM members have spent significant time and resources attempting to mitigate the harmful impact of Sci-Hub's piracy. Elsevier's case against Libgen included Sci-Hub as a defendant, and the court's judgment and permanent injunction extends to Sci-Hub. *Elsevier*, 2017 WL 3868800, at *2. As with Libgen, the case resulted in some disruption to Sci-Hub, but Sci-Hub found ways to continue to operate.

In 2017, the American Chemical Society ("ACS"), another STM member, also sued Sci-Hub. Compl., *American Chemical Society*, Case No. 17-cv-00726-LMB-JFA, Dkt. 1. The court found Sci-Hub and its operators liable for, *inter alia*, willful copyright infringement and awarded ACS $4,800,000 in damages. ACS Judgment at 2. The court also issued a permanent injunction that enjoined Sci-Hub and those in active concert or participation with it from, *inter alia*, copying or distributing ACS's copyrighted works, and ordered that the Sci-Hub domains be deactivated. ACS Judgment at 2-3; Am. Permanent Inj. at 1-3. Sci-Hub again continued operating despite the injunction.

Sci-Hub's mass infringement not only causes financial harm to journal article copyright holders, but also disserves the public interest, including because "there is a delicate ecosystem which supports scientific research worldwide . . . and copyright law plays a critical function within that system." Oct. 30, 2015 Prelim. Inj., *Elsevier*, Case No. 15-cv-04282-RWS, Dkt. 53 at 14. Moreover, Sci-Hub's collection of pirated articles does not adhere to industry-wide standards for retractions and corrections, undermining the public record of science and posing a public health

---

[11] Shane Harris and Devlin Barrett, *Justice Department investigates Sci-Hub founder on suspicion of working for Russian intelligence*, WASHINGTON POST (Dec. 19, 2019), https://www.washingtonpost.com/national-security/justice-department-investigates-sci-hub-founder-on-suspicion-of-working-for-russian-intelligence/2019/12/19/9dbcb6e6-2277-11ea-a153-dce4b94e4249_story.html.

and safety issue. Decl. of Paul F. Doda in Supp. of Pls.' Mot. Default J. ("Doda Decl.") at 4, Dkt. 84.[12]

Journal publishers correct and retract articles when issues are discovered in an academic article, such as errors in the research, data, or results, or issues with reproducibility of the results. *See id*. Thus, Sci-Hub undermines the integrity of the scientific record and progress in fields like medicine and public health that can have a significant direct impact on the public. In the context of Sci-Mag, Meta acknowledged that "it is possible that a model trained on Libgen may produce inaccurate scientific sounding information," and it is unclear whether Meta took any steps to mitigate that risk. *See* Mot. Pretrial Order, Ex. F, Dkt. 417-9 at 2.

**IV.   Internet Archive's Books Database Was Adjudged Infringing.**

Internet Archive ("IA") compiled a database of over 3.6 million digital copies of copyrighted books on its website by scanning print books to create digital books, then distributed full digital copies to users through its websites. *Hachette*, 115 F.4th at 176. IA set up a "lending model" where users could "borrow" these digital copies for a set time period. *Hachette Book Grp., Inc. v. Internet Archive*, 664 F. Supp. 3d 370, 376-77 (S.D.N.Y. 2023), *aff'd,* 115 F.4th 163 (2d Cir. 2024). In 2020, a group of publishers, including STM member John Wiley & Sons, Inc., sued IA for copyright infringement. *Id.* at 377. The court granted plaintiffs' motion for summary judgment, rejecting IA's argument that digitizing the physical books was fair use, and finding that all four fair use factors weighed in plaintiffs' favor. *Id.* at 390-91. The Second Circuit affirmed, explaining that a finding of fair use "would allow for widescale copying that deprives creators of compensation and diminishes the incentive to produce new works." *Hachette*, 115 F.4th at 197. The case against IA did not stop Meta from downloading and distributing copies of these same books. *See* Pls.' Mot. at 21.

---

[12] *See also* John Timmer, *Science paper piracy site Sci-Hub shares lots of retracted papers*, ARS TECHNICA (Jan. 7, 2025) https://arstechnica.com/science/2025/01/science-paper-piracy-site-sci-hub-shares-lots-of-retracted-papers/.

### V.     Anna's Archive Aggregates Illegal Websites' Infringing Files.

Anna's Archive, launched after the 2022 law enforcement efforts to stifle Z-Library, provides a one-stop-shop for illegally downloading, copying, and distributing hundreds of terabytes of unauthorized copies of copyrighted works from the illegal websites.  *See* Pls.' Mot. at 10.  Far from being a mere "repository" as Meta describes it, by providing torrent files for the entire unlawful collections of the so-called "shadow libraries" described above, Anna's Archive commits and facilitates widespread infringement on a staggering scale and provides no remuneration to copyright holders.  The site itself reports that it has copied and distributed over 43 million books and over 98 million papers.[13]  Anna's Archive, along with Z-Library and Libgen, is also the subject to a 2024 order from the U.K. High Court of Justice requiring internet service providers to block access to its domains.[14]

Meta's engineers described Anna's Archive as "a pretty shady website." Pls.' Mot. at 11. But the Anna's Archive operators are more direct: "We deliberately violate the copyright law in most countries."[15]  Indeed, their stated goal is to make unauthorized copies of as many written works as possible and distribute those unauthorized copies as widely as possible.[16]  They do this by seeding torrent files of unauthorized digital copies of copyrighted works from multiple "shadow libraries" and encouraging users to download and seed the files to further distribute the unauthorized works.[17]  And by aggregating the unauthorized digital works available through the illegal websites, Anna's Archive compounds the significant injuries caused by those sites.

