**PRYOR CASHMAN LLP**
Benjamin S. Akley (State Bar No. 278506)
bakley@pryorcashman.com
1901 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 683-6900

Frank P. Scibilia (*pro hac vice* application forthcoming)
fscibilia@pryorcashman.com
Joshua Weigensberg (*pro hac vice* application forthcoming)
jweigensberg@pryorcashman.com
7 Times Square, 40th Fl.
New York, NY 10036
(212) 421-4100

**COPYRIGHT ALLIANCE**
Keith Kupferschmid (*pro hac vice* application forthcoming)
keithk@copyrightalliance.org
Kevin R. Madigan (*pro hac vice* application forthcoming)
kmadigan@copyrightalliance.org
1331 F Street NW, #950
Washington, DC 20004
(202) 470-5070

*Attorneys for Amicus Curiae The Copyright Alliance*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| RICHARD KADREY, et al., Individual and Representative Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., a Delaware corporation, Defendant. | Case No.: 3:23-cv-03417-VC<br><br>Hon. Vince Chhabria<br><br>**BRIEF OF THE COPYRIGHT ALLIANCE AS *AMICUS CURIAE* IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMMARY JUDGMENT** |

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................... ii

Introduction and Interests of the Copyright Alliance ................................................................. 1

Argument ..................................................................................................................................... 2

    A. Meta's Use is Not for a Transformative Purpose, But Even if it Were, a Finding of Transformativeness Does Not Control the Fair Use Analysis ............................................ 2

    B. The Fair Use Decisions Cited by Meta are Significantly Undermined by the Supreme Court's decision in *Warhol* ................................................................................................ 5

    C. The Non-AI Cases Meta Relies Upon are Distinguishable ................................................ 5

        i. *Authors Guild v. Google, Inc. ("Google Books")* ........................................................ 6

        ii. *Kelly v. Arriba Soft Corp. ("Arriba")* ......................................................................... 8

        iii. *Perfect 10, Inc. v. Amazon.com, Inc.* ........................................................................ 8

        iv. *Google LLC v. Oracle Am., Inc.,* ............................................................................... 9

        v. *Sony Computer Entertainment, Inc. v. Connectix Corp. ("Sony")* and *Sega Enters. Ltd v. Accolade, Inc. ("Sega")* ........................................................ 10

    D. Courts in Other AI Copyright Cases Distinguished Meta's Authorities or Found Them to be Inapplicable to AI Fair Use Analysis ............... 11

Conclusion ................................................................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**                                               **Page(s)**

*American Geophysical Union v. Texaco, Inc.*,
  60 F.3d 913, 924 (2d Cir. 1994) .................................................................................................3

*Andersen v. Stability AI Ltd.*,
  744 F.Supp.3d 956 (N.D. Cal. Aug. 12, 2024) .........................................................................13

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
  598 U.S. 508 (2023) ............................................................................................................*passim*

*Authors Guild v. Google, Inc. ("Google Books")*,
  804 F.3d 202, 207 (2d Cir. 2015) .........................................................................................6, 7

*A.V. ex rel. Vanderhye v. iParadigms, LLC ("iParadigms")*,
  562 F.3d 630 (4th Cir. 2009) ..........................................................................................3, 4, 5

*Fox News Network, LLC v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018) ......................................................................................................5

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1183 (2021) ..........................................................................................................9, 10

*Kelly v. Arriba Soft Corp. ("Arriba")*,
  336 F.3d 811 (9th Cir. 2003) ...........................................................................................*passim*

*Perfect 10 v. Amazon*,
  508 F.3d 1146 (9th Cir. 2007) ...............................................................................................8, 9

*Sega Enters. Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) .............................................................................................10, 11

*Sony Computer Entertainment, Inc. v. Connectix Corp. ("Sony")*,
  203 F.3d 596 (9th Cir. 2000) ................................................................................................10, 11

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intelligence Inc.*,
  --- F. Supp. 3d. ---, No. 1:20-CV-613-SB,
  2025 WL 458520 (D. Del. Feb. 11, 2025) ............................................................................11, 12

*VHT, Inc. v. Zillow Grp., Inc.*,
   918 F.3d 723 (9th Cir. 2019) .................................................................................................. 6

**Statutes**

17 U.S.C. § 106(1) ............................................................................................................................ 1

**Other Authorities**

Copyright Alliance, "Generative AI Licensing Isn't Just Possible, It's Essential,"
   *available at* https://copyrightalliance.org/generative-ai-licensing/ ........................................... 7

Jonathan Bailey, *How the Warhol Ruling Could Change Fair Use*, PLAGIARISM
   TODAY (May 18, 2023), https://www.plagiarismtoday.com/2023/05/18/how-the-
   warhol-ruling-could-change-fair-use/ ...................................................................................... 9

