Pages 1 - 112

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

RICHARD KADREY, et al.,          )
                                 )
            Plaintiffs,          )
                                 )
   VS.                           )      NO. C 23-03417 VC
                                 )
META PLATFORMS, INC.,            )
                                 )
            Defendant.           )
_____)

                         San Francisco, California
                         Thursday, May 1, 2025

                **TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

For Plaintiffs:
                         BOIES SCHILLER FLEXNER LLP
                         333 Main Street
                         Armonk, New York 10504
                    BY:  **DAVID BOIES, ESQ.**

                         BOIES SCHILLER FLEXNER LLP
                         44 Montgomery Street, 41st Floor
                         San Francisco, California 94104
                    BY:  **MAXWELL V. PRITT, ESQ.**
                         **JOSHUA MICHELANGELO STEIN, ESQ.**
                         **MARGAUX POUEYMIROU, ESQ.**

                         BOIES SCHILLER FLEXNER LLP
                         1401 New York Avenue Northwest
                         Washington, DC 20005
                    BY:  **JESSE MICHAEL PANUCCIO, ESQ.**
                         **JAY SCHUFFENHAUER, ESQ.**

           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:    James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                Official Court Reporter

1    **APPEARANCES**:    **(CONTINUED)**

2    For Plaintiffs:

                   CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
3                  135 South LaSalle Street, Suite 3210
                   Chicago, Illinois 60603
4              BY: **BRYAN L. CLOBES, ESQ.**

5                  LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
                   250 Hudson Street, Eighth Floor
6                  New York, New York 10013
               BY: **RACHEL GEMAN, ESQ.**

7
                   LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
8                  275 Battery Street, 29th Floor
                   San Francisco, California 94111
9              BY: **REILLY STOLER, ESQ.**

10                 DICELLO LEVITT LLP
                   10 North Dearborn Street, Sixth Floor
11                 Chicago, Illinois 60602
               BY: **NADA DJORDJEVIC, ESQ.**

12
     For Defendant:
13                 COOLEY LLP
                   1333 Second Street, Suite 400
14                 Santa Monica, California 90401
               BY: **BOBBY A. GHAJAR, ESQ.**

15
                   COOLEY LLP
16                 3 Embarcadero Center, 20th Floor
                   San Francisco, California 94111
17             BY: **KATHLEEN R. HARTNETT, ESQ.**

18                 COOLEY LLP
                   3175 Hanover Street
19                 Palo Alto, California 94304
               BY: **MARK WEINSTEIN, ESQ.**
20                 **JUDD D. LAUTER, ESQ.**

21                 PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
                   535 Mission Street
22                 San Francisco, California 94105
               BY: **ANNA MANCHESTER STAPLETON, ESQ.**

23

24           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

25

1   **APPEARANCES**:   **(CONTINUED)**

2   For Defendant:

                    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
3                   2001 K Street Northwest
                    Washington, DC 20006
4          BY:  **WILLIAM THOMAS MARKS, ESQ.**
                **KANNON K. SHANMUGAM, ESQ.**
5
                    CLEARY GOTTLIEB STEEN & HAMILTON LLP
6                   1841 Page Mill Road, Suite 250
                    Palo Alto, California 94304
7          BY:  **ANGELA DUNNING, ESQ.**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Thursday - May 1, 2025**                    **10:00 a.m.** |
| 2 | P R O C E E D I N G S |
| 3 | ---oOo--- |
| 4 |     **THE CLERK:**  All rise. |
| 5 |   Court is now in session.  The Honorable Vince Chhabria is |
| 6 | presiding. |
| 7 |   Please be seated. |
| 8 |     **ZOOM RECORDING:**  Recording in progress. |
| 9 |     **THE CLERK:**  Calling Civil Action 23-3417, Kadrey, |
| 10 | et al., versus Meta Platforms. |
| 11 |   Counsel, please approach the podium and state your |
| 12 | appearances for the record, beginning with counsel for |
| 13 | plaintiffs. |
| 14 |     **MR. BOIES:**  Good morning, Your Honor.  David Boies, of |
| 15 | Boies Schiller and Flexner.  I'd like to introduce also |
| 16 | colleagues from Boies Schiller who are here:  Maxwell Pritt, |
| 17 | Jesse Panuccio, Joshua Stein, Margaux Poueymirou, and |
| 18 | Jay Schuffenhauer. |
| 19 |     **THE COURT:**  Hi, everybody. |
| 20 |     **MR. PRITT:**  Good morning. |
| 21 |     **MR. CLOBES:**  Good morning, Your Honor.  Bryan Clobes, |
| 22 | from Cafferty Clobes, for the plaintiffs as well. |
| 23 |     **THE COURT:**  Hi. |
| 24 |     **MR. CLOBES:**  Hi. |
| 25 |     **MS. GEMAN:**  Good morning, Your Honor.  Rachel Geman, |

1   Lieff Cabraser Heimann & Bernstein.  I'm here along with my

2   colleague, Reilly Stoler.

3           THE COURT:  Hi.

4           MS. GEMAN:  Hi.

5           MR. BOIES:  And, Your Honor, I would also like to

6   introduce three of our clients, who are here in the court:

7   Christopher Farnsworth, Andrew Greer, and Rachel Snyder.

8           THE COURT:  Hi.

9           MR. BOIES:  And we also have one of our experts,

10  Dr. David Choffnes, in the very unlikely event that the Court

11  would have any questions of him.

12          THE COURT:  Okay.

13          THE CLERK:  Your Honor, one other attorney.  Sorry.

14          THE COURT:  No problem.

15          MS. DJORDJEVIC:  Good morning, Your Honor.

16  Nada Djordjevic, from DiCello Levitt, also here for plaintiffs.

17          THE COURT:  Hi.

18          MS. DJORDJEVIC:  Hi.

19          MR. GHAJAR:  Good morning, Your Honor.  Bobby Ghajar,

20  from Cooley, on behalf of Defendant Meta Platforms.

21          THE COURT:  Good morning.

22          MS. HARTNETT:  Good morning, Your Honor.

23  Kathleen Hartnett, from Cooley, also on behalf of Meta.  And

24  I -- if you don't mind, we'll introduce some of our other

25  counsel here today.

1          THE COURT:  Great.

2          MS. HARTNETT:  We have Mark Weinstein and Judd Lauter

3    from Cooley.

4          THE COURT:  Hi.

5          MS. HARTNETT:  We have Anna Stapleton and

6    William Marks from Paul Weiss, and Mr. Shanmugam will be doing

7    the arguing today for Paul Weiss from --

8          THE COURT:  Mr. Shanmugam, you keep haunting my

9    courtroom.  What's going on?

10                    (Laughter.)

11         MR. SHANMUGAM:  For the record, as always, it's a

12   pleasure.

13         THE COURT:  All right.  So --

14         MS. DUNNING:  Your Honor, sorry.  One more.

15         THE COURT:  Oh.  I'm sorry.

16         MS. DUNNING:  Angela Dunning, from Cleary Gottlieb

17   Steen & Hamilton, on behalf of Meta.

18      Thank you.

19         THE COURT:  Hi.

20         MS. DUNNING:  Good morning.

21         THE COURT:  Okay.  Mr. Shanmugam, maybe I'll start

22   with you.

23      You know, I put out -- I put out a bunch of questions

24   yesterday.  I thought of more questions, and I almost put out

25   another list of questions at midnight last night, but I decided

1   I shouldn't do that to you-all.

2       But I think, in a case like this, it's important probably

3   to zoom out and just develop a general understanding of the

4   issues that are presented by it and a general understanding of

5   the issues that are presented by the AI copyright dispute;

6   right?

7       I think it will be tempting for you to answer a lot of my

8   questions by saying, "Well, there's nothing about that in the

9   record" -- right? -- "and they didn't put anything in on that"

10  or "They didn't argue that" or whatever.

11      And I assure you that there will be plenty of time to

12  discuss what's in the record and what's not in the record, but

13  I was wondering -- if you wouldn't mind beginning the

14  discussion by just focusing on the issue in general without

15  regard to any of the facts in this case.

16          **MR. SHANMUGAM:**  Sure.

17      So I'm happy to do that, Judge Chhabria.  And I think

18  that, from our perspective, the key issues here relate to the

19  nature of the use and the absence of a market for a substitute

20  of use.

21          **THE COURT:**  And I guess my -- my view is that -- I

22  agree with you, but as -- between those two issues, it seems to

23  me that the -- the most important question in these kinds of

24  cases is if the use -- assuming the use is transformative --

25  right? -- even highly transformative -- and I think -- you

1    know, I mean, I had a couple questions about that, but I think

2    that that's probably where we come out -- right? -- is that --

3    is that it's -- the use is highly transformative.

4        But we are told over and over again by the courts that the

5    fourth factor is the most important -- right? -- and the effect

6    of the use on the market for the copyrighted works is the most

7    important issue.

8        And it seems to me that you could have a case where the

9    use of the copyrighted works is highly transformative, but

10    nonetheless, it could have a massive effect on the market for

11    the copyrighted works such that it would not constitute fair

12    use.

13        Do you agree -- again, without regard to the facts of this

14    case or what's in the record in this case, do you agree with

15    that statement?

16        **MR. SHANMUGAM:**  So I partially agree with that

17    statement.  So let me explain why.

18        It is certainly true that the Supreme Court has said that

19    the fourth factor is the most important factor, but the Court

20    has also said that the two factors relate to each other.  And I

21    think that the critical respect in which they relate to each

22    other is that, as the Second Circuit put it in the *HathiTrust*

23    case -- and I think that this is the best articulation:

24        "Under Factor 4, any economic harm caused by

25    transformative uses does not count because such uses, by

1    definition, do not serve as substitutes for the original work."

2        Now, why is that --

3        **THE COURT:**  Well -- but I -- I understand that

4    concept, and I understand that quote, but what the courts also

5    tell us over and over again is that these fair use cases are

6    very fact-dependent and very context-specific.  And I think

7    there's a real danger in taking quotes from cases that come out

8    of very different contexts and mechanistically applying it to

9    this very, very new context; right?

10        And this seems like a highly unusual case in the sense

11    that, although the copying is for a highly transformative

12    purpose, the copying leads to, or has the high likelihood of

13    leading to, the flooding of the markets for the copyrighted

14    works in a way that substantially diminishes the value of those

15    works.

16        And I -- and I think that that, you know -- and, again,

17    without regard to what evidence there is in the record of that

18    in this case, I think that is the -- the most important issue,

19    the most important question to be answered in these AI

20    copyright cases.

21        And it gets at some of the examples I -- I gave in my

22    questions; right?  Like, you know, take the, you know -- well,

23    let's take the -- let's take -- let's keep it completely

24    outside the context of this case.  I won't even use one of the

25    plaintiffs as an example.  Let's just take newspaper articles;

1    right?

2        If, you know, an AI company is downloading and copying

3    news articles, copyrighted news articles, without permission,

4    that -- en -- en masse -- that it seems very likely to lead to

5    the creation of a product that will have the capability of and

6    likely will produce an infinite amount of content that will

7    diminish demand for the copyrighted works that were used to

8    feed the model and to the point that -- you know, it's not

9    inconceivable to imagine that the market for the copyrighted

10   works that were fed into the model could be eliminated

11   entirely.

12       And how could -- how could that be fair use?

13       **MR. SHANMUGAM:**  Sure.

14       And I do think that that is what underlies -- I think it's

15   really Questions 2 through 5 that you sent us yesterday.  You

16   used the example of the domestic violence --

17       **THE COURT:**  Yeah, but now --

18       **MR. SHANMUGAM:**  -- article.

19       **THE COURT:**  -- I'm using the example of the

20   newspapers.  So --

21       **MR. SHANMUGAM:**  I think that the two examples come out

22   the same way under our analysis, and I think, really, the

23   critical question here is what market effects are cognizable

24   under the fair use test.  And that's relevant, I think, both

25   for Factor 4 but, I think, more generally -- and I'm happy to

talk about the purposes of the fair use test in the zoom-out as
well.

So let me give you sort of our bottom-line answer and then
explain why I think it's the correct one. Our bottom-line
answer is that, for an effect to be cognizable, it has to
relate to what is protected under the copyright laws, which is
the expressive element of the work.

And so it would not be a cognizable effect merely to
produce the definitive article on the roots of domestic
violence. Keep in mind that that happens all the time. Take
academia. Somebody may be a Shakespeare scholar and may write
an article about Shakespeare that is the definitive analysis of
*Hamlet*, and it may draw very extensively on existing
scholarship.

But as long as it does not reproduce enough of the
expression from those earlier articles, there's not going to be
copyright infringement. And we think that the analysis comes
out the same way --

**THE COURT:** What if you -- what if you copy those
books without permission and then read them and then write the
definitive work on *Ham-* -- *Hamlet*?

**MR. SHANMUGAM:** Right.

Our view is that the protected market effects, for
purposes of the fourth prong, should operate in essentially the
same way, which is to say that, in figuring out what effects

1    count, we are guided by the underlying purpose of the copyright

2    laws, which is, after all, as the copyright clause says, to

3    protect the progress of science and useful arts.

4        When you take a look at the case law -- and I would point

5    as examples of this, but I think there are others -- to the

6    Ninth Circuit's decisions in *Connectix* and *Accolade*, the

7    morph -- the mere fact that you're producing a rival product

8    that obviously is going to have some effect on the sales of the

9    initial product is not enough.

10        And I would submit that it is for that reason.  It is

11    because you're drawing on the functional elements in the

12    reverse engineering software cases in order to produce the

13    alternative product, and, of course, this is all consistent

14    with the broader principle that there are all sorts of effects

15    in the fair use context.

16        There are the effects of a parody.  There are the effects

17    that the Supreme Court has recognized of a negative review.

18    And in all those cases, those effects are not cognizable.

19        **THE COURT:**  But let me -- let me -- again, I mean, I

20    don't want to sound like a broken record, but, you know, we are

21    told over and over again that, you know, the fair use analysis

22    is fact-dependent and context-specific; right?

23        And in the -- I think most of the cases, if not all of the

24    cases you're referring to -- you have one product -- right? --

25    and it's a copyright-protected product, and somebody uses that

1    product or that work to develop another product or work, and

2    the -- the product that is developed partly as a result of the

3    copying is one product in the market that's competing with the

4    copied product; right?

5        In this case, you have companies using copyright-protected

6    material to create a product that is capable of producing an

7    infinite number of competing products; right?  So, to use the

8    domestic violence example, you -- you know, you have a book on

9    domestic violence and the causes of domestic violence and

10   the -- the things we need to do to combat domestic violence.

11       And by -- by -- by training the product with copyrighted

12   works relating to domestic violence, you are giving the product

13   the ability to produce a million articles on domestic violence

14   addressing the same issues that are addressed by the

15   copyrighted work.

16       And so you are dramatically changing -- you might even say

17   obliterating -- the market for that person's work, and you're

18   saying that you don't even have to pay a license to that person

19   for using their work to create the product that's destroying

20   the market for their work.  I just don't understand how that

21   can be fair use.

22           **MR. SHANMUGAM:**  Sure.

23       So let me address that directly.  I'm going to start with

24   an answer that you may not want to hear, which is that, in this

25   case, it is a fact-dependent analysis, and there really is no

```
 1   record of such an effect.  At most, there is speculation about
 2   the possibility.
 3            THE COURT:  I understand that --
 4            MR. SHANMUGAM:  So --
 5            THE COURT:  -- and I assure -- I -- again, I assure
 6   you that we'll have plenty of time to talk about the record.
 7   That's what -- I think, in this case, the record relating to
 8   Factor 4 is the most important thing.
 9        But I also think, in general, the issue of Factor 4 and
10   how big of a deal it is, you know, when put up against the
11   transformative effect of the -- of the product is -- is the
12   most important.
13            MR. SHANMUGAM:  Yeah.
14        And just to set this on the table for purposes of the
15   subsequent discussion here --
16            THE COURT:  Yeah.
17            MR. SHANMUGAM:  -- I think that there are actually a
18   variety of different types of effects that the other side could
19   point to, and the one that we've been discussing is one that
20   they conspicuously have not been relying on.
21        I think, if you take a look at plaintiffs' briefs -- and I
22   hope that this is a fair characterization of their argument --
23   they're really relying on two things.  First, they are relying
24   on the purported market for licensing for this particular
25   purpose.
```

1        And, second, they are relying on an argument with regard

2   to their claim about the reliance on the online data sets, that

3   they were deprived of sales of their product that could have

4   been used in lieu of obtaining these works from Book 3 and the

5   like.

