# EXHIBIT J

Case 3:23-cv-03417-VC   Document 721-11   Filed 05/01/26   Page 2 of 18

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

RICHARD KADREY, et al.,          )
                                 )
            Individual and       )
            Representative       )
            Plaintiffs,          )
                                 )
v.                               )   Case No. 3:23-cv-03417-VC
                                 )
META PLATFORMS, INC.,            )
                                 )
            Defendant.           )
_____)


        ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **
     Videotaped Deposition of BARBARA FREDERIKSEN-CROSS
               Palo Alto, California
              Thursday, March 6, 2025



            Reported Stenographically by
      Michael P. Hensley, RDR, CSR No. 14114

_____

               DIGITAL EVIDENCE GROUP
            1730 M Street, NW, Suite 812
              Washington, D.C. 20036
                 (202) 232-0646

Page 261

Q.   Did those two -- those two scripts that you're referring to there, did they operate in the same way with the sleep command for 60 seconds?

ATTORNEY MORTON:  Object to form.

THE WITNESS:  Oh, sorry.

ATTORNEY MORTON:  Yeah.

THE WITNESS:  They both had the same test and the immediate shut down once the "is seed" condition was detected.

BY ATTORNEY POUEYMIROU:

Q.   So why -- why is there concern at Meta when they have this script, which you said is highly unlikely that Meta would have been seeding, why is Meta so concerned about the risk of tracing back the seeder and downloading to Facebook servers?

ATTORNEY MORTON:  Object to form.  Outside the scope of her report.  Calls for speculation.

THE WITNESS:  Again, you know, the individual expressing concern here or at least mentioning risk is Fred Zhang.  I didn't speak to Mr. Zhang.  I don't know what was in his head or why it was in his head; so I think you would need to ask that question of Mr. Zhang.  I would be speculating wildly, actually, if I tried to answer that.

///

Page 262

BY ATTORNEY POUEYMIROU:

Q.   Okay.

You said before that you weren't -- you're not convinced that Meta employees were so familiar with BitTorrent.

Do you recall that testimony?

A.   Well, I said I don't know one way or the other.  I didn't say I'm convinced of anything.  I don't know.

Q.   Did you find that they used the term "seeding" in a way that was consistent with how BitTorrent works and how that term is used?

ATTORNEY MORTON:  Object to form.  Calls for speculation.

THE WITNESS:  They appear to use that term consistent with how it's understood in BitTorrent and consistent with how Dr. Krein uses the term.  I don't know specifically -- you know, I've looked at a selection of documents.  I don't know that I've seen every use of their term for that.  I would want to search the repository to see where it appears and see if they're always consistent or sometimes consistent.

BY ATTORNEY POUEYMIROU:

Q.   So in your read of Dr. Krein's report, you

Page 263

read him to use the term "seeding" to refer only to the time in which torrent files had been fully downloaded?

A.   Yes, and that is the conventional BitTorrent.  You become a seeder once you have downloaded the full file and are continuing to share it.

Q.   And in your read of Meta documents, you find that Meta employees are using seeder only to refer to the time period after torrent files have been downloaded?

ATTORNEY MORTON:  Object to form.  Asked and answered.

BY ATTORNEY POUEYMIROU:

Q.   As opposed to just a proxy for sharing data that could be traced back to FB servers?

ATTORNEY MORTON:  Object to form.  Vague.

THE WITNESS:  Well, I mean even in this document we're looking at, Mr. Zhang uses the "term risk of tracing back the seeder," and then he changes it to "risk of tracing back the seeder/downloader"; so it would appear to me that at least Mr. Zhang is making that distinction that a seeder is once it's downloaded versus a downloader that's still downloading.

Page 264

But again I don't -- I would want to search all of the documents to answer your question dispositively of what I understood various individuals to be using it, but at least with respect to Mr. Zhang here, I see some evidence he may have understood that there was a distinction and that seeder was once the download was complete.

BY ATTORNEY POUEYMIROU:

Q.   So you read seeder as distinguishable from downloader here or this -- I don't understand.

A.   Okay.  At his post at 153955, he says "Avoiding risk of tracing back the seeder is from FB server."  And then a fractional second later at 154015 he says "Avoiding risk of tracing back the seeder/downloader are from Facebook."

So he's changed the singular to plural and he's changed "seeder" to "seeder/downloader."  That suggests to me that he is distinguishing between those two states and is aware that they are different states.

Q.   And what are those two states?

ATTORNEY MORTON:  Object to form.

THE WITNESS:  Seeder or downloader. What -- downloader is another word for leecher. Leecher is a downloader, someone who is still

Page 265

downloading the file, would be how I read this statement; but, again, I didn't write it.  You might ask Mr. Zhang about that.

ATTORNEY POUEYMIROU:  Okay.  We're going to just look at one more document.

