# EXHIBIT A

COOLEY LLP
KATHLEEN R. HARTNETT (314267)
(khartnett@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone:    +1 415 693 2000
Facsimile:    +1 415 693 2222

EPHRAIM MCDOWELL (*pro hac vice*)
(emcdowell@cooley.com)
ALEXANDER J. KASNER (310637)
(akasner@cooley.com)
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004-2400
Telephone:    +1 202 842 7800
Facsimile:    +1 202 842 7899

Attorneys for Defendant
ANTHROPIC PBC

(Additional Counsel on Next Page)

ARNOLD & PORTER KAYE
SCHOLER LLP
DOUGLAS A. WINTHROP (183532)
(Douglas.Winthrop@arnoldporter.com)
JOSEPH FARRIS (263405)
(Joseph.Farris@arnoldporter.com)
JESSICA L. GILLOTTE (333517)
(Jessica.Gillotte@arnoldporter.com)
ESTAYVAINE BRAGG (341400)
(Estayvaine.Bragg@arnoldporter.com)
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400

Attorneys for Defendant
ANTHROPIC PBC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ, CHARLES GRAEBER, and KIRK WALLACE JOHNSON, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case No. 3:24-cv-05417-WHA <br><br> Action Filed: August 19, 2024 <br><br> **DEFENDANT ANTHROPIC PBC'S MOTION FOR AN ORDER PERMITTING INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(B) OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION** <br><br> Hearing Date: August 28, 2025 <br> Hearing Time: 8:00 a.m. <br> Judge: Honorable William H. Alsup |

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO. 3:24-CV-05417-WHA

ARNOLD PORTER & KAYE SCHOLER LLP
ANGEL T. NAKAMURA (205396)
(Angel.Nakamura@arnoldporter.com)
OSCAR RAMALLO (241487)
(Oscar.Ramallo@arnoldporter.com)
Allyson Myers (342038)
(Ally.Myers@arnoldporter.com)
777 South Figueroa St., 44th Floor
Los Angeles, CA 90017-5844
Telephone:  (213) 243-4000
Facsimile:  (213) 243-4199

LEX LUMINA LLP
MARK LEMLEY (155830)
(mlemley@lex-lumina.com)
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone:  (213) 600-6063

LATHAM & WATKINS LLP
JOSEPH R. WETZEL (238008)
(joe.wetzel@lw.com)
ANDREW M. GASS (259694)
(andrew.gass@lw.com)
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095

Attorneys for Defendant
ANTHROPIC PBC

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO. 3:24-CV-05417-WHA

**TABLE OF CONTENTS**

|  |  | Page |
| --- | --- | --- |
| NOTICE OF MOTION AND MOTION | | 1 |
| STATEMENT OF RELIEF SOUGHT AND ISSUES TO BE DECIDED | | 1 |
| MEMORANDUM OF POINTS AND AUTHORITIES | | 1 |
| I. | INTRODUCTION | 1 |
| II. | BACKGROUND | 3 |
| | A. Factual Background | 3 |
| | B. Procedural Background | 4 |
| | C. *Kadrey* Order | 6 |
| III. | THE COURT SHOULD CERTIFY THE ORDER FOR INTERLOCUTORY APPEAL BECAUSE IT PRESENTS NOVEL QUESTIONS ABOUT FAIR USE | 7 |
| | A. Interlocutory Review Is Warranted to Determine Whether Fair Use Is Analyzed by Reference to the Defendant's Ultimate Use of a Copyrighted Work or by Parsing the Defendant's Use Into Subsidiary Steps | 8 |
| | B. Interlocutory Review Is Warranted to Determine Whether a Defendant's Acquisition of a Copyrighted Work from an Unauthorized Source Counsels Strongly Against Fair Use, Even if the Defendant's Ultimate Use of that Work Is Transformative | 14 |
| IV. | ALTERNATIVELY, THE COURT SHOULD PERMIT ANTHROPIC TO SEEK RECONSIDERATION OF THE ORDER | 16 |
| | A. The Order Manifestly Failed to Consider the Absence of Record Evidence that Anthropic Downloaded Books to Create a General-Purpose Library Unrelated to LLM Training | 17 |
| | B. The *Kadrey* Decision Constitutes an Intervening Change of Law | 20 |
| V. | CONCLUSION | 20 |

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Geophysical Union v. Texaco Inc.,*
60 F.3d 913 (2d Cir. 1994)................................................................................. 8, 10, 11

*Estate of Amaro v. City of Oakland,*
No. C 09-01019, 2010 WL 669240 (N.D. Cal. Feb. 23, 2010)................................. 13

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith,*
598 U.S. 508 (2023) ................................................................................... 11, 12, 15

*Blair v. Rent-A-Center, Inc.,*
No. C 17-02335, 2019 WL 529292 (N.D. Cal. Feb. 11, 2019)................................. 19

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) ................................................................................................ 15

*In re Cement Antitrust Litig.,*
673 F.2d 1020 (9th Cir. 1981).............................................................................. 9, 14

*Doe By & Through Doe v. Petaluma City Sch. Dist.,*
949 F. Supp. 1415 (N.D. Cal. 1996) ...................................................................... 20

*Google LLC v. Oracle Am., Inc.,*
591 U.S. 1 (2021) ..................................................................................................... 8

*Harper & Row Publishers, Inc. v. Nation Enters.,*
471 U.S. 539 (1985) .................................................................................................. 8

*J.B. v. G6 Hospitality, LLC,*
No. 19-cv-07848, 2021 WL 4079207 (N.D. Cal. Sept. 8, 2021) ........................... 20

*Kelly v. Arriba Soft Corp.,*
336 F.3d 811 (9th Cir. 2003)................................................................................... 12

*Kuehner v. Dickinson & Co.,*
84 F.3d 316 (9th Cir. 1996)................................................................................... 9, 14

*Lenz v. Universal Music Corp.,*
815 F.3d 1145 (9th Cir. 2016).................................................................................. 8

*Perfect 10, Inc. v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007)........................................................................... 12, 14

*Reese v. BP Exploration (Alaska) Inc.,*
643 F.3d 681 (9th Cir. 2011)....................................................................... 7, 11, 12, 13

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF AUTHORITIES**
(continued)

Page

*Regents of the Univ. of Cal. v. DHS,*
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ................................................................................. 8

*Sonos, Inc. v. Google LLC,*
   591 F. Supp. 3d 638 (N.D. Cal. 2022) ......................................................................... 7, 8, 11

*Sony Computer Ent., Inc. v. Connectix Corp.,*
   203 F.3d 596 (9th Cir. 2000) ..................................................................................... 9, 11, 12