---

[13] *See* Anna's Archive, https://annas-archive.org/ (last visited Apr. 3, 2025).

[14] *See* Matilda Battersby, *Publishers Association wins High Court bid ordering internet service providers to block pirate websites*, THE BOOKSELLER (Dec. 20, 2024), https://www.thebookseller.com/news/publishers-association-wins-high-court-bid-ordering-internet-service-providers-to-block-pirate-websites; *Authors and Publishers Win High Court Support in Fight Against Infringement*, PUBLISHERS ASSOCIATION (Dec. 20, 2024), https://www.publishers.org.uk/authors-and-publishers-win-high-court-support-in-fight-against-infringement/.

[15] *Introducing the Pirate Library Mirror (EDIT: moved to Anna's Archive)*, Anna's Blog (July 1, 2022), https://annas-archive.org/blog/blog-introducing.html.

[16] *See* Anna's Archive Frequently Asked Questions, https://annas-archive.org/faq (last visited Apr. 3, 2025).

[17] *See* Anna's Archive Torrents, https://annas-archive.org/torrents (last visited Apr. 3, 2025).

# ARGUMENT

## I. Each Act of Alleged Infringement Must Be Independently Considered.

In their Third Amended Consolidated Complaint (Dkt. 407), Plaintiffs have alleged separate acts of infringement as a result of Meta's initial copying of their works (¶ 98) and Meta's further copying to train its LLM (¶ 100). The Court should resist Meta's implicit invitation to judge all of its infringing conduct as a single act or even a series of ongoing infringements. Every act of copyright infringement is an independently actionable legal wrong. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014). That is why, in assessing whether Google's creation of a tool to deliver snippets of copyrighted books was fair use, the Second Circuit emphasized that Google obtained the books through agreements with "a number of the world's major research libraries." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 208 (2d Cir. 2015). The court took pains to note that Google's initial acquisition of the copyrighted works was not itself an infringing act. *See id.*

Because each act of infringement gives rise to a unique cause of action, every act must be assessed separately to determine whether that use is fair. Here, the Court must separately consider Meta's fair use defense as to its reproductions via BitTorrent versus its subsequent reproductions to train the LLM. Plaintiffs' brief explains why Meta's use of BitTorrent does not square with the fair use factors. Pls.' Mot. at 22-30. In particular, the Court must assess the different market harms associated with Meta's failure to license Plaintiffs' works to train its LLM versus the harms associated with Meta's fostering piracy through BitTorrent. *See, e.g., Glacier Films (USA), Inc. v. Turchin*, 896 F.3d 1033, 1035-36 (9th Cir. 2018) ("peer-to-peer networks can have severe financial consequences for copyright holders"; they hurt everyone involved in the creative process and are "helping create a generation of Americans who don't see the harm" in stealing intellectual property).

## II. Use of Stolen Copies Should Not Be Conflated with Choosing Not to License.

Plaintiffs' brief describes in detail how Meta engaged in a massive program of downloading illegal copies of millions of works through BitTorrent, constituting hundreds of terabytes of written

content, and further distributing them as part of the BitTorrent protocol. Pls.' Mot. at 8-15. As noted above, STM's members include academic and professional publishers that publish *tens of thousands, if not millions*, of the journal articles, textbooks, and reference books that Meta torrented. Meta attempts to brush aside its conduct by arguing that courts have called into question the relevance of "bad faith" in the context of the fair use analysis. Meta's argument fails. Meta vastly overstates the extent to which bad faith has been questioned by the courts. More significantly, none of the cases on which Meta relies examined the significance of the defendant's initial copying to acquire the underlying work as itself being an act of infringement.

The cases addressing bad faith generally have one of two outcomes. Cases in which the alleged bad faith is simply the defendant's failure to license the plaintiff's work generally result in the court concluding that bad faith is not determinative of the fair use inquiry. By contrast, where the defendant has used a stolen copy of the copyrighted work in creating its derivative version, courts routinely consider the defendant's conduct in the context of fair use. In this case, the Court should weigh Meta's extensive use of BitTorrent heavily in considering fair use.