Shyamkrishna Balganesh, Jane C. Ginsburg & Peter S. Menell, *Comments on
   Preliminary Draft 9 of the American Law Institute's Restatement of Copyright*
   (2023), *available at*:
   https://scholarship.law.columbia.edu/faculty_scholarship/4159 ............................................ 5

Jiarui Liu, *An Empirical Study of Transformative Use in Copyright Law*, 22 Stan.
   Tech. L. Rev. 163, 185–86 (2019) .......................................................................................... 5

Neil Weinstock Netanel, *Making Sense of Fair Use*, 15 Lewis & Clark L. Rev. 715,
   754–55 (2011 ........................................................................................................................ 5

Tyler Ochoa, *U.S. Supreme Court Upholds Fair Use in Google-Oracle Software
   Battle* (Guest Blog Post) (Apr. 8, 2021), ................................................................................ 9

Tyler Ochoa, *U.S. Supreme Court Vindicates Photographer But Destabilizes Fair
   Use — Andy Warhol Foundation v. Goldsmith* (Guest Blog Post), TECHNOLOGY
   & MARKETING LAW BLOG (June 20, 2023) ......................................................................... 10

PROSKAUER ROSE LLP, *Supreme Court Affirms Andy Warhol's Prince Series Not
   Transformative Fair Use* (June 14, 2023) ............................................................................. 9

**Introduction and Interests of the Copyright Alliance**

The Copyright Alliance[1] submits this *amicus* brief, in accordance with the Court's April 1, 2025 Order, because our members have a strong interest in courts properly applying the Copyright Act, including in the context of generative artificial intelligence (AI).

One of the most important provisions of copyright law is the fair use doctrine, which, the Supreme Court has emphasized, is dependent on the specific facts of a case and so must be applied on a case-by-case basis. When a court considers a fair use defense, past fair use decisions may be instructive, but they do not dictate case outcomes, even when they involve similar facts, uses, and/or technologies. Yet Meta and its amici supporters seek to convince the Court otherwise and extract categorical holdings where there are none. They argue that a number of past fair use cases clearly support their position that Meta's copying[2] of copyright-protected material to "train" its generative AI model qualifies as fair use "as a matter of law." Dkt. 501 at 1. In doing so, they misapply the fair use doctrine, relying on fair use cases that are no longer controlling and that involved facts, uses and technologies bearing little resemblance to Meta's. As other courts considering similar arguments in pending generative AI infringement litigation have found, the cases upon which Meta and its *amici* rely are distinguishable in myriad ways from Meta's unauthorized use of massive amounts of copyrighted works to develop a commercial product for commercial purposes, and thus

---

[1] The Copyright Alliance is a nonprofit, nonpartisan 501(c)(4) public interest and educational organization dedicated to advocating policies that promote and preserve the value of copyright and protecting the rights of creators. It represents the copyright interests of over 2 million individual creators and over 15,000 organizations across all creative industries, including graphic and visual artists, photographers, writers, musical composers and recording artists, journalists, documentarians and filmmakers, software developers, and the businesses that support them. Importantly, Copyright Alliance members include companies that have developed their own AI tools, companies that have been using AI in some form for many years, and companies that have just begun exploring how to use generative AI.

[2] Meta and its *amici* frequently characterize Meta's activities as "scraping," "ingesting," "learning," "training," etc. By using and popularizing such terms, Meta and others with a similar interest in appropriating copyrighted content for their own commercial purposes seek to anthropomorphize their software tools and direct attention away from their own misconduct. These terms are mere euphemism, intended to obscure what Meta is actually doing: copying. Such activity violates the Copyright Act, absent the authorization of the copyright owner or a valid defense. *See* 17 U.S.C. § 106(1) (granting the copyright owner the exclusive right "to reproduce the copyrighted work in copies").

they should be afforded very limited weight.

Moreover, in arguing that the allegedly transformative nature of its Llama model should tip the scales in favor of fair use, Meta improperly asks the Court to disregard the Supreme Court decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, which clarified that even when a court finds a use to be transformative, that finding should have a limited effect on the ultimate fair use determination. For these reasons, the Copyright Alliance respectfully submits that the Court should deny Meta's motion for summary judgment.