6        **THE COURT:**  Those seem like sort of the flip side of

7   the same coin, as far as I can tell.

8        **MR. SHANMUGAM:**  Well, I think that there are slightly

9   different responses to both of them.

10       But in the end, I think, with regard to the -- the

11  relevance of these market effects, our view is the same with

12  regard to really all of them, which is that if you think that

13  it is a highly transformative use -- that the market for those

14  transformative uses cannot be the correct market for purposes

15  of Factor 4.

16       **THE COURT:**  Well -- but -- but -- I mean, I think I

17  would agree with you to an extent on that; right?  And let me

18  make sure we're understanding each other.

19       **MR. SHANMUGAM:**  Sure.

20       **THE COURT:**  So I agree that, you know, you -- you

21  know, the -- let's say that we consider the transformative use

22  to be the development of an AI model that is capable of doing

23  all these things.

24       Is that how you would characterize it?

25       **MR. SHANMUGAM:**  Yes.  We would agree with that

 1    description of the use.

 2          **THE COURT:**  Okay.  Okay.  So -- so that's the

 3    transformative use, but if the -- well, we'll agree on that for

 4    the moment.

 5          The -- I certainly agree with you that we -- we're not --

 6    we shouldn't be considering the entire market for all of the

 7    uses that the new model can be put to; right?  But the new

 8    model is capable of producing works that are in the same genre

 9    of, or quite comparable to, the works produced by the -- by

10    the -- by the -- by the people whose material was fed into the

11    model; right?

12          And if we -- if we analyze those works -- right? -- the

13    works that the model produces that are similar to, or in the

14    same genre of, the works of the people whose material was

15    copied, I think the likely conclusion is that the -- the

16    transformative use will come close to obliterating the market

17    for the works of the people whose material was copied.

18          And I just don't -- to say -- I mean, in a doctrine that

19    is so fact-specific and so context-specific and so -- and a

20    doctrine that tells us that different factors and different

21    effects may be important in one case and not another, I just

22    don't see how we can bury our head in the sand to that -- that

23    likelihood.

24          **MR. SHANMUGAM:**  Yeah.

25          So I think we're a little bit hamstrung here in two

respects.  First, again, I really don't think this is the

theory that the plaintiffs have relied on.

      **THE COURT:**  I --

      **MR. SHANMUGAM:**  And, second, we don't have a record to

that effect.  But if we did have such a record, I'd want a

joint issue.  If we found ourselves, two years from now, in a

world in which there was a robust record that AI tools were

having this impact --

      **THE COURT:**  Well, I don't know if you need to wait

until it has the impact; right?  I mean --

      **MR. SHANMUGAM:**  Potential effects can count.  So --

      **THE COURT:**  Potential effects can count.

    And I would think, to put it in practical terms --

right? -- if the plaintiff had come here -- plaintiffs had come

here, you know, to this summary judgment hearing with an expert

report that laid out, in reliable terms, that the process of

feeding all this copyrighted work into the model will -- will

create a likelihood that massive amounts of content will be

produced by Llama that will sort of serve as potential

substitutes for the plaintiff's works, then I think you -- I

think you would -- you might lose on summary judgment or -- or

at trial -- right? -- because this factor is -- I mean, if --

if it's important to consider what I just described, then I --

you know -- and I think you're -- I think you're destined to

failure in these cases.

1          **MR. SHANMUGAM:**  Well, let me push back on that a

2     little bit --

3          **THE COURT:**  Okay.

4          **MR. SHANMUGAM:**  -- with respect, Your Honor, as a

5     matter of law.  And, again, I'm going to go right back to the

6     purpose of copyright law.

7          The copy- -- purpose of copyright law is to protect

8     expression.  And when you take a look at the enumerated rights

9     that are listed in the Copyright Act, you know, first and

10    foremost is the exclusive right to reproduce your expression.

11    Again, throughout copyright law, expression is protected; ideas

12    are not.

13         And the consequence --

14         **THE COURT:**  But how -- but it's -- how can you say

15    that the expression is not being reproduced when the copying of

16    the expression gives the machine the ability to engage in

17    similar expression?

18         **MR. SHANMUGAM:**  But then transformation takes place;

19    right?  You know, the transformation here is that the machine

20    is not retaining the expression.  The machine is being trained

21    in a very specific way.  It's being trained in the

22    relationships between words, between tokens, which can be parts

23    of words.

24         And so the expression falls out of the equation and --

25         **THE COURT:**  But if -- how does it fall out of the

1  equation if -- I mean, I'm assuming that if -- if Meta were

2  unable to train its model with any domestic-violence-related

3  content, then the model would not be capable of producing a

4  *New Yorker*-style article that goes -- goes on at length about

5  the causes of domestic violence and what we need to do to

6  combat it; right?

7          **MR. SHANMUGAM:**  That -- that may be true, but, again,

8  I come back to the fact that what copyright law doesn't protect

9  against is what takes place, for instance, in my academic

10  hypothetical.

11      So, in other words, you're not entitled to protection from

12  competition in the marketplace of ideas.  What copyright law is

13  giving you is a limited monopoly.  It's a monopoly in your

14  expression itself, and I think one way I sort of find this --

15          **THE COURT:**  Right, but if I'm going to -- if I'm going

16  to steal things from the marketplace of ideas in order to

17  develop my own ideas, that's copyright infringement; right?  I

18  mean, if I'm a professor and I distribute -- if I buy a book,

19  and I make 18 photocopies of it, and I distribute the

20  18 photocopies to my students, that's copyright infringement.

21      And the fact that the students are going to absorb the

22  18 -- the books, along with a bunch of other material that they

23  will absorb, and then do -- create things that may compete with

24  the original book doesn't absolve you from copyright

25  infringement in that -- in that -- on that fact pattern, does

1    it?

2        **MR. SHANMUGAM:**  Well -- and I think that that is

3    right, but I think that that's because the analogy to humans is

4    imperfect, and it's imperfect in two respects.

5        **THE COURT:**  Well, you just made it.  So -- for the

6    record.

7        **MR. SHANMUGAM:**  Well -- well -- but -- but, for the

8    record, to respond to Question Number 1, I think the reason why

9    humans are different is, first, because the training of an AI

10   tool like Llama is different for the reasons that I alluded to.

11   The AI tool is being trained in this very specific, narrow way.

12       It is very different from a human being reading a book,

13   which is, after all, the purpose for which books are originally

14   written.  And I also think that, here, you have a tool at the

15   end of it.  That is the use, as we discussed.  The use is the

16   development of this particular tool, and I don't think you can

17   describe the development of a human as a use.

18       That human is then going to go on and engage in particular

19   uses, which may be transformative or not.  But, again, I want

20   to sort of come back to where we started here in this

21   particular colloquy and really drill down on this question of

22   what exactly it is that these, as you described them, rival

23   works would be doing.

24       I think there are a couple of possibilities.  One is that

25   they are taking content, which, of course, is unprotected --

1   that's the idea/expression dichotomy -- and producing that

2   content for -- potentially in a more attractive way.  And,

3   again, that's the sort of competition that I think the

4   copyright laws do not protect against.  That's the balance of

5   the copyright laws.  Expression is protected; underlying ideas

6   are not.

7       There is a similar version of this that you see, to some

8   extent, in the materials, which is the question of style.  And

9   so if you have a singer who comes along and produces works in

10  the style of Taylor Swift, but they're more attractive to

11  listeners than Taylor Swift's own works, again --

12          **THE COURT:**  That's impossible.

13          **MR. SHANMUGAM:**  No.  I -- I --

14                          (Laughter.)

15          **MR. SHANMUGAM:**  Of course, for the record, I agree

16  with that.

17      But, ultimately, that is not protected by the copyright

18  laws, either, and that's really what these arguments sound in.

19  These arguments, in the end, relate to things that the

20  copyright laws don't protect against.  Now, in the world of AI,

21  perhaps we would want there to be such protection, but --

22          **THE COURT:**  But here -- here's -- let's stay -- let's

23  stay on the Taylor Swift example for a second, shall we?

24          **MR. SHANMUGAM:**  Sure.

25          **THE COURT:**  So I think -- I think I agree with

1    everything that you said about Taylor Swift -- right? -- that

2    if -- you know, if you feed her works and a bunch of other

3    works into an AI model, and you then ask the A model -- AI

4    model to produce songs in the style of Taylor Swift, that is

5    not going to affect the market for Taylor Swift songs; right?

6              **MR. SHANMUGAM:**  Well --

7              **THE COURT:**  And even if -- even if a million songs are

8    produced by the model in the style of a Taylor Swift song, it's

9    not going to affect the market for Taylor Swift songs.

10        But what about the next Taylor Swift?  What about the --

11   the up-and-coming, relatively unknown artist who is writing

12   songs and copyrighting songs, and the -- Meta uses her works

13   and feeds them into the -- the model?  And by feeding

14   copyrighted works like hers into the model, it enables the

15   model to produce a billion pop songs; right?

16        It makes it much less likely that that new artist is going

17   to break through and become the next Taylor Swift because the

18   market has been so dramatically changed for songs in the style

19   that this new artist is writing.

20             **MR. SHANMUGAM:**  So I think you could have that effect

21   even on the great Taylor Swift.  You could have that effect on

22   a new artist.

23        But I think our answer is the same, that that is the sort

24   of competitive effect that the copyright laws do not protect

25   against.  And, again, I acknowledge that, in some cases, you

might have a stronger factual case that --

       **THE COURT:**  But, again, I'm --

       **MR. SHANMUGAM:**  -- that's taking place.

       **THE COURT:**  Okay.  Sorry to interrupt.

       **MR. SHANMUGAM:**  But the one other thing I would say on this, though, is that that is where substantial similarity comes into play in the ordinary infringement context.

So there could come a point at which, if a model produced a song that was close enough in expression, or if a model produced a work that, as has decidedly not been proven with regard to Llama, reproduces the expression of an author in a sufficiently similar way, of course, then you have a relevant effect because you have a work that can be characterized as substitutive, and you would have ordinary infringement as well.

Those two concepts, I think, need to be understood in the same way, and I really do think that that's why the cases talk about this in terms of substitutive effects as opposed to other effects.  And otherwise, I think --

       **THE COURT:**  Right, but -- but -- but substitutive effects is -- it seems to me, is a relevant concept here.  I mean, I think -- aren't -- aren't we discussing substitutive effects when we talk about the person who's trying to become the next Taylor Swift and the market is flooded with similar songs partially as a result of copying her song?

Why isn't that not -- why aren't we talking about

1    substitutive effects there?

2        MR. SHANMUGAM:  I think the reason we aren't is

3    precisely because it is not substitution of a work with similar

4    expressive content.  And I think that the problem with all of

5    this is, otherwise, I think you lead very quickly to a

6    circularity problem because -- and I think, actually, the best

7    way to understand this is with regard to the argument that the

8    plaintiffs are making with regard to the development of a

9    license market for this particular AI person.

10        THE COURT:  I understand your arguments about that,

11   and I agree with you.  So I don't know if it's necessary to

12   talk about that argument that they're making.

13        MR. SHANMUGAM:  Oh.  I'm happy -- well, as you're

14   aware, when the Supreme Court itself has sort of talked about

15   the fourth factor, it has, quoting the *Nimmer* treatise, talked

16   about the fact that, in any fair use case, you can say that

17   that is true.

18        And so I think the way to kind of break the circle here is

19   to say, look, again, when you have a highly transformative use,

20   by definition, what you say is that those uses do not qualify

21   as relevant substitutes for Factor 4.

22        THE COURT:  Right.

23        And I think -- I think the problem -- I think the

24   difference we're having is that, in my view, you're -- you're

25   taking a highly formalistic approach to this question in an

1   area of law that tells us not to do that; right?

2       I mean, it -- I think that it's probably true that, in

3   most copyright cases, you need to look at, you know, the first

4   factor in the way that you're describing it, but it's -- as

5   Justice Breyer and others have told us over and over again,

6   it's -- we're not supposed to be taking that highly formalistic

7   approach such that we are mechanistically applying the concept

8   from one case to the next case.  It really depends on the

9   facts.

10      And in this case, you know -- well, not this -- maybe not

11  this particular case, but in this area, in this type of case,

12  what I'm saying is that it seems highly plausible, at a

13  minimum, that copying people's protected works and using it to

14  train models will, in some con- -- in some situations, come

15  close to obliterating the market for the work of the person

16  whose material is copied.

17      And the reason is that the copier is not just producing

18  one work.  The copier has the capability of producing a billion

19  works and completely changing the market for this -- this type

20  of work, and you seem to be telling me that, in the fair use --

21  in the fair use analysis, I have to ignore that; I have to

22  disregard that possibility.  And I just don't think that that

23  is how the fair use doctrine works.

24      So I think that's inconsistent with what the courts have

25  told us about how to think about fair use doctrine.

1          **MR. SHANMUGAM:**  Yes.  So let me say a couple of things

2     about that.

3          First, one of the questions you asked was the question of

4     whether or not you have a case where there is a transformative

5     use, and yet the courts have said not fair use because of the

6     market effects.

7          And we are unaware of any case -- I don't think that the

8     plaintiffs have cited any -- where you have a highly

9     transformative use and that has been found to be the case.

10         **THE COURT:**  What if you took out the word "highly"?

11    What if you said "a transformative use," not "a highly

12    transformative use"?

13         **MR. SHANMUGAM:**  So there are a couple of cases, I

14    believe, from the Second Circuit.  There is the *Fox News* case.

15    There is also the *Warner Bros.* case.

16         But they're not really great cases because, in the

17    *Fox News* case, I think that there is a genuine question about

18    how transformative the use actually was.  And in the

19    *Warner Bros.* case, the court said that the use was

20    transformative and yet said that the first factor pointed in

21    the plaintiff's direction.

22         So neither one of them, I think, is a very good fit for

23    this situation.

24         **THE COURT:**  Well -- but -- but how transformative -- I

25    mean, that gets us to the question of -- of how to think of the

1    issue of transformative in this case.  How transformative is

2    the use when the works that are being produced are cheap

3    imitations of the original?

4         **MR. SHANMUGAM:**  Well, I think, in that circumstance --

5    and, again, I am not going to fight you on the facts other than

6    to, once again, point out that we don't really have a record on

7    any aspect of this.

8         **THE COURT:**  Right.

9         **MR. SHANMUGAM:**  So we are engaging in -- in

10   speculation as a factual matter, but I want to really directly

11   address the real concern, and I'll bring it back to broader

12   principles as well.

13        So I think, when it comes to the transformative nature of

14   the use, again, this is a context in which it is quite clear

15   that the inability to reproduce expression is a large part of

16   what makes this use transformative.

17        As the Court is aware, the primary case we rely on is

18   *Google Books*, and that is a context in which even those

19   snippets of the expression itself are reproduced.  The court

20   still said transformative use, in part, because of the broader

21   purpose for which those snippets were being used.

22        **THE COURT:**  Yeah.

23        And I -- and the *Google* case is very helpful as far as it

24   goes.  But, you know, in the *Google Books* case, there wasn't --

25   a product wasn't created that -- that had the -- as a result of

1    the copying that had the ability to produce a billion new works

2    in the same genre as the work that was copied.

3         MR. SHANMUGAM:  It's not an unhelpful case to us in

4    the sense that I think that the Second Circuit --

5         THE COURT:  It's not unhelpful, but I just don't --

6    and it's helpful because it's a really good description of

7    copyright law, but I -- I think that case underscores the point

8    I'm making, which is that it's all context-specific.

9         And in this case, unlike that case -- or in these types of

10   cases, unlike that case, you have -- you're creating a product

11   that has the ability to create a billion works that it -- or

12   likely has the ability to create a billion works that are

13   similar to the work that's being copied.

14        MR. SHANMUGAM:  So *Google Books* is a really helpful

15   case to us, just to be clear, and it's really helpful to us

16   because I think it's the closest analogue, at the appellate

17   level, to what's going on here.  But I think it's helpful to us

18   even --

19        THE COURT:  But why is it -- if it doesn't -- how

20   could it be such a close analogue if it doesn't have what I

21   just described?