25, Aaron.

(Sotto voce discussion among counsel.)

ATTORNEY POUEYMIROU:  Thank you.

11, please.  Exhibit 11?

THE COURT REPORTER:  10.

ATTORNEY POUEYMIROU:  10?  Okay.

(Exhibit 10 was marked for identification.)

THE WITNESS:  Okay.  I've had a chance to review it, Counsel.

BY ATTORNEY POUEYMIROU:

Q.   Great.  So a second ago when we looked at the document with Mr. Zhang, it talked about seeder/downloader, and you distinguished, speculating, that he was talking about the seeding period and the leeching period.

Here, in the middle of the page, Nikolay Bashlykov is speaking, and he says:

[As Read]  Currently I have the following dilemmas.  Also discussion them

Page 266

with Angela later today.  Seeding, i.e., sharing any of the files outside, only loading it to fair cluster.  The con is that it is quite slow and I am regularly throttled by the server.  The alternative is to download the files in batches through torrent, but this way we will see the files from our fair cluster servers.

Do you know what the fair cluster servers are?

A.   I understood those to be cluster servers, likely a part of the fair Spark path, but I haven't seen the configuration of anything other than the configurations that I understand to have been the standard template.  So that would be my assumption with respect to fair clusters.

Q.   Did you review this document in preparation?

A.   I do not recall.

ATTORNEY MORTON:  Object to form.

Go ahead.

THE WITNESS:  Oh, sorry, go ahead.

I do not recall having seen this document before.  And I think you left a line out when you were reading when he was saying:

Page 267

[As Read]  The dilemma is loading the library.  I'm loading the library file by file using a download link.  This way I am not seeding.

And so I think you jumped right to that second line.

BY ATTORNEY POUEYMIROU:

Q.  Oh, okay.

A.  I may have misheard you but just to leave a clear record there.

Q.  And how does he define seeding there?

A.  He says, "Seeding, i.e., sharing of the files -- any of the files outside."

Q.  Did you speak to Mr. Bashlykov as to whether by "seeding" he just meant sharing torrented data?

A.  Again, I don't recall having seen this document; and so I did not discuss this document or what he meant in that specific sentence with Mr. Bashlykov.

Q.  But you testified earlier that you couldn't -- that you can change the settings of libtorrent to prevent the things they're concerned about.

A.  Well, you can change the actual program,

3/6/2025                    Richard Kadrey, et al. v. Meta Platforms, Inc.  Barbara Frederiksen-Cross
                                    Highly Confidential - Attorneys' Eyes Only

Page 268

the settings program, to suppress it there.  And if you're using an API to interface with it, you can conceivably feed it a value via the API, though I would want to check that in this specific version. Later versions allowed that, but I don't recall if this specific one does.  But there is a settings program that provides the default values.

Q.   So Meta could've done this in a way in which there was zero risk; isn't that correct?

ATTORNEY MORTON:  Object to form.  Outside the scope of her report.

THE WITNESS:  Again, to answer that question, I would want to know Meta's familiarity and comfort level with the libtorrent code itself and with the modifications that can be made to that code to understand whether they had the knowledge of that code to modify it.  And then ideally I would want to speak to an individual to understand the reasons that they used it in the default value versus some other configuration.  And that was outside the scope of my report.  Again, that was not something that Dr. Krein opined on, their motive or their motivations; therefore it's not something I responded to in my report.

///

Page 269

BY ATTORNEY POUEYMIROU:

Q.   So my question was Meta could have eliminated the risk it's concerned with here, and your answer was I would want to know Meta's familiarity and comfort level with the libtorrent code itself.

I understand that your position is Meta employees might not have actually understood how the protocol worked, but my question is different.  It's simply that Meta could have eliminated the risk that Mr. Bashlykov here is discussing; isn't that correct?

A.   Well, you ask --

ATTORNEY MORTON:  Object to form.  Outside the scope.  Asked and answered.

Go ahead.

THE WITNESS:  You ask if they could eliminate the risk by modifying libtorrent, and my point as a software engineer of 50 years or more is that you don't just go take a chain saw to code that you're not familiar with.  You would have to understand the code; you would have to understand where the change needed to be made and what specific values needed to be changed.

Once you did that, hypothetically, if you

Page 270

had that knowledge, then hypothetically you could do it, but I don't know if anyone at Meta possessed that knowledge of libtorrent.  I don't even know if they knew there were such parameters as the -- you know, the upload slots.

So I would be speculating about whether they could or could not do that without having knowledge about what their skills and capabilities were and understanding of that software was.

So that's the point that I was making.

BY ATTORNEY POUEYMIROU:

Q.   But you could do it; right Ms. Frederiksen-Cross?

A.   I have studied this libtorrent code extensively for several years, and I could go in and make changes, yes.

Q.   And a company of Meta's size and stature could've certainly retained some -- have you worked for Meta before in the past?