*U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC,*
   583 U.S. 387 (2018) ................................................................................................................ 8

**Statutes**

28 U.S.C. § 1292(b) .........................................................................................................*passim*

17 U.S.C. § 107 .......................................................................................................... 4, 9, 14

**Other Authorities**

Federal Rule of Civil Procedure 54(b) ............................................................................... 1

Local Rule 7-9 .................................................................................................. 1, 16, 17, 20

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- iii -

### NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE THAT**, on August 28, 2025, at 8:00 a.m., or as soon thereafter as may be heard, Defendant Anthropic PBC ("Anthropic") will and hereby does move this Court (1) for an order certifying this Court's June 23, 2025 order denying in part Anthropic's motion for summary judgment (ECF No. 231, or the "Order") for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), or (2) in the alternative, pursuant to Federal Rule of Civil Procedure 54(b) and Northern District of California Civil Local Rule 7-9, for leave to file a motion for reconsideration.  This motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities, the papers on file in this action, and such other and further evidence or argument that the Court may consider.

### STATEMENT OF RELIEF SOUGHT AND ISSUES TO BE DECIDED

Anthropic requests that the Court certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  Alternatively, Anthropic seeks leave to file a motion for reconsideration of the Order, for the reasons set forth below.

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.      INTRODUCTION**

The Court should certify its Order for interlocutory appeal under 28 U.S.C. § 1292(b).  The Order addresses novel and consequential legal questions about the proper fair-use standard in the context of copyright-infringement challenges to groundbreaking generative artificial intelligence ("AI") technology.  Courts in this District have already diverged on those questions, and the answers to them will have significant implications for this case and the many other pending cases involving copyright challenges to large language models ("LLMs").  *See, e.g.*, *Denial et al. v. OpenAI, Inc. et al.*, No. 25-cv-05495 (N.D. Cal. June 30, 2025); *Bird v. Microsoft Corp.*, No. 25-cv-05282, (S.D.N.Y. June 24, 2025); *In re Mosaic LLM Litig.*, No. 24-cv-01451 (N.D. Cal. Mar. 8, 2024); *Nazemian v. NVIDIA Corp.*, No. 24-cv-01454 (N.D. Cal. Mar. 8, 2024); *Authors Guild v. OpenAI Inc.*, No. 23-cv-08292 (S.D.N.Y. Sept. 19, 2023), MDL No. 3143; *In re Google Generative AI Copyright Litig.*, No. 23-cv-03440 (N.D. Cal. July 11, 2023); *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, (N.D. Cal. July 7, 2023); *Tremblay v. OpenAI, Inc.*, No. 25-cv-03482 (S.D.N.Y.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO.  3:24-CV-05417-WHA**

June 28, 2023), MDL No. 3143.

In particular, the Order raises two "controlling question[s] of law as to which there is substantial ground for difference of opinion" and for which "an immediate appeal . . . may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). First, the Order presents the question whether fair use is analyzed based on the defendant's ultimate purpose in copying a copyrighted work or instead may be parsed into separately analyzed constituent steps. This Court sought to deconstruct Anthropic's conduct into separate constituent "uses," including by asking whether Anthropic "immediately" transformed the copyrighted works and "immediately" deleted them. Order at 21. The Court then concluded that a supposed preliminary step— downloading books from "pirate" websites to be retained in a general-purpose library—was not compatible with a fair use of those books to train an LLM. *Id.* at 1, 9. But just two days later, Judge Chhabria adopted the opposite approach in a very similar case, viewing Meta's downloading of books in light of Meta's ultimate objective of LLM development, and deeming that copying fair use. *See Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417 (N.D. Cal. June 25, 2025), ECF No. 598 ("*Kadrey* Op."). Resolving this dispute over the proper mode of analysis is critically important to the outcome of this and the many other pending copyright challenges to LLMs. This Court should obtain guidance from the Ninth Circuit on the issue now instead of holding a trial that may need to be redone under a different legal framework—or may not be necessary at all.

Second, the Order raises a question about the significance of a defendant's initial acquisition of a copyrighted work from an unauthorized source—here, "pirate sites." Order at 18. This Court expressed its "doubts that any accused infringer could ever meet its burden of explaining why downloading source copies from pirate sites *that it could have purchased or otherwise accessed lawfully* was itself reasonably necessary to any subsequent fair use." *Id.* (emphasis in original). By contrast, Judge Chhabria concluded that Meta's unauthorized downloading of "books from shadow libraries"—including, again, some of the same Internet sources that Anthropic drew from—did not undermine Meta's fair use defense because "the whole point of fair use analysis is to determine whether a given act of copying was unlawful." *Kadrey* Op. at 19; *see id.* at 10-11. Those diverging views have profound implications for this case and others like it because most if not all of the

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO.  3:24-CV-05417-WHA

leading AI companies developing LLMs are accused of engaging in the same downloading of books from unauthorized online sources. *See, e.g.*, Defs.' Mot. for Partial Summ. J. at 6, 8, *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417 (N.D. Cal. Mar. 24, 2025), ECF No. 489 (explaining that Meta used "Books3" and "LibGen" as datasets for training its models); Consolidated Class Action Compl. ¶ 119, *Authors Guild v. OpenAI Inc.*, No. 23-cv-08292 (S.D.N.Y. June 13, 2025), ECF No. 456 (alleging that OpenAI used "books downloaded from LibGen to train its models"). It is important that the Ninth Circuit resolve this disagreement now so that the correct legal framework governs pending and future copyright challenges to generative AI technology.

Alternatively, if this Court does not certify its Order for interlocutory appeal, it should grant Anthropic leave to move for reconsideration of the Order. The Order should be reconsidered because it overlooks that, even taking the record facts in the light most favorable to Plaintiffs, there is no evidence that Anthropic acquired books "to create a central, general-purpose library" separate from the use of those books for LLM training. Order at 19. Plaintiffs never asserted any "general-purpose library" theory, so Anthropic had no opportunity to respond to it. The Court should give Anthropic that opportunity now. And in this rapidly evolving area of law, the conflicting opinion in *Kadrey*, although not binding on this Court, also provides an independent basis for reconsideration.