The Supreme Court has explained that in evaluating the first fair use factor, *see* 17 U.S.C. § 107, courts should consider the "propriety of the defendant's conduct." *Harper & Row Pub., Inc. v. Nation Enters.*, 471 U.S. 539, 562-63 (1985). The Court in *Harper & Row* held that because the defendant knowingly exploited a "purloined" manuscript with the intent to displace the plaintiff's right of first publication, the defendant's actions weighed against a finding of fair use. *Id*. Meta's re-copying of millions of stolen works for its own use is on all fours with the Court's decision. Indeed, the defendant in *Harper & Row* used only 13% of one copyrighted work. *Id.* at 565. Here, Meta copied 100% of all Plaintiffs' works, as well as those of STM members and many other authors and publishers, while simultaneously distributing on BitTorrent. Meta's bad faith dwarfs the troubling conduct in *Harper & Row*.

The Court briefly considered the role of the defendant's failure to license the copyrighted work in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994). In *Campbell*, the musical group 2 Live Crew initially sought a license to use Acuff-Rose's song *Oh Pretty Woman*, but the offer

was rejected. 510 U.S. at 593. The *Campbell* Court held that the offer may have simply been a good faith attempt to avoid litigation, which would not count in 2 Live Crew's favor, and neither would being denied permission weigh against a finding of fair use. *Id.* at 585 n.18. There was no finding of bad faith in *Campbell*. In *Oracle v. Google*, 593 U.S. 1 (2021), the Court again considered the relevance of Google's failure to obtain a license for Oracle's software before using it in its own products, which it equated with "bad faith." The Court interpreted its prior ruling in *Campbell* as expressing "some skepticism" about the role of bad faith in a fair use analysis but ultimately sidestepped the issue, concluding "given the strength of the other factors pointing toward fair use . . . that factbound consideration is not determinative in this context." *Id.* at 32-33.

Meta's attempt to paint *Campbell* and *Oracle* as eliminating the nature of the defendant's conduct from the fair use analysis is erroneous. The Court simply declined to hold that the mere failure to license overcame the rest of the first factor analysis. Finally, Meta suggests that the Supreme Court's most recent fair use decision, *Andy Warhol Foundation. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), in which the Court soundly rejected the Andy Warhol Foundation's fair use argument, somehow supports its position. Def.'s Mot. for Partial Summ. J. and Opp'n. to Pls.' Mot.*,* Dkt. 501 ("Meta Mot.") at 19. The Court in *Goldsmith* observed that the defendant's use (*i.e.*, whether it is parodic or otherwise transformative) is judged on an objective standard without considering what the defendant intended to achieve. 598 U.S. at 545. This citation to *Goldsmith* does not further Meta's argument. If anything, it supports Plaintiffs' view that Meta's conduct – and the harm caused by that conduct – in obtaining the original works from known illegal sources can be judged objectively without considering Meta's subjective intent in creating an LLM or injuring the Plaintiffs. Nothing in *Campbell*, *Oracle*, or *Goldsmith* undermines the clear holding in *Harper & Row* that where the defendant has used a stolen copy of the plaintiff's work to create its derivative work, that fact can and should be considered as part of the first fair use factor.

Meta also misrepresents the state of the law in the lower courts. Meta waives away the strong decision in *Atari Games Corp. v. Nintendo of America, Inc.,* 975 F.2d 832 (Fed. Cir. 1992),

which held that a party invoking the fair use defense must have started with an authorized copy of the work. *Id.* at 843 (citing *Harper & Row*, 471 U.S. at 562-63). Meta argues that case was superseded by later Supreme Court decisions, Meta Mot. at 21, but as discussed above, nothing in those cases can be read to overrule the clear holding in *Harper & Row*. Meta's other citations are equally unavailing. At most, they stand for the unremarkable proposition that "bad faith" – particularly where that term is synonymous with a failure to license – is not *dispositive* to the fair use determination. *See* Meta Mot. at 19-20 (citing cases). Those decisions are fully consistent with the weight of authority, including in the Ninth Circuit, that the defendant's infringing conduct must be *considered* as part of the first factor analysis – particularly where the conduct is more egregious than a simple failure to license. *See NXIVM Corp. v. Ross Institute*, 364 F.3d 471, 478 (2d Cir. 2004) ("to the extent [defendants] knew [their] access to the manuscript was unauthorized or was derived from a violation of law or breach of duty, this consideration weighs in favor of plaintiffs"); *Los Angeles News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997) (whether defendant knowingly exploited a purloined work was relevant to the fair use analysis); *Fioranelli v. CBS Broadcasting Inc.,* 551 F. Supp. 3d 199, 242-43 (S.D.N.Y. 2021) (defendant's use of footage marked "not for broadcast" should be considered).

## CONCLUSION

Meta knowingly copied and distributed a shocking amount of infringing material from the world's most notorious infringing websites to serve its commercial ends. Meta's brazen acts of infringement, unprecedented in the annals of copyright law, must be considered in the context of fair use and should weigh heavily against it.

Respectfully submitted,

Dated: April 11, 2025

By: */s/ Thomas A. Harvey*
**COBLENTZ PATCH DUFFY & BASS LLP**
Thomas A. Harvey (SBN 235342)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5781
tharvey@coblentzlaw.com

**OPPENHEIM + ZEBRAK, LLP**
Michele H. Murphy (*pro hac vice* pending)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
michele@oandzlaw.com

*Attorneys for Amicus Curiae The International Association of Scientific, Technical and Medical Publishers*