## Argument

### A.     Meta's Use is Not for a Transformative Purpose, But Even if it Were, a Finding of Transformativeness Does Not Control the Fair Use Analysis

Central to the Supreme Court's decision in *Andy Warhol Foundation v. Goldsmith* ("*Warhol*") was its confirmation that the defendant's purported "justification" for the use must be considered as part of the first-factor analysis. This standard, which was first explained by the Supreme Court's discussion of parodic uses in *Campbell v. Acuff-Rose*, was unmistakably reaffirmed in *Warhol*, which confirmed that when an original work and secondary use share the same or highly similar purposes, and the secondary use is commercial, "a particularly compelling justification is needed." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 547 (2023). Applying this standard to the facts of this case, there is insufficient justification to support Meta's claims that it needs to copy the entire internet (including pirate websites) or ignore existing licenses offered by copyright owners in order to train its generative AI models.

To determine whether a use qualifies as fair use, one must consider the ultimate purpose of the use and whether there is a justification for the use. For example, in *Warhol*, the use was not simply "commercial licensing" but rather licensing *for a story about Prince* (the celebrity in the image), which was the same use that the copyright owner, Goldsmith, made of her images. *Id*. at 536 n.11 ("The Court does not define the purpose as simply 'commercial' or 'commercial licensing.'"); *id.* at 539 n.15 ("Both Goldsmith and AWF sold images of Prince (AWF's copying Goldsmith's) to magazines to illustrate stories about the celebrity, which is the typical use made of Goldsmith's photographs.").

Meta seeks to isolate the "training" process and ignore the output of generative AI when describing the purpose of generative AI. *E.g.*, Dkt. 501 at 14 ("Meta's copying of books to train Llama furthers the purposes of copyright by enabling the creation of a transformative new technology . . . ."). In describing its purpose as "training," Meta claims its copying "serves a manifestly different purpose from Plaintiffs' books." *Id*. But Meta's motion ignores what comes after the initial "training"—most notably the generation of output that *serves the same purpose* of the ingested works. The *Warhol* decision and many other pre-*Warhol* cases are careful to *consider the ultimate purpose of a use* and not simply end their analysis at an intermediate step—whether that be reverse engineering, shrinking a work into a thumbnail image, archiving a work for use in a plagiarism detection service or a searchable digital repository for those with print disabilities, sampling, or training.

For example, when the court analyzed the fair use defenses in *Kelly v. Arriba Soft Corp.* ("*Arriba*") and *A.V. ex rel. Vanderhye v. iParadigms, LLC* ("*iParadigms*"), both of which Meta relies on, the court did not simply analyze the immediate purpose of the intermediate copying standing alone. Rather, it considered the ultimate purpose of the use and what effect it might have on the need for the original, and on creativity in general. In *Arriba*, Arriba Soft copied an image, shrank the image into the size of a thumbnail, and displayed the thumbnail image as part of an image search engine. The court considered the ultimate purpose of displaying the thumbnail images on the search page, not the purpose of the shrinking process itself. 336 F.3d 811, 818 (9th Cir 2003). Similarly, in *iParadigms,* the court considered the ultimate purpose of detecting plagiarism, not only the archiving students' papers in isolation. 562 F.3d 630, 639-641 (4th Cir. 2009).

Further demonstrating courts' considerations of the ultimate or actual purpose of a use, the Second Circuit in *American Geophysical Union v. Texaco, Inc.* rejected over-generalized fair use justifications for widespread infringement:

> The purposes illustrated by the categories listed in section 107 refer primarily to the work of authorship alleged to be a fair use, not to the activity in which the alleged infringer is engaged. Texaco cannot gain fair use insulation for [its employee]'s archival photocopying of articles (or books) simply because such

> copying is done by a company doing research. It would be equally extravagant for a newspaper to contend that because its business is "news reporting" it may line the shelves of its reporters with photocopies of books on journalism or that schools engaged in "teaching" may supply its faculty members with personal photocopies of books on educational techniques or substantive fields. Whatever benefit copying and reading such books might contribute to the process of "teaching" would not for that reason satisfy the test of a "teaching' purpose.

60 F.3d 913, 924 (2d Cir. 1994) ("Texaco"). These cases and many of the cases discussed below make clear that, when considering the purpose of the use in a factor-one fair use analysis, the analysis must not merely consider the intermediate step but rather must take into account the ultimate purpose of the use. Thus, the purpose of Meta's Llama cannot be considered in a vacuum of "training." "Training," standing alone, is unlikely to constitute a sufficiently transformative use or purpose any more than "licensing" in *Warhol*, "sampling" in *Campbell,* "shrinking" in *Arriba*, "archiving" in *iParadigms*, or "teaching" in *Texaco*. Meta's wholesale copying of Plaintiffs' copyright-protected literary works for "training" must be considered alongside its ultimate purpose—to generate output that serves the same purpose and compete with the ingested works.