22        MR. SHANMUGAM:  But it's helpful to us even with

23   regard to the Factor 4 issue, which we've been discussing,

24   because, of course, the Second Circuit recognized that some

25   individuals might be looking for the snippets that are

1  reproduced by *Google Books* and, therefore, that the authors

2  would lose sales of the books as a result.

3      And yet the court nevertheless concluded, in that

4  context, that there was fair use.

5          **THE COURT:**  And that makes sense to me.  I mean, if --

6  if you're -- you are -- what you're doing is you're putting up

7  the transformative use against the effect on the market --

8          **MR. SHANMUGAM:**  Correct.

9          **THE COURT:**  -- for the copied work; right?

10     And just because the market for the copied work is

11  affected to a degree doesn't automatically mean that the

12  defendant loses on fair use -- right? -- because it may be that

13  the work is so transformative and the effect on the market for

14  the copied work is so de minimus or minimal that, when you're

15  balancing, you know, the defendant comes out ahead.

16          **MR. SHANMUGAM:**  Well --

17          **THE COURT:**  But I think the problem is that the

18  effect -- the potential effect on the market for the copied

19  work in this case is so much more tectonic than in

20  *Google Books*.

21          **MR. SHANMUGAM:**  So I want to point you to what the

22  Supreme Court said in its most recent fair use case on this,

23  and it was quoting from the *Google Books* case when it said

24  this.

25      It said, quote, "The more the appropriator is using the

1    copied material for new transformative purposes, the more it

2    serves copyright's goal of enriching public knowledge, and the

3    less likely it is that the appropriation will serve as a

4    substitute for the original or its possible derivatives,

5    shrinking the protected" -- "the protected market opportunities

6    of the copyrighted work."

7         THE COURT:  Right.

8         And that, I think, gets to the question that I asked you,

9    and then I think -- before you had a chance to answer it, I

10   think I interrupted you, but -- and I apologize for that.

11        But, you know, how transform- -- if the -- if the use that

12   is affecting the market for the copied work is the production

13   of similar works, cheap imitations of those works, whatever you

14   want to call it -- right? -- how transformative is it really?

15        MR. SHANMUGAM:  So it won't surprise you to hear me

16   say that we do not think that that's a fair way to characterize

17   the purpose of AI tools.  AI tools have all sorts of purposes.

18        THE COURT:  Not the purpose of AI tools, but it's

19   the -- but if you're comparing the -- the use that the

20   copyright holder is complaining of -- right? -- copyright

21   holder -- again, you could imagine -- you know, you can

22   imagine it -- let me think of -- let me see if I can think of

23   another example.

24        You know, cookbooks.  I'm the author of a cookbook, and

25   I -- you know, you're feed- -- it's a copyrighted work, and

1  you're feeding my book into the model to train it, and you're

2  feeding other copyrighted cookbooks into the model to train it.

3        And as a result, what is happening is people are

4  producing -- people have now -- are producing billions of

5  cookbooks using artificial intelligence, and there's really

6  no -- no longer -- the market for my book has become so diluted

7  that it's not even worth writing another cookbook because I'm

8  not a famous chef.  I'm up-and-coming; right?  I'm not the

9  Taylor Swift of cookbooks.  I'm the next Taylor Swift -- or I

10 want to be the next Taylor Swift of cookbooks.

11       And, you know, so if it -- in a case like that, the

12 plaintiff comes in and complains that the conduct that's being

13 engaged in is the creation of a -- of a system that allows

14 for -- that causes the proliferation of cookbooks in a way that

15 obliterates the market for my cookbook, I think you can't

16 answer that by saying, "Well, AI does a lot of other things,

17 too."

18       You have to say -- I think the question is, you know,

19 "It's great that AI does a lot of other things, but is there a

20 way to prevent AI from proliferating a billion new cookbooks?"

21 And if there's not a way to prevent AI from proliferating a

22 billion new cookbooks, then you need to pay a license to the

23 author of the cookbook that you -- that you used to train your

24 model.

25            MR. SHANMUGAM:  Sure.

1    So let me -- there are a lot of parts to that.  So let

2    me --

3              THE COURT:  Pay royalty, I should say.  Sorry.

4              MR. SHANMUGAM:  Yeah.

5    So let me address each of those -- each part of that.  I'd

6    point to the fact that AI has much broader and very different

7    purposes, really primarily for purposes of underscoring how

8    highly transformative it is.  I think all of that is fair game

9    for purposes of Factor 1 because, under Factor 1, you are

10    looking at the purpose and character of the use.

11    So the fact that it has this broader purpose is highly

12    germane and relevant to that analysis.  I think what we have

13    really been focusing on is the question of what Factor 4 is

14    designed to address.

15    And I think one thing that is really important, whether

16    we're talking about cookbooks or whether we're talking about

17    the next Taylor Swift -- I think, in both of those

18    circumstances, the fact that a technology comes along and has

19    an effect on the ability of a new artist or a cookbook author

20    is not enough, in and of itself, to give rise to a problem such

21    that there is no fair use because, regardless of whether the

22    tool trains on the works of that new artist or whether it

23    trains on the works of the cookbook, whether it's a cookbook

24    author or whether it's the new Taylor Swift, in either of those

25    circumstances, you could still have exactly the same effect,

1    and it's an effect that the copyright laws do not protect

2    against.

3        And I think maybe the best example of this in the case law

4    is the *Sony Betamax* case.  Now, keep in mind that that was a

5    case where the court concluded that there was fair use, even

6    absent transformation, and that was a context in which a lot of

7    the same arguments about the effect of this on the marketplace

8    for film, for television shows were made.  And yet the

9    Supreme Court said that is not enough to defeat the conclusion

10   that there is fair use, and I think that the same is true here.

11       I think, when you look at both the Supreme Court's cases

12   and the cases in the Courts of Appeals, you have similar broad

13   arguments about the effect of rival products, the effects on

14   sales.  And the Supreme Court has focused on effects that are

15   relevant to the expression that is being protected and effects

16   that relate to non-tran- -- substitution in the market for

17   non-transformative products.

18       And so that is really the line that we're trying to

19   extract from these cases.  Now, what is the principle

20   underlying this line?  I think it is the principle that I cited

21   earlier, which is the principle underlying the whole copyright

22   system, the balance that the copyright system strikes between,

23   on the one hand, protecting authors' expression and, on the

24   other hand, ensuring innovation, promoting the progress, as I

25   discussed earlier, of science and the useful arts.

1    **THE COURT:**  But how is -- how is that -- how is that

2    balance struck properly if your -- if a company is allowed to

3    copy somebody's work without protection -- without permission,

4    and that is going to result in the creation of a product that

5    could obliterate the market for that person's work?

6    I just -- I mean, the balance between protecting

7    somebody's right to expression and the -- the need to promote

8    innovation -- I just don't see how that balance is struck

9    properly by allowing a company to download protected works

10   without permission, not pay for them, and use it to -- to

11   create a product that is capable, and probably likely, to

12   destroy the market for the copyrighted work.

13   **MR. SHANMUGAM:**  So, again, I -- you know, we have a

14   statute that sets out these factors.  And I think, as a

15   practical matter, the way that the statute currently strikes

16   that balance is by protecting transformative uses and

17   protecting transformative uses in the absence of a market

18   effect on the non-transformative aspects of the market, which

19   is to say the expressive aspects of the market.  And that is

20   the balance that Congress has currently struck.

21   And I think, in an area like this involving a new

22   technology, I would respectfully submit that a court should be

23   reticent about wading in in a way that would impede the

24   development of that new market, at least absent some direction

25   from Congress.

1          **THE COURT:**  What is the evidence that it would impede

2     the development of the new market to -- to rule that that --

3     the companies developing these products are required to pay --

4     or required to get a license to use copyrighted works?

5          **MR. SHANMUGAM:**  So leaving aside the effects of

6     damages awards and the other remedies that are being sought on

7     a class-wide basis by the plaintiffs in this case, I would

8     really point to the impracticality of developing a licensing

9     regime on which -- I would submit that the record before this

10    Court is clear.

11         The record before this Court reflects that a licensing

12    regime, especially in this context, in the context of trade

13    books, would be impractical and has not developed.  And as this

14    Court is aware, the plaintiffs have pointed to only one

15    example, the example of an agreement between another technology

16    company and another publisher, which is an agreement for online

17    access that proved, as the record illustrates, not to be

18    effective even as to the authors --

19         **THE COURT:**  You're telling me that these companies

20    couldn't figure out how to develop a market for copyrighted

21    works if it was important to use the copyrighted works to

22    develop their AI technology?

23         **MR. SHANMUGAM:**  I think that the fundamental problem

24    that gives rise to a market failure in this context is the fact

25    that any individual work has relatively low value for purposes

1   of training one of these tools, and the rights to these books

2   are held not by the publishing houses but by the individual

3   authors.

4       And so -- and, again, I think that we do run fairly

5   quickly into this circularity problem, which is that, unless

6   the plaintiffs can come forward with an actual record to this

7   effect, what we're really talking about is the mere possibility

8   that, in the face of a finding of no fair use, such a market

9   could theoretically develop, which the Supreme Court has told

10  us is not cognizable for purposes of Factor 4.

11      **THE COURT:**  Let me look at my list of questions to see

12  if there's -- there are any other questions I want to pose to

13  you regarding, you know, this AI copyright issue generally --

14      **MR. SHANMUGAM:**  Sure.

15      **THE COURT:**  -- before we turn to the record and --

16      **MR. SHANMUGAM:**  Sure.

17      **THE COURT:**  -- you know -- it seems like so long ago

18  that I wrote these questions.

19                      (Laughter.)

20      **MR. SHANMUGAM:**  It wasn't so long ago that we received

21  them, but --

22                      (Laughter.)

23      **THE COURT:**  No.  I mean, I wrote them the same day

24  that you received them.

25                      (Laughter.)

1          **THE COURT:**  Oh, yeah.

2      Okay.  There's at least one.  Hold on.

3      Okay.  I guess I'd -- I'd like to -- I'd like to talk a

4  little bit more about different types of works and -- and how

5  it might affect the way we think about cases like this,

6  including this case -- right? -- because the -- the plaintiffs

7  have -- I think there are, what, like, 12 or 14 plaintiffs or

8  something like that.

9      And -- and, you know, one or two of them have written

10  nonfiction.  I believe that one or two have writ- -- of them

11  have written memoirs.  I think there's a -- there's a poet;

12  right?  And there are -- and it's mostly -- other than that, I

13  think it's all fiction authors; right?

14      It seems like -- and, again, without regard to the record

15  in this case, it seems like, in these cases, the -- the effect

16  of AI models on the market for the copyrighted works will often

17  really depend on what type of work it is.

18      For example, there was a reason I chose the domestic

19  violence example -- right? -- because intuitively, at least, it

20  seems easier to imagine the market for nonfiction -- protected

21  nonfiction works being diminished more rapidly than the market

22  for fiction works; right?

23      And I used the example of newspaper articles; right?  It's

24  even easier, I think, to imagine the market for copyrighted

25  newspaper articles being diminished extremely rapidly by using

 1    copyrighted news articles to train an AI model.  I think it --

 2    with visual art, it's probably easy to imagine pretty quickly

 3    the market being diminished.  Fiction is a little bit harder.

 4        And so, again, maybe without -- I'm not trying to get into

 5    the record on this case yet, but I was wondering if you could

 6    comment on that.  I mean, do you -- do you agree there are

 7    going to be significant differences, even -- I know you don't

 8    accept the idea that I can even consider this as part of the

 9    fair use analysis; right?

10        But assuming I disagree with you about that, what -- is it

11    going -- is -- is it going to be a very different market

12    analysis, depending on what type of work it is?

13            MR. SHANMUGAM:  Well, I think this actually brings out

14    an issue that we have been talking about, which is that I think

15    it's no accident that the hypotheticals that we've been

16    focusing on are domestic violence, newspaper articles,

17    et cetera, because those are contexts in which the secondary

18    work that is produced is a work that draws on facts and ideas.

19        In the newspaper contexts, that's probably clearest.

20    Chances are that, when we're in the context of a newspaper

21    article, it's not that the AI tool is producing a work that

22    draws on the expression of a distinctive -- right? -- or like

23    Maggie Haberman.  It's probably drawing on what she's reporting

24    about what's going on in the administration, unprotected facts,

25    unprotected ideas.

1          And it's a lot harder, in the context of fiction -- of

2    fiction, to come up with an analogue to that.  But I think the

3    closest analogue is work produced in the style of Junot Díaz,

4    and that's like our Taylor Swift hypothetical from earlier.

5    And the problem with that, again, is that the style is not

6    protected; the expression is.

7          So in the context of visual art, if you have visual art

8    that is produced that is substantially similar in the form of

9    the expression, that can give rise to copyright infringement.

10   That would be protected if you created an alternative market

11   for work that was sufficiently similar.

12         So I think this all fits together in terms of the

13   application of the principle -- or at least the principle that

14   we are advancing.  I think it is a lot harder to know how it

15   would work in a world in which you are just measuring

16   diminution in sales, regardless of the extent to which the

17   alternative product contains an expressive component.

18         It seems like that's probably going to have to end up

19   being a factual question, one way or another.  And, again, we

20   don't have a record at all, in this context, to show that

21   that's taking place with regard to these particular plaintiffs.

22         **THE COURT:**  Okay.  So -- so now, at long last,

23   let's -- let's turn to the record in this case, and, you know,

24   you've heard what I view to be the most important issue for,

25   you know, deciding this type of case.  You may disagree with

1   me, but you've -- you've heard what I believe to be the most

2   important issue.

3       I don't think that anybody can win one of these cases

4   without winning pretty decisively on Factor 4; right?  I think

5   that's the only path to victory in a case like this for a

6   plaintiff.

7       And so what -- what is the -- what is the -- what do we

8   have in the summary judgment record about the issues that we've

9   been talking about in terms of the ability of the model to

10  flood the market with works that are similar to the works of

11  the -- similar to the copied works?

12          **MR. SHANMUGAM:**  Sure.

13      So this is really a question, in the end, for the

14  plaintiffs, but let me offer my characterization of what I

15  think we have in the record, which is not very much, with

16  regard to the type of market effect that you had posited at the

17  beginning.

18      So, you know, their expert on these issues is Spulber, and

19  I think that the most that can be said --

20          **THE COURT:**  And Spulber is an economist; right?

21          **MR. SHANMUGAM:**  Yes.

22          **THE COURT:**  Not -- not an expert on AI and what sort

23  of thing it's going to produce -- things it's going to produce

24  and all that; right?

25          **MR. SHANMUGAM:**  Correct.

1        And when you take a look at Spulber, I think that the most

2    that can be said about Spulber, you know, reading the testimony

3    charitably, is that he speculated about the possibility that

4    the outputs of AI tools could compete for attention in the way

5    that we have been discussing.  That's Paragraphs 192 to 203 of

6    Plaintiffs' Exhibit 126.

7        But then he goes on to say that he's not aware of any

8    particular instance in which this has occurred as to the

9    plaintiffs.  He says, "You are not aware" -- the question was,

10    "You're not aware of any instance when output generated by Meta

11    AI acted as a substitute for one of plaintiffs' books?"

12        "Answer:  No, I'm not."  And that's Mr. Ghajar's

13    Exhibit 25, at Pages 247 to 248.  So that's from the deposition

14    testimony.

15            THE COURT:  Right.

16            MR. SHANMUGAM:  That is all we have with regard to

17    that particular effect --

18            THE COURT:  Yeah, but -- but --

19            MR. SHANMUGAM:  -- and so --

20            THE COURT:  But I don't -- I think you agreed with me

21    earlier that it's -- that it's -- a plaintiff is not required

22    to present evidence that it's already happening; right?  They

23    could present evidence that it's about to happen, or it's

24    likely to happen; right?

25        If -- if this chain of events is set off or allowed to

1  continue -- and when I say "chain of events," I mean a chain of

2  events that includes downloading these works without permission

3  and without paying royalties -- this is what's going to happen

4  to the market.

5       I mean, if there were a -- if there were a reliable expert

6  opinion that presented something like that, that would

7  presumably be enough to go to trial on the fourth factor;

8  right?

9           MR. SHANMUGAM:  Well -- so, you know, again, I do want

10 to respectfully reiterate that, from our perspective, this is

11 not the relevant market, as a matter of law.  I would also

12 acknowledge, as I did earlier, that the fourth factor looks at

13 the effect upon the potential market.