A.   I did work on the Oculus case which Facebook had purchased; so in that sense I think I had that they were involved in that case.  I didn't work with anyone there directly.  I was strictly in the Oculus section.

Q.   So it was -- it would've been feasible for

Page 271

Meta to have figured out how to eliminate this risk?

ATTORNEY MORTON:  Object to form.  Vague.
Outside the scope of your report.  Calls for
speculation.

THE WITNESS:  So in your hypothetical, it
would've been possible for Meta to study the
libtorrent software they were using, become aware of
the various handles and bells and whistles it has,
and then make modifications to that code in order to
overcome a risk that at least one individual appears
to have had a concern about.

In that hypothetical, yeah, I can think
probably someone at Meta has the skills to do that.

BY ATTORNEY POUEYMIROU:

Q.   If you did a little Google search and
approximate said "How do I stop seeding data when
torrenting," do you not think you would find that
pretty quickly?

ATTORNEY MORTON:  Object to form.

Oh, God.

Calls for speculation.  Outside the scope
of your report.

THE WITNESS:  When I have done so in the
past, the results I got were very mixed.  They
pertained to various different clients.  They were

Page 272

sometimes contradictory, and sometimes wrong.  You might get some hints of how to do it that you -- I don't think that you could do it without doing some additional research and study.  I don't think -- I've never found a page that just said "Do it this way and it will stop" that actually had accurate information on it that was 100 percent correct.

And again, it -- that's probably because the software varies over time, and so just like the controls on your iPhone might vary from release to release, the controls for these -- this software can vary from release to release; and so information you find on the Internet may or may not be accurate, may or may not be misleading.

So in my personal experience doing research on the types of controls for various BitTorrent clients, I found it to be a very mixed bag.

BY ATTORNEY POUEYMIROU:

Q.   So your testimony essentially is that Meta's engineers didn't really know what they were doing as a potential explanation for why they didn't prevent the risk they were concerned about?

ATTORNEY MORTON:  Object to form. Misstates testimony.  Outside the scope of her

Page 273

report.

THE WITNESS:  Yeah, that is -- is not my testimony.  I think you would like that to be my testimony, perhaps, but my testimony is I have not seen evidence that would allow me to know, and you're asking me to make an opinion about what they could do without having information about what they know or what their skills were.

So could Meta, a technology company, have put a team on this potentially who could solve the problem?  Probably.  But I don't know these particular individuals.  I don't know who they elevated their concerns to.  I don't know whether someone in a decision-making capacity who had the authority to investigate and to direct someone to figure it out -- you know, I just don't know. You're asking me to suppose a lot of things, and I just don't have that data, and I'm not going to speculate on it.

BY ATTORNEY POUEYMIROU:

Q.    I'm not actually asking you to suppose anything.  You've testified that someone who understands how libtorrent works would've been able to set the defaults or reconfigure the default settings?

Page 274

A.   To change.

Q.   To change the default settings to stop sharing, and you have also testified that Meta employees might not have had the knowledge to do that.

Is that a fair summary of what you've now stated?

ATTORNEY MORTON:  Object to form.  Outside the scope of her report.

THE WITNESS:  Yeah, I'm -- I would prefer to stick with my own testimony that, you know, to the extent that this hypothetical is posed and I haven't researched it, I haven't interviewed employees about what they knew or didn't know, I would be concerned that they may or may not have the familiarity with the product to know what to do and how to do it.

I don't necessarily think that if they -- that if someone had directed the Meta IT team to go solve a problem like that, that I'm certain that they have competent programers who could eventually sort it out.

But again, you know, you're asking me to put together a chain of things that I don't have data on.

Page 275

ATTORNEY POUEYMIROU:  Okay.  Well, that's all for me.  Thank you very much.

ATTORNEY MORTON:  I'm going to take a short break.

THE VIDEOGRAPHER:  Okay.  Off the record. We are now off the record at 5:49.

(A break was taken.)

THE VIDEOGRAPHER:  We are now on the record at 6:02.

EXAMINATION

BY ATTORNEY MORTON:

Q.  Thank you, Ms. Frederiksen-Cross, for your testimony today.  I had a few follow-up questions for you.

Towards the end of the day you were asked some questions, you know, regarding the state of mind of Meta's employees.  Do you recall that?

A.  I do recall that, yes.

Q.  Yeah.  Have you expressed any opinions as an expert in this matter about the state of mind of Meta's employees?

A.  No.

(Procedural admonition by the Court Reporter.)

///

Page 279

CERTIFICATE OF SHORTHAND REPORTER

I, Michael P. Hensley, Registered Diplomate Reporter for the State of California, CSR No. 14114, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Michael P. Hensley, CSR, RDR