## II.   BACKGROUND

### A.   Factual Background

Anthropic is an AI company that develops LLMs, and its product is called Claude. ECF No. 119-5 ("Kaplan Decl.") ¶ 6. LLMs are text-based generative AI models trained on extremely large volumes of data to develop a functional understanding of how language works, so that they can generate completely new text. *Id.*; *see* Order at 26. Claude is a versatile LLM that assists with various tasks, including writing computer code, drafting professional emails, and analyzing business data. Kaplan Decl. ¶¶ 20-22. Developing LLMs like Claude requires an almost unimaginably voluminous and diverse set of data, which allows LLMs to generalize beyond specific inputs and produce creative and useful outputs. *Id.* ¶¶ 38, 40. Indeed, many trillions of words were required to train Claude, and that scale is a technological necessity. *Id.* ¶ 39; *see* Order

Cooley LLP
Attorneys at Law
San Francisco

3

Anthropic PBC's Mot. for
Cert. Order or Reconsideration
Case No.  3:24-cv-05417-WHA

at 26. Thus, developing LLMs is why Anthropic collected an astronomical body of data composed of a wide variety of source materials, from the Internet, to computer code, to books. Kaplan Decl. ¶¶ 45-53. And in 2021, when Anthropic first started developing LLMs, it downloaded certain books datasets, such as "Books3" and "LibGen," that were available only on the Internet. *Id.* ¶¶ 48-50. Nothing in the record suggests that the Internet sources that offered the books datasets profited from Anthropic's downloading.

Anthropic starts the process of LLM development by building a computational model capable of learning patterns in language and concepts from enormous data sets. *Id.* ¶ 35. Anthropic then processes the massive amounts of data that it has obtained by deduplicating portions that appear repeatedly, converting the remaining characters to tokens, and translating the tokens into "vectors," or mathematical representations of how words relate to other words. *See id.* ¶¶ 54-59. Anthropic also assesses the quality and utility of datasets to ensure that they are suitable for training. Claude then trains on the translated data by adjusting the model's weights and biases based on vector inputs as it learns more about how humans use words and concepts in writing. *Id.*

### B.     Procedural Background

Plaintiffs filed this putative class action in August 2024, alleging that Anthropic infringed their copyrights by using their books in the training corpus for Claude. ECF No. 1 (Compl.) ¶¶ 68-74; *see* ECF No. 70 (FAC) ¶¶ 72-78. This case was one of many recent putative copyright class actions filed by authors against major AI companies, including OpenAI, Meta, Microsoft, and others. *See supra* at 3 (citing cases). Anthropic moved for summary judgment on the ground that its use of Plaintiffs' works was fair under Section 107 of the Copyright Act, 17 U.S.C. § 107. ECF No. 119-7.

The record before the Court at summary judgment was that Anthropic used Plaintiffs' books—among millions of other works—to create training data for its LLMs, including Claude. *Id.* at 2-10. Anthropic argued that its use of Plaintiffs' books was fair because it was profoundly transformative, *id.* at 11-16, and because Claude never produced copies of Plaintiffs' books as an output, *id.* at 7. Plaintiffs' Opposition agreed that Anthropic downloaded the books at issue in order "to train its large language models" and never claimed that Anthropic used the downloaded books

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO. 3:24-CV-05417-WHA

to build a "library."  ECF No. 157-2 ("MSJ Opp.") at 1.  Plaintiffs nonetheless contended that Anthropic's downloading of Plaintiffs' books from unauthorized Internet sources was "a standalone act of infringement," notwithstanding Anthropic's transformative use of those books.  *Id.* at 6. Plaintiffs did not argue that Anthropic downloaded and stored books for any purpose other than training its LLMs.  *See id.*  To the contrary, Plaintiffs contended that, "like most technology companies, Anthropic's 'research' [on training LLMs] drove its commercial development" and "commercially released Claude model."  *Id.* at 15 n.8.

On June 23, 2025, the Court issued an order granting in part and denying in part Anthropic's summary-judgment motion.  The Court found that the copies of Plaintiffs' works "used to train specific LLMs were justified as a fair use" because "[t]he technology at issue was among the most transformative many of us will see in our lifetimes."  Order at 30 (emphasis omitted).  The Court explained that "using copyrighted works to train LLMs" generates "new text" that is "quintessentially transformative" and "different" from the original.  *Id.* at 13-14.  And the Court further determined that the majority of the other fair use factors likewise favored finding that Anthropic had fairly used Plaintiffs' works to train LLMs.  *Id.* at 30.

But the Court also concluded that the record, taken in the light most favorable to Plaintiffs, indicated that Anthropic may have used Plaintiffs' works for another purpose, distinct from LLM training—namely, "creat[ing] a central, general-purpose library."  *Id.* at 19.  Because Plaintiffs had not asserted any such "library" use, the theory that Anthropic stored the books data it downloaded from the Internet in a "library" never arose during the summary judgment proceedings. Accordingly, Anthropic never had the opportunity to rebut the theory.

Nonetheless, the Court proceeded to analyze Anthropic's supposed "retain[ing]" of "copies in its central library" as an independent "use" subject to a separate fair-use analysis.  *Id.* at 14.  The Court rejected Anthropic's argument that it should "look[] only at the 'ultimate use'" of the copies rather than "a series of atomized acts of 'infringement' distinct from that overall purpose.'"  *Id.* at 22 (citation omitted).  The Court thus parsed what it viewed as several discrete steps of Anthropic's conduct: "download[ing] over seven million pirated copies of books"; "retain[ing] pirated copies even after deciding it would not use them or copies from them for training its LLMs ever again";

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO.  3:24-CV-05417-WHA

and then assembling "a central library of all the books in the world," which could be "available for any number of further uses." *Id.* at 18-19.  The Court also emphasized that the downloaded copies were stored, rather than "immediately transformed" and "immediately deleted." *Id.* at 21.  The Court therefore concluded that the parties would "have a trial on the pirated copies used to create Anthropic's central library." *Id.* at 31.

### C.   *Kadrey* Order

Two days after this Court's Order, Judge Chhabria issued an order in *Kadrey v. Meta Platforms, Inc.*, granting Meta's cross-motion for partial summary judgment and denying plaintiffs' cross-motion for partial summary judgment.  As here, *Kadrey* concerned whether the training of a generative AI model constituted fair use.  *Kadrey* Op. at 1.  And as here, the court in *Kadrey* confronted whether fair use protects companies that "feed copyright-protected materials into their models—without getting permission from the copyright holders or paying them for the right to use their works for this purpose." *Id.*  Indeed, Meta had downloaded some of the same book datasets from some of the same so-called "shadow libraries" as Anthropic, including "Books3" and "LibGen." *Id.* at 10-11.  Yet unlike the Court here, Judge Chhabria found that fair use doctrine protected Meta from liability for infringement. *Id.* at 40.