Furthermore, even if the use is found to be for a transformative purpose, the Supreme Court made clear in *Warhol* that whether a use is transformative is not dispositive of the question of fair use; rather, it is merely one subfactor within the first statutory fair use factor. Under *Warhol*, it is thus inappropriate for courts to attribute dispositive weight to what is simply one aspect of the first-factor analysis. Any factor-one analysis must involve a weighing of other considerations, such as the commercial nature of and justification for the use, both of which will factor prominently here. *See* 598 U.S. at 537. Llama is clearly part of a commercial venture, designed to attract as many users as possible and bolster Meta's position in the market. This commercial purpose should weigh against fair use under the first factor and offset in whole or in part any finding of transformative purpose. Therefore, even if the use of copyrighted works for ingestion by Meta were found to be a transformative use in this case (though it is not), that would not necessarily mean factor one favors fair use, and it most certainly would not control the fair use analysis.

**B.   The Fair Use Decisions Cited by Meta are Significantly Undermined by the Supreme Court's decision in *Warhol***

Many of the cases on which Meta relies for its argument that its copying of Plaintiffs' works is transformative were decided after *Campbell* (1994), but before *Warhol* (2023). During that three-decade period, courts took a very broad view of transformativeness, and in fact, a finding of transformativeness was very often dispositive of the ultimate fair use question.[3]

*Warhol* dramatically changed the landscape of fair use jurisprudence, both by narrowing what "transformative" means and clarifying that a finding of transformativeness does not lead ineluctably to a conclusion that the use was fair. As a result, it is now inherently suspect that a pre-*Warhol* fair use case in which the determination turned on a finding of transformativeness is still good law.[4] Thus, many of the fair use cases on which Meta relies, including *Authors Guild v. Google, Inc., Authors Guild v. HathiTrust*, *iParadigms, Arriba*, *Perfect 10 v. Amazon,* and *Sony Computer Entertainment, Inc. v. Connectix Corp.*, all of which were decided between *Campbell* and *Warhol*, and all of which relied heavily on a transformative use finding for their ultimate holding of fair use, simply do not reflect the current, post-*Warhol*, state of the law.

**C.   The Non-AI Cases Meta Relies Upon are Distinguishable**

Claiming that its use of Plaintiffs' copyrighted works is "radically transformative," Meta then argues that "[t]ime and again, courts have held uses far less transformative than Meta's to be

---

[3] Indeed, between 1994 and 2023, a determination that a use was transformative almost always meant that a court concluded it was fair use. A 2011 study found that of all the fair use cases decided in 2006 through 2010, the defendant won 100% of the time when the court found the subject use to be transformative. Neil Weinstock Netanel, *Making Sense of Fair Use*, 15 Lewis & Clark L. Rev. 715, 754–55 (2011). Between 2010 and 2023, the Copyright Alliance is aware of only one circuit court decision holding that a use was transformative but not fair use. *See Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 180–81 (2d Cir. 2018); *see also* Jiarui Liu, *An Empirical Study of Transformative Use in Copyright Law*, 22 Stan. Tech. L. Rev. 163, 185–86 (2019), *available at* SSRN: https://ssrn.com/abstract=3330236 (finding that transformative use was the only statistically significant subfactor driving the first factor determination).

[4] Shyamkrishna Balganesh, Jane C. Ginsburg & Peter S. Menell, *Comments on Preliminary Draft 9 of the American Law Institute's Restatement of Copyright* (2023), *available at*: https://scholarship.law.columbia.edu/faculty_scholarship/4159 ("The Supreme Court's Warhol decision shifted fair use analysis back to the course that Congress intended. It is important to recognize many cases decided during the interim period [between *Campbell* and *Warhol*] that boil fair use analysis down to a mere transformativeness inquiry are no longer good law.")

fair at summary judgment." Dkt. 501 at 15. However, the transformative nature and purpose of the uses in these cases are in no way analogous to the use and underlying generative AI technology in the instant case.

     **i.**    *Authors Guild v. Google, Inc. ("Google Books")*

While Meta claims that *Google Books* is "the most factually analogous case" to the instant dispute, Dkt. 501 at 15, *Google Books* is clearly distinguishable because it involved a completely different purpose for the use of the copyrighted materials—to provide information location services to drive readers to the relevant source material. The Second Circuit agreed with the district court's ruling that Google's digitization and subsequent use of the copyrighted works was fair use. Concluding that Google's use was transformative, the appellate court held that "Google's making of a digital copy to provide a search function . . . augments public knowledge by making available information about [p]laintiffs' books without providing the public with a substantial substitute for matter protected by the [p]laintiffs' copyright interests in the original works or derivatives of them." 804 F.3d 202, 207 (2d Cir. 2015).