14      I do think that it is, you know, incumbent on a plaintiff,

15 recognizing that we bear the ultimate burden -- but, of course,

16 we're trying to prove a negative, which is something the courts

17 have recognized is -- is particularly challenging with regard

18 to the fourth factor.

19      And I think, in this circumstance, it's incumbent on a

20 plaintiff, once the relevant market has been identified, to

21 come forward with at least some evidence to give rise to a

22 genuine issue of material fact as to whether such a market is

23 likely to arise.

24          THE COURT:  Well -- but let me -- could I -- could I

25 ask you about that --

**MR. SHANMUGAM:** Sure.

**THE COURT:** -- as it gets to the burden of proof --

**MR. SHANMUGAM:** Yes.

**THE COURT:** -- and the fact that fair use is a defense and all of that?

You -- what evidence have you put in that the market concerns that I'm expressing are not likely to materialize? Is it -- have you put in any evidence to that effect? Maybe your answer is, "Well, they didn't really argue what you're arguing now, and so we didn't need to put in any evidence."

**MR. SHANMUGAM:** Well, I do think that that is our answer in part because, again, when it comes to the relevant market effects, we, as the Court would be aware, put in evidence that expression cannot be reproduced by our model. And that's the so-called regurgitation issue.

I think it is undisputed that this model cannot, when prompted, reproduce meaningful portions of expression --

**THE COURT:** And as an aside, it does seem like Meta has done a good job perhaps, compared to a number of other companies, you know, with implementing mitigations to prevent its product from regurgitating.

**MR. SHANMUGAM:** Right.

And on that issue, I would point to the Ungar declaration, which explains in great detail how the Llama model operates. It makes clear that the Llama model, as it is constructed, can

1    reproduce, on average at most, one additional token, which is a

2    word or a portion of a word, and that that is, in large part,

3    as a result of the fact that Meta has taken great pains,

4    through deduplication, to prevent the model from excessively

5    training on a particular work such that it reproduces the

6    expression.

7        Now, the other aspect of this that was debated is this

8    question of licensing and the issues with the licensing market.

9    And on that, I would point to our expert, Dr. Michael

10   Sinkinson, who walked through, you know, all of the

11   difficulties in the creation of a market for this purpose.

12       And I've already pointed to the fact that individual books

13   have negligible value for purposes of training.  I've pointed

14   to the fact that, in the context of trade books, which is

15   somewhat different from the context of other media -- that the

16   right to license the book rests with the author.

17       So there's no one place you can go in the way that there

18   is in music, for instance, where you have clearinghouses like

19   ASCAP and BMI.  And I've also pointed to the fact that -- and

20   Sinkinson also pointed to the fact that these large language

21   models require, you know, large quantities of text.

22       And so one of the challenges here is that it would be

23   impractical -- and I don't think there's really any dispute

24   about this -- for a company like Meta to go to authors one by

25   one for purposes of this training.

1          In order to have an effective large language model -- and

2     Ungar talks about this at great length -- you need to have --

3          **THE COURT:**  And one -- one just quick sidebar -- is

4     buying the e-book is not enough -- right? -- because the use

5     would be beyond the license that you get when you buy the

6     e-book; right?

7          **MR. SHANMUGAM:**  Yes, that is correct.

8          And I think one thing that is really important to keep in

9     mind -- and this goes back to the hypotheticals involving

10    humans -- is that this is a context where you're talking about

11    a digital tool.  You have to have copying in order to train the

12    tool.  You have to have a digital copy.  That digital copy gets

13    replicated in the training process.

14         And so that's one thing that's a little bit different

15    from, say, the human context, where the copying itself is not

16    necessary.  That's relevant to Factor 3, and it's relevant to

17    the fair use analysis in other regards.  And, again, I think

18    that the record is undisputed in this regard, that the more

19    materials you have to train, the better.

20         And those materials, of course, include both copyrighted

21    and non-copyrighted materials.  It's not just in the trade

22    books context but beyond.  You know, one of the things that is

23    discussed in the briefs is how necessary is it for us to show

24    that we needed any particular work.

25         And I would submit that that is not the appropriate

1   analysis for purposes of fair use.  Instead, the question, as

2   was true in the thumbnail cases like *Kelly* and *Perfect 10*, is

3   would you have a better model if you had more materials,

4   including the copyrighted materials in question?

5           **THE COURT:**  Anything else you want to say about the

6   record?

7           **MR. SHANMUGAM:**  I don't think so.  I think that that

8   addresses the issues that you raised in your questions

9   concerning the state of the record.

10      I think I would just make the broader point that I think

11  that one of the things that is hazardous in this area is that

12  it is very tempting to speculate about what might happen to the

13  market, and this is obviously a moving target.  The way these

14  issues may look two or three years from now, when this gets to

15  the Supreme Court, may be very different from the way they look

16  now.

17      I would submit that that is really a reason to focus on

18  the record as it exists now in this case and to write an

19  opinion that --

20          **THE COURT:**  Yeah.

21      And I just want to be clear that, of course, the -- you

22  know, the focus for deciding this case is on the record that --

23  in this case.

24      But I do think that, in a case like this, which is, you

25  know, more important than the average case we get, even in the

1    Northern District of California, it is important to sort of

2    develop an overall understanding of the legal issues presented

3    before diving into the facts of the case.

4        So that's why I wanted to --

5            **MR. SHANMUGAM:**  Yeah.  No.  Understood.

6        And, look, I think we all recognize that there is no exact

7    context here in terms of the prior precedent.  Again, we think

8    the *Google Books* case is probably the closest case, but AI does

9    present distinctive issues that the prior cases do not squarely

10   address.

11       I think our fundamental submission here is that you have

12   to go back to the underlying purposes of copyright law, the

13   underlying purposes of the fair use doctrine.  We think that

14   they support our position here.

15       And to the extent that AI presents distinctive problems,

16   the Court should be cautious about imposing crushing copyright

17   liability that would really throttle this industry,

18   particularly in a context where it may very well be that

19   Congress needs to act to address these issues.  A lot of these

20   issues concerning an artist --

21           **THE COURT:**  Well, I mean, I think what you're saying

22   is a little bit question-begging; right?  Imposing crushing

23   copyright liability that would really throttle the -- I mean,

24   if the -- if it was illegal for the companies to download

25   copyrighted material and use it to train the products, then

1    they're going to be subject to liability.

2         And the -- I don't think -- I mean, you seem to be saying

3    that it would be bad for these companies or it would be bad for

4    AI if you -- if you impose liability for copyright

5    infringement, and that cannot be --

6              **MR. SHANMUGAM:**  Of course.  Of course, Judge Chhabria.

7              **THE COURT:**  I'm sure you didn't mean to be saying

8    that.

9              **MR. SHANMUGAM:**  No.  I think what I am saying,

10   however, is that this really goes to the issues that we were

11   discussing a minute ago about the impracticality of training

12   these tools through another means.

13        In other words, precisely because it was impossible to

14   license, the companies went this route of -- and not just Meta,

15   but other companies as well went the route of using these

16   online repositories, where they could get large quantities of

17   language in order to train these tools effectively.

18        And, of course, it's an issue not just in the

19   United States but really worldwide, where companies and other

20   company -- countries are engaging in precisely the same type of

21   development.  So my point is simply the more modest one, that

22   when it comes to a transformational technological tool like

23   generative AI, the Court should be cautious about imposing

24   liability.

25        And it really is a matter, I think, ultimately for

Congress in the first instance if it wants to extend protection
beyond the protection for expression that copyright law
currently provides.

When you get into these issues such as protection of style
and the like, as the Court will be aware, in some contexts,
there is a broader right of publicity as a matter of state law.
There are broader protections.  And it may very well be that,
as a matter of policy, we might, as a country, want to go
there.

**THE COURT:**  And it certainly would be very easy for
Congress to amend the Copyright Act to say, you know, if you --
if you are -- if you are training your product with copyrighted
material and that product is going to have the ability to
produce -- mass-produce similar material, you need to pay a
royalty for it, or you need to -- you need to get a license to
do it.

**MR. SHANMUGAM:**  Right.

And I think that any case like this, where there is no
suggestion that our tool is producing substantially similar
works -- you know, there's agreement on that.  Their expert
Lopes agreed to that.

And where there is no evidence of a diminution in the
market for plaintiffs' works as a result of the sort of output
that we were discussing at the beginning of this argument, I
think that the Court can write a cautious opinion that focuses

1    on the record in this case and that leaves open questions about

2    what might take place in the future if these tools produce

3    outputs other than the outputs that are currently before the

4    Court.

5         And this is an area in which the technology is rapidly

6    evolving.  And so, you know, I think that, from our

7    perspective, that is a reason to focus on the four corners of

8    the record here and not to indulge in significant speculation

9    about what these tools could produce.  And I think all of us

10   can't resist the -- the temptation to go to these tools and

11   prompt these tools to produce things.

12        This morning, I went in my office to one of these AI tools

13   and tried to produce the *New Yorker*-style article on domestic

14   violence and was unable to do so, but I think that just

15   illustrates --

16        **THE COURT:**  For the record, I have not tried to

17   produce anything on any of these AI tools --

18        **MR. SHANMUGAM:**  Well --

19                        (Laughter.)

20        **THE COURT:**  -- but maybe I'll -- maybe I will.  I

21   don't know, but I haven't -- I haven't yet.

22        **MR. SHANMUGAM:**  Well, you can always ask the AI tools

23   to produce a song about Judge Chhabria in the style of

24   Taylor Swift, if you so choose.

25        **THE COURT:**  Right.

1     I'm now going to do that.

2                    (Laughter.)

3          MR. SHANMUGAM:  I think that -- I think that's all we

4     have in terms of our affirmative arguments unless you have any

5     other questions.

6          THE COURT:  And your -- your -- your concluding

7     remarks did trigger one more question in me, and then we'll

8     maybe take a little break since the court reporter has been

9     going for a while.

10         But you -- you wrote this down.  You said, "There's no

11    evidence we're producing substantially similar works,"

12    and you -- and I want to -- I want to ask you a question about

13    the phrase "substantially similar" for a moment.

14         My understanding of the phrase -- the importance of the

15    phrase "substantially similar" is when you are deciding whether

16    somebody committed copyright infringement -- right? -- like

17    we -- usually, there's going to be no -- so outside the fair

18    use context -- right? -- we say -- I mean, I had a -- I had a

19    case involving Disney --

20         MR. SHANMUGAM:  Yeah.

21         THE COURT:  -- and the *Frozen* movie -- right? --

22    and -- and there was this animated short that someone created

23    involving a snowman and a deer struggling for a carrot on a

24    frozen pond, and then there -- you know, there -- Disney

25    produced a trailer for *Frozen*, which had Olaf and the moose.

1      Does anybody remember the moose's name?  No?

2           **AUDIENCE MEMBER:**  Sven.

3           **THE COURT:**  Sven.

4      Olaf and Sven, you know, struggling for a carrot on a

5  frozen pond.  And there was no direct evidence that anybody at

6  Disney copied her thing; right?  But the inquiry is, is it --

7  is it substantially similar such that you can create -- that

8  you can -- you can draw an inference of copying?  Right?

9      You used the phrase "substantially similar" in the context

10  of Factor 4; right?  "There's no evidence that we're producing

11  substantially similar works."  And my question to you is:  Does

12  it have to be substantially similar to affect the market for

13  the works?  Right?  Is it -- I don't know if you were using it

14  in the colloquial sense --

15           **MR. SHANMUGAM:**  Yeah.

16           **THE COURT:**  -- or in the legal sense.

17           **MR. SHANMUGAM:**  I think I was, but I think -- here's

18  what I would say more generally about the state of the record,

19  and then we can talk about how this maps onto the law.

20      So there's no claim in this case based on the outputs, and

21  so the questioning of the expert really focused on the issue of

22  actual reproduction of meaningful portions of plaintiffs'

23  books, and that's the Lopes testimony that I referred to.  I

24  believe it's Exhibits 23, 24, and 56 of Mr. Ghajar's

25  declaration, where Lopes says, in answer to the question,

1    "You're not offering any opinion that Llama is able to

2    reproduce any significant percentage of these books; correct?"

3        "Answer:  Correct."

4        Now, I don't think that there was any claim in the case

5    that Llama could produce works that were substantially similar

6    in this sort of infringement way, either.

7            **THE COURT:**  In the -- right.

8            **MR. SHANMUGAM:**  Yeah.

9            **THE COURT:**  And -- nor, I think -- I mean, I think the

10   problem for the plaintiffs may also be that, you know, there

11   was no evidence that Llama can produce works that are

12   substantially similar in the infringement sense, in the legal

13   technical infringement sense, but also maybe no evidence, or

14   not enough evidence, that Llama will ultimately be able to, if

15   it can't already, produce works that are similar enough, in the

16   colloquial sense, to obliterate the market for the -- the

17   copyrighted works.

18           **MR. SHANMUGAM:**  Yeah.

19       And I guess what I would say is that, in terms of the way

20   that you've just formulated a potential Factor 4 test, I think

21   the right way to think about the Factor 4 test is that it turns

22   not so much on that question of similarity of expression, as it

23   does on the transformative nature of the use, because that's

24   what defines what is a relevant market substitute.

25       So, in other words --

1          **THE COURT:**  Then what's the point of having Factor 4?

2    I mean, are you saying Factor 4 is only relevant when the use

3    is not transformative?

4          **MR. SHANMUGAM:**  Well, I'm saying that when you've got

5    a transformative use, you know -- and I would circle back to

6    the language that I quoted earlier from *HathiTrust*:  "Any

7    economic harm caused by transformative uses does not count

8    because such uses do not serve as substitutes for the original

9    work."

10        And so, again, when you're talking about what constitutes

11   a substitute, the mere fact that something could be a rival

12   product, for instance, is not enough.  And that's where I would

13   circle back to cases like *Connectix*, *Accolade*, and the like.

14        And, again, you know, I think, in some sense, I would

15   point to *Google Books* in this regard because you could

16   describe -- if you took an expansive view of Factor 4, you

17   could say that *Google Books* was a substitute because some

18   people who go to Google Books would end up not buying the

19   underlying books because they would find what they need, and

20   that is not enough.

21        And so, yes, there is a sense in which Factor 4 is the

22   flip side of Factor 1.  The Supreme Court itself has recognized

23   that, and I would submit that the reason why that is true is to

24   avoid going all the way to the circularity problem, that if you

25   said that there is a market or a potential market for the

1    product that is the transformative use, you would always

2    satisfy Factor 4.  And I think that that's how courts have

3    squared the circle in that regard.

4        And, again, the best evidence of that, Your Honor, is the

5    absence of any cases that find no fair use in the face of a

6    determination, at least a clear determination, of transform- --

7            **THE COURT:**  Well, I think the main answer to that is

8    probably that, you know, there's never been a case like this.

9        But, anyway, why don't we -- why don't we take a break.

10   We've been going for a while now.  Why don't we resume at

11   11:20, and I'll -- I'll turn to the plaintiffs --

12           **MR. SHANMUGAM:**  Great.

13           **THE COURT:**  -- unless I think of any other questions

14   that I forgot to ask you.

15           **MR. SHANMUGAM:**  Great.

16       Thank you.

17           **THE CLERK:**  Court is in recess.

18                   (Recess taken at 11:14 a.m.)

19               (Proceedings resumed at 11:23 a.m.)

20           **THE CLERK:**  Please remain seated.  Please come to

21   order.

22           **THE COURT:**  Okay.  Mr. Boies?

23           **MR. BOIES:**  Thank you, Your Honor.

24           **THE COURT:**  Can you -- you know, you heard the

25   concerns I have about this issue generally and, you know, the

1    concerns that I have about the record in this case.

2        So could -- could you start off by addressing that?

3            MR. BOIES:  Sure.

4        Let me begin by addressing the record.  First, there's no

5    doubt that Meta, not the plaintiffs but Meta, bears the burden

6    of proof with respect to fair use.  So if it is the case -- if

7    there is nothing in the record about some of these subjects,

8    that dooms the fair use argument.

9            THE COURT:  Well, I mean, I guess part of it might

10   depend on what is part of the case -- right? -- whether you've

11   made it part of the case.  If you haven't made it part of the

12   case, if -- you know, in the complaint and in your --

13           MR. BOIES:  Sure.

14           THE COURT:  -- you know, contention interrogatory

15   responses and all of that kind of stuff, if you have not

16   alleged as the basis for, you know, winning on Factor 4, the

17   kind of stuff that I'm talking about now, then I don't know if

18   they have any obligation to put forth any evidence on that

19   issue.