Judge Chhabria's analysis diverged from this Court's in two respects pertinent to this Motion.  First, Judge Chhabria concluded that Meta's conduct must "be considered in light of its ultimate, highly transformative purpose: training Llama," Meta's LLM. *Id.* at 21.  He therefore rejected the plaintiffs' contention that "Meta's downloading of the plaintiffs' books" from unauthorized sources "must be considered wholly separately from" Meta's "use of the books to train Llama." *Id.*  And he emphasized that even if "only *some* of [Meta's] copies were used for LLM training," they all "had the ultimate purpose of LLM training," including the copies made to "see whether the books in the database made for good training data." *Id.* at 21-22 (emphasis added).

Second, Judge Chhabria concluded that Meta's "download[ing] the books from shadow libraries" rather than "start[ing] with an 'authorized copy' of each book" did not "give[] [the plaintiffs] an automatic win." *Kadrey* Op. at 19.  He explained that "[t]o say that Meta's downloading was 'piracy' and thus cannot be fair use begs the question because the whole point of

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO.  3:24-CV-05417-WHA

fair use analysis is to determine whether a given act of copying was unlawful." *Id.* His reasoning therefore diverges from this Court's suggestion that even a highly transformative "ultimate use" may not adequately justify initial unauthorized copying. *Kadrey* Op. at 21 (disagreeing with page 18 of this Court's Order).

## III. THE COURT SHOULD CERTIFY THE ORDER FOR INTERLOCUTORY APPEAL BECAUSE IT PRESENTS NOVEL QUESTIONS ABOUT FAIR USE

Anthropic requests that the Court certify its Order for interlocutory appeal under 28 U.S.C. § 1292(b). Section 1292(b) allows a non-final order to be certified for interlocutory appeal when it "involves a controlling question of law as to which there is substantial ground for difference of opinion" and when "an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Id.* The Ninth Circuit employs a "flexible approach" under Section 1292(b) to avoid "undesirable consequences," such as "unnecessary, protracted litigation and a considerable waste of judicial resources." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 n.5 (9th Cir. 2011). This Court has certified questions under Section 1292(b) to prevent "vast amount[s] of resources" from "being consumed" before the legal "ground rules" are established. *Sonos, Inc. v. Google LLC*, 591 F. Supp. 3d 638, 649 (N.D. Cal. 2022) (Alsup, J.).

This case presents a novel and important legal issue dividing the courts: the standard for assessing whether the use of copyrighted works, obtained as large datasets from specific sources on the Internet, to train generative AI tools is fair use under the Copyright Act. Two specific questions of law warrant immediate appellate review. The first is whether fair use is analyzed based on the defendant's ultimate purpose in using a copyrighted work or instead parsed into separately analyzed constituent steps. Because this Court engaged in such parsing, it treated Anthropic's downloading, storage, and retention of books datasets as isolated acts, and emphasized that Anthropic did not immediately transform the datasets or immediately delete them. But none of those issues would have mattered if the Court had focused only on Anthropic's ultimate use— LLM training. Under that approach, Anthropic's actions would be recognized as interconnected parts of a single transformative use.

The second controlling question of law is whether a defendant's acquisition of a copyrighted

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO. 3:24-CV-05417-WHA

work from a third party that distributed it without permission strongly weighs against the availability of the fair use defense even if the use is otherwise fair. This Court's denial of summary judgment on that basis lacks doctrinal support because the entire premise of fair use is that the particular acts of copying at issue were unauthorized, yet nonetheless fair. Nor is there any principle that a third party's unauthorized copying and distribution—in which the defendant played no part—should taint the defendant's subsequent transformative use.

This Court has previously certified similarly novel legal questions of nationwide significance. *See, e.g.*, *Sonos*, 591 F. Supp. 3d at 649; *Regents of the Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1049 (N.D. Cal. 2018) (Alsup, J.). And courts have specifically permitted Section 1292(b) interlocutory appeals following the resolution of an important fair use issue, including in one of the principal decisions upon which this Court's Order relied. *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 915 (2d Cir. 1994); *see also Thomson Reuters Enter. Centre GmbH v. ROSS Intel. Inc.*, 20-cv-00613 (D. Del. May 23, 2025), ECF No. 804; *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016). Interlocutory review is likewise warranted here.

**A.    Interlocutory Review Is Warranted to Determine Whether Fair Use Is Analyzed by Reference to the Defendant's Ultimate Use of a Copyrighted Work or by Parsing the Defendant's Use into Subsidiary Steps**

The first controlling question of law justifying interlocutory review is whether courts should analyze fair use by reference to the defendant's ultimate purpose in using a copyrighted work or instead by parsing the defendant's use into subsidiary steps. That legal question is important and novel, has divided courts in this District, and materially affects the outcome of this case.

***Controlling question of law***: This Court's Order presents "question[s] of law." 28 U.S.C. § 1292(b). Because "[f]air use is a mixed question of law and fact," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985), courts aim to "break" the "question into its separate factual and legal parts," *Google LLC v. Oracle Am., Inc.*, 591 U.S. 1, 24 (2021). The question here—whether to analyze the defendant's ultimate purpose or instead seek to assess each subsidiary step—is a "legal part[]" of the fair-use inquiry. *Id.* That is so because answering the question requires the court "to expound on the law" and "elaborat[e] on [the] broad" fair use "legal standard." *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018).

Cooley LLP
Attorneys at Law
San Francisco

8

Anthropic PBC's Mot. for
Cert. Order or Reconsideration
Case No. 3:24-cv-05417-WHA

That legal question is also "controlling." 28 U.S.C. § 1292(b). A question is controlling when its resolution "on appeal could materially affect the outcome of the litigation in the district court," *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981), even if it will not necessarily "determine[] who will win on the merits," *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996). Here, the Court analyzed Anthropic's conduct as multiple subsidiary steps, rather than focusing on Anthropic's ultimate purpose of using the works to develop its LLMs. *See* Order at 22. The Court therefore parsed what it viewed as distinct acts: Anthropic's initial copying of works from online "pirate" websites; its supposed storage of books in a "central library"; its training of LLMs; and its supposed retention of books after their use for training. *See id*. at 19. And within that piecemeal analytical framework, the Court placed great weight on whether Anthropic "immediately" transformed the downloaded books and "immediately" discarded them. *Id.* at 21. After breaking up Anthropic's conduct into what it viewed as discrete steps, the Court concluded that books downloaded from "pirated sources" and stored in a "central library" were not fairly used in the course of LLM development. *Id.* at 24.