Significantly, the decision made clear that the case "tests the boundaries of fair use"—a position that the Ninth Circuit agreed with—and may have come out differently had any one of several factors varied. *Id.* at 206; *see also VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 743 (9th Cir. 2019) ("We agree with the Second Circuit's observation that the copyright dispute over the Google Books search engine 'tests the boundaries of fair use.'"). First, the Second Circuit explained that the fair use analysis would have been different if the purpose of Google's scanning of literary works was to substitute for the original works. 804 F.3d at 222 ("Google has constructed the snippet feature in a manner that substantially protects against its serving as an effectively competing substitute for Plaintiffs' books.") *Id*. at 226 ("The program does not allow access in any substantial way to a book's expressive content."). In other words, it was critical that Google used the books to provide information *about* the works and to serve as a pointer for readers by helping readers "identify and locate" the original works. *Id.* at 217. By contrast, Meta's Llama cannibalizes Plaintiffs' copyrighted works for the purpose of allowing its users to manufacture the same type of works and thus is much more likely to usurp the market for (and obviate any need to consume)

Plaintiffs' works.

Second, in *Google Books*, Google used the works *for the information* in the works, but in the instant case, Meta is using both the information and the *expressive elements* of the work. What Meta considers to be unprotectable information is actually protected copyrightable expression.[5] That Meta may extract and retain data about plaintiffs' works while later discarding the works themselves does not change the fact that they copied entire copyrighted works, including all the expressive elements that make the works copyrightable—an act that unambiguously constitutes prima facie copyright infringement.

Third, in *Google Books*, Google copied legitimate copies of books. But in the instant case, Plaintiffs have cited evidence indicating that Meta illegally copied copyrighted works from *pirate* websites and services.

Fourth, and perhaps most important, the court in *Google Books* concluded (with regard to the fourth fair use factor) that there was no actual or potential market for the licensing of copyrighted works to search engines. *Id.* at 226-227. This is significantly different than with generative AI, where there is very clearly an actual market for the licensing of copyrighted works for ingestion.[6]

Any of these differences standing alone would likely be sufficient to push this case beyond "the boundaries of fair use" set forth in *Google Books*. When taken together, there can be no doubt

---

[5] In the case of Plaintiffs' literary works, the words an author chooses to express herself, the relationship of those words into a sentence, the relationship of that sentence to other sentences within a paragraph, and so on, represent that author's copyrightable expression. It is that type of expression that makes literary works protectable under copyright.

[6] There is already high demand for corpora of copyrighted works for ingestion by AI systems, and copyright owners are offering and entering into various licensing agreements. Publishers and copyright owners of scientific and research works such as Elsevier, JSTOR, the Copyright Clearance Center (and many others) have either offered or entered into licensing agreements that allow for text and data mining (TDM) or other generative AI uses. Getty Images has struck several licensing deals with generative AI companies for use of portions of its catalog of stock images for "training." Reddit has partnered with Google on a $60 million-per-year deal to provide content for "training" its AI models, including Gemini. Multiple news organization, including NewsCorp, the Associated Press, the Atlantic, and the Financial Times, have reached deals with OpenAI for use of their works to "train" ChatGPT. The list goes on and on–with new licensing deals being announced almost daily. *See* Copyright Alliance, "Generative AI Licensing Isn't Just Possible, It's Essential," *available at* https://copyrightalliance.org/generative-ai-licensing/ (citing original sources and media coverage).

that they do.

### ii.   *Kelly v. Arriba Soft Corp. ("Arriba")*

Meta asserts that the Ninth's Circuit's decision in *Arriba* is "instructive," but it ignores the major distinction that in *Arriba* there was no risk of supplanting the market for the original. Dkt. 501 at 16. In that case, Arriba Soft was sued for copyright infringement for copying the plaintiff's photographs from the internet and then displaying smaller, lower resolution "thumbnail" copies of the photographs on the search results page of its visual search engine. The court held that Arriba Soft's reproduction of the plaintiff's photos as thumbnail images qualified as fair use because the thumbnail images served an entirely different purpose than the original images. Specifically, the court held that the plaintiff's photographs were artistic works that were "intended to inform and to engage the viewer in an aesthetic experience," in contrast to Arriba's use, which the court found was "unrelated to any aesthetic purpose" but instead offered a way "to help index and improve access to images on the internet and their related web sites." 336 F.3d 811, 818-19 (9th Cir. 2003).