20           MR. BOIES:  I would agree with the Court that --

21           THE COURT:  Okay.

22           MR. BOIES:  -- if we've not raised the issue, they

23   don't have to --

24           THE COURT:  Okay.

25           MR. BOIES:  -- deal with the issue, but I think we've

```
 1   clearly raised the issue.  Indeed, Counsel, in his argument,

 2   says --

 3          THE COURT:  All right.  So where -- where have you

 4   raised the issue?  Is it -- is it in the complaint anywhere?

 5   Is it --

 6          MR. BOIES:  It is in the complaint.

 7          THE COURT:  Do you want to show me where -- where it

 8   is in the complaint?

 9          MR. BOIES:  If I -- if my memory is right, it would be

10   98 -- Paragraphs 98, 99 --

11          THE COURT:  Okay.  Let me go --

12          MR. BOIES:  -- something like that, but let me -- let

13   me just check --

14          THE COURT:  Let me go there, too.

15          MR. BOIES:  -- see whether -- is that the complaint?

16          THE COURT:  No.  It's not those paragraphs.

17          MR. BOIES:  The -- well, in 98, it talks about the

18   downloading of the --

19          THE COURT:  Yeah.

20       That's not what I'm talking about, though.  I'm talking

21   about the outputs having an effect on the market for the

22   plaintiffs' works.

23          MR. BOIES:  Well, that -- that is certainly in our

24   expert report, and let me just take -- be sure it's Exhibit 76.

25          THE COURT:  It is, but Exhibit 76 is an -- is an
```

exhibit of an economist; right?  So it's a report of an

economist, and the economist explains how, if the -- if the

relevant market -- if the genre is flooded with, you know,

cheap imitations --

          **MR. BOIES:**  Right.

          **THE COURT:**  -- produced by AI models --

          **MR. BOIES:**  Right.

          **THE COURT:**  -- that will have the following economic

effect on the plaintiffs' works; right?  And I -- that is --

that all makes sense to me.

     But the part that I think the economist doesn't cover is

what's the likelihood that this is going to happen as a result

of copyrighted works being used to train the models, how soon

is it going to happen, what's going to be the magnitude of it,

all of that kind of stuff.

     In -- in other words, an AI expert who can explain how,

you know, the -- these models are on a -- you know, barreling

irrevocably down a path that will result in the production of

countless cheap imitations of copyrighted works that will

diminish the market for the copyrighted works.

          **MR. BOIES:**  I think I would -- would say two things.

     First, whether or not the economist makes a good case or

not, I think that clearly indicates that we have put the issue

in the case.

     Second, I would say I think the economist does go a little

 1  further than that.  For example, to the extent that there is

 2  some evidence of the sharp decline in the use of people who are

 3  writing articles on a freelance basis, he -- he shows that

 4  correlating very sharply with open A- -- open AI.

 5       So if you look at the whole set from, like, the high 90 --

 6  190s to 230, I think there is -- I think there's more in --

 7            THE COURT:  You're saying the -- the paragraphs of

 8  Exhibit 180 -- of Exhibit 76?

 9            MR. BOIES:  Yes.

10            THE COURT:  Yeah.

11            MR. BOIES:  And so I think we've clearly put that at

12  issue.  They responded to that in -- in their argument.  So I

13  think that's -- I think that is -- is at issue.  I also think

14  the record --

15            THE COURT:  Is there -- is there anything else in the

16  record that you would be able to point to to show that you put

17  that in issue for -- with respect to Factor 4?  Because in your

18  papers --

19            MR. BOIES:  Right.

20            THE COURT:  Right.

21       -- you talk -- all you -- all you focus on is the market

22  for providing licenses for the downloading of this -- of these

23  works.  And I -- if I remember your papers correctly, you --

24  you know, they said something about how the plaintiffs haven't

25  put any evidence in of, you know, substantially similar works

1  being produced by Llama.

2      And your response was, "Well, that's beside the point

3  because we're talking about this market for" -- "for licenses."

4          **MR. BOIES:**  Well, I think --

5          **THE COURT:**  And so, putting aside for a moment the

6  market about -- market for licenses, I'm just wondering if you

7  could -- it seemed like, in your papers, just from reading your

8  briefs, that you were like this stuff that I was talking to

9  Mr. Shanmugam about for the last hour and ten minutes doesn't

10  actually matter; right?

11      And so I'm -- I'm -- I'm wondering if there's anything

12  else that you could point to in the record, whether it's the

13  complaint or interrogatory responses or anything else, that

14  indicates that you thought that it did matter and that you were

15  putting it in issue in this case.

16          **MR. BOIES:**  I would -- I would say, among other

17  things, our whole discussion of the style is related to this

18  issue.

19          **THE COURT:**  The whole discussion of the style?

20          **MR. BOIES:**  In other words, we have, in our papers --

21  and they respond to it by saying style is not a protected

22  element.

23      That's not our point.  Our point is not that style is a

24  protected element.  It is that the fact that it can replicate

25  the style means that it is competing with our works so that the

1  style point goes not to whether we are claiming that copying

2  style is a copyright violation.

3      What we are alleging is that the copying of the style

4  shows that this work is competitive with the work that we --

5  that we have.

6          THE COURT:  And where is that?  Can you show me where

7  that is?  I apologize.  It's just -- you know, there have

8  been -- I've -- there has been so much to read --

9          MR. BOIES:  Right.

10         THE COURT:  -- in this -- in this case.  I --

11         MR. BOIES:  I will -- I will find that part of the

12  exhibit.

13     And -- and, for example, Mr. Farnsworth, who's here,

14  testified at his deposition that he had gone to the Meta AI and

15  asked it to write something in his style, and it did write

16  something in his style.  I believe that Ms. Silverman also did

17  the same thing.

18     Again, the reason that this is relevant is it shows that

19  the model is copying our creativity, and --

20         THE COURT:  Right.

21         MR. BOIES:  -- they're using that --

22         THE COURT:  Right, but in terms of what -- how that is

23  ultimately going to affect the market -- I mean, I'll --

24  I'll --

25         MR. BOIES:  Sure.

1        **THE COURT:**  I -- I'm -- I have no doubt that you

2   could -- you know, that I could go on there and ask, you know,

3   the AI to write an opinion in the style of Judge Kozinski or

4   whatever; right?  But -- well, I shouldn't say I have no doubt,

5   but I assume that I could do that.

6        But the -- the question I'm asking is a different one,

7   which is, you know, have you put in issue the effect of -- you

8   know, have you put in issue the question of how likely is it

9   that these models will start producing, you know, similar

10  competing works, and what effect will that have on the

11  protected works?  That's really the question.

12       And then I'll add one more question before I forget, which

13  is related, which is wouldn't you also need to make some sort

14  of presentation on the difference between the effect on the

15  market without using copyrighted works to train the model

16  versus the effect on the market with using copyrighted works to

17  train the model?

18       Because, you know, there -- there's -- AI is happening.

19  Nobody's stopping AI.  Whether they can use copyrighted works

20  or not, AI is happening.  And AI is going to be able to produce

21  works in the genre of, you know, the plaintiffs' works.

22       And so it seems to me the real question is how much of a

23  difference is it going to make in terms of the effect on the

24  market if they're able to do AI with -- if they're able to

25  include in their models copyrighted works that are downloaded

1  without permission?

2        MR. BOIES:  I think that the record may not be as

3  robust as either of us would like, but I think there is a lot

4  in the record about the importance to Meta of having

5  long-length books --

6        THE COURT:  Definitely --

7        MR. BOIES:  -- and --

8        THE COURT:  -- but I'm not sure -- I'm not sure that

9  that speaks to the question that I'm asking, which is what's in

10  there about the effect on the market --

11        MR. BOIES:  Well, in terms of --

12        THE COURT:  -- for -- for plaintiffs' works?

13        MR. BOIES:  In terms of running the model, with and

14  without, we don't have the capacity to do that.

15     Okay.  And --

16        THE COURT:  But what you're -- what you're saying -- I

17  think I understand what you're saying now.  You're saying that,

18  based on the evidence that is in the record, we can assume that

19  the model is going to do -- or it's reasonable to infer that

20  the model will do a significantly better job at producing works

21  in a particular genre by virtue of having been trained on

22  copyrighted works.

23        MR. BOIES:  Yes.

24        THE COURT:  I get that.  Okay.

25        MR. BOIES:  Yes.

1        And, for example, the way we approached -- I mean, for
2   example, in Paragraph 9 of -- of the complaint --
3            THE COURT:  Okay.
4            MR. BOIES:  -- we talk about them using the
5   copyrighted books to enable their AI model to mimic the
6   copyrighted works.  And in our expert report, what we say is
7   that if they mimic these -- they will be able to substitute for
8   them.  That will affect the market.
9        Now, how much it will affect the market, I don't think we
10  have the capacity.  That is within Meta's capacity to do.  We
11  don't have the capacity to take their models and run them.
12  The -- and that is one of the reasons why I think the burden is
13  properly on the alleged infringer.
14           THE COURT:  Yeah.
15       I mean, that's why I'm -- it's a good point, and it's --
16  it's -- I guess that's why I'm asking whether you've -- you've
17  put this in issue, you know, in the case.
18       And maybe -- maybe the answer is it doesn't matter, and
19  it's still their burden, but it would seem weird -- I mean, if
20  you -- you know, like, let's just say hypothetically they --
21  they submitted an interrogatory -- a contention interrogatory
22  to you, and they said, "State all" -- you know, "Just state all
23  facts to support your contention that you win on Factor 4."
24       And you include all this stuff about the licenses, the
25  market for license- -- licensing, but you didn't include

1  anything that Mr. Shanmugam and I were discussing this morning.

2       MR. BOIES:  Uh-huh.

3       THE COURT:  It -- under those circumstances, it seems

4  like it would -- it doesn't seem right to say that summary

5  judgment should be denied to them because they didn't put in

6  any -- they didn't put in evidence to -- to prove a negative.

7       MR. BOIES:  Well, first, I think we -- we did put it

8  at issue.  And I think once we put it at issue, they do have

9  the burden of proof, but --

10      THE COURT:  But that's why I'm asking.  Like, how did

11  you put it -- can you show me how you put it in issue?

12      MR. BOIES:  Well, I think when we say that they mimic

13  it, when we say that they copy our style, when they say -- when

14  we say, in our -- our economist declaration, that this is going

15  to adversely affect the market for our work -- I think the

16  title of that is -- I think -- I think the title of these

17  sections is --

18      THE COURT:  You're saying the section of Exhibit 76?

19      MR. BOIES:  Court -- Exhibit 76.

20    The paragraphs start, I think, at 192 and go to 230.  And

21  I think the title of that is something that -- what Meta is

22  doing will, quote, "allow creation of works that compete with

23  plaintiffs' works," which I think is exactly the point that the

24  Court is making.

25      THE COURT:  Right, but that's an economist.

1    I mean, it -- I guess it -- the two things about that

2    statement are, one, it will allow it -- I -- I agree.  You

3    know, it seems likely that it will allow it, but I don't know

4    for sure because I don't know what sort of mitigations have

5    been put in place to -- you know, to protect against that

6    beyond actually creating, you know, actual regurgitation.

7        But even assuming that the use of copyrighted material to

8    train the -- the model will allow the model to create works

9    that compete with the plaintiffs' works, there's a question of,

10   like, to what magnitude, to what extent.  I've been assuming,

11   you know, based on, you know, my own sort of activities as a

12   citizen --

13            MR. BOIES:  Hmm.

14            THE COURT:  -- you know, reading the newspaper and

15   stuff like that -- I've been assuming that it will -- you know,

16   that these models will be capable of producing competing works

17   en masse to the point that it -- that it will obliterate the

18   market for certain copyrighted works, maybe not all -- not all

19   copyrighted works, probably not Sarah Silverman's work -- we'll

20   get to that in a minute -- but -- but a lot of copyrighted

21   works.

22       But -- but I -- I think, to rule in your favor, like, I

23   need -- I need you to show that you've made that an issue in

24   the case --

25            MR. BOIES:  Well --

1          **THE COURT:**  -- and that you've made some sort of

2    presentation on it, I think.  I mean, I am struggling with the

3    burden issue; right?  But -- but I just -- if you -- anyway, I

4    think I've -- I think --

5          **MR. BOIES:**  I think I understand --

6          **THE COURT:**  Yeah.

7          **MR. BOIES:**  -- what -- what the Court is saying, and

8    what I would say to -- what I would say to the Court is -- is

9    three things.

10        First, I think that we have put it in issue, and it may be

11   that, at trial, we ought to have more evidence than we've put

12   in at summary judgment.  But at summary judgment, we've put it

13   at issue, and that has clearly put the burden on them.  We --

14   we talk explicitly in the expert report about them creating --

15   Meta creating works that compete with our works.

16        We have said in the complaint, and we've said in the

17   testimony in the record -- Mr. Farnsworth, Ms. Silverman, and

18   others -- that they mimic the work -- their work, that they

19   produce work in their style.  I don't think you need more

20   testimony than that to say that's going to be competitive with

21   the work that our authors have produced originally.

22        So I think that the -- the record is pretty clear that we

23   have put it at issue, we've put in evidence about it, and they

24   have not.

25        And the second -- the second thing I would say is that,

```
 1    even if we had not put in evidence here, once we've raised it,
 2    they -- they cannot say, "We didn't know that" -- "we didn't
 3    know it was in issue."  And, indeed, I think if you look at
 4    their -- their papers, they know that that is an issue.
 5         The third thing that I would say is that, even if we had
 6    not put it in issue, they have the burden of proving fair use,
 7    and I think that one of the aspects of fair use is to deal with
 8    Factor 4; that is, I think they have an obligation, even if we
 9    had not put it in issue, because they have the burden on fair
10    use.  They have the burden of going through Factor 4 --
11    Factors 1 through 4, indeed, and making the case on that,
12    which -- which they have not done.
13         And I think that the -- the stuff that was cited in
14    Counsel's argument about what they have in some of their expert
15    reports are, as we've put in our briefs, disputed.  We have
16    disputes even -- even with respect to regurgitation and
17    memorization.  Those -- those are disputed factual issues.
18         THE COURT:  I mean, they're disputed in the sense that
19    you dispute them, but I don't know if you've put in any
20    evidence of regurgitation.
21         MR. BOIES:  I think -- I think we did, Your Honor.  I
22    think -- and I think they mentioned some of it, the Lopes
23    expert report and testimony.
24         And -- and, indeed, in the cross-examination of Ungar, he
25    talked about the extent to which you could reproduce
```

1   significant port- -- portions, not the whole thing.  And -- and

2   our -- our expert went through and showed how you could give

3   the model a partial quotation from our authors' work, and the

4   model would complete it.

5           **THE COURT:**  Could I -- could I ask you a question

6   about that?

7       So the -- you know, the ability to regurgitate a snippet

8   of a work, it seems to me, could be significant and could

9   really make the difference on the fair use question; right?

10      And I keep going back to my newspaper example -- right? --

11  is that if -- if a -- you know, if a -- if a -- if there's a

12  regurgitation of 25 percent of a news article, the heart of the

13  news article or whatever, then the fact that the other

14  75 percent is not regurgitated, it seems to me, does not matter

15  and does not help the defendant; right?

16      But if you're talking about a novel, I guess I don't

17  understand why, like, regurgitation of a snippet of a novel

18  would matter or the ability of the -- the model to complete a,

19  you know, sentence if you put part of the sentence from the

20  novel.

21      I mean, that might be because the model is trained --

22  really well-trained in language, or it might be because the

23  model has the ability to regurgitate the remainder of the

24  sentence.  But either way, I'm just not sure why that is

25  terribly important from a -- a copyright standpoint.

1          **MR. BOIES:**  Well, I think it depends a little bit on

2     the factor.  I think if all it can do is regurgitate a snippet,

3     that snippet is not going to compete with the sale of the

4     author's book.  I would agree with that.

5          On the other hand, the fact that it can regurgitate that

6     snippet indicates that what they have done in that model is

7     they have copied into the model the creativity and expression

8     of the author and --

9          **THE COURT:**  I think I agree with you on that,

10    but it -- but I'm not sure how it affects Factor 4, but --

11    which I think is the most important, but I think I agree with

12    you on that.