If the Court had instead adopted Anthropic's argument that it should "look[] only at the 'ultimate use'" of the downloaded works—namely, developing the LLMs—then the outcome would have likely been different. *Id.* at 22; *cf. Kadrey* Op. at 21. Anthropic's framing accords with Section 107's text, which refers to "the purpose . . . of the use," without directing courts to deconstruct the defendant's use into constituent steps. 17 U.S.C. § 107. Under that framing, Anthropic's actions were all interconnected, necessary elements in pursuit of the single purpose of LLM development—which this Court recognized as "among the most transformative" uses "many of us will see in our lifetimes." Order at 30. Likewise, if only the ultimate use of the copyrighted works (LLM development) is legally relevant, then it does not matter whether Anthropic immediately used the books for training, whether it immediately discarded them thereafter, or whether "every book" became part of the LLM training corpus. *Id.* at 19. Indeed, neither the Ninth Circuit nor Supreme Court has considered promptness of a defendant's use and deletion of copyrighted work in this manner. *See Sony Computer Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 598 (9th Cir. 2000) (finding fair use where the defendant "repeatedly copied Sony's copyrighted

[material] during a process of 'reverse engineering,'" without asking whether the defendant discarded the material).  Thus, if the Court had viewed Anthropic's ultimate purpose as dispositive, then Anthropic likely would have prevailed on its fair use defense.[1]

The Court's emphasis on subsidiary steps (rather than ultimate use) also led it to focus on Anthropic's supposed creation of a "central library of texts," which it compared to "any university or corporate library."  Order at 20.  In so doing, the Court misapplied the Second Circuit's decision in *Texaco*.  There, the court found no fair use when a company library "circulated one copy" of a journal issue and "invited all the [company] researchers to make their own photocopies" so that they could have the articles "readily available [to read] in their own offices."  *Texaco*, 60 F.3d at 918-19.  The court reasoned that the company's photocopying was not "a transformative use of the copyrighted material" because it did not "add[] something new, with a further purpose or different character."  *Id.* at 923 (citation omitted).  Here, in stark contrast, Anthropic acquired, stored, and organized books not so that they could be used for their original purpose of being read, but rather so that they could be used for the transformative purpose of developing LLMs.  Importantly, Anthropic is an AI company—not a library, or even a more general technology company that might put the works to some other use.  And nothing in the record supports the conclusion that any Anthropic employee read a single one of the books at issue.  Thus, unlike the company in *Texaco*, Anthropic has no "research" objective that requires consuming the books as ordinary reading material; it has only the transformative objective of developing LLMs.  *Id.* at 924.  Further, in *Texaco*, the scientists had created no other "work of authorship," *id.*—just a plainly non-transformative photocopy of the original journal.  In contrast, here, Anthropic directly employed the books in a "further fair use," Order at 21-22, to create a highly transformative work of its own— Claude.  If the Court had appropriately focused on Anthropic's ultimate purpose in using the books,

---

[1] To be sure, if Anthropic were to subsequently use retained works for purposes *other* than LLM development activities—such as allowing its employees to "borrow" those works for reading— then those separate uses would be subjected to their own fair use analysis.  *Cf.* Order at 28 (noting that if an LLM produced "an[] exact cop[y]" of a copyrighted work, that "would be a different case" that Plaintiffs "remain free to bring . . . in the future should such facts develop").  But Anthropic's only use of the downloaded works is for developing LLMs.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO.  3:24-CV-05417-WHA

it would not have separately analyzed Anthropic's supposed "library" use at all.[2]

**Difference of opinion**: A "substantial ground for difference of opinion" also exists as to the proper resolution of the controlling legal question here.  28 U.S.C. § 1292(b).  That requirement is met "where novel and difficult questions of first impression are presented" or "where reasonable jurists might disagree on an issue's resolution."  *Reese*, 643 F.3d at 688 (cleaned up); *see Sonos*, 591 F. Supp. 3d at 649 (certifying question where "reasonable minds may differ" about the "ground rules" for pleading "infringement").

Jurists can reasonably disagree—and, indeed, have disagreed—over whether fair use in the context of LLM training should be analyzed by reference to ultimate purpose or broken up into subsidiary steps.  In *Kadrey*, Judge Chhabria maintained that all of Meta's copying of books from the Internet must "be considered in light of its *ultimate*, highly transformative purpose: training [the LLM]."  *Kadrey* Op. at 21 (emphasis added).  Because all relevant copies "had the ultimate purpose of LLM training," Judge Chhabria found them all to be protected by fair use doctrine, even if "only some" were actually "used for [LLM] training."  *Id.* at 21-22.  This reasoning cannot be reconciled with this Court's focus on subsidiary steps rather than "ultimate use."  Order at 22.  Moreover, in Judge Chhabria's view, even copies made simply "to see whether the books in the database made for good training data" were "a reasonable first step towards training an LLM."  *Kadrey* Op. at 22.  He further observed that "even if Meta did download some copies that weren't ultimately used for training, fair use doesn't require that the secondary user make the lowest number of copies possible."  *Id.* (citing *Connectix*).  And he never considered whether Meta had retained copyrighted books after using them for training.  Judge Chhabria's reasoning cannot be squared with this Court's concern that "[n]ot every copy [Anthropic made] was even necessary nor used for training LLMs"—which undergirded its conception of a separate "central library" use.  Order at 21-22.

Contrary to the Court's suggestion, Order at 19-20, *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), does not resolve the question in Plaintiffs' favor.  In

---

[2]  At the summary judgment hearing, this Court stated that it was "not sure *Texaco* is on point."  MSJ Tr. at 67.  The Court explained that whereas in *Texaco*, the relationship between the copied journals and "some transformative future product . . . was so attenuated that you could not say that that was fair use, [i]n our case there was a direct use of these products to create and train this artificial intelligence machine learning."  *Id.*  Anthropic agrees with this statement.

Cooley LLP
Attorneys at Law
San Francisco

11

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO.  3:24-CV-05417-WHA

*Warhol*, the Supreme Court observed that "[t]he same copying may be fair when used for one purpose but not another," noting that the copyrighted photograph at issue "has been used in multiple ways." *Id.* at 533. But the original photograph in *Warhol* was copied to multiple distinct ends—from creating an illustration, to creating 15 further works, to licensing one of those further works to a magazine. *Id.* at 534. Here, the asserted uses—downloading books, storing the books data, training the LLMs on the data, and retaining the data for future training—are all interconnected steps. As noted, Anthropic is an AI company that develops and researches LLMs; it has no other mission or product to which Plaintiffs' books are plausibly relevant.