Here, by contrast, both the purpose of Plaintiffs' works that are ingested and the purpose of the material generated by Llama are often the same. Because both the ingested work and AI-generated output often serve the same purpose, that "seriously weakens" Meta's fair use claim. *Id*. The court ruled in favor of fair use in *Arriba* because "[t]he thumbnails do not stifle artistic creativity because they *are not used for illustrative or artistic purposes* and therefore *do not supplant the need for the originals*." *Id.* at 820 (emphasis added). This is very different from ingestion by Meta's Llama model. Unlike the thumbnail images at issue in *Arriba*, when literary material is generated by an AI model, it is certainly possible, and in many cases, likely, that such AI-generated output would "supplant the need for the original [*i.e.*, the ingested work]." *Id*.

### iii.   *Perfect 10, Inc. v. Amazon.com, Inc.*

Meta's motion repeatedly cites to *Perfect 10 v. Amazon*, claiming that it, like the *Arriba* case, represents a transformative fair use decision that applies to generative AI copying. Dkt. 501 at 16, 20-23. But just like the *Arriba* case, *Perfect 10* is unhelpful here because it involved copying works in service of creating a search function that provided information about those works, rather than supplanting the need for the original works. In *Perfect 10*, Google and Amazon were sued for,

among other things, infringing Perfect 10's copyrighted images by displaying smaller, lower resolution "thumbnail" copies of the images on the search results page of Google's image search. Similar to *Arriba*, the court in *Perfect 10* concluded that the use of thumbnail versions of the plaintiff's images in the search engine qualified as fair use because, "[a]lthough an image may have been created originally to serve an entertainment, aesthetic, or informative function, a search engine transforms the image into a pointer directing a user to a source of information." 508 F.3d 1146, 1165 (9th Cir. 2007). This statement clearly distinguishes the facts in both *Perfect 10* and *Arriba* from the instant case because the purpose of Meta's copying is not to point a user to a source of information.

    iv.    *Google LLC v. Oracle Am., Inc.*

Meta asserts that the Supreme Court's 2021 decision in *Google v. Oracle* is "also on point." Dkt. 501 at 16. However, the decision in *Google v. Oracle* is expressly limited to the specific type of computer declaring code at issue in that case and cannot be applied to past or future fair use analyses outside of that specific context. *See Google LLC v. Oracle Am., Inc.,* 141 S. Ct. 1183, 1208 (2021) (the Court was clear that its decision "do[es] not overturn or modify [its] earlier cases" involving fair use). It is widely recognized that *Google v. Oracle* has a very limited application—and is simply inapplicable when the work being used is a traditional copyrighted work (*e.g.*, book, song, movie, photograph, etc.).[7]

---

[7] *See e.g.,* Brief for the United States as Amicus Curiae Supporting Defendants, *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 143 S. Ct. 1258 (2023) (No. 21-869), at 25 ("[Andy Warhol Foundation's] reliance on Google is likewise misplaced. Emphasizing the difficulty of 'apply[ing] traditional copyright concepts in th[e] technological world' of 'functional' computer programs, the Google Court principally focused on the second statutory factor, emphasizing the copied code's distance 'from the core of copyright.'") (citations omitted); Jonathan Bailey, *How the Warhol Ruling Could Change Fair Use*, PLAGIARISM TODAY (May 18, 2023), https://www.plagiarismtoday.com/2023/05/18/how-the-warhol-ruling-could-change-fair-use/ ("However, given how narrow [the *Google v. Oracle* case] was, applying solely to software code, the Warhol case is the first broad SCOTUS decision on fair use in nearly 30 years."); PROSKAUER ROSE LLP, *Supreme Court Affirms Andy Warhol's Prince Series Not Transformative Fair Use* (June 14, 2023), https://www.proskauer.com/blog/supreme-court-affirms-andy-warhols-prince-series-not-transformative-fair-use ("Recently, the court in Google v. Oracle interpreted fair use broadly but limited its decision to the context of software codes."); Tyler Ochoa, *U.S. Supreme Court Vindicates Photographer But Destabilizes Fair Use — Andy Warhol Foundation v. Goldsmith* (Guest Blog Post), TECHNOLOGY & MARKETING LAW BLOG (June 20, 2023),

Significantly, the Court was careful to distinguish computer code from highly expressive works (like those at issue in this case) that have no functional elements that may impact a factor-two analysis, stating that "computer programs differ from books, films, and many other 'literary works' in that [software] programs almost always serve functional purposes." *Id.* at 1198; *see also id.* at 1202 (explaining that the declaring computer code at issue was, "if copyrightable at all, further than are most computer programs (such as the implementing code) from the core of copyright" and "inherently bound together with uncopyrightable ideas"). When considering the circumstances surrounding Meta's use of Plaintiffs' creative, expressive works of authorship, the instant case is easily distinguishable from the software-specific facts of *Google v. Oracle*.