13         I mean, if -- how is it that the copying process or the

14    training process doesn't incorporate expressive aspects of the

15    work if it gives the product the ability to engage in similar

16    expression or mimic the expression that is engaged -- you know,

17    mimicked the style or whatever?  I think -- I think I agree

18    with you about that.

19         Let me -- could I ask you one other question, going back

20    to the issue of the record and whether you raised the issue of

21    the -- you know, the effect on the market in the way that I've

22    been discussing this morning?  You made a comment to the effect

23    of, "Well, you know, maybe the presentation has not been as

24    robust as it should be, and maybe we'll need to put in more

25    evidence at trial."

```
 1          I mean, didn't we have a discovery cutoff as to liability
 2   with respect to the named plaintiffs in this case?  And if we
 3   did --
 4          MR. BOIES:  Yes.
 5          THE COURT:  -- doesn't that mean that there -- you
 6   know, there's evidence that you -- if you haven't produced the
 7   evidence already, you can't -- you can't use it at trial?
 8          MR. BOIES:  Well, I don't -- I wouldn't think so; that
 9   is, I wouldn't think the summary judgment record is the only
10   record that we have at trial.  At trial, people will come and,
11   I think, testify.  And -- and, for example, they can testify
12   about what they said at their depositions.
13          I think Mr. Farnsworth can come and testify, as he
14   testified at his deposition, about how he asked the model.
15          THE COURT:  Right, even if it's not in the summary
16   judgment record.  I get that, but I'm just asking about
17   adducing additional evidence that you have not adduced and not
18   disclosed --
19          MR. BOIES:  Well, I --
20          THE COURT:  -- to the other side and stuff.
21          MR. BOIES:  I don't think -- I mean, I don't think, in
22   most trials, the -- the evidence is limited to what the
23   evidence was at summary judgment.  I mean, for the decision
24   that the Court needs to make, you need to make it on the
25   summary judgment record here.
```

1      **THE COURT:**  No.  I -- yeah.  No.  I'm asking a

2  different question.

3      I mean, usually -- maybe this is a problem with doing it

4  the way we -- you know, structuring this case the way we

5  structured it.  But usually, you -- you know, you have a -- you

6  have a discovery cutoff on February 1st, and then you have an

7  expert discovery cutoff on April 1st, and then you have trial

8  on June 1st.

9      And the only material that can be used at trial was the

10  evidence that was adduced before the discovery cutoff --

11  right? -- lists like rebuttal evidence and whatever --

12      **MR. BOIES:**  I don't --

13      **THE COURT:**  -- right?

14      **MR. BOIES:**  I don't --

15      **THE COURT:**  You're the -- you're the -- you're the

16  expert trial lawyer.  So tell me what I'm missing.

17      **MR. BOIES:**  I think that trials often have more

18  evidence than you have at a summary judgment -- judgment

19  record.

20      **THE COURT:**  Yeah, but you've got to disclose the

21  witness.  If it's from an expert, you've got to prepare an

22  expert report.  You've got to make them available for

23  deposition.

24      You've got to -- you know, you've got to identify all

25  documents that you're use- -- you know, assuming that you

```
 1    received a discovery request to this effect, you've got to

 2    identify all documents that you used --

 3              MR. BOIES:  Sure.

 4              THE COURT:  -- to support various contentions.

 5              MR. BOIES:  And we can do that, but --

 6              THE COURT:  So what do you have?  What have you -- and

 7    you have to do that before the discovery cutoff; right?

 8              MR. BOIES:  No.  No, not usually.  I mean, usually --

 9    usually, you don't do your exhibits or your witnesses before

10    the discovery cutoff.  I mean, you may -- if you name a new

11    witness that has not been -- take his deposition, sometimes

12    people get a chance --

13              THE COURT:  Or has not been disclosed.

14              MR. BOIES:  Or -- or -- well -- but you don't even

15    disclose.  What you do -- under Rule 26, you will disclose

16    people with knowledge, but you will continue to update that --

17              THE COURT:  Right --

18              MR. BOIES:  -- throughout the --

19              THE COURT:  -- but if you haven't disclosed that

20    person as somebody with knowledge, and then you, you know --

21              MR. BOIES:  Right.

22              THE COURT:  -- in the pretrial conference, you list

23    them as a witness, that witness will probably be excluded --

24    right? -- unless you have --

25              MR. BOIES:  Unless you have a reason for why you
```

 1  didn't list them before.

 2          THE COURT:  Yeah.  Right.  That's what I'm saying.

 3      So I guess what I'm saying is, like, putting aside whether

 4  you put this in issue, what evidence do you have now?  Like,

 5  what evidence have you adduced up to this point that -- that

 6  the -- the markets for the plaintiffs' protected works will be

 7  dramatically impacted by the proliferation of, you know,

 8  competing works produced by Llama?

 9          MR. BOIES:  Well, I think that it would be, in part,

10  our expert testimony that says, "Yes, Llama can produce works

11  that compete with the works of our authors in the style of our

12  authors, that that will adversely affect their work."  That is

13  a matter of economic theory that I think --

14          THE COURT:  Well -- but let me -- so -- so let me ask

15  you about that.  I mean, let's take Sarah Silverman, for

16  example --

17          MR. BOIES:  Right.

18          THE COURT:  -- right?

19      Her -- if I recall, her book was -- it's a memoir, and

20  it's a series of, like, ten essays or something like that;

21  right?  And it's funny, and it's about her, and she's a pub- --

22  you know, a famous person.

23      Like, how is the proliferation of material from Llama

24  going to affect the market for her memoir?

25          MR. BOIES:  Well, if --

```
1          THE COURT:  What evidence is -- and is there any
2    evidence that the prolif- -- proliferation of material from
3    Llama will affect the market for her -- for her memoir?
4          MR. BOIES:  Well, I think that, to the extent that it
5    is able to mimic her work, it will affect the market for her
6    work in different ways.  One way that it will affect it is that
7    some people will read her book to learn about her.  Some people
8    will read that book for the jokes, for the --
9          THE COURT:  Because Sarah Silverman -- because they
10   know that Sarah Silverman is funny.
11         MR. BOIES:  Because they know that Sarah Silverman is
12   funny and because it is funny, and if you have a -- and her
13   particular style, for some people, is very funny.
14      And so if you have a mimicked book in the style and jokes
15   of Sarah Silverman, that, for some people, is going to diminish
16   their interest in buying her book, and particularly --
17         THE COURT:  And where is the evidence -- where is the
18   evidence of that?
19         MR. BOIES:  Well, I would suggest that if it is
20   limited --
21         THE COURT:  That seems like a -- you know, again,
22   talking about the different types of works that could be
23   copied.
24         MR. BOIES:  Yes.
25         THE COURT:  I mean, it seems like her work is
```

1  probably, like, the least likely -- the market for her work is

2  about the least likely to be affected of anybody's work, like

3  her and, you know -- and somebody who's famous and is writing

4  about themselves and, you know, is telling a story about their

5  life.

6      I mean, I, you know -- so where -- what evidence have you

7  adduced thus far in the case, whether it's in the summary

8  judgment record or not?

9      I mean, it seems like you're asking me to speculate that

10  the market for Sarah Silverman's memoir will -- will be

11  affected by the -- you know, the billions of things that Llama

12  will ultimately be capable of producing, and it's just not

13  obvious to me that that's the case.

14      **MR. BOIES:**  Right.

15      I think that if you have a copy, a mimic, something that

16  is able to reproduce in the style of the original, I think, as

17  a matter of economics, that is going to compete with the

18  original.  I think an economist -- our economist has said that.

19  I think an econ- -- I think an economist is entitled to say

20  that.

21      I think we have in the record --

22      **THE COURT:**  What about Barack Obama's autobiography?

23      **MR. BOIES:**  I think there are a lot of people who read

24  Barack Obama's biography just because they want to hear it from

25  Barack Obama.

1      And I think that in a situation like that, really unique,

2   you know -- maybe not unique, but a very unusual person in our

3   history -- I think that those -- those kind of people will want

4   to substitute -- they will want to hear what he says.

5      Now, I think the closer they mimic, I think, and

6   particularly if it's -- if it's very cheap or free, compared to

7   paying $26 or $46 for the book, that may affect some of the

8   market.

9         THE COURT:  So you think -- you think Barack Obama's

10  book sales will be -- we can just assume, as a matter of

11  economics, that Barack Obama's book sales will be affected by

12  AI?

13        MR. BOIES:  I think virtually every -- virtually every

14  economist would say that, although the degree, I think, will

15  vary, and I think the degree will vary significantly.

16        THE COURT:  Well, doesn't that matter for purposes of

17  the fair use inquiry?  Because, you know, you are -- you're

18  balancing -- I mean, the -- the *Google Books* case is an

19  example; right?

20      The -- the Pierre Leval case, the Second Circuit case --

21        MR. BOIES:  Right.

22        THE COURT:  I can't remember the name of it, but it --

23  you know, yes, the market for the plaintiffs' work was

24  diminished to a degree, but the transformative use was

25  substantial.

```
 1        And so there was -- there was fair use in that case.   I
 2   mean, if Barack Obama filed a lawsuit -- right? -- the fair use
 3   outcome, it seems to me, could be different -- right? -- from
 4   the outcome of a lawsuit filed by, you know, a magazine
 5   publisher, you know, the -- what's the -- what's the
 6   magazine --
 7             MR. BOIES:   The Atlantic --
 8             THE COURT:   No.   I was going to say, like, a gun
 9   magazine --
10             MR. BOIES:   Oh.
11             THE COURT:   -- right?
12             MR. BOIES:   Right.
13             THE COURT:   I mean, a magazine -- the gun magazine.
14   If the -- all of a sudden, there were a bunch of magazine
15   articles about guns -- Gun & Rifle?   Is that what it was
16   called?
17        Anyway, the -- the -- you know, if, all of a sudden, there
18   are a bunch of similar magazine articles about guns, it's going
19   to dramatically affect the market for -- for that magazine, but
20   it's barely going to affect, if at all, the market for Obama's
21   autobiography.
22        And so -- and the problem -- one problem, I think, is you
23   haven't put in anything about how the market would be affected
24   for different types of authors, different types of artists,
25   different types of producers; right?
```

1        **MR. BOIES:**  Well, I would -- I would suggest first

2   that the plaintiffs that you have in front of you, the

3   13 plaintiffs you have in front of you, are not Barack Obamas.

4        **THE COURT:**  Yeah, but what about -- that's why I asked

5   about Sarah Silverman.  I mean, it's -- it's not obvious to me

6   at all.

7        I mean, it seems like you're -- you're saying that I can

8   sort of take on faith, as a matter of economics, that

9   Sarah Silverman -- the market for Sarah Silverman's memoir will

10  be affected by Llama's outputs, and I just don't know --

11       **MR. BOIES:**  Well --

12       **THE COURT:**  I don't -- I don't know -- there's nothing

13  I can look to in the summary judgment record to tell me that

14  that's so.

15       **MR. BOIES:**  Well, I think that -- two things.

16       One, I don't want to lose --

17       **THE COURT:**  Or that -- or that that competition in the

18  market -- you know, that the market for her work would be

19  affected in anything more than a de minimus way.

20       **MR. BOIES:**  Well, first of all, I don't want to lose

21  track of who has the burden here -- okay? -- because we've put

22  this issue.  And whether you agree or not, whether a jury would

23  agree or not, that's not the issue here, I think.

24       The second thing is that how much the market is going to

25  be affected is, as I thought you put very well in your 12th

question -- I think it was your 12th question -- is related to

how valuable it is to copy the copyrighted work.

We're not talking about do we have AI or not.  We're going

to have AI.  What we're talking about is, in the language of

the cases, is it reasonably necessary in order for them to have

AI for them to copy Sarah Silverman's work or Mr. Kadrey's

work?

**THE COURT:**  Well, not -- not is it reasonably

necessary for them to have AI.  I think the question would be,

you know, is the improvement in the creativity as a result of

using copyrighted works to train the model so great that it

justifies whatever diminishment of the market it would be

caused for the -- for the owners of the copyrighted works?

**MR. BOIES:**  And --

**THE COURT:**  Do you agree with that?

**MR. BOIES:**  I do, Your Honor.

And -- and now you look at the record, and you see nothing

that would bear Meta's burden on that issue.  And -- and if we

have the burden, you might be arguing do we have enough.  I

actually think we do have enough in the record, even -- even if

we had the burden, but we don't have the burden.

**THE COURT:**  Right, but you -- I mean, the thing that's

so procedurally odd about this situation is that you also moved

for summary judgment on fair use.  And you -- you moved for

summary judgment on fair use, in part, because you contended

1    that you win the fourth factor.  And -- but you didn't put in

2    anything, and you didn't rely on anything related to the stuff

3    we're discussing today.

4        I mean, you had -- yes, you have that -- those paragraphs

5    from that report from that economist, Exhibit 67.  I mean,

6    that's it; right?  And you didn't argue it in your motion, and

7    you didn't -- you know, you focused on the market -- you know,

8    the market for licenses.

9        And so it's -- it's just so -- I've twisted myself into a

10   pretzel trying to conceptualize this because you're right that

11   they have the burden on fair use, but you moved for summary

12   judgment on fair use.  You put in the materials that you felt

13   could get you summary judgment on fair use.

14       And you barely put anything in on this issue that we've

15   been spending all this time talking about, and then you're

16   saying, "They can't have summary judgment because they didn't

17   put anything in on this issue that we didn't raise in our

18   summary judgment motion."

19       Its a -- it's a -- it's a -- it's a head-spinner for me.

20   I'm not --

21            MR. BOIES:  Okay.

22            THE COURT:  I'm having a hard time figuring out how

23   to -- how to deal with it.

24            MR. BOIES:  I think that -- we did not move for

25   summary judgment on the whole case.  We moved for summary

1    judgment on only those copies that they made when they were

2    downloading from the pirate websites.  The -- the -- to the

3    extent that fair use --

4         THE COURT:  I thought you moved for summary judgment

5    on all -- on all acts of training the model on copyrighted

6    works.  Did I -- did I misunderstand that?

7         MR. BOIES:  I -- I think so, but -- but if you did, we

8    obviously weren't clear enough.

9         THE COURT:  No.

10        MR. BOIES:  The --

11        THE COURT:  I misunderstand things all the time.

12        MR. BOIES:  The -- but what we were moving for summary

13   judgment on was the initial copy.  There were numerous copies

14   made along the way.  We were -- we were moving for summary

15   judgment just on that initial copy that they made downloading

16   it from the pirate websites, the copy that we know was made

17   from something that was illegal.

18        THE COURT:  Could I interrupt you for a second and

19   just read to you --

20        MR. BOIES:  Sure.

21        THE COURT:  -- from your notice of the motion?

22        MR. BOIES:  Yeah.

23        THE COURT:  So just pull it up, and it's on Page 1,

24   and it says, "Take notice that we are moving for summary

25   judgment" -- no.  No.  Sorry.  I'm looking at theirs.

```
 1          Hold on.  Let me look at yours.
 2                      (Laughter.)
 3          MR. BOIES:  Let me --
 4          THE COURT:  I was about to say, "Yes, you did move
 5   completely on fair use."
 6          MR. BOIES:  Well, if we moved completely on fair use,
 7   we didn't support it, Your Honor, in terms of --
 8          THE COURT:  Yeah.
 9          Hold on.  Let me just -- let me just look at it.
10          I mean, you say Meta's reproduction of plaintiffs'
11   copyrighted books without permission, including through
12   peer-to-peer file sharing, is not fair use.
13          I -- I took it to mean that you were filing a motion for
14   partial summary judgment.  You weren't seeking summary judgment
15   on the distribute- -- the claim that you have for distribution,
16   but you were moving for summary judgment on your copyright
17   infringement claim based on copying.
18          That's how -- that's how I took it.  That's where -- how
19   it reads to me.
20          MR. BOIES:  And -- and you may very well be correct,
21   Your Honor.  I think the -- the thrust of the motion that we
22   made was to deal with the downloading, the torrenting, and the
23   like.
24          THE COURT:  You certainly focused heavily on that,
25   yes.
```

1          **MR. BOIES:**  The -- and if I can limit it to this

2     point, what I would say is what we're moving for summary

3     judgment on is that downloading from the illegal websites,

4     which we don't think raises any fair use issue.

5          **THE COURT:**  Right.