Ninth Circuit precedent likewise does not support Plaintiffs' position. This Court relied on *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003), but those cases found fair use, emphasizing that—as here—the defendant search engines put the plaintiff's "thumbnail images" to a "significant transformative use." *Perfect 10*, 508 F.3d at 1168; *see also Kelly*, 336 F.3d at 819. The Ninth Circuit did not ask whether the images were "deployed immediately" or "immediately deleted." Order at 21. Nor did it suggest that the defendants' uses were unfair simply because they had "download[ed]" the plaintiffs' images onto a "server" and stored them in a "database" before using them. *Kelly*, 336 F.3d at 815. And in *Connectix*, the court found fair use while deeming it irrelevant that the defendant may have "ma[d]e more intermediate copies" than "necessary" and "repeatedly copied" material to "find out how the Sony PlayStation worked." 203 F.3d at 598, 605. This Court, in contrast, found it significant that "[n]ot every copy was even necessary" to train LLMs, Order at 22—without considering how Anthropic could have known which book datasets were useful for training without assessing them to "find out," just as the defendant did in *Connectix*. 203 F.3d at 598.

The "novel and difficult" legal issue here will recur in the many pending copyright challenges to generative AI tools. *Reese*, 643 F.3d at 688; *see supra* at 3 (listing cases). As this Court recognized, LLM development involves multiple steps, including cleaning the data, translating it into a tokenized copy, and uncovering "contingent statistical relationships" through an "iterative" process. Order at 6. A copyrighted work therefore cannot be "immediately" used to

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO. 3:24-CV-05417-WHA

train an LLM, in part because it takes time to amass and assess the amount of diverse data required to train a model. Additionally, because techniques for processing data are quickly improving, LLM developers may store raw data for further processing as advanced techniques develop, as well as to run experiments comparing old and new methods to determine which results in a more capable LLM. And both before and after training, data must be stored and organized in some location. In addition, defendants who immediately deleted training data would run the risk of spoliation accusations by potential plaintiffs. In other words, in *all* copyright challenges to generative AI tools, plaintiffs could seek to parse the process of LLM training into constituent steps and argue a lack of "immediate" use. The acceptance or rejection of such arguments could well shape the outcome in this entire line of industry-defining cases.

***Materially advance the litigation***: Finally, an interlocutory appeal will "materially advance the ultimate termination of the litigation" by providing guidance on the proper approach to fair use. *See* 28 U.S.C. § 1292(b). This factor does not insist on "a final, dispositive effect on the litigation," so long as an appeal could move the ball forward toward resolution. *Reese*, 643 F.3d at 688. If the Ninth Circuit were to adopt Anthropic's view that the ultimate purpose of developing the LLM is what matters, then it would be legally irrelevant whether Anthropic took the supposed initial step of assembling a "central library" of data or the later step of retaining copies that may later be needed for further training. In that circumstance, summary judgment should be granted for Anthropic in full, averting the need for a trial. And where "a different outcome in the court of appeals would *end* the litigation," an interlocutory appeal will plainly "advance the ultimate termination of the litigation." *Estate of Amaro v. City of Oakland*, No. C 09-01019, 2010 WL 669240, at *15 (N.D. Cal. Feb. 23, 2010) (Alsup, J.) (emphasis added). Moreover, even if the Ninth Circuit were to adopt a position other than Anthropic's, it would provide helpful guidance on the proper fair-use standard and minimize the chance that any trial will have to be redone, thus "materially advanc[ing] the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

Cooley LLP
Attorneys at Law
San Francisco

13

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO. 3:24-CV-05417-WHA

**B.** **Interlocutory Review Is Warranted to Determine Whether a Defendant's Acquisition of a Copyrighted Work From an Unauthorized Source Counsels Strongly Against Fair Use, Even if the Defendant's Ultimate Use of that Work Is Transformative**

The Court's Order raises a second controlling legal question that also warrants immediate review: whether a defendant's initial acquisition of a copyrighted work from a third party who distributed the work without permission counsels strongly against fair use—even if the defendant's ultimate use of that work is transformative. This Court and Judge Chhabria offered divergent approaches to that issue, and its resolution will materially affect the disposition of this and the many similar pending cases.

***Controlling question of law***: This Court's Order presents a "question of law" about how a defendant's initial acquisition of a copyrighted work from an unauthorized source affects the fair use analysis. 28 U.S.C. § 1292(b). Section 107 of the Copyright Act references neither the means of acquisition nor the source of the copyrighted work as relevant fair-use factors. *See* 17 U.S.C. § 107. And the Ninth Circuit has found fair use even when the defendant copied images from websites that had themselves distributed those images "without authorization." *Perfect* 10, 508 F.3d at 1157. Nonetheless, the Court "doubts that any accused infringer could ever meet its burden of explaining why downloading source copies from pirate sites" was "reasonably necessary to any subsequent fair use." Order at 18. Thus, the Court's analysis raises the legal question of what effect making an initial copy from an unauthorized source—here, the so-called "pirate libraries," Order at 3— has on the fair use analysis.

This legal question is "controlling" because it "could materially affect the outcome of the litigation." *In re Cement Antitrust Litig.*, 673 F.2d at 1026. Although the Court stated that it "need not decide this case on th[e] rule" that an initial acquisition of copyrighted work from an unauthorized source is "inherently" infringing, that "rule" will weigh heavily on further proceedings in this case. Order at 18-19. Indeed, if the Court ultimately adopts that rule, then Anthropic's fair use defense could fail even if Anthropic disproves the notion of a "general-purpose library" (as it believes it will upon more fulsome development of an evidentiary record). *Id.* at 30. That prospect suffices to make the legal issue "controlling." 28 U.S.C. § 1292(b); *see Kuehner*, 84

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO. 3:24-CV-05417-WHA

F.3d at 319 (issue can be controlling even if it will not necessarily "determine[] who will win on the merits").