Meta also cites to *Google v. Oracle* to argue that Llama is "precisely the kind of 'highly creative and innovative tool' the Supreme Court found to be 'consistent with that creative "progress" that is the basic constitutional objective of copyright itself." Dkt. 501 at 17. In comparing its development of Llama with the innovation at issue in *Google v. Oracle*, Meta ignores the limited application of *Google v. Oracle* and misrepresents the scope of the fair use doctrine. Moreover, if creative progress and innovation, standing alone, were the only litmus test for fair use, very few uses would not qualify. In reality, the fair use test is a much more nuanced and complex doctrine.

**v.  *Sony Computer Entertainment, Inc. v. Connectix Corp.* ("*Sony*")
and *Sega Enters. Ltd. v. Accolade, Inc.* ("*Sega*")**

Meta wrongly analogizes its conduct to the facts of *Sony*, in which reverse engineering of software code was found to be fair use, contending that Meta "made copies of Plaintiffs' books to

---

https://blog.ericgoldman.org/archives/2023/06/u-s-supreme-court-vindicates-photographer-but-destabilizes-fair-use-andy-warhol-foundation-v-goldsmith-guest-blog-post.htm ("Despite those caveats, the opinion is likely to be enormously consequential, far more so than the Court's similarly narrow and context-specific ruling two years ago in the *Google v. Oracle* software case."); Tyler Ochoa, *U.S. Supreme Court Upholds Fair Use in Google-Oracle Software Battle* (Guest Blog Post) (Apr. 8, 2021), https://blog.ericgoldman.org/archives/2021/04/u-s-supreme-court-upholds-fair-use-in-google-oracle-software-battle-guest-blog-post.htm ("Any Supreme Court opinion is important, and this one no doubt will be quoted often in future briefs and opinions. But other than clarifying the standard of review, I doubt the decision will have much impact on fair use cases that do not involve software.").

train Llama on statistical information about their language and syntax without including any protected expression in its code or weights" and "[t]hat information is then used to enable Llama to perform functions and create outputs completely unrelated to, and different from, reading Plaintiffs' books." Dkt. 501 at 17.

In *Sony*, the Ninth Circuit concluded that Connectix's intermediate copying for reverse engineering qualified as fair use, necessary to permit Connectix to make its non-infringing game station function with PlayStation games. 203 F.3d 596 (9th Cir. 2000). Specifically, the court held that Sony's copyrighted software code included functional elements that resulted in a lower degree of protection. Similar to the decision in *Google v. Oracle*, the decision in *Sony* largely depended on the analysis of factor two and the work at issue being a computer program. The factor-two analysis was central to the ultimate fair use finding, and it would be inapplicable to the highly expressive works copied by Meta here.

The Ninth Circuit in *Sega*, a case involving very similar facts to *Sony*, further confirmed the inapplicability of reverse engineering computer code cases when the works at issue are highly expressive. The court explained that because "Sega's video game programs contain unprotected aspects that cannot be examined without copying, we afford them a lower degree of protection than more traditional literary works." 977 F.2d 1510, 1526 (9th Cir. 1992). The works that Meta copied to train Llama are the exact type of "traditional literary works" that the Ninth Circuit in *Sega* and *Sony* confirmed deserve a higher degree of protection and thereby significantly impact any fair use analysis.

**D.     Courts in Other AI Copyright Cases Distinguished Meta's Authorities or Found Them to be Inapplicable to AI Fair Use Analysis**

Few courts have yet had occasion to address the issue of whether copying of copyright works for AI "training" purposes is fair use, but the courts that have considered the issue have disregarded much of the case law cited by Meta.

In *Thomson Reuters v. Ross*, the district court rejected the fair use defense for AI training. *Thomson Reuters Enter. Ctr. GmbH* v. *Ross Intelligence Inc.*, --- F. Supp. 3d. ---, No. 1:20-CV-613-SB, 2025 WL 458520 (D. Del. Feb. 11, 2025) ("Thomson"). Relying heavily on the Supreme

Court's decision in *Warhol*, the court held that Ross's use was not transformative because it did not have a "further purpose or different character" from Thomson Reuters' works. *Id*. at *7. Most importantly for purposes of Meta's summary judgment motion, the court held that many of the cases on which Meta relies—specifically *Google v. Oracle*, *Sony*, and *Sega*—"are inapt." *Id.* at *8. The court gave several reasons to support of its conclusion:

> First and foremost, those cases are all about copying computer code. This case is not… In copyright, 'computer programs differ from books, films, and many other literary works in that such programs almost always serve functional purposes.' *Google*, 593 U.S. at 21 (internal quotation marks omitted). So the fair-use considerations for these programs do not always apply to cases about copying written words.