6          **MR. BOIES:**  And -- and -- and, indeed, you know, one

7     of your, you know, questions was, you know, about how we say

8     when you download, it's dispositive.  They say it's irrelevant,

9     and maybe the answer is somewhere in between.

10         But what we were -- with respect to the initial

11    downloading -- okay? -- this was -- this was something in which

12    they knew what they were copying from was not an authorized

13    copy.  They concealed the use of that, which we think goes to

14    their intent and knowledge.

15         And they did this for reasons not just to train their AI

16    model.  They did it in order to evaluate the works, to see

17    whether they would be valuable for the training.  They used it

18    to determine whether they needed to get licenses.  The record

19    is clear that they started out thinking they were going to get

20    licenses.

21         And then they decide -- then they downloaded this, and

22    they found they got good copies of this for free.  And so then

23    they write internally saying, "We're only going to now license

24    the gap."  By "gap," what they mean is the difference between

25    what was on the illegal websites and what they need.

 1     And as late as last year, they estimate in their

 2   documents, which are in -- which is -- which are in the summary

 3   judgment record, that they're going to -- 10 to 20 percent of

 4   the text that they're going to use, they're going to get from

 5   licensing.

 6     So I think that in terms of --

 7         **THE COURT:**  Seems kind of messed up.

 8       **MR. BOIES:**  Yeah.  Yeah.

 9                         (Laughter.)

10         **THE COURT:**  But the -- the question, as the courts

11   tell us over and over again, is not whether something is messed

12   up.  It's -- the question is whether it's copy infringement and

13   whether it's fair use.

14       **MR. BOIES:**  No, but this -- this goes to copy- --

15   whether it's copyright infringement.  If they're taking illegal

16   copies, and they know they're taking illegal copies, that goes

17   to copyright infringement.

18     And I -- I don't know whether this is the right time to do

19   it or not, but I think that -- that while -- as our framing it

20   went on this morning about the issue is -- is relevant, we

21   can't lose sight of the fact that what Congress has said is

22   that you can't copy works unless you can justify it under

23   free -- under fair use.

24     It's not that you only look at whether they're copying

25   some elements or not elements.  You can't copy any of those

copyrighted works.  Okay?  Whether they're copying expressive

elements or not goes to whether it's going to be fair use under

some of the cases.  Those cases are -- are not at all like the

kind of cases the Court has in front of you today.

Okay.  These are things like search engines, where the --

where the court says this is not going to affect the -- the

work.  And when you look at *Google Books* and they say that

maybe somebody isn't going to buy a book because of the

snippets, first, the court -- the court says that's not

realistic.

And in addition to that, Google -- if you filled out an

online form, Google wouldn't even give you the snippets.  And

in *HathiTrust*, we didn't even get a --

**THE COURT:**  If the author -- if the author or the

copyright holder filled out a form?

**MR. BOIES:**  Yeah, filled out an online form, and

that's in the Supreme Court decision.

And in *HathiTrust*, all we got was page numbers, which is

not going to substitute for -- for reading the book.  The

courts talk about it as a pointer.

The other case -- the kind of cases that they cite are the

computer code cases, where, as the court says in *Google* against

*Oracle*, they said these are functional things.  You're using

these to get at the creative value.

The same thing was true with -- with *Connectix* that, you

know, Counsel cited.  They were making those intermediate

copies to get at the thing that they needed to get at to make

it compatible, and they expressly did not use any of those --

any of the content of that in their final product.  They

created it all themselves.  They reverse engineered it.

So none of those cases, I think, have anything to do with

the kind of case that you're -- you're dealing with here.  This

is a situation in which, when they make the copy, it -- it

shouldn't make any difference.  Whether they think they're

copying expressive elements or not-expressive elements, that's

a violation of the copyright law.

Now, they do copy the expressive elements.  And when we

show that they can, you know, mimic it, when they show they can

complete the sentence, when they show they can do it in the

same style, that's not because each of -- one of those is

necessarily a copyright violation, but it shows that what they

have done is copy it.

And what they have done is create something that is

inconsistent with a -- with a copyholder's rights.

**THE COURT:**  I was just reminded of one other question.

I think this is the last question, although I can't promise

that.

**MR. BOIES:**  Yes.

**THE COURT:**  What about the -- my shadow library

question?  That is, you know, would a rule that said that it

1    was fair use for companies making AI models to download stuff

2    off of LibGen and other shadow libraries create -- would

3    bolster the market for those shad- -- those illegal shadow

4    libraries?

5              MR. BOIES:  It would, Your Honor --

6              THE COURT:  How?

7              MR. BOIES:  -- and it would -- would in several ways.

8        First of all, the way they -- the way Meta did it -- it

9    didn't have to do it this way, but -- but the way they did

10   it --

11             THE COURT:  Put aside the leeching for a second.  I'm

12   just asking about downloading from shadow libraries; right?

13   These shadow libraries are -- they offer these copyrighted

14   works for free to download off the Internet.  It's illegal for

15   them to do that; right?

16       And forget about -- I'm happy to talk about the leeching,

17   but put -- put aside the leeching for a second.

18             MR. BOIES:  Yes.  Okay.  Sure.

19             THE COURT:  And I'm just saying the -- but if we had a

20   rule, a copyright rule, that said that it's okay for companies

21   that create AI models to download works from shadow libraries,

22   would that bolster the market, strengthen the market of shadow

23   libraries?  Should -- would that strengthen the position of

24   shadow libraries?  Would it give strength to these illegal

25   shadow libraries?

1    And -- and you say yes, and I want to -- I want to

2  understand how.

3        **MR. BOIES:**  Sure.

4    Well, first, if Meta is going to do it, there's going to

5  be increased pressure on all the competitors to do it.

6        **THE COURT:**  Sure.

7        **MR. BOIES:**  And so --

8        **THE COURT:**  And then do we know -- speaking of

9  competitors, I mean, do we know how many people there are out

10  there in the world, how many companies there are out there in

11  the world, you know, who might use shadow libraries to download

12  copyrighted works to -- to train their models?

13        **MR. BOIES:**  I don't think we know.  I think what the

14  record does show is that there are a number of them, and they

15  are growing all the time, and that they are both people like

16  open AI and Meta who are doing very large models designed to do

17  many, many things.  And then there are also people that are

18  doing much more discrete AI models.

19    But I think what we do know is that there are a number of

20  them now, and they're growing, and there are going to be a lot

21  of them in the future.  And if -- if the rule is take whatever

22  you want from the shadow library:

23    A.  If you have that rule, then a lot of people are going

24  to do it;

25    B.  If you have that rule for some people, then everybody

```
 1   who competes with those people are going to have to do it.
 2       In addition, I don't think you can --
 3           THE COURT:  Could I -- could I ask a follow-up
 4   question about that?
 5       Does more people downloading stuff from shadow libraries
 6   somehow strengthen the illegal shadow libraries?  Do you know
 7   anything about how they make their money or -- or anything like
 8   that?
 9           MR. BOIES:  Most of them do not primarily make their
10   money by charging people for doing this.  Most of them have
11   other ulterior purposes for -- for doing it.  There are --
12           THE COURT:  Like ideological purposes or what?
13           MR. BOIES:  What?
14           THE COURT:  Ideological purposes?
15           MR. BOIES:  Ideological purposes or just -- just that
16   information ought to be free.  Like, there are people who don't
17   believe in the copyright laws, generally don't believe in it.
18       Now, some of them do offer people accelerated priority
19   downloads if they pay them money, but that's not primarily --
20   they're not -- they're not profit-making organizations.  They
21   are illegal.  I mean, they -- they are -- you know, they're --
22           THE COURT:  So -- so how -- how would -- so if we
23   assume that this -- you know, a rule allowing companies like
24   Meta to download stuff off -- from shadow libraries to train
25   their AIA models -- AI models, if we -- we can assume that that
```

1    will cause lots more companies to be downloading stuff from

2    shadow libraries to train their AI models, but how would that,

3    like, strengthen these illegal shadow libraries?

4           MR. BOIES:  Well, the -- the more people that use

5    them -- these are often peer-to-peer, and the more people that

6    use them, the more bandwidth and processing power they have.

7        I know there -- I don't want to talk about the -- the

8    uploading right now for this purpose, but -- but most people,

9    when they download, upload at the same time.  And when they do,

10   they are giving all of their bandwidth and processing power to

11   what is called the swarm, which is a phrase I had never heard

12   until this case.

13       But the -- all of the nodes, the people who participate in

14   these things, together are called a swarm.  And the more people

15   that are participating in the swarm, the more efficient it --

16   the swarm is in getting all of this copyrighted material out.

17          THE COURT:  Okay.  And that's -- but that is when

18   you're downloading and uploading at the same time, leeching --

19          MR. BOIES:  Yes.

20          THE COURT:  -- or is it also when you are -- what's

21   the other word?  Seeding?

22          MR. BOIES:  Well, seeding and leeching are two ways of

23   uploading.

24          THE COURT:  Seeding is uploading after the downloading

25   is complete --

1           MR. BOIES:  Yeah.

2           THE COURT:  -- and leeching is uploading

3    simultaneously.

4           MR. BOIES:  That's the way I understand it.

5           THE COURT:  Okay.  And -- and so what -- so you wanted

6    to talk about the leeching.

7       So you -- so one point you're making about the leeching is

8    that if you download this, and you're -- and you're

9    simultaneously uploading materials, and you're making your

10   computing power available to the swarm, you're making it easier

11   for illegal shadow libraries to disseminate the copyrighted

12   works illegally?

13          MR. BOIES:  Yes.

14          THE COURT:  Okay.  What -- anything else you want to

15   say about the leeching issue?

16          MR. BOIES:  No.

17          THE COURT:  Okay.  All right.

18          MR. BOIES:  Now -- now, in addition to the other

19   things that I just talked about, there's a reputational thing.

20   At least until companies like Meta began to do this,

21   respectable companies didn't want to be associated with these

22   pirate websites.

23       And, indeed, you see throughout Meta's documents people

24   saying, "This" -- "this is a line we shouldn't cross.  We don't

25   want to be associated it.  There's terrible reputational

risks."  That discourages, and has discouraged, most companies

from -- you know, most large, respectable companies from using

these pirate websites.

Once, if it happens, courts begin to rule, "Well, that's

fair use.  Go ahead and do it," the reputational stigma, which

is real, in terms -- most people generally don't want to be

associated with criminal enterprises, and -- and even if it's

helpful to them, they will try to avoid it.  The more

respectability that these criminal enterprises get, the more

people are going to use it and the less -- the less of an

inhibition that will have.

So I think the competitive part, the -- if you let Meta do

it, Meta's competitors are going to have to do it, the

reputational part as well as the leeching --

THE COURT:  And then all this stuff -- there's -- I

appreciate the tutorial on it, but none of this stuff is in the

record; correct?

MR. BOIES:  None of this what?

THE COURT:  None of this stuff is in the record;

correct?

MR. BOIES:  Oh, no, no.

THE COURT:  The stuff that we're talking about?

MR. BOIES:  No.  The -- the fact about the competition

is in the record.  In fact, one of the things -- Meta is

saying, "We can't let other people get ahead of us."

1              **THE COURT:**  No, no, no.  I understand that, but if --

2         **MR. BOIES:**  But by -- by "get ahead of us," I didn't

3    mean just generally.  I meant in terms of using these pirated

4    websites.

5              **THE COURT:**  Oh, yeah.  No.  I know that.

6         But in terms of the effect that allowing companies to use

7    the shadow libraries for this purpose would have on the shadow

8    libraries, there's nothing in -- on the record on that, is

9    there?

10             **MR. BOIES:**  No, there -- no, there is, Your Honor.  I

11   mean, we covered this in expert reports and in depositions in

12   terms of the bandwidth and the processing power that is --

13             **THE COURT:**  The processing power part is in there?

14        Okay.  All right.

15             **MR. BOIES:**  The -- and, you know -- and the

16   reputational part, you know, is in there, you know -- I mean,

17   not the way I said it exactly, which is more of an argument

18   based on what's in the record, but the fact that these are

19   criminal enterprises and that people are reluctant to use them

20   for that reason -- that's in the record.

21             **THE COURT:**  Okay.  All right.  Anything else you want

22   to -- you want to say before -- I'll let -- I'll let them have

23   the last word.

24             **MR. BOIES:**  There are -- there are lots of things.

25                         (Laughter.)

1          **MR. BOIES:**  The -- but -- I mean, like, you know, for

2     example, on the licensing thing that was -- was talked about,

3     the -- the standard, as I know the Court knows, is not just

4     whether there's a market effect on the traditional market.

5     It's also whether there's a market effect on a market that's

6     reasonable to develop or that is likely to develop in the

7     future.

8          And -- and the fact that you had all these negotiations

9     and that you still have them saying they're going to have 10 to

10    20 percent of what they license of -- with the use --

11         **THE COURT:**  Yeah.

12         I just think the problem is if -- if you can't show that,

13    you know, the proliferation of this -- of these models using

14    copyrighted works will affect, in a significant way, the market

15    for the copyrighted works, then I think the -- all the

16    discussion of the market for a license or the potential market

17    for a license is beside the point --

18         **MR. BOIES:**  Well --

19         **THE COURT:**  -- because I think you'd lose if you can't

20    show that the market for the copyrighted works that are being

21    used to train the models are dramatically impacted, not the

22    life -- for -- not the market for a license to use the work for

23    training AI but the market for the works themselves.

24         If you can't show that the market for the works themselves

25    is dramatically impacted by using them to train AI, then I

1    think the -- the discussion of the market for a license to use

2    the products to train AI is beside the point because you -- you

3    wouldn't win in that case because you -- you know, it's -- you

4    would lose significant -- you would lose badly on Factor 1, and

5    you wouldn't have done enough on Factor 4 to win.

6         I'd tend to agree with you.  Like, I'm -- it strikes me as

7    pretty fanciful to argue that a license -- a market for a --

8    for licensing copyrighted materials for AI training could not

9    form.  I mean, I -- I'm assuming, for purposes of this

10   discussion, that it could.

11        **MR. BOIES:**  But if it could form, if it's original for

12   it to form.

13        **THE COURT:**  Yeah.

14        **MR. BOIES:**  And that is a license -- and that is a

15   market that they have the copyright for.  There's no doubt

16   that --

17        **THE COURT:**  No.  They don't have a copyright for -- to

18   license people to use works -- their works for training AI

19   models.  That's the question in this case.

20        **MR. BOIES:**  No.  No.  I know that, but what I'm saying

21   is they -- they have that right unless -- unless it's taken

22   away by fair use.

23        **THE COURT:**  Right.

24        **MR. BOIES:**  So -- and --

25        **THE COURT:**  And I think it's only -- it's -- it's -- I

1  think -- to be blunt about it, I think it is taken away by fair

2  use unless the plaintiff can show that the market for their

3  actual copyrighted work is going to be dramatically affected by

4  the -- the use of copyrighted works to train the models.

5          **MR. BOIES:**  Right, but --

6          **THE COURT:**  I think that's the heart of this -- of the

7  issue in this case and in all -- all of these cases.

8          **MR. BOIES:**  Since the -- the right to license for use

9  in training for any purpose is imperative to the bundle of

10  rights that the copyright holder has, and that's a market.  I

11  don't understand why that market is any more -- is less subject

12  to protection than the market for the original work.

13      The -- the copyright law clearly gives not only the right

14  to distribute your original work but the right to license

15  somebody to make a copy of that to do whatever they want, to

16  make a movie, to do something transformative with it.

17      And what Factor 4 says is that if you are adversely

18  affected in a significant way, the -- the copyright holder's

19  markets, what the copyright holder has a right to do -- that

20  that's not fair use.

21      And, for example --

22          **THE COURT:**  But it just -- it begs the question of

23  whether, you know -- if -- if the use is transformative, then

24  it begs the question of whether you can make them get a

25  license.

1          **MR. BOIES:**  Well --

2          **THE COURT:**  And I -- I think, in a case like this, in

3     this context, you have to show something more than an adverse

4     effect on the market for licenses to train -- to use materials

5     to train AI models.  I think that is circular, as the -- as the

6     other side says.

7          **MR. BOIES:**  But if it is, it's circular both ways

8     because what they're saying -- because what you would have to

9     say is that it's -- it's fair use because it's transformative.

10    And because it's fair use, you don't have to look at Factor 4

11    in terms of the licensing market.

12         And I think if you look at *Warhol*, for example, in *Warhol*,

13    there was no doubt that what Andy Warhol did was transformative

14    and --

15         **THE COURT:**  But the Supreme Court said that it wasn't.