**_Difference of opinion_**: Reasonable jurists may disagree—and, indeed, have disagreed—about the significance of initial acquisitions of copyrighted work from third-party sources that distributed the work without permission. Two days after this Court's ruling, Judge Chhabria granted summary judgment to Meta on the plaintiffs' infringement claim despite "the fact that Meta downloaded the [plaintiffs'] books from shadow libraries and did not start with an 'authorized copy' of each book." *Kadrey* Op. at 19. Judge Chhabria explained that "[t]o say that Meta's downloading was 'piracy' and thus cannot be fair use begs the question because the whole point of fair use analysis is to determine whether a given act of copying was unlawful." *Id.* And he noted that the plaintiffs there—like Plaintiffs here—"ha[d] not submitted any evidence" suggesting that "Meta's act of downloading propped up these libraries or perpetuated their unlawful activities." *Id.* at 21. Judge Chhabria's reasoning conflicts with this Court's suggestion that a defendant may not be able to prove fair use after "downloading source copies from pirate sites." Order at 18.[3]

Notably, this disagreement about the significance of unauthorized acquisition in the fair use analysis closely tracks related precedent addressing what role, if any, bad faith plays in the fair use framework. In both *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), and *Google*, the Supreme Court "expressed some skepticism about whether bad faith has any role in a fair use analysis," reasoning that "[c]opyright is not a privilege reserved for the well-behaved." *Google*, 593 U.S. at 32 (citation omitted); *see also Campbell*, 510 U.S. at 585 n.18. Most recently, in *Warhol*, the Court cast further doubt on the relevance of bad faith by "h[olding] squarely that it is not the 'subjective intent' of a copyist that counts, but the 'objective . . . use' of the copy." Order at 20 n.5 (quoting *Warhol*, 598 U.S. at 544-45). Thus, this Court correctly observed that the Ninth Circuit "has not yet reappraised how bad faith (or good faith) figures in fair use after *Warhol*" and

---

[3] This Court also observed that "[t]here is no decision holding or requiring that pirating a book that could have been bought at a bookstore was reasonably necessary to writing a book review." Order at 18-19. Here, however, as the Court itself noted, "the volume of text required to train an LLM is monumental," *id.* at 26—and no market currently exists for that quantity of digital books. Moreover, writing a book review does not require making a full copy of the book, whereas it is undisputed that LLM development necessarily does.

Cooley LLP
Attorneys at Law
San Francisco

15

**Anthropic PBC's Mot. for
Cert. Order or Reconsideration
Case No. 3:24-cv-05417-WHA**

*Google*, Order at 20-22 & n.5, while Judge Chhabria likewise noted that "[t]he law is in flux about whether bad faith is relevant to fair use," *Kadrey* Op. at 19.

This issue of initial copying from an unauthorized source—whether or not viewed through the lens of bad faith—carries significant implications for the many pending copyright cases involving generative AI technology, as well as for copyright law more broadly.  The entire premise of these cases is that technology companies trained their LLMs on copyrighted content absent the rightsholders' authorization.  The fair use analysis should focus on the copies made by Anthropic, not copies made by third parties over whom Anthropic had no control.  Whether the rightsholders authorized an unrelated third party to make a predicate "pirate" copy of the works should not taint the defendant's subsequent transformative use.  Nor is it enough to say that the defendant's copying was unauthorized because that is an inherent feature of a fair use inquiry.  If a contrary position were widely adopted, then LLM training by any company that downloaded works from third-party websites like LibGen or Books3 could constitute copyright infringement—even though, as this Court correctly recognized, LLM training is "exceedingly transformative."  Order at 9.

***Materially advance the litigation*:** Resolving this legal issue now "may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  If Anthropic is correct that initial unauthorized downloading of books from third-party websites should not preclude its fair use defense (as Judge Chhabria held)—and in fact, should play little if any role in the analysis—then judgment will likely be warranted for Anthropic given its highly transformative use of those works to train its LLMs.  That result would avert a trial that may be unnecessary or that will have to be redone under the correct legal standard.  The Court and the parties should obtain Ninth Circuit guidance before a trial moves forward.

## IV.   ALTERNATIVELY, THE COURT SHOULD PERMIT ANTHROPIC TO SEEK RECONSIDERATION OF THE ORDER

Alternatively, the Court should grant Anthropic leave to move for reconsideration of the Order.  Anthropic has shown the requisite diligence by filing this motion only 21 days after this Court's Order and 19 days after Judge Chhabria's order in *Kadrey*.  *See* Civil L.R. 7-9(b).  It also meets the substantive requirements for reconsideration.  *See id.* 7-9(b)(2)-(3).  The Order failed to

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO. 3:24-CV-05417-WHA

consider the material fact that the record does not support (nor did Plaintiffs argue) that Anthropic downloaded books to create a "general-purpose library" separate from LLM development. And the Order necessarily could not have considered the subsequently issued *Kadrey* opinion. Accordingly, leave to seek reconsideration is warranted.

**A.      The Order Manifestly Failed to Consider the Absence of Record Evidence that Anthropic Downloaded Books to Create a General-Purpose Library Unrelated to LLM Training**

The Order "manifest[ly] fail[ed]" to "consider material facts," L.R. 7.9(b)(3), showing that the record does not support the Court's conclusion that Anthropic downloaded and retained books to create a "general-purpose library of works for various uses for which the company might have of them," Order at 30. Instead—and as Plaintiffs have acknowledged, *see* MSJ Opp. at 1—the record allows only one inference: that Anthropic downloaded and retained books to develop LLMs. In particular, it is a matter of undisputed fact that when Anthropic first started developing LLMs in 2021, it obtained datasets composed of books from the Internet "as there were no other sources of books datasets available that were *suitable to train LLMs*." Kaplan Decl. ¶ 48 (emphasis added). It is further undisputed that "datasets of books" then became "part of [Anthropic's] training corpus for its LLMs." *Id.* ¶ 47. And it is still further undisputed that "the collection of a massive amount of data"—including the books downloaded from the Internet—is a critical first step in "[t]he iterative, multi-step LLM training process." *Id.* ¶ 38.

Specifically, once data is collected, it must be "assembled into the training corpus" and "processed" prior to training. *Id.* ¶ 54. Among other things, the data must be "filter[ed]" to eliminate "low-quality" and "toxic" content and "to ensure the model aligns with human ethical standards." ECF No. 122-33 (MSJ Ex. 32) at 8. The data must also be converted into computer code called "tokens" and then further converted into "'vectors,' which are mathematical representations of how words relate to other words." Kaplan Decl. ¶¶ 55-56. Only at that point can LLM training begin—and such training involves "on the order of a million billion billion repeated mathematical calculations," through which "the model adjusts the weights based on the vector inputs . . . as it learns more about how humans use words and concepts in writing." *Id.* ¶ 56. Again, all of these facts were undisputed. Accordingly, the record establishes, as a matter of

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO.  3:24-CV-05417-WHA

undisputed fact, that Anthropic acquired and stored books for the sole purpose of developing LLMs.