*Id.* The court explained that intermediate-copying cases like *Sega* and *Sony* that have found in favor of fair use involve copying of functional computer code (usually through the process of reverse engineering) that was *necessary* for a competitor to innovate. *Id*. In contrast, the court found that the "training" on literary works involved in that case was not analogous to copying of computer code whose underlying ideas can be reached only by copying their expression. *Id.* Specifically, the court concluded:

> [T]hese computer-programming cases about intermediate copying rely on a factor absent here: The copying was *necessary* for competitors to innovate. In *Google*, Google had copied part of a computer-programming language—specifically, the code that lets programmers speak to software in a particular way. *Id.* at 6, 29–33. That copying was "necessary for different programs to speak to each other." *Id.* at 31. The copying in *Sony* was also necessary. The Ninth Circuit 'appl[ied] fair use to intermediate copying [that was] necessary to reverse engineer access to unprotected functional elements within a program.' *Id.* at 22. '[I]ntermediate copying . . . was a fair use for the purpose of gaining access to the unprotected elements of Sony's software.' *Sony*, 203 F.3d at 602. Likewise, *Sega* addressed copying that occurred "solely in order to discover the functional requirements for

>compatibility." 977 F.2d at 1522. Here, though, there is no computer code whose underlying ideas can be reached only by copying their expression. The "copying is [not] reasonably necessary to achieve the user's new purpose." *Warhol*, 598 U.S. at 532.

*Id.* at 18-19. Because the present case involves written works and not computer code, functional elements, or reverse engineering, similar to the court's reasoning in the *Ross* case, these intermediate copying cases are wholly inapplicable.

In *Andersen v. Stability AI Ltd.,* a generative AI infringement case pending before the Northern District of California in which similar fair use questions are being considered, Judge Orrick issued an order granting in part and denying in part motions to dismiss a first amended complaint. 744 F.Supp.3d 956 (N.D. Cal. Aug. 12, 2024). In the *Andersen* order, Judge Orrick made clear that AI technology is different from past technologies such that past copyright infringement cases involving other technologies may have little relevance to these AI infringement cases. *Id*. at 9. In *Andersen*, the defendants attempted to argue that AI technology is no different than the VCR, xerography machines, or other technologies previously found to be non-infringing. *Id*. Judge Orrick debunked that notion, explaining that AI infringement is not at all similar to the copyright infringement cases involving the sales of VCRs:

>[T]his is a case where plaintiffs allege that Stable Diffusion is built to a significant extent on copyrighted works and that the way the product operates necessarily invokes copies or protected elements of those works. The plausible inferences at this juncture are that Stable Diffusion *by operation* by end users creates copyright infringement and was created to facilitate that infringement by design.

*Id.* In other words, Judge Orrick distinguished generative AI from past technologies that were found to be a fair use because generative AI models ingest copies before making the models available to users. By contrast, with VCRs and similar copying devices, the copies were made by the consumer, not beforehand by the defendants. Thus, unlike the makers of VCRs and similar "dumb machines," Meta relies on infringement of Plaintiffs' works as the means to make their AI machine, Llama.

Judge Orrick went on to explain that because of the unique nature of generative AI, the "run

of the mill" copyright cases relied upon by the defendants (including Meta in the present case) were unhelpful. *Id.* at 17 n.15. He noted that defendants' reliance on cases where a showing of substantial similarity between works is required when determining whether an inference of copying can be supported was also unavailing "in this case where the copyrighted works themselves are alleged to have not only been used to train the AI models but also invoked in their operation." *Id*.

### Conclusion

The cases relied on by Meta for its fair use arguments are of limited relevance here given the narrowed interpretation of transformativeness post-*Warhol*. This Court should deny Meta's motion for summary judgment.

Dated: April 11, 2025            Respectfully submitted,

PRYOR CASHMAN LLP

 */s/ Benjamin S. Akley*
Benjamin S. Akley (State Bar No. 278506)
1901 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 683-6900
bakley@pryorcashman.com
Frank P. Scibilia (*pro hac vice* application forthcoming)
Joshua Weigensberg (*pro hac vice* application forthcoming)
7 Times Square, 40th Fl.
New York, NY 10036
(212) 421-4100
fscibilia@pryorcashman.com
jweigensberg@pryorcashman.com

COPYRIGHT ALLIANCE

Keith Kupferschmid (*pro hac vice* application forthcoming)
Kevin R. Madigan (*pro hac vice* application forthcoming)
1331 F Street NW, #950
Washington, DC 20004
(202) 470-5070
keithk@copyrightalliance.org
kmadigan@copyrightalliance.org

*Attorneys for Amicus Curiae The Copyright Alliance*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on April 11, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing to all counsel of record.

/s/ Benjamin S. Akley
Benjamin S. Akley