16         **MR. BOIES:**  No.  No.  That's the thing.  The court did

17    not say it wasn't.  What -- what in fact, what the court

18    implied was that --

19         **THE COURT:**  No.  She basically said that it wasn't.

20                         (Laughter.)

21         **MR. BOIES:**  But what the -- no.  What the court

22    implied was it was transformative.  And, in fact, the court

23    went out of its way to say, "We're not saying that what is here

24    is not transformative for all sorts of purposes."  It's simply

25    not something that can be done for purposes of selling this" --

```
 1    or licensing this to a magazine for a story about Richard --
 2    you know -- you know, about Richard -- not Richard Prince.
 3    That's a different author -- different artist -- but
 4    Bob Prince.
 5              THE COURT:  Prince.
 6         MR. BOIES:  The -- I think if you look at what -- what
 7    the court is saying -- is that the court is saying that this is
 8    not fair use for this purpose, which is the purpose of
 9    marketing it to a magazine.  But the court is, I think,
10    quite -- quite pointedly, saying, "We're not saying that this
11    is not transformative for other purposes."
12       But they have -- that because this was having an effect on
13    the photograph's -- photographer's ability to license their
14    product for -- for a similar purpose, that's what made it not
15    fair use.
16       So I think that you can have something that's very --
17              THE COURT:  Yeah, but the purpose of having the
18    photograph is to license it for use.  The purpose of having --
19    of writing a book is to sell the book.
20         MR. BOIES:  No, Your Honor.  You license -- you may
21    sell the book.  You may license it.  You -- you license it for
22    all sorts of purposes.  You can license it to make a movie.
23    You can license it to be used in a song.  You can license it to
24    do a -- build on a sequel.  You can license it for all sorts of
25    reasons, and when you're licensing it here, you're licensing it
```

1  for its creative purpose.

2      You've got to look, I would respectfully suggest, at the

3  use of the copyrighted work, not the end product of what that

4  copyrighted work does.  The use here is to appropriate the

5  creativity of the author.  It is not like in a -- one of these

6  computer code cases to allow somebody to connect or

7  compatibility.  It's not like the search engine, which is just

8  to have a pointer to point to the copyrighted work.

9      This is -- this is a situation in which they are taking

10  the creativity.  They are appropriating the creativity.  That

11  is unlike any of these other cases.

12      **THE COURT:**  Okay.  I understand that now.  I'll go

13  back and look at that.

14      **MR. BOIES:**  Thank you.

15      **THE COURT:**  Any other comment -- final comments?

16      **MR. BOIES:**  No.  Thank you.

17      **THE COURT:**  No?

18  Last word?

19      **MR. SHANMUGAM:**  The Court has been --

20      **THE COURT:**  I think the -- I think the most important

21  thing to discuss -- I'm happy to hear whatever you want to say

22  in closing, but the most important thing to discuss is the

23  record and the burden issue --

24      **MR. SHANMUGAM:**  Yeah.

25      **THE COURT:**  -- relating to Factor 4.

1          MR. SHANMUGAM:  Sure.

2      And the Court's been very generous with its time.  So I'll

3  be accordingly brief.

4          THE COURT:  That's your way of saying, "When are you

5  going to end this hearing?"

6                         (Laughter.)

7          MR. SHANMUGAM:  We're all hungry, particularly those

8  of us on East Coast time.

9      The one thing we didn't hear from my friend, Mr. Boies, is

10  any real suggestion that this use is not highly transformative

11  for purposes of Factor 1.  So let me respectfully submit how we

12  think the analysis, under Factor 4, should go here.

13      I think that there are really four conceivable theories of

14  market harm that could be in play in this case.  The first

15  would be if Llama actually regurgitated expressive content such

16  that the output from Llama was a very close substitute.  And,

17  again, as I said in my opening argument, there's no suggestion

18  whatsoever of this in this case.

19      I would point to the concessions made by Lopes, their

20  expert, at Exhibits 23 and 24 of the Ghajar --

21          THE COURT:  I get that.

22          MR. SHANMUGAM:  -- declaration.  So that theory is off

23  the table, but we would certainly recognize that that would be

24  the paradigmatic cognizable theory if it were in play.

25      The second is the theory that you had been focusing on

today, which is whether Llama produces, or could produce, rival

works that could lead to reduced sales.  And I do think that

that is a matter of proof, and I do think that the way that it

should work here, notwithstanding the fact that we bear the

ultimate burden, is whether or not this is a theory that they,

in fact, pursued.

    And I would invite the Court to look at the complaint and

the briefing and reach a conclusion about that, but I would say

that the reason why this is a matter of proof is that it turns

on a number of very specific questions.

    The first is the effect on the market for plaintiffs'

work, and I think the cases are clear that it has to be an

effect on plaintiffs' work, not the work of other hypothetical

authors.

    The second is that it has to focus on Llama and what Llama

produces, and it's not enough to focus on other AI tools, which

operate quite differently.  And the third is a facet that you

fastened onto, which is what would the effects be in the

absence of the otherwise-infringing conduct.

    And I think, with respect, that Spulber's testimony in the

declaration and in his deposition falls far short of that.  And

these are the paragraphs that my friend, Mr. Boies, referred

to, starting at, I believe, Paragraph 196 of the declaration.

And I -- those portions of the report discuss the possible

effect of market harm from models made by other developers.  It

 1   relies on statements made in news reports by nonparties.

 2        And when pressed on this at his deposition, Spulber

 3   admitted that he didn't look at any outputs from Llama, that he

 4   didn't conduct any analysis of lost sales, and that it was

 5   possible that Llama's outputs would not have a negative impact

 6   on future sales of plaintiffs' books.

 7        And I would go further than that and note that plaintiffs

 8   themselves acknowledge that they could not identify a single

 9   example of a lost sale due to Llama, and I would point to the

10   RFAs and what plaintiffs said in response to that.

11        And I would also note that our expert, Sinkinson, did

12   conduct a regression analysis that showed that there were no

13   lost sales from --

14        **THE COURT:**  Yeah.

15        **MR. SHANMUGAM:**  -- Llama.  So --

16        **THE COURT:**  I mean, I want to just -- I don't want to

17   be repeating myself too much, but I don't think that they have

18   to show lost sales; right?  They have to show the potential

19   for, you know -- and a significant effect on -- on the market

20   for their product.

21        **MR. SHANMUGAM:**  Yeah.

22        And I do think that, again, those paragraphs of Spulber's

23   declaration, I would submit, are not sufficient to put that

24   theory in play.  And, of course, one can always speculate about

25   that.  That is one of the challenges of proof in this context.

1    And I think the way to reconcile our burden with the

2  summary judgment standard here is to say that, at a minimum,

3  they have to put those theories in play.  And then, at that

4  point, you apply the ordinary summary judgment standard, and

5  they have simply failed to do that.

6        **THE COURT:**  Can I -- I know you wanted to --

7        **MR. SHANMUGAM:**  Yeah.

8        **THE COURT:**  You probably want to list the other

9  theories of market harm, but just one other question about

10 that, I think.

11    You know, I think you're right that the focus needs to be

12 on Llama; right?

13        **MR. SHANMUGAM:**  Yes.

14        **THE COURT:**  And -- but do you deny that Llama either

15 is capable, or soon will be capable, of mass-producing, you

16 know, works in particular genres like the young adult fiction

17 genre or the, you know, mystery genre or the romance genre or

18 whatever?

19    I mean, isn't Llama already capable of mass-producing

20 works in those genres?

21        **MR. SHANMUGAM:**  So I don't mean to be difficult in

22 saying what I'm about to say.  I think that that is a question

23 of proof, and I think that one of the --

24        **THE COURT:**  I know.  I'm just asking as a matter of

25 common sense.  I mean, can't Llama -- I mean, I bet -- I

 1    haven't bothered to do this, but I'm guessing, if we looked at

 2    advertisement -- advertising materials for Llama, we would see

 3    that Llama is touted as being able to do that kind of stuff.

 4         **MR. SHANMUGAM:**  Well, I think one of the real

 5    difficulties here, Judge Chhabria, is that if you decide to go

 6    down this route as a legal matter, I think there are some very

 7    difficult legal questions about what the exact contours of this

 8    rule are going to be.

 9         In other words, how far do you go beyond substantial

10    similarity, for lack of a better term, in saying that a market

11    effect is going to be cognizable?  And I think the easy outcome

12    in this case is to say this issue hasn't been put into play,

13    and the Court could write an opinion very easily that leaves

14    those issues open for another day.

15         But I don't want to leave you with a sense that we don't

16    have support for the notion that the cognizable effects are the

17    effects that bear on the expressive component of plaintiffs'

18    work, and I do want to leave you with just a couple of other

19    sources that I think are elucidating in this regard.

20         One of them is a source cited by the Supreme Court in

21    *Campbell*, at 510 U.S, at 591, which is an article written by

22    Patry & Perlmutter, the current register of copyrights, that I

23    think makes this exact point that I was discussing earlier

24    about the fact that the cognizable effect is the effect on the

25    expressive component of plaintiffs' work.

1    And the *Nimmer* treatise also makes this point.  It makes

2    the point that Factor 4 doesn't consider, quote, "the adverse

3    impact on the potential market for plaintiff's work by reason

4    of defendant having copied from it non-copyrightable factual

5    material."  That's at Section 13F.08, brackets, C, brackets, 2,

6    and it cites the *Connectix* and *Sega* case for that proposition.

7    So while I recognize that this is an issue that may not

8    have been fully fleshed out in so many terms in the case law, I

9    think both of those sources support our view that these effects

10   become uncognizable once you get beyond the expressive

11   component, and I'll circle back to that in just a second.  Let

12   me just say a couple of quick things about the other theories.

13   I think your colloquy with Mr. Boies well-exposed why the

14   third theory, which is the potential market for licensing for

15   the specific use of AI training, cannot, in and of itself, be a

16   sufficient theory if the theory about effects on sales is off

17   the table, and that is because of the circularity problem that

18   we've been discussing.

19   And I would note that that really is the primary theory

20   that plaintiffs have advanced, and there's no better source for

21   that than their summary judgment briefing, where they spend

22   almost the entirety of their time on that.

23   I do think that there is no genuine issue of fact on this

24   point, and I understand what might be the judicial impulse to

25   think, "Well, this is an important enough technology that

surely such a market is going to develop."  But I think that
the reasons for market failure in this particular context --
and by "particular context," I really mean the context of trade
books in particular -- are enormous, and there was no real
dispute about those problems.

It's precisely why Meta abandoned the licensing route and
chose to go the route that brought us here today, and I would
note that the other major AI developers have used these similar
online data sets, and we know that from the records in cases
that they are currently litigating as well as -- as well as
statements that they have made publicly.

And then the last thing I would say about these theories,
before I conclude, is that the other theory that they advance
in passing is this theory about the lost sale from the initial
acquisition.  And I think the response to that is that that is
not cognizable for the simple reason that we could have trained
our tools through other means.

We could have borrowed books from the San Francisco Public
Library, leaving aside the impracticality of training on books
one by one.  And if we had made an unauthorized copy of those
books, we could have trained on them without the payment that
would have been the lost sale, under their view.  And the
*HathiTrust* District Court opinion, I believe, by Judge Baer in
the Southern District of New York makes this point.

And I would just say one thing about what Mr. Boies had to

say about the issue of bad faith here, and that is simply that

the important thing to remember here is that, by "bad faith,"

what the plaintiffs are really saying in this context is that

we made an unauthorized copy from an unauthorized copy, perhaps

even with knowledge that that was itself an unauthorized copy.

I think the Court is well aware of our legal arguments as

to why bad faith shouldn't come into the analysis, and I won't

say anything more about that unless the Court has any

questions.

The final thing that I would say is that I think that so

many of the Court's questions have been based on this very

understandable concern about the effect that a ruling in our

favor would have on creative industries.

But I do think that this is a problem that the copyright

laws do not protect against, and that is this specific

notion -- and the Supreme Court said this, I think, most

clearly in *Eldred v. Ashcroft* -- that every idea, theory, and

fact in a copyrighted work becomes instantly available for

public exploitation at the moment of publication.

And as other courts have said, progress -- intellectual

progress is possible only if a new author is free to build on

the work of existing ones.

And so, to use the example that you used with Mr. Boies,

it is certainly true that other comics could come along and

build on Sarah Silverman's memoir.  They could write a memoir

 1    in the style of Sarah Silverman.  They could write a better

 2    memoir.  All of that is going to have impacts on the sales of

 3    Sarah Silverman's own memoirs.

 4        But copyright is meant to foster and encourage the

 5    creation of new noninfringing works.  It may very well be that

 6    Llama and other AI tools --

 7            THE COURT:  What about machines?

 8            MR. SHANMUGAM:  Well, I think -- if machines do it, I

 9    think the same analysis would apply, leaving aside that there

10    would be difficult questions down the road about who the --

11            THE COURT:  Really?  I mean, I don't know -- why would

12    the same analysis apply if the machine is creating the work?  I

13    mean --

14            MR. SHANMUGAM:  Because --

15            THE COURT:  -- I thought that copyright was about

16    human creativity.

17            MR. SHANMUGAM:  Well, it is, but copyright is not

18    intended to benefit authors at all costs.  What copyright is

19    intended to do is to protect the expressive components of what

20    they produce and not the underlying ideas or the underlying

21    facts.  And that's precisely why, if someone comes along --

22            THE COURT:  But -- but -- I mean, you know, we're

23    balancing two things; right?  One is, you know, sort of

24    promoting the creativity of the authors who have the

25    copyrighted works, and the other is using fair worst -- fair

1    use to promote the creativity of others, you know, who might

2    want to use the copyrighted works as a springboard.

3         And if the machine is doing the creating, I -- is -- is

4    copyright interested in protecting the machine --

5              MR. SHANMUGAM:  Well, just to be clear --

6              THE COURT:  -- the machine's ability to create?

7              MR. SHANMUGAM:  -- the machine is not doing the

8    creating, at least now.  When it comes to a tool like Llama,

9    humans are prompting Llama, and it's the humans who are really

10   using Llama as a tool to create --

11             THE COURT:  Yeah, but if I say -- if I -- but -- hold

12   on.

13        I mean, if I say, you know, "Write a funny memoir in the

14   style of Sarah Silverman," and then they write it, the machine

15   is creating it.  I'm not creating it.  I have the idea for it,

16   but I'm not creating it, and you -- you're the one who's

17   hammering away at the distinction between ideas and creation;

18   right?

19        It's humans that are feeding an idea to the machine, and

20   the machine is doing the creation; right?

21             MR. SHANMUGAM:  You're the one who is providing the

22   prompts.  You may provide substantial information to the tool

23   in order to get the output and return.  And, to be sure, there

24   are difficult questions --

25             THE COURT:  If I call it "bipacking," is that what

1    that's called?

2        **MR. SHANMUGAM:**  It's not a term with which I'm

3    familiar.

4        But the broader point is that there are difficult

5    questions in the law, to be sure.  There are questions about,

6    you know, who will hold the copyright for the output and so

7    forth.

8        My point is simply that when we are thinking about how the

9    copyright law, as it is presently written, operates in this

10   area, regardless of how it is that subsequent works are

11   produced, what the copyright law protects is the author's

12   expression, which is embodied in the specific right to

13   reproduce and the right to produce derivative works, and that's

14   a limitation on what Mr. Boies suggested earlier.

15       Sarah Silverman does not have plenary protection over all

16   of the ideas in her memoirs.  That is the classic sort of

17   building on prior ideas that the copyright laws protect.  And,

18   again, if the copyright laws are going to provide broader

19   protection than that, that's a matter of Congress.

20       But this Court really doesn't need to get to that issue if

21   it leaves aside the question of whether or not the effect on

22   sales is cognizable in a case where there is simply no record

23   that there is such an effect that would give rise to the legal

24   question that you've been raising.

25       **THE COURT:**  Okay.  Thank you very much.  It's very

1    interesting.

2        I'll issue a ruling later today.  Just kidding.

3                        (Laughter.)

4        **THE COURT:**  I will -- I will -- I will take a lot

5    longer to think about it and then issue a ruling.

6        **THE CLERK:**  Court is adjourned.

7            (Proceedings adjourned at 12:49 p.m.)

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Tuesday, May 6, 2025

8

9

10

11    _____

12         James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                        U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25