This Court nonetheless hinged its Order on what it found to be a potential conclusion viewing the evidence in the light most favorable to Plaintiffs: that Anthropic acquired and stored books to "[c]reat[e] a permanent, general-purpose library," separate from the purpose of LLM training. Order at 9. In so doing, the Court failed to address all of the undisputed facts discussed above and instead relied principally on incomplete portions of deposition testimony from Anthropic Vice President Tom Turvey. *Id.* at 3-5. As an initial matter, the portions of Turvey's testimony that this Court quoted addressed only the books that Anthropic purchased and scanned—not the ones at issue here that Anthropic downloaded from the Internet. MSJ Opp. Ex. 22, at 145-146 ("We were *purchasing* books . . . for the purpose of data acquisition that would help inform our . . . products.") (emphasis added). In fact, Turvey did not join Anthropic until 2024, and he initiated the book scanning project years after Anthropic had downloaded the books datasets from Internet sources in 2021 and 2022—so he had no firsthand knowledge of Anthropic's acquisitions from those sources. *See* ECF No. 123-2 ("Turvey Decl.") ¶ 13. Therefore, none of Turvey's statements about his purposes in acquiring used books in 2024 have *any* bearing on Anthropic's purpose in *downloading* books from the Internet years earlier.

Moreover, the complete transcript of Turvey's testimony provides important context for his assertions. For instance, Turvey explained that when he referred to a "research library" and "use for research," he was not discussing a research purpose separate from LLM training. MSJ Opp. Ex. 22, at 145. Specifically, when asked what he meant by those phrases, Turvey said: "*Research that we would conduct when we were building our LLM.*" *Id.* at 145 (emphasis added). And when asked whether "*building a research library*" was "*one and the same*" as "*train[ing] LLMs*," Turvey responded: "*Yes.*" *Id.* at 145-146 (emphasis added). The complete record will not support a conclusion that there was a separate "general-purpose library."

The Court also relied on an exhibit to Plaintiffs' class certification motion—not the summary judgment record—for its "general-purpose library" theory. Order at 5. But the quoted document is from 2024—well after Anthropic's 2021-2022 acquisition of books datasets from Internet sites—and thus addresses only Anthropic's efforts to purchase and scan books into digital

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO. 3:24-CV-05417-WHA

form.  *See* ECF No. 121-8 ("Pls. CC Ex. 12") at 144507 (listing date as 7/17/24); *id.* at 144508 (listing date as 5/23/24).  Indeed, the quoted document expressly refers to "purchas[ing]" and "scanning" "the books."  *Id.* at 144508; *see id.* at 144509 (referring to "scanning costs").  In short, the document has nothing to do with the only works relevant to this Motion—those downloaded from Internet sites years earlier.

The Court also quoted a statement that Anthropic planned to "store everything forever" because there was "no compelling reason to delete a book."  Order at 5.  But that statement directly followed a statement that "these books' data would be used across all models"—that is, all LLMs— and supports the proposition that the future storage was only for the purpose of LLM training.  Pls. CC Ex. 12 at 144509.  Similarly, the Court quoted the phrase "general purpose" from that document, Order at 5, but "general purpose" was used in the document to modify the word "model," not "library," Pls. CC Ex. 12 at 144509.  In fact, the quoted document never used the term "library" at all.  *See id.*

These issues regarding the interpretation of the evidence are particularly significant because the Court did not have the benefit of briefing on a "general-purpose library" theory.  Plaintiffs never asserted such a theory; to the contrary, they consistently referred to the relevant "use" as "[u]sing books to train LLMs."  MSJ Opp. at 15; *see, e.g.*, *id.* (arguing that "the infringing copies are the numerous copies of Plaintiffs' books Anthropic made to train its LLMs").  Among other things, Plaintiffs asserted that Anthropic downloaded books to "fuel its commercial mission" of "train[ing] thousands—possibly millions—of LLMs."  *Id.* at 14-15.  Plaintiffs also emphasized that Anthropic "used each of Plaintiffs' works to train a commercially released Claude model."  *Id.* at 15 n.8.  Nothing in Plaintiffs' briefing asserts that Anthropic used the downloaded books for a supposed "general-purpose library."  Order at 30.  Because Plaintiffs never raised a general-purpose library theory, Anthropic never had a chance to rebut that idea.  This Court should grant Anthropic leave to move for reconsideration so that it can now have that opportunity.  *See Blair v. Rent-A-Center, Inc.*, No. C 17-02335, 2019 WL 529292, at *3 (N.D. Cal. Feb. 11, 2019) (Alsup, J.) (granting reconsideration where a factual "subtlety went unnoticed" in the Court's prior order).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO. 3:24-CV-05417-WHA

**B.     The *Kadrey* Decision Constitutes an Intervening Change of Law**

The Court may grant leave to move for reconsideration based on the "emergence of . . . a change of law occurring after the time of [its] order." Civil L.R. 7-9(b)(2). In a "rapidly changing area of the law," reconsideration may be warranted even in the wake of merely persuasive "developing case authority." *Doe By & Through Doe v. Petaluma City Sch. Dist.*, 949 F. Supp. 1415, 1417 (N.D. Cal. 1996); *see, e.g.*, *J.B. v. G6 Hospitality, LLC*, No. 19-cv-07848, 2021 WL 4079207, at *4 (N.D. Cal. Sept. 8, 2021) (reconsidering prior order because of two intervening district court opinions reaching a contrary conclusion on an unsettled question under Section 230 of the Communication Decency Act). This case plainly arises in a rapidly changing area of the law. Thus, the Court may regard the conflicting decision in *Kadrey* as an applicable change in law, even though that decision is not controlling authority, and grant leave for Anthropic to move for reconsideration on that basis.

**V.     CONCLUSION**

Based on the foregoing, Anthropic respectfully requests that the Court certify its Order for interlocutory appeal. Alternatively, Anthropic respectfully requests that the Court grant leave for Anthropic to move for reconsideration of the Court's Order.

Dated: July 14, 2025                                          COOLEY LLP

                                                             By: */s/ Kathleen R. Hartnett*
                                                                  Kathleen R. Hartnett

                                                             *Attorneys for Defendant*
                                                             *Anthropic PBC*

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO.  3:24-CV-05417-WHA

## <u>CERTIFICATE OF SERVICE</u>

I, Kathleen Hartnett, am the ECF user whose identification and password are being used to file the foregoing Defendant Anthropic PBC's Motion for an Order Permitting Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) or, in the Alternative, Motion for Leave to File Motion for Reconsideration.

Dated: July 14, 2025

By: */s/ Kathleen R. Hartnett*
Kathleen R. Hartnett

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

**ANTHROPIC PBC'S MOT. FOR
CERT. ORDER OR RECONSIDERATION
CASE NO.  3:24-CV-05417-WHA**